1  JOHN B. BULGOZDY (Cal. Bar No. 219897)
   Email:  bulgozdyj@sec.gov
2  SUSAN F. HANNAN (Cal. Bar No. 97604)
   Email:  hannans@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Acting Regional Director
5  John M. McCoy III, Associate Regional Director
   John W. Berry, Regional Trial Counsel
6  5670 Wilshire Boulevard, 11th Floor
   Los Angeles, California 90036
7  Telephone:  (323) 965-3998
   Facsimile: (323) 965-3908
8

ORIGINAL FILED

JUN 2 7 2012

Richard W. Wieking
Clerk, U.S. District Court
Northern District of California
San Jose

9

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12              SAN JOSE DIVISION

CV12 - 03237 EJD

13  SECURITIES AND EXCHANGE          Case No.
    COMMISSION,
14                                   COMPLAINT FOR VIOLATIONS OF THE
               Plaintiff,            FEDERAL SECURITIES LAWS
15
        vs.
16
    SMALL BUSINESS CAPITAL CORP.;
17  MARK FEATHERS; INVESTORS PRIME
    FUND, LLC; and SBC PORTFOLIO FUND,
18  LCC,
19             Defendants.
20

21

22

23

24

25

26

27

28

COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.      This matter concerns an offering fraud by defendant Mark Feathers through three entities he controls – defendant Small Business Capital Corp. ("SB Capital") and two mortgage investment funds SB Capital and Feathers manage, defendants Investors Prime Fund, LLC ("IPF") and SBC Portfolio Fund, LLC ("SPF") (collectively, IPF and SPF are referred to herein as the "Funds").  As of March 30, 2012, Feathers and SB Capital had raised net $42 million from over 400 investors through the offer and sale of membership interests in the Funds.  In doing so, since at least 2009, defendants have violated the antifraud provisions of the federal securities laws by making material misrepresentations and omissions regarding the Funds' investment activities.  In addition, SB Capital has also violated the broker-dealer registration provisions by failing to register as a broker-dealer with the Commission.

2.      Defendants represented to prospective investors that the Funds would pay "Member Returns" of at least 7.5% from profits generated by the Funds' mortgage loan portfolios.  Contrary to those representations, since at least 2010 for IPF and since 2011 for SPF, Feathers and SB Capital have paid returns to investors in excess of net profits of the Funds, in a Ponzi-like scheme in which the returns were partially funded with money from new investors.

3.      Defendants also represented to investors that the Funds would use between 96% and 98% of offering proceeds to make or invest in mortgages, that the Funds had conservative lending standards and for the most part were prohibited from making loans to SB Capital, and that the Funds' loans were secured, performing, and current.  Contrary to these representations, from 2009 to early 2012, Feathers and SB Capital caused the Funds to transfer over $6 million to SB Capital, and improperly to record these transfers as receivables due from SB Capital.  The $6 million in receivables due from SB Capital represents over 14% of the Funds' combined total assets.  SB Capital used the money to pay its operating expenses, including over $485,850 paid to Feathers and companies he controls.  Defendants' disclosures to investors were false and misleading because they failed to disclose that SB Capital had improperly taken $6 million from the Funds, that defendants caused the Funds to record the amounts taken as assets in the form of

receivables, that the receivables that were recorded were unsecured loans, that SB Capital borrowed additional money from IPF to make interest payments on these receivables,  and that the Funds were not able to assess the collectability of these receivables because of the uncertainty of SB Capital's cash flow.  Moreover, by recording the $6 million as receivables on the Funds' financial statements, defendants concealed that the money was used to pay SB Capital's expenses rather than to invest in mortgage loans.

4.       Defendants represented that SB Capital owed a fiduciary duty to the Funds' investors, and disclosed certain limited, potential conflicts of interest.  However, defendants Feathers and SB Capital failed to disclose the significant conflicts of interest arising from causing the Funds to transfer $6 million to SB Capital so it could pay its expenses, and recording these transfers as assets of the Funds.  In addition, in the first quarter of 2012, Feathers and SB Capital caused SPF to sell eight mortgage loans to IPF at substantial premiums over the outstanding balance of the loans, and then caused SPF to use the premiums to pay over $570,000 in management fees to SB Capital.  Defendants failed to disclose the significant conflicts arising from such inter-company transactions, at inflated prices, designed solely to funnel investor funds to SB Capital and Feathers.

5.       By engaging in the conduct described in this complaint, defendants have violated, and unless enjoined will continue to violate, the antifraud provisions of the federal securities laws, specifically Section 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77q(a)(1), 77q(a)(2) & 77q(a)(3), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5(a)-(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c), and, with respect to defendant SB Capital, the broker-dealer registration provisions in Section 15(a) of the Exchange Act, 15 U.S.C. §78o(a).  SB Capital and Feathers are also liable as a control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78o(a) – Feathers for violations of Section 10(b) and 15(a) of the Exchange Act, and SB Capital for violations of Section 10(b).

6.       By this action, the Commission seeks emergency relief against the defendants, including a temporary restraining order; an asset freeze; accountings; expedited discovery; an

1    order prohibiting the destruction of documents; and a temporary receiver over SB Capital, IPF,

2    and SPF.  The Commission also seeks preliminary and permanent injunctions; disgorgement

3    with prejudgment interest; a permanent receiver over SB Capital, IPF, and SPF; and civil

4    penalties against Feathers.

5                            **JURISDICTION AND VENUE**

6            7.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1)

7    and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a); and Sections 21(d)(1),

8    21(d)(3)(A), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e)

9    and 78aa.  Defendants have, directly or indirectly, made use of the means or instrumentalities of

10   interstate commerce, of the mails, or of the facilities of a national securities exchange, in

11   connection with the transactions, acts, practices, and courses of business alleged in this

12   Complaint.

13           8.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15

14   U.S.C. § 77v(a); and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the

15   transactions, acts, practices, and courses of conduct constituting violations of the federal

16   securities laws occurred within this district, defendants Feathers resides in this district, and

17   defendants SB Capital, IPF and SPF have their principal place of business in this district.

18                                  **DEFENDANTS**

19           9.      **Small Business Capital Corp.** ("SB Capital") is a privately-held California

20   corporation formed in 2004 with its principal place of business in Los Altos, California.  SB

21   Capital is the sole manager of co-defendants IPF and SPF.  SB Capital also manages two other

22   funds:  (1) Small Business Capital, LLC ("SBC LLC"), which is a wholly owned subsidiary of

23   defendant IPF; and (2) SBC Commercial Mortgage Fund, LLC, which through March 31, 2012,

24   had raised about $2.8 million from fourteen investors.  SB Capital is not registered with the

25   Commission in any capacity.

26           10.     **Mark Feathers**, age 48, resides in Los Altos, California.  He is the founder, CEO

27   and a director of SB Capital.  Through SB Capital, Feathers is the controlling person of IPF and

28   SPF.  Feathers is not registered with the Commission in any capacity and has never had a

1  securities license.

2      11.    **Investors Prime Fund, LLC** ("IPF") is a California limited liability company

3  formed in May 2005 with its principal place of business in Los Altos, California.  SB Capital is

4  the sole manager of IPF.  IPF is engaged in the business of investing in loans secured by first

5  deeds of trust encumbering commercial and income-producing residential real estate located

6  primarily in California.  IPF began raising funds from investors in 2005, but did not begin

7  operations until June 26, 2006 when its minimum capitalization of $500,000 was reached.  As of

8  March 31, 2012, approximately 314 investors had invested about $31.5 million in IPF.  IPF has a

9  subsidiary, SBC LLC, and through March 31, 2012, IPF had contributed approximately $10

10  million to SBC LLC.  IPF and its securities are not registered with the Commission.

11      12.    **SBC Portfolio Fund, LLC** ("SPF") is a California limited liability company

12  formed in July 2007 with its principal place of business in Los Altos, California.  SB Capital is

13  the sole manager of SPF.  SPF is engaged in the business of investing in loans secured by deeds

14  of trust secured by commercial and income-producing residential real estate in California and

15  other states.  SPF began raising funds from investors in 2007.  As of March 31, 2012,

16  approximately 103 investors had invested about $10.5 million in SPF.  SPF and its securities are

17  not registered with the Commission.

18                              **ALLEGATIONS**

19  I.    **DEFENDANTS' OFFER AND SALE OF IPF AND SPF**

20      A.    **The Formation and Operating Agreements of IPF and SPF**

21      13.    IPF was formed in May 2005 as an investment fund, which would use proceeds

22  raised from investors in IPF to purchase loans secured by first deeds of trust on commercial and

23  income-producing residential real estate located primarily in California.  In 2007, SB Capital

24  became the sole manager of IPF.  Beginning in 2007, IPF's offering documents identified

25  Feathers as the majority owner and operator of SB Capital.

26      14.    SB Capital and Feathers formed SPF in 2007 as an investment fund that would

27  use investor proceeds to purchase loans secured by first and second deeds of trust secured by

28  commercial and income-producing residential real estate in California and other states.  SB

1    Capital has been the sole manager of SPF since it was formed.  SPF's offering documents also

2    identified Feathers as the majority owner and operator of SB Capital.

3         15.    IPF and SPF entered into similar operating agreements with SB Capital.  These

4    operating agreements defined the terms of SB Capital's duties and obligations as manager of IPF

5    and SPF.  The operating agreements were signed, or to be signed, by Feathers on behalf of SB

6    Capital, and by Feathers as "attorney-in-fact" for the investors in IPF and SPF.

7         16.    The operating agreements expressly provided that SB Capital owed a fiduciary

8    duty to IPF and SPF, as the sole manager of each Fund.  In a provision titled "Fiduciary Duty,"

9    the IPF and SPF operating agreements state that SB Capital has a "fiduciary responsibility for the

10   safekeeping and use of all funds and assets" of IPF or SPF, and that "the Manager [SB Capital]

11   shall not employ such funds or assets in any manner except for the exclusive benefit of" IPF or

12   SPF.

13        B.    **Defendants' Offerings of Investments in IPF and SPF**

14        17.    At all relevant times, in their role as sole manager, Feathers and SB Capital had

15   ultimate authority over IPF and SPF, including the content of any statements made by IPF or

16   SPF in connection with their offering of securities to investors, such as the advertisements,

17   newsletters, and offering documents.

18        18.    SB Capital and Feathers offered investments in IPF through advertisements in

19   California publications, as well as through their monthly newsletters to investors currently

20   invested in SB Capital's funds.  The advertisements generally offered a rate of return and invited

21   interested persons to contact SB Capital for additional information.

22        19.    As for SPF, SB Capital and Feathers offered investments in SPF in their monthly

23   newsletters.  The newsletters contained a signature block at the end from Feathers, as CEO of SB

24   Capital.  Some versions of the newsletters stated that SPF was open only to accredited investors

25   who were existing SB Capital clients and that investment restrictions applied.  In some

26   newsletters, Feathers invited prospective SPF investors to contact him directly for more

27   information about SPF.

28        20.    Defendants SB Capital, Feathers, IPF, and SPF were successful in raising money

from investors.  Feathers, SB Capital, and IPF raised $5,502,911 in new contributions in 2009 for IPF; $8,498,899 in new contributions in 2010; $13,795,357 in new contributions in 2011; and $6,041,077 in new contributions during the first quarter of 2012.

21.     Defendants SB Capital, Feathers and SPF raised $1,395,934 in new contributions in 2009 for SPF; $2,044,551 in new contributions in 2010; $7,351,038 in new contributions in 2011, and $2,243,732 in new contributions during the first quarter of 2012.

**C.     SB Capital's Broker-Dealer Activities**

22.     SB Capital employed several people whose duties included meeting with prospective investors to discuss investments in IPF or SPF.  Feathers also offered to meet with prospective investors interested in SPF, or with investors who wanted to increase their investments in IPF.

23.     The duties of the SB Capital employees who met with prospective investors included responding to requests for information, providing offering documents to prospective investors, and processing investments.

24.     SB Capital paid its investor representatives a salary and a commission on any investments that they brought into IPF or SPF.

25.     Beginning around February 2010, Feathers, SB Capital, and IPF began a "thank-you referral program" which rewarded investors with a capital contribution of up to $500 "from Fund management" for referring a new investor, or increasing the amount invested.  The referral program was announced in defendants' February 17, 2010 newsletter to investors.  In subsequent newsletters, Feathers and SB Capital advertised the need for more capital and touted the popularity of the referral program.

**D.     IPF's and SPF's Offering Documents**

26.     After defendants were contacted by prospective investors, SB Capital sent prospective investors offering materials for the Fund in question – an offering circular for IPF, and a private placement memorandum for SPF (collectively, the "Offering Documents").  The Offering Documents for IPF and SPF were updated and re-issued generally on an annual basis.

### 1.   The IPF Offering Circulars

27.     IPF issued and provided offering circulars to prospective investors, four of which were issued in 2009, 2010, and 2011 and are the subject of this Complaint (collectively, the "Offering Circulars"):  an offering circular dated June 11, 2009 ("2009 Offering Circular"), an offering circular dated June 9, 2010 ("2010 Offering Circular"), an offering circular dated January 28, 2011 ("1/2011 Offering Circular"), and an offering circular dated June 29, 2011 ("6/2011 Offering Circular").  Feathers reviewed and approved the IPF offering circulars before they were distributed to prospective investors.

28.     The IPF Offering Circulars disclosed substantially similar offering terms.  In general, IPF would make or purchase loans secured by first deeds of trust on commercial and income-producing residential real estate.  Investors were to receive monthly a "Member Preferred Return" on their investments of at least 7.5%.  Investors were offered the option to receive their Member Preferred Return as a monthly cash distribution from income from Fund operations, or to "allow their proportionate share of Fund income to compound and be reinvested by the Fund for their accounts."

29.     SB Capital and Feathers claim that they ceased offering and selling IPF securities on March 30, 2012.  As of March 31, 2012, IPF had raised a net $31.5 million from 314 investors and had $1.2 million in cash on hand.

### 2.   The SPF Private Placement Memoranda

30.     SPF issued and provided private placement memoranda to prospective investors. Three private placement memoranda are the subject of this Complaint (collectively, the "Private Placement Memoranda"):  a private placement memorandum dated July 26, 2007 ("2007 PPM"), a private placement memorandum dated December 28, 2009 ("2009 PPM"), and a private placement memorandum dated January 25, 2011 ("2011 PPM").

31.     The SPF Private Placement Memoranda disclosed substantially similar terms as those offered by IPF.  In general, SPF would make or purchase loans secured by first and seconds deeds of trust on commercial and income-producing residential real estate.  Investors were to receive monthly "Member Return" on their investment of at least 7.5%.  As with IPF,

investors in SPF were offered the option to receive their Member Return as a monthly cash distribution of income from Fund operations, or to allow their proportionate share of Fund income to be reinvested for their accounts.

32.     SB Capital and Feathers claim that they ceased offering and selling SPF securities on February 9, 2012.  As of March 31, 2012, SPF had raised a net $10.5 million from 103 investors and had $3.5 million cash on hand.

### 3.     The Funds' Financial Statements

33.     The SPF Private Placement Memoranda did not purport to include financial statements for SPF.

34.     The 2010 IPF Offering Circular purported to include as an attachment a copy of the 2009 audited financial statements.  The 1/2011 IPF Offering Circular did not include any audited financial statements as attachments, and instead stated that a copy of the audited financial statements "as of December 31, 2009" were available from SB Capital.  The 2009 IPF audited financial statements did not disclose the receivable to SB Capital.

35.     The 6/2011 IPF Offering Circular did not include any audited financial statements as attachments, and instead stated that a copy of the audited financial statements as of December 31, 2010, were available from SB Capital.

36.     Beginning in at least 2009, defendants did not send audited, or un-audited, financial statements of either Fund to investors.  According to Feathers, the only way an investor could obtain those financial statements was to ask Feathers or SB Capital for a copy of the financial statements.

## II.     DEFENDANTS' OPERATION OF IPF AND SPF (2009 TO PRESENT)

### A.     Feathers' and SB Capital's Misuse of the Funds' Moneys

37.     Since at least 2009, Feathers and SB Capital have caused the Funds to transfer over $6 million to SB Capital, which monies were not payable to SB Capital under the terms of the offerings, and caused the Funds to record the amounts taken as assets in the form of receivables.  As the auditors noted in the 2010 audit report, issued in March 2011, the Funds were unable to assess the collectability of the receivables due from SB Capital, and thus could

not determine whether an allowance for loss was necessary, and whether the receivable should be carried at full value.  In the notes to the Funds' audited financial statements, defendants acknowledged that the value of the receivable assets may be impaired due to the unsecured nature of the note and the lack of certainty of cash flows of SB Capital.  Defendants further acknowledged in these financial statements that the receivables from the Funds' manager were "prohibited" by the Funds' operating agreement and Offering Documents.

38.    The chart below shows the amounts that Feathers and SB Capital caused the Funds to transfer to SB Capital:

| Amounts Recorded as Receivables due from SB Capital on the Funds' Financial Statements | | |
|---|---|---|
| Period ended | IPF | SPF |
| December 31, 2009 | $405,623 | $534,736 |
| December 31, 2010 | $1,850,000 | $707,464 |
| December 31, 2011 | $4,838,478 | $708,555 |
| March 31, 2012 | $5,328,311 | $524,967 |

### 1.    Feathers and SB Capital caused IPF to lend money so SB Capital can make loan payments to the Funds

39.    SB Capital did not generate sufficient income to pay the interest due on the receivables it owed to the Funds.

40.    In addition, in 2008, SB Capital had borrowed money from IPF to purchase two properties out of foreclosure, which were identified as Loan 30001 and Loan 65.  In fact, IPF had originally made the loans on the properties that secured Loan 30001 and Loan 65.  However, the borrowers had defaulted, and IPF foreclosed.  Feathers caused IPF to loan money to SB Capital to buy the properties out of foreclosure.  In 2008, the two mortgage loans had a total outstanding balance of $1.15 million.  Feathers has caused IPF to advance additional amounts under these loans, so that as of March 31, 2012, the outstanding principal balance on these two loans was $1.96 million (or 6.2% of the total amount invested).  In 2010 and 2011, SB Capital did not generate sufficient income to make payments to IPF on Loan 30001 and Loan 65.

41.     In 2010 and 2011, Feathers and SB Capital caused IPF to transfer additional funds to SB Capital, and increase the amount of the receivable asset on IPF's books, so that SB Capital could make payments to IPF on Loan 30001 and Loan 65, as well as payments to both IPF and SPF on the receivables due from SB Capital.

42.     The chart below shows the amount recorded as an increase in the receivable due to IPF from SB Capital, and payments from SB Capital to IPF and SPF that correspond in time to such increases, during 2010:

| 2010 | | |
|---|---|---|
| **Date** | **$ Increase in SB Capital's Receivable to IPF** | **SB Capital's Description and Amount of Payment** |
| 1/4/2010 | $125,000 | |
| 1/18/2010 | | Loan 30001:  interest payment to IPF in amount of $6,535.64 |
| 1/18/2010 | | Loan 65:  interest payment to IPF in the amount of $6,020 |
| 6/25/2010 | $100,000 | |
| 6/28/2010 | | Loan 30001:  interest payment to IPF in amount of $10,000 |
| 6/28/2010 | | Loan 65:  interest payment to IPF in the amount of $10,000 |
| 12/23/2010 | $174,047.17 | |
| 12/29/2010 | | Loan 30001:  interest payment to IPF in amount of $34,238.58 |
| 12/29/2010 | | Loan 65:  interest payment to IPF in the amount of $60,056.60 |

43.     The chart below shows the amount recorded as an increase in the receivable due to IPF from SB Capital, and the payments from SB Capital to IPF and SPF that correspond in time to such increases, during 2011:

| 2011 | | |
|---|---|---|
| **Date** | **Date** | **Date** |
| 6/14/2011 | $250,000 | |
| 6/14/2011 | | Loan 30001:  interest payment to IPF in amount of $24,718.14 |
| 6/14/2011 | | Loan 65:  interest payment to IPF in amount of $38,250.00 |
| 6/30/2011 | $100,000 | |
| 6/30/2011 | | IPF Promissory Note:  interest payment to IPF of $67,633.02 |
| 6/30/2011 | | SPF Promissory Note:  interest payment to SPF of $26,457.34 |
| 9/28/2011 | $225,000 | |
| 9/28/2011 | | Loan 30001:  interest payment to IPF in amount of $16,248.76 |
| 9/28/2011 | | Loan 65:  interest payment to IPF in amount of $22,500.00 |
| 9/28/2011 | | IPF Promissory Note:  interest payment to IPF of $68,007.18 |
| 9/28/2011 | | SPF Promissory Note:  interest payment to SPF of $13,374.04 |
| 12/15/2011 | $75,000 | |
| 12/21/2011 | $80,000 | |
| 12/21/2011 | | Loan 30001:  interest payment to IPF in amount of $15,704.52 |
| 12/21/2011 | | Loan 65:  interest payment to IPF in amount of $16,634.84 |
| 12/21/2011 | | IPF Promissory Note:  interest payment of $82,221.51 |
| 12/21/2011 | | SPF Promissory Note:  interest payment of $13,559.88 |

44.     Feathers has admitted that some of the interest payments from SB Capital to IPF and SPF were funded with money from the Funds.

**2.      Feathers and SB Capital cause IPF to purchase loans at a premium from SPF to generate money to pay management fees**

45.     In the first quarter of 2012, Feathers and SB Capital caused IPF to purchase eight mortgage loans from SPF at a premium above the outstanding balances of the loans, and then caused SPF to use the premiums to pay $576,598 in management fees to SB Capital.

46.     In these first quarter 2012 transactions, at about the same time that Feathers and SB Capital caused IPF to purchase mortgages from SPF at a premium, Feathers and SB Capital

COMPLAINT

11

1  caused SPF to pay management fees to SB Capital.  In some cases, the management fees

2  corresponded to the exact amount of the premium.  For example, on March 12, 2012, SPF sold

3  IPF a loan at a $25,989 premium above the outstanding balance, and SPF then made a payment

4  to SB Capital for management fees of that exact same amount – $25,989 – on that same day.

5  The chart below summarizes this and other loan sales from SPF to IPF at premiums, and the

6  payments of management fees from SPF to SB Capital, in the first quarter of 2012.  The chart

7  shows the date of the mortgage sale, the outstanding principal balance of the mortgage on SPF's

8  books, the sale price for the loan paid by IPF, the percentage premium of the sale price over book

9  value, the dollar amount of the premium, and the dates and amounts of management fees paid by

10  SPF to SB Capital:

| Date | Outstanding Balance of Mortgage Loan on SPF's books | Price IPF Paid to Purchase Loan from SPF | Sale Price Premium over Mortgage Loan's Outstanding Balance | | SPF Management Fee Payment to SB Capital |
|---|---|---|---|---|---|
| | | | (as %) | (in $) | |
| 2/15/2012 | | | | | $95,000 |
| 2/16/2012 | $284,986 | $379,981 | 33.33% | $94,995 | |
| 2/16/2012 | $342,628 | $456,837 | 33.33% | $114,209 | |
| 2/16/2012 | $747,789 | $997,052 | 33.33% | $249,263 | |
| 2/17/2012 | $82,271 | $109,695 | 33.33% | $27,424 | |
| 2/17/2012 | $106,732 | $142,309 | 33.33% | 35,577 | |
| 2/17/2012 | | | | | $60,000 |
| 2/29/2012 | | | | | $225,115 |
| 3/12/2012 | $796,000 | $821,989 | 3.26% | $25,989 | |
| 3/12/2012 | | | | | $25,989 |
| 3/12/2012 | $1,178,500 | $1,225,169 | 3.96% | $46,669 | |
| 3/12/2012 | | | | | $46,669 |
| 3/30/2012 | $1,000,000 | $1,123,825 | 12.38% | $123,825 | |
| 3/30/2012 | | | | | $123,825 |
| **Totals** | $4,538,906 | $5,256,857 | | $717,951 | $576,598 |

47.    IPF recorded the loans it purchased from SPF as assets at the full price paid to

SPF, including the $717,951 in premiums over the outstanding value of the mortgages.

**3.**    **Feathers' efforts to amend the IPF Operating Agreement in 2010**

48.    During 2010, SB Capital and Feathers sought approval from investors in IPF to amend the operating agreement between IPF and SB Capital.  The purported purpose of the amendment was to allow SB Capital to borrow money from IPF to pay operating expenses.  Under the terms of the operating agreements and Offering Documents in effect prior to the amendment, IPF was not permitted to make loans to SB Capital except under specific circumstances.

49.    In or around August 2010, SB Capital sent letters to IPF investors, signed by Feathers, which requested the investors' "concurrence to a modification of the IPF operating agreement in order to initiate beneficial financial and tax planning for the fund…."  Defendants authored at least two different versions of the letter to send to investors.

50.    Neither version of the letter sent to investors disclosed that SB Capital and Feathers had already used over $1 million of investor money from the Funds to pay SB Capital's day-to-day expenses, that the amounts were being carried as unsecured, receivable assets on the Funds' financial statements, and that the collectability of the receivables was uncertain because of the lack of certainty of SB Capital's cash flows.

**B.**    **Defendants' Ponzi-like Payments of Member Returns to Investors**

51.    The Offering Documents represented that the Funds would pay returns to investors from profits generated by the Funds' mortgage lending operations.  The Offering Documents for the Funds also represented that monthly returns would be no less than 7.5% per annum for both IPF and SPF.

52.    In 2010, 2011, and the first quarter of 2012, Feathers and SB Capital caused IPF to pay more in Member Returns than IPF earned in profits, while IPF continued to raise money from investors.

53.    In 2011 and the first quarter of 2012, Feathers and SB Capital caused SPF to pay more in Member Returns than SPF earned in profits, while SPF was continuing to raise funds from investors.

54.    The chart below shows the amount of investor contributions that the Funds raised

in 2010, 2011, and the first quarter of 2012; the Funds' net profit; and the amount paid in Member Returns.  In addition, the Funds' profits for the first quarter of 2012 are also shown adjusted to account for the sale of eight loans from SPF to IPF at a premium of $717,951.

| Selected Financial Results for the Funds (2010 to Q1 2012) | | | |
|---|---|---|---|
| | | **IPF** | **SPF** |
| 2010 | Amount Raised from Investors | $8,498,899 | |
| | Net Profit | $852,686 | |
| | Member Return Paid | $1,284,874 | |
| | | | |
| 2011 | Amount Raised from Investors | $13,795,357 | $7,351,038 |
| | Net Profit | $1,036,212 | $436,988 |
| | Member Return Paid | $2,146,299 | $673,812 |
| | | | |
| Q1 2012 | Amount Raised from Investors | $6,041,077 | $2,243,732 |
| | Net Profit | $793,131 | $330,429 |
| | *Adjusted Net Income* | *$75,180* | *$163,328* |
| | Member Return Paid | $572,322 | $400,758 |

55.     In 2010, 2011, and the first quarter of 2012, IPF paid Member Preferred Returns totaling approximately $4,003,495.  During the same period, IPF had a net profit, adjusted, of only $1,964,078.

56.     IPF's net profit from 2010 through Q1 2012 was sufficient to fund only about 49% of the Member Preferred Returns paid during the same period.  The only source to fund the additional amounts paid above net profits was new investor funds.

57.     In 2011 and the first quarter of 2012, SPF paid Member Returns totaling approximately $1,074,570.  During the same period, SPF had a net profit of only $767,417.  SPF had an adjusted profit of only $573,316.

58.     SPF's net profit from 2011 through Q1 2012 was sufficient to fund only about 71% of the Member return paid during the same period; its adjusted profit was sufficient to fund only about 54% of the Member Returns.  The only source to fund the additional amounts paid

1   above net profits was new investors funds.

2   **III.**    **DEFENDANTS' FRAUD IN THE OFFER AND SALE OF SECURITIES**

3        **A.**    **Defendants Made Fraudulent Ponzi-like Payments to Investors in Excess of**

4              **Fund Profits**

5       59.    Defendants paid distributions to IPF and SPF investors in excess of the profits of

6   IPF and SPF in a Ponzi-like scheme and in direct conflict with the representations in the Offering

7   Documents.

8              **1.**    **Defendants' representations regarding Membership Returns**

9       60.    The 2009 Offering Circular for IPF stated: "Fund profits will first be allocated

10  entirely to the Members each year up to the amount of the Member Preferred Return, which is

11  the greater of 7.5% per annum or the prime rate, which is adjusted monthly. Any profits

12  exceeding the Member Preferred Return may be retained by the Manager." Substantially similar

13  and/or identical representations were made in IPF's 2010 Offering Circular, 1/2011 Offering

14  Circular, and 6/2011 Offering Circular.

15      61.    The various IPF Offering Circulars, again using substantially similar, if not

16  identical, language, also disclosed how profits would be allocated and distributed to IPF

17  investors:

18              Profits and losses for the Fund will be calculated monthly, on an annualized

19              basis, based upon information available to the Manager at the time of such

20              allocation. Monthly profits will be allocated among the Members as of the

21              last day of each month in accordance with their respective capital account

22              balances as of such date. Each month, profits shall be allocated entirely to

23              the Members until they have been allocated the Member Preferred Return

24              for that year to date, and all profits in excess of that amount may be

25              allocated to the Manager. To the extent the Fund's profits in any given

26              month are less than the Member Preferred Return for such month, any

27              unpaid Member Preferred Return will accrue in favor of the Members on a

28              non-compounded basis and shall be payable from subsequent monthly

1    profits earned by the Fund (if any) in the same calendar year.

2        62.    The SPF Private Placement Memoranda contained substantially similar

3    representations as those in the IPF Offering Circulars.  The 2007 PPM stated, in pertinent part:

4    "Members are entitled to a preferred return on their investment at a simple annual rate equal to

5    the greater of (a) the Prime Rate plus 1.5%, or (b) 7.5% per annum.  All profits of the Fund

6    exceeding the Member Return shall be retained by the Manager."  Substantially identical

7    representations were made in SPF's 2009 PPM and 2011 PPM.  The SPF Private Placement

8    Memoranda contained substantially similar representations that investor returns would be paid

9    from profits as the representations in the IPF offering circulars.

10       **2.    Defendants told investors that IPF and SPF were paying Member**

11       **Returns of 7.5% and greater in 2010 and 2011**

12       63.    Throughout 2010 and 2011, Feathers and SB Capital were trying to raise

13   additional money for IPF and SPF.  To that end, in addition to the representations in the Offering

14   Documents, Feathers and SB Capital routinely stated the amount of the monthly return in the

15   monthly newsletters to investors.

16       64.    In the January 5, 2010 newsletter, defendants stated:  "Fund yield, compounded,

17   for 2009 will be approximately 7.5 for [IPF] and 8.5% for [SPF].  These yields considerably

18   exceeded many other investment categories for 2009.  Barring unexpected events, we anticipate

19   stable yields at about the same range for the next year."

20       65.    In the February 17, 2010 newsletter, defendants listed the IPF "current yield" at

21   7.5%, and the "January SBC Portfolio Fund Yield (compounded)" as "9.0%."

22       66.    In the September 9, 2010 newsletter, defendants stated:  "The September

23   distribution for [IPF] was 7.2% when annualized."  For SPF, defendants stated:  "[SPF] investors

24   received a distribution of 9%, annualized, for the month, which will likely increase in October to

25   10% for the remainder of the year."

26       67.    In the February 2011 newsletter, defendants stated that IPF "distributed at 7.25%

27   (compounded = 7.5%) for February."  Defendants stated that SPF "distributed at 10%

28   (compounded = 10.47%) for February."

68.     Similarly, in the September 2011 newsletter, defendants stated that IPF distributed "7.50% (compounded) for September." They further stated that SPF "distributed at 10.00% (compounded) for September."

### 3.     IPF's Ponzi-like payments in 2010, 2011, and Q1 2012

69.     Contrary to these representations, Feathers and SB Capital caused IPF to pay more in Member Preferred Returns to the IPF investors than IPF earned in profits in 2010, 2011 and in the first quarter of 2012.

70.     In 2010, IPF recorded a net profit of $852,685, but paid Member Preferred Returns to investors of $1,284,874. IPF's 2010 profits were sufficient to fund only 66% of the returns paid to investors.

71.     In 2011, IPF recorded a profit of $1,036,212, but paid Member Preferred Returns to investors of $2,146,299. IPF's 2011 profits were sufficient to fund only 48% of the returns paid to investors.

72.     For the first quarter of 2012, IPF recorded a profit of $793,131, however, that profit did not include as an expense the $717,951 paid to SPF as a premium to purchase eight mortgage loans during the quarter. As adjusted to take those transactions into account, IPF's adjusted profit was $75,180, but IPF paid Member Preferred Returns to investors of $572,322. IPF's adjusted Q1 2012 profits were sufficient to fund only 13% of the returns paid to investors.

73.     The IPF Offering Circulars were false and misleading, and omitted material information, because they stated that Member Preferred Returns would be paid from the Fund's profits, when, in fact, defendants Feathers and SB Capital caused IPF to pay returns in 2010, 2011 and the first quarter of 2012 that substantially exceeded IPF's profit for those periods.

74.     The newsletters were false and misleading, and omitted material information, when they represented that investor returns were being paid from profits.

75.     Defendants Feathers, SB Capital and IPF knew, or were reckless in not knowing, that the IPF Offering Circulars and newsletters were materially false and misleading when they represented that investor returns would be paid from profits, and omitted material information that defendants Feathers and SB Capital were causing IPF to pay more in returns than IPF's

profits.

### 4.     SPF's Ponzi-like payments in 2011 and Q1 2012

76.     Contrary to the representations in the SPF Private Placement Memoranda, Feathers and SB Capital caused SPF to pay more in Member Returns to investors than SPF earned in profits in 2011 and the first quarter of 2012.

77.     In 2011, SPF recorded a profit of $436,989, but paid Member Returns to investors of $637,812.  SPF's 2011 profits were sufficient to fund only 64% of the returns paid to investors.

78.     In the first quarter of 2012, SPF recorded a profit of $330,429, but paid Member Preferred Returns to investors of $400,758.  SPF's Q1 2012 profits were sufficient to fund only 82% of the returns paid to investors.  Moreover, SPF's Q1 2012 results include the related party loan sales to IPF at a premium, and when its profit is adjusted to account for those related party transactions, the adjusted net profit of $163,328 was sufficient to fund only 40% of the returns paid to investors.

79.     The SPF Private Placement Memoranda were false and misleading because they stated that Member Returns would be paid from the Fund's profits, when, in fact, defendants Feathers and SB Capital caused SPF to pay returns in 2011 and the first quarter of 2012 that substantially exceeded SPF's profits for those periods.

80.     The newsletters were false and misleading, and omitted material information, when they represented that investor returns were being paid from profits.

81.     Defendants Feathers, SB Capital and SPF knew, or were reckless in not knowing, that the SPF Private Placement Memoranda were materially false and misleading when they represented that investor returns would be paid from profits, and omitted material information that defendants Feathers and SB Capital were causing SPF to pay more in returns than the SPF's profits.

### B.     Defendants' Fraudulent Misuse of the Funds' Money

82.     As alleged above, from 2009 through at least March 2012, Feathers and SB Capital caused IPF and SPF to transfer at least $6 million to SB Capital.  Feathers and SB

1    Capital caused IPF and SPF to record these amounts as assets of the Funds, specifically,

2    receivables due from SB Capital.

3           83.    Taking $6 million from the Funds violated the terms of the Offering Documents,

4    which contained express representations concerning SB Capital's compensation and express

5    prohibitions against loans to the manager, except under specific circumstances.

6           84.    The Offering Documents for IPF and SPF expressly identified the fees and

7    compensation that could be paid to SB Capital.  The IPF Offering Circulars stated that SB

8    Capital as manager was entitled to the following compensation:  (1) "Manager's Administrative

9    Fee," paid from the proceeds of the offering, of up to "1% of the funds maximum offering

10   amount invested to cover its operating expenses, marketing, and other overhead items"; (2)

11   "Manager's Subordinated Profits Interest," which was the remainder of the funds available for

12   distribution after all fund expenses and all allocations of investor returns were made; and (3)

13   "Origination and Loan Documentation Fees," which were payable by the borrowers.  Feathers,

14   SB Capital, and IPF made such representations in IPF's Offering Circulars.

15          85.    The SPF Private Placement Memoranda contained substantially similar

16   representations about the fees and compensation that could be paid to SB Capital.  The SPF

17   Private Placement Memoranda stated that SB Capital as manager was entitled to the following

18   compensation:  (1) "Manager's Subordinated Profits Interest," which was defined the same for

19   SPF as for IPF; (2) "Origination and Loan Documentation Fees," payable by borrowers; and (3)

20   Reimbursement of Expenses to Manager," which was defined as "reimbursement for all out-of-

21   pocket organization and syndication and all operating and administrative expenses of the Fund."

22   Feathers, SB Capital, and SPF made such representations in SPF's 7/26/2007 PPM, 12/29/2009

23   PPM, and 1/25/2011 PPM.

24          86.    Feathers, SB Capital, IPF, and SPF also represented in the Offering Documents

25   that the Funds would not make loans to the manager, SB Capital, except for limited and

26   identified purposes.  In IPF's Offering Circulars, in a section titled "Lending Standards and

27   Policies," under the heading "No Loans to Managers," defendants represented, in pertinent part:

28   "No loans will be made by the Fund to the Manager or to any of its affiliates, except for any

19

COMPLAINT                                                                    CASE NO. ---------------

1   financing extended as part of a sale of real estate owned or loans purchases as a result of

2   foreclosure."

3       87.     Substantially similar, if not identical, representations were made in SPF's Private

4   Placement Memoranda, again under the heading "No Loans to Managers."

5       88.     As of March 31, 2012, IPF's unaudited financial statements show that SB Capital

6   owes IPF approximately $5,328,311.61, recorded under the category "Fund Loans Receivable."

7   The amount due from SB Capital accounts for approximately 17% of IPF's total assets as of that

8   date.

9       89.     As of March 31, 2012, SPF's unaudited financial statements show that SB Capital

10  owed SPF approximately $524,967.02, recorded under the category "Other Receivables."  The

11  amount due from SB Capital accounts for approximately 4.78% of SPF's total assets as of that

12  date.

13      90.     Feathers, SB Capital, and IPF knew, or were reckless in not knowing, that the

14  statements in IPF's Offering Circulars concerning the compensation that would be paid to SB

15  Capital were materially false and misleading because Feathers and SB Capital took substantial

16  amounts from IPF that was not compensation allowed under the offering, and the Offering

17  Circulars omitted material information about money being advanced from IPF to SB Capital by

18  Feathers and SB Capital.

19      91.     Feathers, SB Capital, and IPF knew, or were reckless in not knowing, that the

20  statements in IPF's Offering Circulars that there would be "no loans to managers" were

21  materially false and misleading because Feathers and SB Capital caused IPF to loan substantial

22  amounts to SB Capital, and the Offering Circulars omitted material information that Feathers and

23  SB Capital were causing IPF to lend money contrary to the express representations in the

24  Offering Circulars.

25      92.     Feathers, SB Capital, and SPF knew, or were reckless in not knowing, that the

26  statements in SPF's Private Placement Memoranda concerning the compensation that would be

27  paid to SB Capital were materially false and misleading because Feathers and SB Capital took

28  substantial amounts from SPF that was not compensation allowed under the offering, and the

Private Placement Memoranda omitted material information about money being advanced from SPF to SB Capital by Feathers and SB Capital.

93.     Feathers, SB Capital, and SPF knew, or were reckless in not knowing, that the statements in SPF's Private Placement Memoranda that there would be "no loans to managers" were materially false and misleading because Feathers and SB Capital caused SPF to loan substantial amounts to SB Capital, and the Private Placement Memoranda omitted material information that Feathers and SB Capital were causing SPF to lend money contrary to the express representations in the Private Placement Memoranda.

**C.      Defendants Made Fraudulent Statements About Use of Investor Proceeds**

94.     Defendants Feathers, SB Capital, IPF, and SPF represented to investors that over 96% of investor proceeds from the offerings would be invested in mortgage loans.  However, defendants caused the Funds to advance substantial amounts of investor proceeds to SB Capital instead of investing those proceeds in mortgage loans, contrary to the representations to investors in the Offering Documents.

95.     Each of the Offering Documents for IPF and SPF that was issued by defendants during 2009 through 2009 included a section titled "Use of Proceeds."  The Use of Proceeds section contained a chart which listed various ways that the proceeds were to be used, with corresponding percentages of the amount of proceeds that would be used as listed.  The Use of Proceeds section disclosed that proceeds from the sale of units in the Fund "will be used approximately as set forth below.  The figures set forth below are only estimates, and actual use of proceeds will vary."  In the IPF and SPF Offering Documents, the Use of Proceeds charts included a category labeled "mortgage loans," and the percentage of proceeds that defendants represented would be invested in mortgage loans varied, among the differing Offering Documents, from 96% to 98%.

96.     The chart below summarizes the representations in the Funds' Offering Documents about use of proceeds:

| Disclosure of Use of Offering Proceeds in Offering Documents | | | |
|---|---|---|---|
| Offering Document | % Mortgage Loans | % Reserve | % Organizational and/or Syndication Expenses |
| 2009 IPF Offering Circular | 96.5% | 3% | 0.5% |
| 2010 IPF Offering Circular | 99% | 0% | 1% |
| 1/2011 IPF Offering Circular | 98% | 0% | 2% |
| 6/2011 IPF Offering Circular | 98% | 0% | 2% |
| 2009 SPF PPM | 96% | 2% | 2% |
| 2011 SPF PPM | No percentages assigned to use of proceeds | | |

97.     Using net offering proceeds of $42 million, at most Feathers and SB Capital could claim $840,000, or 2% of offering proceeds, for expenses (assuming *arguendo* that those funds were used for permitted expenses).

98.     The approximately $6 million that Feathers and SB Capital took from the Funds during that same period is over 4% of net total combined contributions.

99.     Defendants Feathers, SB Capital, IPF, and SPF knew, or were reckless in not knowing, that the representations concerning use of proceeds in the Offering Documents were materially false and misleading because defendants were not using over 96% of the offering proceeds for mortgage loans, and that the Offering Documents omitted material information that defendants were using substantial amounts of the offering proceeds for purposes other than to make mortgage loans.

**D.      Defendants Made Fraudulent Statements About the IPF's Loan Portfolios and Performance**

100.     In the Offering Documents for IPF and defendants' monthly newsletters, defendants represented that the IPF's portfolios consisted of secured loans, and that all loans were performing and current.  However, defendants' representations about IPF's loan portfolios and performance were false and misleading and omitted material information about the large, unsecured receivables owed by SB Capital, and that SB Capital was borrowing additional money from IPF to make payments on its                outstanding obligations to the Funds.

101.    In the IPF Offering Circulars, defendants included representations about the composition of the loan portfolio and statistics on the performance of the loan portfolio. Defendants represented that (1) "100%" of the mortgage loans held by IPF were secured by "first trust deeds"; (2) "0%" of the loans were categorized as "non-accrual status loans" (i.e., loans that IPF had ceased to accrue interest on for purpose of calculating earnings because the loans were delinquent); (3) "0%" of the loans were "impaired" (i.e., loans for which there was serious doubt about the full recovery of the loan balance); (4) IPF did not have any real estate owned, or "REO" properties, where the property had been taken through foreclosure; and (5) there were no loan loss reserves recorded for any of IPF's mortgage loans.

102.    The chart below summarizes the disclosures that Feathers, SB Capital, and IPF made in the IPF Offering Circulars about its loan portfolio:

| Statements About IPF Loan Portfolio and Performance in IPF Offering Circulars | | | | |
|---|---|---|---|---|
| | 2009 Offering Circular | 2010 Offering Circular | 1/2011 Offering Circular | 6/2011 Offering Circular |
| Information as of | 12/31/2008 | 12/31/2009 | 12/31/2010 | 5/31/2011 for loan portfolio composition; 12/31/2010 for loan performance |
| Amount of Loans | $6,400,000 | $8,100,000 | $9,900,000 | $11,400,000 |
| First Trust Deed | 100% | 100% | 100% | 100% |
| Commercial Property | 100% | 100% | 100% | 100% |
| Non-Accrual Status Loans | 0% | 0% | 0% | 0% |
| Impaired Loans | 0% | 0% | 0% | 0% |
| REO | 0% | 0% | 0% | 0% |
| Loan Loss Reserve | $0 | $0 | $0 | $0 |

103.    Defendants Feathers, SB Capital, and IPF knew, or were reckless in not knowing, that these representations were materially false and misleading, and omitted material information, because SB Capital had taken substantial amounts from IPF and defendants had caused these amounts to be recorded as an unsecured receivable due from SB Capital to IPF.  In

1   addition, defendants were unable to assess the collectability of the SB Capital receivable, as

2   required by GAAP, due to its unsecured nature and the lack of certainty of SB Capital's cash

3   flow, which material information was also omitted from the IPF Offering Circulars. Defendants

4   also omitted material information that SB Capital was borrowing additional amounts from IPF to

5   make payments on the amounts it owed to IPF.

6         104.    In addition to these misrepresentations and omissions in the IPF Offering

7   Circulars, during 2010 and 2011 Feathers and SB Capital sent regular newsletters to investors in

8   IPF and SPF.  In those newsletters, defendants regularly made statements reassuring investors

9   that the funds were making loans secured by first and second deeds of trust and that all loans

10  were performing.

11        105.    For example, Feathers and SB Capital stated, in pertinent part  (a) in a May 7,

12  2010 newsletter:  "Within IPF we make only 1st position note investments"; (b) in a March 2011

13  newsletter, in a section entitled "Investors Prime Fund":  "The fund is comprised entirely of first

14  position real estate secured note investments."  (c) in a July 2011 newsletter:  "our 'problem

15  loan' projections are very, very low, and because all of our loans are real estate secured, and also

16  have personal guarantees as well as government repayment guarantees, our expected 'loss' rate

17  of capital is ***well below*** 1%" (emphasis in original); and (d) in a November 2011 newsletter

18  (under heading "Investors Prime Fund"):  "Additionally, IPF's note investment portfolio is 100%

19  current with no borrowers late on payments."

20        106.    Defendants Feathers, SB Capital, and IPF knew, or were reckless in not knowing,

21  that these representations in newsletters to investors were false and misleading, and omitted

22  material information, because SB Capital had taken substantial amounts from IPF and defendants

23  had caused these amounts to be recorded as an unsecured receivable due from SB Capital to IPF.

24  In addition, defendants were unable to assess the collectability of the SB Capital receivable, as

25  required by GAAP, due to its unsecured nature and the lack of certainty of SB Capital's cash

26  flow, which material information was also omitted from the IPF Offering Circulars. Defendants

27  also omitted material information that SB Capital was borrowing additional amounts from IPF to

28  make payments on the amounts it owed to IPF

1    **E.**       **Defendants' False Representations About the Funds' Conservative Lending**

2             **Standards**

3         107.    In the various Offering Documents for IPF and SPF, defendants SB Capital,

4    Feathers, IPF, and SPF represented that the Funds used conservative lending standards, and that

5    loans would be secured by first deeds of trust for IPF, first or second deeds of trust for SPF, and

6    loan-to-value ratios would not exceed 65% of the value of the security property.

7         108.    Defendants SB Capital, Feathers, and IPF stated in IPF's Offering Circulars, in a

8    section entitled "Lending Standards and Policies":  "All fund loans will be secured by first deeds

9    of trust on commercial or industrial real estate collateral."  Other sections in the offering

10   circulars reiterated these lending standards.  Under "Priority of Mortgages," IPF stated that its

11   loans "will be secured by first deeds of trust (i.e., senior to any other encumbrances on the

12   security property)."  In a section entitled "Loan-to-Value Ratios," defendants stated that the

13   "average amount of the Fund's loans without a Federal guarantee will not exceed 65% of the

14   value of the security property based upon an appraisal performed by an independent California

15   certified appraiser."

16        109.    Defendants Feathers, SB Capital, and IPF knew, or were reckless in not knowing,

17   that these representations in the Offering Circulars were false and misleading, and omitted

18   material information, specifically defendants were causing IPF to make large, unsecured loans

19   and advances to SB Capital, and these loans and advances were contrary to the conservative

20   lending standards disclosed in the Offering Circulars for IPF.

21        110.    Defendants Feathers, SB Capital, and SPF stated in the SPF Private Placement

22   Memoranda, in a section entitled "Lending Standards and Policies":  "Most loans will be secured

23   by commercial or other non-residential real estate, but the Fund may in some instances also make

24   or purchase loans secured by deeds of trust that encumber residential real estate when, in the

25   Manager's discretion, it is beneficial for the Fund to do so."  In a section entitled "Loan-to-Value

26   Ratios," they stated that the "amount of the Fund's loan (when added to the indebtedness secured

27   by senior liens on the same property) generally will not exceed sixty five percent (65%) of the

28   value of the security property…."

111.    Defendants Feathers, SB Capital, and SPF knew, or were reckless in not knowing, that those representations in the Private Placement Memoranda were false and misleading, and omitted material information, specifically defendants were causing SPF to make a large, unsecured loans and advances to SB Capital, and these loans and advances were contrary to the conservative lending standards disclosed in the Private Placement Memoranda.

F.    **Defendants Omitted Material Information About Conflicts of Interest Between SB Capital and the Funds**

112.    The Offering Documents represented that SB Capital owed a fiduciary duty to IPF and SPF, and to their members (i.e., the investors), that SB Capital would exercise good faith and integrity with respect to Fund affairs, and that the members should rely on general fiduciary standards to prevent unfairness by SB Capital or an affiliate in a transaction with a Fund.

113.    The IPF and SPF Offering Documents disclosed a list of contemplated transactions between the respective Fund and SB Capital that presented potential, contemplated conflicts of interest:  (a) SB Capital would receive a loan origination or brokerage fee from borrowers of up to 5% on loans made or purchased by a Fund; (b) SB Capital would operate other loan funds and other businesses; and (c) SB Capital or its affiliates could purchase defaulted loans or foreclosed properties from a Fund.

114.    The Offering Documents were false and misleading, and omitted material information, about the substantial amounts of money that Feathers and SB Capital were taking from the Funds to pay SB Capital's operating expenses, and which Feathers and SB Capital were causing the Funds to record as assets.

115.    The Offering Documents also failed to disclose that the amounts they caused the Funds to record as receivables from SB Capital were unsecured, and the Funds could not account for such receivables in accordance with GAAP because the collectability could not be assessed, and that the collectability could not be assessed because of the lack of certainty of the cash flows of SB Capital.

116.    The Offering Documents were also false and misleading, and omitted material information, that Feathers and SB Capital would cause the Funds to engage in related party

transactions in which SPF would sell loans to IPF at a premium over the outstanding balance, to generate profits for SPF that would then be used to pay management fees to SB Capital.

117.   Defendants Feathers, SB Capital, IPF, and SPF knew, or were reckless in not knowing, that these representations were materially false and misleading, and omitted material information, about the conflicts of interest caused by SB Capital taking money from the Funds, causing the Funds to record such amounts as assets, failing to disclose material information about the collectability of the receivables, and failing to disclose that they were going to cause the Funds to engage in related party transactions for the purpose of generating management fees for SB Capital, and contrary to the interests of the investors.

118.   At all relevant times, in connection with the actions alleged above, Feathers acted with scienter.  Feathers' scienter is imputed to the entities he controlled, specifically, SB Capital, IPF, and SPF.

## FIRST CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act

### (Against All Defendants)

119.   The Commission realleges and incorporates by reference paragraphs 1 through 118 above.

120.   The defendants, and each of them, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:

        a.   with scienter, employed devices, schemes, or artifices to defraud;

        b.   obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        c.   engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

121.   By engaging in the conduct described above, all of the defendants violated, and

1   unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3)

2   of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

3   <u>**SECOND CLAIM FOR RELIEF**</u>

4   **Fraud In Connection With the Purchase or Sale of Securities**

5   **Violations of Section 10(b) of the Exchange Act**

6   **and Rules 10b-5(a), 10b-5(b), and 10b-5(c) Thereunder**

7   **(Against All Defendants)**

8   122.   The Commission realleges and incorporates by reference paragraphs 1 through 118

9   above.

10   123.   The defendants, and each of them, by engaging in the conduct described above,

11   directly or indirectly, in connection with the purchase or sale of a security, by the use of means or

12   instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

13   exchange, with scienter:

14          a.   employed devices, schemes, or artifices to defraud;

15          b.   made untrue statements of a material fact or omitted to state a material fact

16   necessary in order to make the statements made, in the light of the circumstances under which

17   they were made, not misleading; or

18          c.   engaged in acts, practices, or courses of business which operated or would

19   operate as a fraud or deceit upon other persons.

20   124.   By engaging in the conduct described above, the defendants violated, and unless

21   restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. §

22   78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-

23   5(b), & 240.10b-5(c).

24   ///

25   ///

26   ///

27   ///

28   ///

**THIRD CLAIM FOR RELIEF**

**Unregistered Broker-Dealer**

**Violations of Section 15(a) of the Exchange Act**

**(Against SB Capital)**

125.    The Commission realleges and incorporates by reference paragraphs 1 through 118 above.

126.    Defendant SB Capital by engaging in the conduct described above, used the mails and the means and instrumentalities of interstate commerce, to effect transactions in, or induct or attempt to induce the purchase or sale of securities, without registering being with the Commission as a broker.

127.    By engaging in the conduct described above, defendant SB Capital violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

**FOURTH CLAIM FOR RELIEF**

**Controlling Person Liability**

**Under Section 20(a) of the Exchange Act**

**(Against Feathers and SB Capital)**

128.    The Commission realleges and incorporates by reference paragraphs 1 through 118 above.

129.    Defendant Feathers is, or was at the time the acts and conduct set forth herein were committed, directly or indirectly, a person who controlled SB Capital, IPF, and SPF, each of which sold securities in the Funds through fraudulent means in violation of the Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), & 240.10b-5(c).

130.    Defendant Feathers is, or was at the time the acts and conduct set forth herein were committed, directly or indirectly, a person who controlled SB Capital who effected securities transactions without being registered with the Commission as a broker in violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

131.    By engaging in the conduct described above, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), defendant Feathers is jointly and severally liable with, and to the same extent as, the persons he controlled for violations of Sections 10(b) and 15(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78o(a), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), & 240.10b-5(c).

132.    Defendant SB Capital is, or was at the time the acts and conduct set forth herein were committed, directly or indirectly, a person who controlled IPF and SPF, each of which sold securities in the Funds through fraudulent means in violation of the Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), & 240.10b-5(c).

133.    By engaging in the conduct described above, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), defendant SB Capital  is jointly and severally liable with, and to the same extent as, the persons it controlled for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), & 240.10b-5(c).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily, preliminarily, and permanently enjoining the defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1), 77q(a)(1), & 77q(a)(3), and Sections 10(b) and 15(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78o(a), and Rules 10b-5(a), 10b-5(b), and 10b-5(c)

1   thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), & 240.10b-5(c).

2                                                            **III.**

3          Issue, in forms consistent with Rule 65 of the Federal Rules of Civil Procedure, a

4   temporary restraining order and a preliminary injunction freezing the assets of each of the

5   defendants and any entity affiliated with any of them; appointing a temporary and permanent

6   receiver over SB Capital, IPF, SPF any entity affiliated with any of them; prohibiting each of the

7   defendants from destroying documents; granting expedited discovery from each of the

8   defendants; and requiring an accounting from each defendant

9                                                            **IV.**

10          Order defendants to disgorge all ill-gotten gains from their illegal conduct, together with

11   prejudgment interest thereon.

12                                                            **V.**

13          Order defendant Feathers to pay civil penalties under Section 20(d) of the Securities Act,

14   15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. 78u(d)(3).

15                                                            **VI.**

16          Retain jurisdiction of this action in accordance with the principles of equity and the

17   Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

18   decrees that may be entered, or to entertain any suitable application or motion for additional

19   relief within the jurisdiction of this Court.

20                                                            **VII.**

21          Grant such other and further relief as this Court may determine to be just and necessary.

22

23

24   DATED:  June 21, 2012                     /s/ John B. Bulgozdy_____
                                               John B. Bulgozdy
25                                             Susan F. Hannan
                                               Attorneys for Plaintiff
26                                             SECURITIES AND EXCHANGE COMMISSION

27

28