UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | ) ) ) | Case No. 5:12-cv-03237-EJD |
| Plaintiff | ) ) | **ORDER DENYING REQUEST FOR LEGAL EXPENSES** |
| v. | ) ) | |
| SMALL BUSINESS CAPITAL CORP; MARK FEATHERS: INVESTORS PRIME FUND, LLC; and SBC PROTFOLIO FUND LLC. | ) ) ) ) | |
| Defendants. | ) | |

Presently before the Court is a request from Defendant Feathers[1] for the limited use of receivership assets to pay for his personal defense in these proceedings. Specifically, Defendant seeks an initial payment of $375,000, exclusive of costs, to pay for his legal defense. Plaintiff Securities and Exchange Commission (SEC) opposes the request.

Having reviewed the relevant materials filed by the parties, the Court denies Defendant's request – particularly in circumstances where Defendant has not pointed to any of his own personal funds to assist in payment of the defense. The Court, however, will afford some allowance and priority for legal fees from the receivership assets should Defendant be successful on the merits.

---

[1] The term Defendant will generally mean Mr Feathers, unless context demands otherwise.

Case No. 5:12-cv-3237 - EJD
ORDER GRANTING MOTION TO REMAND

United States District Court
For the Northern District of California

# I.      BACKGROUND

## A.  Parties Allegations

Defendant alleges that he is entitled to assets – previously frozen by this Court[2] – which may assist in payment of his personal defense expenses.  To support his position, Defendant also alleges that the contract, that governs the funds relevant to these proceedings, contains an express clause that allows for indemnity of attorney fees 'as incurred'. See, Def.'s Brief, Dkt 48 at 2.

Plaintiff does not dispute that this Court has the discretion to release any of Defendant's *own* assets from an asset freeze to pay Defendant's personal legal fees out of his own frozen assets. See, Pl.'s Brief, Dkt 51at 2. Rather, the Plaintiff opposes Defendant's request because Defendant is allegedly seeking to apply "other people's money" for purposes of his personal defense – specifically the assets of the Receivership Entities, which are currently frozen and held for the benefit of (alleged) defrauded investors. Id.[3]

## B.  Factual and Procedural Background

Defendant started a California 'S' corporation and three funds that loaned money to small businesses. The S Corporation and funds included: Small Business Capital Corporation dba SB Capital (**"SB Capital"**), Investors Prime Fund, LLC (**"IPF"**), including its wholly-owned SBA licensing subsidiary Small Business Capital, LLC (**"SBC LLC"**), Small Business Capital Portfolio Fund, LLC (**"SPF"**),and SBC Senior Commercial Mortgage Fund (**"CMF"**) (collectively, the **"Funds"**).

On June 12, 2012, Plaintiff filed a Complaint against Defendant regarding the offer and sale of membership interests in the Funds. See, Compl. Dkt No. 1 at | 1.  The amount raised by Defendant, as of March 30, 2012, amounted to over $42 million from over 400 investors. Id.

On June 26, 2012, and after a seven-month investigation of Defendant, the Court granted Plaintiff a temporary restraining order. See, TRO, Dkt. No. 16 at 2. That order found that the SEC had made a *prima facie* case that Defendant had engaged in practices that constituted violations

---

[2] See, TRO, Dkt. No. 16.

[3] Plaintiff further alleges that Defendant has not attempted to make any showing that he does not have other assets that could be used to pay his personal legal fees. Id

Case No. 5:12-cv-3237 - EJD
ORDER GRANTING MOTION TO REMAND

under Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; and Section 15(a) of the Exchange Act, 15 U.S.C § 78o(a). See, id. The Court found that Plaintiff demonstrated a probability of success on the merits. See, id. The TRO froze all assets of Defendant, and a receiver was appointed to manage the assets of the above-mentioned entities and funds. Id. [4]

On July 3, 2012, and without admitting or denying any allegations of the Complaint, Defendant consented to the entry of a preliminary injunction in accordance with the findings and orders specified in the TRO. See, Preliminary Injunction, Dkt No. 29. The preliminary injunction mirrored the order stated in the TRO. Id. (Exh. A). It is also specified that Defendant's counsel was of "limited engagement." Id., at 2.

The parties have now filed supporting and opposing briefs in relation to Defendant's request; all of which the Court found helpful in disposition of the request.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

---

[4]The Receiver to the Funds recently reported that, as of the filing of the TRO, the Funds had more than $10 million in cash and more than $24 million in other assets. See, Def.'s Brief, Dkt 48 at 2

Case No. 5:12-cv-3237 - EJD
ORDER GRANTING MOTION TO REMAND

## II.   ISSUES FOR DETERMINATION

The parties' contentions center on several issues, some of which overlap, and can be summarized as follows:

**A.** Whether the Funds, frozen by the TRO and subsequent preliminary injunction, contain contributions owned by Defendant?

**B.** Whether the parties have made the relevant showings that the Funds can be traced, and are not tainted by fraud?

**C.** Whether the Operating Agreement, governing the Funds, contains an indemnification clause that allows for reasonable attorneys' fees for all civil proceedings against Defendant?

**D.** Whether Plaintiff has any personal funds that have been frozen as a result of the TRO, and whether such personal funds can be released so to allow for payment of the legal defense?

At the onset, it is worth observing that several cases cited by the parties examined issues similar to this matter (albeit in the criminal context.) While these cases have been mentioned, it is important to note that this matter has been raised in the civil context; thus, constitutional concerns going to the 'right to counsel' are largely inapplicable in this context. See, SEC v. Prater, 296 F. Supp. 2d 210, 218 (D. Conn. 2003); SEC v. Current Fin. Servs., 62 F. Supp. 2d 66, 67 (D.D.C. 1999) (rejecting a claim that asset freeze violated constitutional right to counsel in SEC action because "the Sixth Amendment provides defendants the right to counsel only in criminal, not civil, proceedings.") and SEC v. Cherif, 933 F.2d 403, 416-17 (7th Cir. 1991) ("A criminal defendant has 'no Sixth Amendment right to spend another person's money for services rendered by an attorney.')

\\

\\

\\

\\

\\

\\

\\

Case No. 5:12-cv-3237 - EJD
ORDER GRANTING MOTION TO REMAND

United States District Court
For the Northern District of California

## III.   DISCUSSION

### A. Whether the Funds, frozen by the TRO and subsequent preliminary injunction, contain contributions owned by Defendant?

Defendant contends that he made personal contributions to the Funds that are now managed by the Receiver.  He contends that he "contributed approximately $550,000." See, Def.'s Brief, Dkt 48 at 2 and 9.  The Court, however, is not convinced by the evidence before it that could support Defendant's contention.

Specifically, Defendant provides insufficient and contradictory evidence to support his claimed contribution of $550,000, amongst others.[5]  For instance, there is insufficient evidence as to when the contribution(s) were made, and timing of when those contributions were expended.  Defendant provides little (if any) information for the Court to determine what the contributions are, whether they actually exist, or whether they have any value.  Indeed, Defendant's definition of "the Funds" includes all of the Receivership Entities, so it is unclear if Defendant is claiming to have invested in IPF or SPF, or whether the contribution was to SB Capital – which is not a fund at all.

Moreover, the vague contributions purportedly made by Defendant must be viewed in the context of the Defendant's salary and loans made by SB Capital to Defendant (and the purported dealings between Defendant and the Funds).  During the past three years, Defendant took a substantial salary[6] and owed SB Capital approximately $266,800 at the time the Receiver was appointed. See, Receiver's First Status Report and Inventory, Dkt No. 30 at p. 8 ll. 23-24. It is, therefore, unclear whether Defendant may have already taken out some, or all of the *purported monies* he claims to have contributed to "the Funds." [7]

---

[5] For example, a claim is made of an 80% equity interest in SB Capital. See, Def.'s Reply. Dkt. No. 55.

[6] Also, Defendant's two 9 year old sons and a caregiver were also on the payroll. The Receiver subsequently ceased payments to them. See, Receiver's First Status Report and Inventory, Dkt No. 30 at p. 6 ll. 6.

[7] Examples cited in the Receiver's Brief, Dkt No. 54 at 1, also illustrate the insufficiency of evidence.  The Receiver's Brief states:

"Mr. Feathers initially contended he contributed $650,000 to the companies.  In his letter brief, he contends he contributed $550,000 but only provided evidence of one cash payment of $50,000 and two payments totaling approximately $166,000 to Mr. Feathers' apparent

5

United States District Court
For the Northern District of California

1   Issues have also been raised as to a 'so called' Manager's Note involving the sale of assets

2   between IPF and SPF. In 2009 and 2010, the Manager's Note led an independent auditor to

3   conclude that it was unable to issue a "clean" audit during those financial years. See, Declaration of

4   Roger Boudreau, Dkt No. 8 (Ex. 3 and Ex. 7) and also, Declaration of John Bulgozdy, Dkt, 52 (Ex.

5   2.) This lack of clarity, amongst other examples, is even more telling where – on the day the TRO

6   was granted – Defendant caused a $100,000 cashier's check to be issued payable to himself for his

7   personal expenses. See, Receiver's First Status Report and Inventory, Dkt No. 30 at p. 6 ll. 5-8.

8       As such, the evidence that Defendant made contributions to the Funds (and/or SB Capital)

9   is vague and contradictory – and insufficient to support any real theory that a *portion* of the Funds,

10  owned by the entities, include any of the Defendant's own contributions.

11      **B. Whether the parties have made the relevant showings that the Funds can be traced,**

12  **and are not tainted by fraud?**

13      Defendant next argues that, irrespective of his own purported contributions, he may use

14  assets in the Funds to provide for his own personal defense.  The Court, again, disagrees.

15      In rejecting Defendant's argument, the Court looks to SEC v. Trabulse, 526 F. Supp. 2d

16  1008 (N.D. Cal. 2007).  There, the Court denied the use of frozen assets (in a 'hedge fund') for the

17  purposes of the defendant's own personal defense. The Court premised its reasoning on the notion

18  that "just as a bank robber cannot use the loot to wage the best defense money can buy, so a

19  swindler in securities markets cannot use the victims' assets to hire counsel who will help him

20  retain the gleanings of crime." Id., at 1018. The Trabulse holding relied on a two-prong analysis

21  that was previously adopted in SEC v. Quinn, 997 F.2d 287, 289 (7th Cir.1993).

22      In Quinn, the Court first found that the SEC made a preliminary showing that the

23  defendant's assets could be traced to fraud. Second, when the preliminary showing was made, the

24  _____

25      former business partner.  To the contrary, the capital accounts only reflect reductions in Mr.
        Feathers purported equity. Moreover, SB Capital's Balance Sheet reflects Loans to Related

26      Parties attributable to Mr. Feathers in the approximate amount of $246,000. In addition, the
        company's  records reflect payments to Mr. Feathers for consulting fees and dividends in

27      the amount of at least $232,000 over a 28-month period in addition to his monthly salary
        of$15,000 per month. Mrs. Feathers was also taking a salary of$15,000 per month at the

28      time the Receiver was appointed."

6

1    defendant was then required to show that the assets were untainted by fraud – a showing that the

2    defendant ultimately failed to establish. Id.

3        These same foundations exist in this case. Here, the preliminary injunction granted on July

4    3, 2012, supports the necessary findings that the assets in the Funds can be traced to the

5    Defendant's alleged fraud. See, TRO, Dkt. No. 16 at 2 and See, Preliminary Injunction (PI), Dkt

6    No. 29. (Exh. A).   Specifically, the preliminary injunction found that the SEC made a *prima facie*

7    case that Defendant engaged in practices that constituted violations under relevant securities

8    legislation. Further, the Court found that Plaintiff demonstrated a probability of success on the

9    merits in this action and the possibility of dissipation of assets. Id.  These findings, particularly

10   those pointing to the merits of the case, cut against Defendant's request.

11       While the Court acknowledges that the preliminary injunction was granted with the consent

12   of Defendant (without admitting or denying any allegations of the Complaint), these *prima facie*

13   showings cannot be ignored – ever more so where there has been no subsequent evidence since

14   July 3, 2012 to reverse the preliminary injunction as applied the frozen Funds.[8] Accordingly,

15   Defendant's request for legal expenses is denied.

16       **C. Whether the Operating Agreement, governing the Funds, contains an**

17   **indemnification clause that allows for reasonable attorneys' fees for all civil proceedings**

18   **against Defendant?**

19       This issue, ultimately, relates to *when* Defense counsel fees are to be paid by the Receiver.

20   Defendant argues that because the Operating Agreement governing the Funds contains an express

21   indemnity clause, Defendant has a right to legal fees as they incur.  Specifically, that Defendant is

22   entitled to indemnity of expenses as they arise and until such time as the SEC has proven he has

23   committed fraud. See, Def.'s Brief, Dkt 48 at 5.  Defendant asserts that the phrase "as incurred"

24   dictates this preferred construction of the indemnity clause because of "well-established California

25   precedent [which] obligates the estate to cover the defense" before a final determination in the

26   proceedings. See, Reply, Dkt 55 at 1.

_____

[8] The preliminary injunction mirrored the TRO. The latter was filed ex parte requiring the Court to
make a determination at that stage irrespective of the Defendant's consent.

7

1    Plaintiff rebuts Defendant's indemnification theory by pointing to SEC v. Onyx Capital

2    Advisors, LLC, Case No. 10-cv-11633, 2011 WL 4528216, at *3-4 (E.D. Mich. Sept. 29, 2011)

3    (holding "whether the potential indemnitee is entitled to indemnification generally cannot be

4    determined until after the [final] merits of the underlying controversy have been decided.") See,

5    Pl.'s Brief, Dkt 51at 10.

6    Before addressing the parties' contentions, it is first important to outline the indemnity

7    clause that binds the parties in this dispute (and also address the principles that govern indemnity

8    disputes such as the instant one.)

9    ***Operating Agreement and the Indemnity Clause***

10    The relevant Operating Agreement contains an express indemnity clause. The relevant

11    language states:

> The Manager and its agents or Affiliates and the shareholders,
> officers, directors… of the Company shall be entitled to be
> indemnified and held harmless by the Company, at the expense of the
> Company, against any loss, expense, claim or liability (**including
> reasonable attorneys' fees, which shall be paid as incurred)**
> resulting from the assertion of any claim or legal proceeding relating
> to the performance or nonperformance of any act concerning the
> activities of the Company, including claims or legal proceedings
> brought by a third party of by Members, on their own behalf or as a
> Company derivative suit, **so long as the party to be indemnified
> determined in good faith** that such course was in the best interest of
> the Company **and did not constitute fraud, bad faith or willful
> misconduct**; provided, that any such indemnity shall be paid solely
> from the assets of the Company. (*Emphasis Added*.)

19    Defendant contends that the purpose of an indemnity clause is to enable payment of a

20    defense when fraud allegations have been leveled against the Manager *et al*. Defendant relies on

21    Crawford v. Weather Shield Mfg. Inc., 44 Cal. 4th 541, 558 (2008). However, on closer inspection,

22    Defendant's reliance on this case is misplaced; as is Defendant's preferred construction of the

23    indemnity clause.

24    ***Relevant Law regulating the Indemnity Clause***

25    The Crawford case involved several issues with respect to indemnity contracts.  The case

26    aptly summarized the relevant law, which binds this Court on the interpretation of state contract

27    law. Specifically, the court defined an indemnity agreement as a contract by which "one engages to

28    save another from a legal consequence of the conduct of one of the parties, or of some other [third

8

United States District Court
For the Northern District of California

party conduct]." It allows for moneys to be paid for expenses incurred as a result of such

consequences. <u>See</u>, <u>Crawford</u> 44 Cal. 4th 551, and Civ. Code, § 2772.[9]

Indemnity contracts are construed under the same rules that govern the interpretation of *all*

contracts, that is: "effect is to be given to the parties' mutual intent", as ascertained from the

contract's language if it is "clear and explicit". <u>Id</u>. <u>See</u> <u>also</u>, §§ 1636 and 1638.  Unless the "parties

have indicated a special meaning, the contract's words are to be understood in their ordinary and

popular sense." <u>Id</u>.[10] In noninsurance contexts, "it is the indemnitee who may often have the

superior bargaining power" to the contract and, as a result, the courts tend to construe language

against the indemnittee.[11]  <u>See</u>, <u>id</u>. at 552.  Finally, and as addressed in <u>Crawford</u>, section 2778 sets

forth specific rules for the interpretation of indemnity contracts.  These specific "rules are to be

applied unless a contrary intention appears" from the contract itself.  <u>Id</u>.[12]

Here, Defendant points to verbiage in the indemnity clause that states that the "Company"

must indemnify Defendant "against any loss, expense, claim or liability (including *reasonable*

*attorneys' fees,* which shall be paid as *incurred.*)" <u>See</u>, Receiver's Brief, Dkt No. 54 at 2 (*Emphasis*

*added*).  Defendant also places much weight in the rules cited in § 2778 as applied in the <u>Crawford</u>

decision. But in doing so, Defendant fails to acknowledge that the rules in § 2778 "*are to be*

---

[9] The Code provides specific rules, in addition to the general principles of interpretation, regarding California indemnity contracts.

[10]<u>See</u>, <u>also</u>, <u>Centex Golden Construction Co. v. Dale Tile Co</u>. (2000) 78 Cal.App.4th 992, 996–997, 93 Cal.Rptr.2d 259.

[11] The basis being: the indemnitee may "unfairly shift to another a disproportionate share of the financial consequences of its own legal fault." <u>See</u>, <u>Crawford</u> 44 Cal. 4th 551.

[12]<u>See</u>, <u>Crawford</u> 44 Cal. 4th 552-3, which summarized those rules: "[T]he statute first provides that a promise of indemnity against claims, demands, or liability "embraces the costs of defense against such claims, demands, or liability" insofar as such costs are incurred reasonably and in good faith. (§ 2778, subd. 3, italics added.) Second, the section specifies that the indemnitor "is bound, on request of the [indemnitee], to defend actions or proceedings brought against the [indemnitee] *in respect to the matters embraced by the indemnity*," though the indemnitee may choose to conduct the defense. (Id., subd. 4, italics added.) Third, the statute declares that if the indemnitor declines the indemnitee's tender of defense, "a recovery against the [indemnitee] suffered by him in good faith, is conclusive in his favor against the [indemnitor]." (Id., subd. 5.) On the other hand, section 2778 provides, if the indemnitor got no reasonable notice of the action or was not allowed to control the indemnitee's defense, recovery by the third party against the indemnitee is only presumptive evidence against the indemnitor. (Id., subd. 6.)."  Looking to the those words above (*italicized*), there is nothing in the contract to suggest that it 'embraces' fraud claims.  Rather, the language in the clause indicates the opposite.

Case No. 5:12-cv-3237 - EJD
ORDER GRANTING MOTION TO REMAND

1  *applied unless a contrary intention appears*" in the contract. Put differently, § 2778 precludes

2  application of the specific rules therein where the parties have expressly stated otherwise.  In such

3  circumstances, the rules have no bearing on the interpretation of an indemnity.   Here, Defendant

4  omits reference to this important qualification. The omission largely undercuts Defendant's

5  preferred construction, making reliance on § 2778 misplaced – and particularly where express

6  language in the contract points the other way.

7  Defendant's preferred construction is also defeated by the positions taken by Plaintiff and

8  Receiver, collectively.  Both submit that verbiage in the indemnity clause demonstrate a clear

9  intent of the parties (which circumvents any notion that the specific rules in § 2778 are applicable

10  to this case). In sum, Plaintiff and Receiver argue that the indemnity clause is inapplicable to

11  claims based on fraud.  The Court agrees with this preferred construction; ever more so where the

12  express language of the contract states that the indemnity only applies "so long as the party to be

13  indemnified" acted in "good faith" and whose actions did "not constitute fraud, bad faith or wilful

14  misconduct." <u>See</u>, Receiver's Brief, Dkt No. 54 at 2. Such verbiage is critical. It is "clear and

15  explicit," and only serves to fortify the Receiver and Plaintiff's position. <u>See</u>,§§ 1636 and 1638.

16  <u>See</u>, <u>also</u>, <u>Centex Golden Construction Co. v. Dale Tile Co.</u> (2000) 78 Cal.App.4th 992, 996–997,

17  93 Cal.Rptr.2d 259. [13]

18  Accordingly, the Court finds that acts constituting fraud or wilful conduct are excluded

19  from the indemnification – at least until after the final merits of the "underlying controversy have

20  been decided."[14] <u>See</u>, <u>Onyx Capital Advisors</u> 2011 WL 4528216, at *3-4.   This construction not

21  only reflects the clear language of the parties' indemnity clause, but is also conforms with the

---

[13] And, in any event, any ambiguity as to language in the contract is construed against the indemnitee (here, Defendant) due to his superior bargaining power when the contract was entered into. <u>See</u>, <u>Crawford</u> 44 Cal. 4th 552-3 and <u>Rooz v. Kimmel</u> (1997) 55 Cal.App.4th 573, 583.

[14] While Defendant does not directly advocate that the clause could be construed as an advancement clause, the Court finds that there is not enough in the language of the clause to give rise to this construction. <u>See</u>,for example, <u>Reddy v. Electronic Data Sys. Corp.</u>, Del.Chancery No. CIV.A. 19467, 2002 WL 1358761, *4 (June 18, 2002).  ("Each person who at any time shall serve or shall have served as a Director, officer, employee or agent of the Corporation ... shall be entitled to (a) indemnification and (b) the advancement of expenses incurred by such person from the Corporation as, and to the fullest extent, permitted by Section 145 of the DGCL or any successor statutory provision, as from time to time amended.")

Case No. 5:12-cv-3237 - EJD
ORDER GRANTING MOTION TO REMAND

broader purposes of protecting investors from further harm in the event that Defendant is found to have committed fraud.

Notwithstanding the Court's holding above, the indemnity clause would allow indemnification assuming Defendant is determined not to have committed fraud. To that end, the Court will provide a 'carve out' for legal expenses.  That is, and at this stage, priority is made for Defendant's legal fees to the sum of $200,000 (inclusive of all costs) for the entire proceedings. This sum will take priority over all other claims relevant to the receivership (much like that of the receiver's fees).  Importantly, and in accordance with the Court's construction of the indemnity clause, Defendant's legal expenses only take priority where Defendant is successful on the final merits of these proceedings.

**D. Whether Plaintiff has any personal funds that have been frozen as a result of the TRO, and whether such personal funds can be released so to allow for payment of the legal defense?**

Defendant may identify any such personal assets and make application to the Court to release any identified asset from the Court's current orders. [15]

\\

\\

\\

\\

\\

\\

\\

---

[15] The Court has previously considered the stipulation of the SEC and Mr. Feathers and found good cause to order that the preliminary injunction be partially modified to release from the asset freeze the following assets, which allowed for necessary and reasonable living expenses – including: (1) the remaining proceeds from the sale of a 2007 Porsche Turbo automobile totaling approximately $23,507.80; (2) cash on-hand of approximately $5,000; (3) funds in personal bank accounts held in the name of Mark and/or Natalie Feathers totaling approximately $10,492.65; (4) funds in a Golden State Business Capital account totaling approximately $12,282.02; (5) Feathers' monthly VA disability retirement payment of $1,600; and (6) funds received from unemployment benefits, if any." See, Stipulated Order, Dkt No. 46.

Case No. 5:12-cv-3237 - EJD
ORDER GRANTING MOTION TO REMAND

United States District Court
For the Northern District of California

### IV.    CONCLUSION

For the reasons stated above, the request is DENIED. Additionally, and to tailor provision with what has been addressed above regarding indemnification, the Court also ORDERS:

1. That the Receiver establish a 'Defense Counsel Account', separate to the account that presently holds the Funds, that will maintain monies and will be paid forthwith to Defendant's counsel upon any finding that Defendant is successful on the final merits of these proceedings. Such monies are intended to cover any monies Defendant would obtain from the indemnity clause in the Operating Agreement.

2. That Receiver establish the Defense Counsel Account within two weeks of this Order being published and inform Defendant's counsel in writing, accordingly.

3. That Receiver: (a) allocate an initial sum of $200,000 from the Funds to the Defense Counsel Account for Defense counsel fees (inclusive of all costs in these proceedings, which also includes expert reports), and (b) acknowledge, in writing, that such monies have been allocated within three weeks of this Order being published.

4. That the sum of $200,000 for reasonable attorneys' fees be paid forthwith to Defendant's counsel upon any finding that Defendant is successful on the final merits of these proceedings, and which takes priority over all other claims.

5. If Defense counsel continues to represent Defendant, that the Court be provided with quarterly Status Reports of legal expenses summarizing such expenses.[16]

6. That the Status Reports also include the legal expenses of the Receiver at same date.

7. That the Court reserves the right to modify (increase or decrease) the initial sum of $200,000 (which has priority) pending compelling reasons by the parties.

**IT IS SO ORDERED.**

Dated: September 26, 2012

_____
EDWARD J. DAVILA
United States District Judge

---

[16] At the time of the preliminary injunction, it was specified that Defendant's counsel was of "limited engagement." See, Preliminary Injunction, Dkt No. *29.

12

Case No. 5:12-cv-3237 - EJD
ORDER GRANTING MOTION TO REMAND