1  DAVID R. ZARO (BAR NO. 124334)
   TED FATES (BAR NO. 227809)
   KIM A. BUI (BAR NO. 274113)
2  ALLEN MATKINS LECK GAMBLE
     MALLORY & NATSIS LLP
3  515 South Figueroa Street, Ninth Floor
   Los Angeles, California 90071-3309
4  Phone: (213) 622-5555
   Fax: (213) 620-8816
5  E-Mail: dzaro@allenmatkins.com
           tfates@allenmatkins.com
6          kbui@allenmatkins.com

7  Attorneys for Receiver, Thomas A. Seaman

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. CV12-03237 |
| Plaintiff, | **RECEIVER'S PRELIMINARY FORENSIC ACCOUNTING REPORT AND PETITION FOR INSTRUCTION** |
| vs. | |
| SMALL BUSINESS CAPITAL CORP.; MARK FEATHERS; INVESTORS PRIME FUND, LLC; and SBC PORTFOLIO FUND, LLC, | Ctrm: 4 - 5th Floor<br>Judge: Hon. Edward J. Davila |
| Defendants. | |

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**
798671.01/SD

Case No. CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT
-1-

# TABLE OF CONTENTS

**Page**

I.   PROCEDURAL BACKGROUND ................................................................................ 1

II.   EXECUTIVE SUMMARY ........................................................................................... 2

III.   SCOPE, OBJECTIVES, METHODOLOGY AND LIMITATIONS ............................. 3

IV.   SOURCES AND USES OF FUNDS ............................................................................ 5

V.   THE USE OF INVESTOR PRINCIPAL FOR OPERATING EXPENSES AND INVESTOR DISTRIBUTIONS ........................................................................ 9

    A.   Transfer of Loans Between Funds ..................................................................... 9

    B.   The Funds lent money to SB Capital ............................................................... 11

    C.   The Receivership Entities moved funds between one another by transferring membership interests ................................................................... 12

    D.   The Funds redeemed member interests, then reinvested the proceeds in another Fund ................................................................................................ 12

    E.   The Funds "reinvested" member interest payments and added them to unpaid principal ............................................................................................ 12

    F.   SB Capital recycled cash back to the Funds .................................................... 13

VI.   OTHER OBSERVATIONS ........................................................................................ 13

VII.   PRELIMINARY CONCLUSIONS ............................................................................ 14

VIII.   COST OF THE FORENSIC ACCOUNTING ........................................................... 15

IX.   RECOMMENDATIONS AND PETITION FOR INSTRUCTION ............................ 15

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**

798671.01/SD

(i)

Case No. CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

1   Thomas A. Seaman ("Receiver") Court-appointed permanent receiver for Small Business
2   Capital Corp. ("SB Capital"), Investors Prime Fund, LLC ("IPF"), SBC Portfolio Fund, LLC
3   ("SPF") and their subsidiaries and affiliates (collectively, the "Receivership Entities"), submits this
4   preliminary forensic accounting report which provides a status of completion of the accounting
5   work, preliminary summary level information, an analysis of the cost of the accounting work and a
6   petition for instruction directing the Receiver to complete the detailed compilation of cash based
7   receipts and disbursements, or, should the information presented herein be deemed sufficient by the
8   Court, to stop the forensic accounting work to conserve receivership estate resources.  The
9   accounting information presented herein covers the period from January 1, 2007 through the time of
10  the Receiver's appointment on June 26, 2012.

11  ***Due to the volume and complexity of data analyzed and the incomplete status of the***
12  ***Receiver's accounting, the data and conclusions provided in this report are preliminary only and***
13  ***may need to be materially modified after further investigation and analysis.***

14  **I.     PROCEDURAL BACKGROUND**

15  On June 21, 2012, the Securities and Exchange Commission ("Commission") filed its
16  Complaint against SB Capital, Mark Feathers ("Mr. Feathers"), IPF and SPF (collectively,
17  "Defendants").  The Commission simultaneously filed an Ex Parte Application for Temporary
18  Restraining Order and Order to Show Cause and an Ex Parte Application to Temporarily Seal the
19  Court's File for the Case.  After a hearing held on June 26, 2012, the Court issued the Temporary
20  Restraining Order and Orders (1) Freezing Assets, (2) Prohibiting the Destruction of Documents,
21  (3) Granting Expedited Discovery, (4) Requiring Accountings, and (5) Appointing a Temporary
22  Receiver; and Order to Show Cause re Preliminary Injunction and Appointment of a Permanent
23  Receiver ("TRO").  The TRO appointed Thomas Seaman temporary receiver for the Receivership
24  Entities and set an Order to Show Cause re: Preliminary Junction for July 10, 2012.

25  The Commission and Defendant Feathers stipulated to entry of the Preliminary Injunction
26  and Orders: (1) Freezing Assets; (2) Prohibiting the Destruction of Documents; (3) Requiring
27  Accountings; and (4) Appointing a Permanent Receiver ("Preliminary Injunction Order").  On
28  July 10, 2012, the Court entered the Preliminary Injunction Order.

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**

798671.01/SD

-1-

Case No. CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

## II. EXECUTIVE SUMMARY

The Preliminary Injunction Order orders the Receiver to "make an accounting, as soon as practicable, to this Court and the Commission of the assets and financial condition of SB Capital, IPF and SPF, and to file the accounting with the Court and deliver copies thereof to all parties." Preliminary Injunction Order, Docket No. 34, Part VII.E. As discussed below, pursuant to this order, the Receiver analyzed the books and records of the companies and determined certain important aspects of the accounting data to be unreliable. The Receiver, therefore, began a cash based accounting of receipts and disbursements. Although the accounting is not yet complete, the Receiver is able to draw significant preliminary conclusions from the work completed to date and the financial data determined to be reliable.

As discussed in his prior Interim Reports, the Receiver reviewed the financial statements of the Receivership Entities and identified (a) certain non-performing or otherwise impaired loans and other assets that appeared to be over-valued, (b) intercompany entries for purported obligations of one Receivership Entity to another, and (c) capitalization of expenses. Therefore, the Receiver reported the estimated aggregate value of the Receivership Entities' assets as $34.1 million. The financial statements and accounting records indicated that the amount of principal outstanding invested by members of the funds was $46.1 million. The principal invested by members had therefore been dissipated by approximately $12 million.

The Receiver also examined the cash needs of the Receivership Entities. The Receivership Entities were generating gross revenues from interest income and loan servicing income of $196,500 per month during 2012. The Receivership Entities also made profits on the sales the SBA guaranteed portion of 7-A loans to unrelated third parties. These sales began in June 2010 and continued until the time of the Receiver's appointment. The total amount of profits on these loan sales was $3,831,944, or approximately $160,000 per month. The total operating expenses of the Receivership Entities were approximately $518,000 per month, including payroll expenses of approximately $228,000 per month. The amount of interest promised to investors was approximately $309,800 per month. Accordingly, prior to any redemption requests from members,

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**

798671.01/SD

-2-

Case No. CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

the Receivership Entities had a shortfall in minimum monthly cash requirements of $471,300.  The foregoing monthly cash shortfall is summarized as follows:

| | |
|---|---:|
| Interest income and loan servicing income | $196,500 |
| Gains on loan sales | $160,000 |
| Sub-total revenue from operations | $356,500 |
| Payroll expenses | ($228,000) |
| Operating expenses | ($290,000) |
| Net cash available for Distributions | ($161,500) |
| Interest promised to investors | ($309,800) |
| Shortfall to cash requirements | ($471,300) |

Clearly, this was an unsustainable condition and it was growing worse in the months leading up to the Receiver's appointment.  The Receiver's accounting work to date, as discussed below, shows how SB Capital's operating expenses more than consumed revenues from the Receivership Entities' lending activities.  As a result, the Receivership Entities were forced to use a series of facilitating intercompany transactions to make promised payments to members.  In reality, member principal was being used to pay member returns, which explains the approximately $12 million in dissipation of member equity.

The Receiver proposes that the accounting be completed such that a more complete analysis of the transactions and preliminary conclusions discussed herein can be provided.

### III.   SCOPE, OBJECTIVES, METHODOLOGY AND LIMITATIONS

In order to more fully understand the dissipation of member principal, the Receiver reviewed the Receivership Entities' books and records more closely and found that they could not explain the dissipation in member equity.  Moreover, they were incomplete in that the QuickBooks files began on January 1, 2010 with beginning balances as of that date, but provided no visibility prior to that time.  While there are separate QuickBooks files for the entire accounting period (eight in total for five entities), they are incongruent and inconsistently maintained, making consolidation difficult, if not impossible.  In addition, there were numerous accrued entries for intercompany transfers of assets, intercompany loans and equity, and profits purportedly earned on loans

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**

798671.01/SD

-3-

Case No.  CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

transferred from one Receivership Entity to another at values in excess of the principal balance of the loans. The Receiver also reviewed the Receivership Entities' accounting of amounts invested and distributed to investors and amounts lent to and collected from borrowers, which was maintained in The Mortgage Office software, referred to as the ABS System. This data appeared to be generally reliable. What was not certain was the profitability of the Receivership Entities and the true value of their assets and liabilities.

The Receiver, therefore, undertook a cash basis forensic accounting to determine how money raised from investors was invested or spent. The Receiver created a QuickBooks model, which is essentially a relational database, designed to accumulate all cash receipts and disbursements which reconcile to the banking records of the Receivership Entities from January 1, 2007, through the time of the Receiver's appointment. The data is organized into money raising, money lending and intercompany activities and is designed to provide the Receiver, the Court and the parties the following information:

- A reconciled sources and uses of funds analysis;
- Whether the Receivership Entities' lending activities were profitable;
- A functioning database of all cash flows for purposes of determining potential sources of recovery, including disgorgement and damages, and analyzing investor and creditor claims;
- The impact of intercompany asset transfers;
- An accounting of the use of funds taken from IPF and SPF by SB Capital;
- Payments to Defendant Feathers and other insiders;
- Visibility of the financial position cash balances of the Receivership Entities at any given time;
- Support for further investigation, including discovery requests and subpoenas; and
- Support for tax accounting.

As the accounting progressed, the project became larger and more time consuming than anticipated due to the high volume of transactions to be entered into the database and reconciled. Additional bank accounts were identified. The Receivership Entities used 45 bank accounts over

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**

798671.01/SD

-4-

Case No. CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

the 66-month accounting time period. Not all subpoenas have been fulfilled and certain banks accounts have not yet been entered into the database. In addition, the Receiver has not completed entry of charges on company credit cards. Completion of a fully reconciled forensic accounting is therefore not completed and will require entry and reconciliation of approximately 700 bank statements. To date, 398 statements have been entered, reflecting transactions in the amount of nearly $70 million.

Although a fully reconciled functional database of receipts and disbursements has not yet been completed, key elements of the accounting can be taken from several reliable sources, including the ABS System, payroll and operating expenses maintained in QuickBooks, and the Receiver's incomplete database. The Receiver is therefore able to make the following preliminary forensic accounting report.

## IV. SOURCES AND USES OF FUNDS

In order to explain the dissipation in member equity, the Receiver has prepared a summary level analysis of estimated cash flows from the Receivership Entities that raised funds, namely IPF, Small Business Capital LLC, a subsidiary of IPF that made SBA 7-A loans ("SBC"),[1] SBC Portfolio Fund, LLC ("SPF"), and SBC Senior Commercial Mortgage Fund, LLC ("SCMF," collectively the "Funds"). The analysis is provided by financial activity, i.e., money raising, money lending, and payments to SB Capital, the parent company. The money raising sources and uses of funds are taken from the ABS System.

Money Raising Activities. The following table provides the amount raised from members and the amount of members' unpaid principal by Fund as of the time of the Receiver's appointment.

| Fund | Invested | Outstanding |
|---|---|---|
| IPF | $45,150,177 | $32,040,023 |
| SPF | $15,395,757 | $10,258,707 |
| SCMF | $3,659,430 | $3,738,762 |
| Total | $64,205,964 | $46,037,492 |

---

[1] SBC did not raise funds from investors but was a lending subsidiary of IPF and its financial activity is included under IPF in this report.

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**

798671.01/SD

-5-

Case No. CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

Collectively, the Funds returned principal in the amount of $20,544,497 and paid interest in the amount of $4,139,733. The aggregate total of the Receivership Entities' money raising activities was therefore a net source of funds in the amount of $39,521,735, as set forth in more detail by Fund below.

(in $ millions)

| Money Raising Activity | IPF | SPF | SCMF | Total |
|---|---|---|---|---|
| Funds invested | 45.151 | 15.396 | 3.659 | 64.206 |
| Principal returned | 14.918 | 5.627 | -0- | 20.544 |
| Interest paid | 3.110 | .996 | .034 | 4.140 |
| Total | 27.123 | 8.773 | 3.626 | 39.522 |

Money Lending Activities. The exact total of loans made less payments received will not be fully known until the forensic accounting is completed. Thus, the precise profitability of the Receivership Entities' lending activities is not yet known. However, the ABS System accurately tracks the amount lent for currently active loans, which has been adjusted for loans where the lender exercised its rights to the collateral, and the amount lent can be estimated as follows:

| Fund | Total Lent |
|---|---|
| IPF | $16,317,965 |
| SPF | $6,379,298 |
| SCMF | $2,777,281 |
| Total | $25,474,544 |

The Funds earned interest income from these loans in the amount of $4,995,881. The Funds also earned loan servicing income from these loans in the amount of $715,899. The Funds, and in particular SBC, made SBA 7-A loans and sold a portion, typically 75%, to other financial institutions and investors, and made a profit of $3,818,845 from these sales. SCMF also earned profits of $13,099 from the sale of a loan to a third party. The gross profit from the lending activities is therefore $9,543,724. This is less than the operating expenses of SB Capital as discussed in further detail below. Deducting these profits from the total lent of $25,474,544, and

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**

798671.01/SD

-6-

Case No. CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

adjusting for $400,000 from a loan SPF took with the Natoma property[2] as collateral, shows that the money lending activities were a net use of funds in the amount of $19,705,807.

<u>Intercompany Uses of Cash</u>.  As discussed above, the net amounts from money raising ($39,521,735) and money lending ($19,705,807) are known with reasonable certainty.  The exact ending cash balance taken into the possession of the Receiver of $9,701,039 is also known.  Accordingly, by deduction, approximately $10,114,889 of investor funds was taken for other uses.  The foregoing deductive process can be summarized as follows:

| | |
|---|---|
| Money raising activities | $39,521,735 |
| Money lending activities | $19,971,975 |
| Net Cash out for other uses | $9,848,721 |
| Ending cash balance | $9,701,038 |

Other than money raising and money lending, the Receiver has not identified any significant transactions outside of the Receivership Entities.  Therefore, it appears the vast majority of the approximately $9,848,721 in net cash out was paid to SB Capital.  These payments were recorded as loans or management fees in the Receivership Entities' QuickBooks.  Completion of the accounting will substantiate this number, provide detail by transaction, and identify any additional recipients other than SB Capital.  In the meantime, the following chart reflects the amount of investor funds taken in cash from the Funds for uses other than money raising and lending activities.

(in $ millions)

| Activity | IPF | SPF | SCMF | Total |
|---|---|---|---|---|
| Money raising | 27.123 | 8.773 | 3.625 | 39.522 |
| Money lending | (11.674) | (5.481) | (2.816) | (19.972) |
| Other cash out (net) | (8.505) | (.559) | (.785) | (9.849) |
| Ending Cash balance | 6.943 | 2.734 | .024 | 9.701 |

---

[2]  The Natoma property is discussed in detail in the Receiver's Fourth Interim Report.

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**
798671.01/SD

-7-

Case No.  CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

1    The net cash out of $9,848,721 explains the majority (82%) of the dissipation in member
2 equity of $12 million.

3    Completion of the forensic accounting will allow the Receiver to more fully report how the
4 $9,848,721 transferred to SB Capital was used. In the meantime, a preliminary report based on the
5 Receiver's accounting to date and extracting cash data deemed to be reliable from the Receivership
6 Entities QuickBooks follows.

7    <u>SB Capital Sources and Uses of Funds</u>. In order to estimate SB Capital's sources and uses
8 of funds, the Receiver extracted some cash data from the Receivership Entities' accounting of
9 operating expenses and other expenses. SB Capital was extremely thinly capitalized and its only
10 significant source of funds, other than $401,552 in cash at the start of the accounting period, was
11 cash from operations. Its operational income, which was largely comprised of loan origination fees,
12 broker fees, rental income and other miscellaneous income, totaled $2,858,035. The total sources
13 of funds to SB Capital is estimated to be $12,706,756, which includes the $9,848,721 transferred to
14 SB Capital from the Funds.

15    SB Capital used the vast majority of these funds, $10,475,244, for its operating expenses.
16 The company also paid down a line of credit with Bank Alameda in a net amount of $600,000 and
17 lent Mr. Feathers $266,855. SB Capital's operating expenses were vastly disproportionate to the
18 size of the loan portfolios owned by the Funds that it managed. More specifically, the operating
19 expenses of approximately $10.5 million exceed the $9.5 million total sum of gross revenue from
20 interest income, loan servicing income and gains on the sale of loans (a factor of 110%). The
21 operating expenses are 41% of the loan portfolio balance. The transfer of monies from the Funds to
22 SB Capital to cover SB Capital's operating expenses made the Funds unable to pay returns
23 promised to members.

24    The following table summarizes the estimated sources and uses of SB Capital funds.
25    Sources:
26        Beginning cash balance         $401,522
27        Cash received from the Funds   $9,848,721
28        Other income                   $2,858,035

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**
798671.01/SD
-8-
Case No. CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

|   | Uses: | |
|---|---|---|
| | Payroll | $3,690,898 |
| | Rent expense | $794,847 |
| | All other operating expenses | $5,989,499 |
| | Loans to Feathers | $266,855 |
| | Net payments on line of credit | $600,000 |
| | Unaccounted for | $1,502,634 |
| | Ending cash | $263,575 |

## V.   THE USE OF INVESTOR PRINCIPAL FOR OPERATING EXPENSES AND INVESTOR DISTRIBUTIONS

As set forth above, due to the use of the Funds' revenue for SB Capital's operating expenses, the Funds did not have sufficient cash to make promised distributions to members and satisfy redemptions. This resulted in a $12 million dissipation of member equity as principal was used to satisfy cash needs that could not be met from gross revenue from lending activities. The Receivership Entities used six types of facilitating transactions that enabled the use of member principal to meet cash needs.

### A.   Transfer of Loans Between Funds.

The Receiver has identified at least 48 transactions involving 19 current loans that were transferred between the Funds, thereby moving cash between the Funds to meet cash needs. The total value of these transactions was $23,732,884.31. In many cases, the Fund that originated the loan would transfer it to another fund in exchange for cash, and later the receiving Fund would transfer it back to the originating Fund, also for cash. Thus, there was no loss of cash to the Funds in the aggregate from the transfers (other than the recognition of a premium on certain loan transfers discussed below), but rather, the transfers represented offsetting movements of cash between Funds to provide for the cash needs of a particular Fund, which otherwise could not have been met. The Receiver can discern no business reason to transfer the loans between Funds other than to disguise the dissipation in member principal and delay its impact. Moreover, the Receiver

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**

798671.01/SD

-9-

Case No. CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

believes that completion of the forensic accounting will identify additional loan transfers between Funds and the list of transferred loans is therefore incomplete.

Of the loan transfers that have been identified, there were relatively few in 2007, 2008, and 2009, and none in 2010.  Most occurred between June 2011 and June 2012.  The gross amount of cash moving between Funds due to loan transfers can be broken down by year as follows.

|      |              |
|------|--------------|
| 2007 | $395,278     |
| 2008 | $388,163     |
| 2009 | $125,000     |
| 2010 | -0-          |
| 2011 | $2,887,826   |
| 2012 | $19,927,616  |
| Total | $23,732,884 |

Of the 19 loans that were transferred between Funds, eleven were "sold" to other Funds for an amount higher than the principal lent.  The premium was purportedly paid because the loans had been pooled in the SBA 504 program, making them more valuable.  The Receiver has not yet determined to what extent the pooling of the loans enhanced their value, and if so, whether the premiums paid correspond with the enhanced values.  The premiums paid resulted in accrued profits to the originating Fund.  However, the originating Fund did not benefit because, although it recognized the profit, the profit was then paid to SB Capital as a management fee.  In this manner, SB Capital took management fees of $1,135,191 from the Funds, as detailed below.

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**
798671.01/SD

-10-

Case No. CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

| Loan | Amount | Premium Paid | Mgmt. fee |
|---|---|---|---|
| 3 AM, LLC | $564,933 | $128,053 | $128,053 |
| 47300 Kato, LLC | $1,662,500 | $94,995 | $95,000 |
| Airport Blvd. | $1,200,000 | $249,623 | $145,000 |
| Aung San | $1,287,000 | $114,209 | $60,000 |
| Aung Solvang | $1,542,500 | $81,444 | $81,444 |
| Auto Spa | $1,460,000 | $25,989 | $25,989 |
| Sherwin | $550,000 | $27,423 | -0- |
| Edge Partners | $1,178,500 | $46,669 | $46,669 |
| Focus Hospitality | $301,125 | $63,036 | $63,036 |
| Justin Giaria | $712,500 | $35,577 | -0- |
| Milliken-Napa | $3,395,000 | $169,750 | $175,000 |
| Sunshine Hosp. | $1,089,150 | $500,000 | $315,000 |
| Total | $14,943,208 | $1,536,768 | $1,135,191 |

B.  <u>The Funds lent money to SB Capital</u>.  As set forth in the SB Capital Sources and Uses of Funds section above, the operating expenses of SB Capital were vastly disproportionate to the income the Funds were generating.  To help cover the shortfall, SB Capital borrowed money from the Funds.  The following table provides a summary of these loans by year and Fund.

| Year | IPF | SPF |
|---|---|---|
| 2009 | 55,623 | 534,736 |
| 2010 | 1,194,377 | 172,727 |
| 2011 | 2,792,846 | (16,594) |
| 2012 | 595,632 | (237,872) |
| Total loans to parent | 5,238,478 | 452,996 |

The Funds received interest payments from SB Capital for these loans; IPF received $79,961.58 and SPF received $81,489.71.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

798671.01/SD

-11-

Case No.  CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

C.  **The Receivership Entities moved funds between one another by transferring membership interests.**  The Receiver identified three transactions where IPF invested a total of $400,000 in SPF; two $50,000 investments, one made in October 2007 and one in December 2007, and a $300,000 investment in March 2008. SPF then bought out IPF's membership interest in June 2008 for a total of $412,146. The Receiver identified two membership interest purchases made by SB Capital which transferred cash to IPF and SPF. The IPF membership interest was purchased for $150,000 on June 11, 2009, then repurchased shortly thereafter for $150,557. The SPF membership interest was purchased for $200,000 in June 2009, then repurchased over the next three months for $203,422.

D.  **The Funds redeemed member interests, then reinvested the proceeds in another Fund.**  Certain membership interests in a Fund were redeemed and the proceeds were invested in other Funds, thereby moving cash between Funds. The following table provides a summary of these transfers.

(in $ millions)

| Year | IPF to SPF | SPF to IPF | IPF to SCMF | SPF to SCMF | Total |
|---|---|---|---|---|---|
| 2007 | .115 | -0- | -0- | -0- | .115 |
| 2008 | .044 | -0- | -0- | -0- | .044 |
| 2009 | .285 | -0- | -0- | -0- | .285 |
| 2010 | 1.117 | .142 | -0- | -0- | 1.258 |
| 2011 | 1.393 | .049 | .256 | -0- | 1.698 |
| 2012 | .167 | 1.470 | .120 | .010 | 1.767 |
| Total | 3.121 | 1.661 | .376 | .010 | 5.168 |

E.  **The Funds "reinvested" member interest payments and added them to unpaid principal.**  Investors were given the opportunity to reinvest their monthly interest payments. This had the effect of reducing the cash needs of the Receivership Entities. The following table provides a summary of the amount of interest reinvested by Fund. The practice of reinvesting dividends ended with the June 1, 2012 payment, the final payment before the appointment of the Receiver.

| Fund | Interest due | Interest paid in cash | Reinvested interest |
|---|---|---|---|
| IPF | 4,920,229 | 3,110,331 | 1,809,998 |
| SPF | 1,550,436 | 995,542 | 554,894 |
| SCMF | 113,190 | 33,829 | 79,331 |
| Total | 6,582,855 | 4,139,732 | 2,444,223 |

F.  **SB Capital recycled cash back to the Funds.**  The ABS System reflects cash contributed from SB Capital back to the Funds in the amount of $663,099. This amount includes interest in the amount of $474,526 that SB Capital paid on two defaulted loans (Whiskey Junction and Sweet Fingers), which remained on the balance sheets of the Funds. SB Capital also paid $188,572 to the Funds for referral fees to members who referred new investors.[3] The ABS System reflects that this cash went to the Funds, which added the referral fee amounts to the members' unpaid principal.[4] These transactions recycled monies previously taken from the Funds back to the Funds. Moreover, the ABS System does not include all cash transactions and the Receiver has identified several other transactions both from the Receivership Entities' accounting and the forensic accounting indicating that there are many other instances of SB Capital recycling monies back to the Funds. These transactions cannot be fully identified until the forensic accounting is completed.

## VI.  OTHER OBSERVATIONS

**Non-Performing Loans, Real Estate Owned and Loan Modifications.**  There are now seven loans the Receiver has identified as impaired; two are SBA 7-A loans, one is an SBA 504 loan, and four are non-SBA loans. Each of these loans is discussed in detail in the Receiver's concurrently filed Fourth Interim Report. In addition to the non-performing loans, there are two properties acquired by the Receivership Entities through foreclosure and two small loans which were modified

---

[3] Referral fees were also paid to members who transferred their membership interest between Funds.
[4] Certain members received direct cash payments for referral fees in the approximate of $75,000, which are not included in the $188,572 paid to the Funds.

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**

798671.01/SD

-13-

Case No.  CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

to extend their maturity dates. These two properties and two loan modifications are also discussed in the Receiver's Fourth Interim Report.

<u>Self dealing</u>. The Receiver has identified several examples where Mr. Feathers appears to have engaged in self-dealing. As discussed in the Receiver's Fourth Interim Report, SB Capital assumed the role of the borrower for the defaulted Sweet Fingers loan. Despite the fact that the Sweet Fingers loan was in monetary default, IPF advanced an additional $260,000 to SB Capital as borrower. One of the advances was made on March 31, 2009, for $50,000. The next day, Mr. Feathers took $50,000 from SB Capital, which SB Capital otherwise did not have, and accounted for it as a stock repurchase by the company.

Another example of potential self-dealing involved the purchase of a portion of a defaulted loan to Lipari by the IRA accounts of Mr. Feathers' minor children. Each child purchased a portion of the defaulted loan for $15,000 in June 2010. In August 2010, when SPF foreclosed on the property (which transaction included a $110,000 settlement payment to the borrower), SPF bought the children's interests in the loan for $20,000 each, thereby paying them a profit of $5,000 each, representing a 33% return in less than two months.

The company credit card statements reflect payment of some personal expenses, including numerous charges at restaurants and travel expenses for two trips to Hawaii taken by Mr. Feathers and his family. The credit cards also reflect tuition payments and a variety of other personal expenses. It is not clear at this point if Mr. Feathers reimbursed the company for these charges. The forensic accounting will shed further light on these transactions.

## VII.   PRELIMINARY CONCLUSIONS

As discussed above, SB Capital's operating expenses vastly exceeded the cash generated by the Funds' lending activities. The Receivership Entities used the revenue from the Funds' lending activities to pay SB Capital's operating expenses, and therefore did not have sufficient income to make promised payments to members. The Receivership Entities used the facilitating transactions described above to move monies from Fund to Fund in order to make promised payments to members. In reality, member principal was being used to pay member returns. This resulted in a dissipation of member equity of $12 million.

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**

798671.01/SD

-14-

Case No. CV12-03237
RECEIVER'S FORENSIC
ACCOUNTING REPORT

## VIII. COST OF THE FORENSIC ACCOUNTING

The Receiver previously estimated the cost of the forensic accounting would be $128,425. The date the Receiver has expended approximately $65,000. Given that 400 of the 700 bank statements have been entered, the Receiver believes that the total cost estimate of $128,425 can be met.

## IX. RECOMMENDATIONS AND PETITION FOR INSTRUCTION

The Receiver believes that completion of the forensic accounting is necessary to affirm the conclusions reached herein, accurately determine the profitability of lending activities, provide a functioning database of all receipts and disbursements, and provide a complete analysis of the approximately $12 million in dissipation of member equity and the uses of investor funds taken by SB Capital, including payments made to or on behalf of Mr. Feathers. Completion of the forensic accounting database will have the added benefit of allowing the Receiver to respond to subpoenas and discovery requests of the SEC, Mr. Feathers, the IRS, and other interested parties. The Receiver, therefore, respectfully requests Court authorization to complete the forensic accounting.

Dated: January 15, 2012

By: _/s/ Thomas A. Seaman_
Thomas A. Seaman, Receiver

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP

By: _/s/ Ted Fates_
TED FATES
Attorneys for Receiver
Thomas A. Seaman