1   JOHN B. BULGOZDY (Cal. Bar No. 219897)
    Email:  bulgozdyj@sec.gov
2   LYNN M. DEAN (Cal. Bar No. 205562)
    Email:  deanl@sec.gov
3   SUSAN F. HANNAN (Cal. Bar No. 97604)
    Email:  hannans@sec.gov
4
    Attorneys for Plaintiff
5   Securities and Exchange Commission
    Michele Wein Layne, Regional Director
6   John W. Berry, Regional Trial Counsel
    5670 Wilshire Boulevard, 11th Floor
7   Los Angeles, California 90036-3648
    Telephone:  (323) 965-3998
8   Facsimile:  (323) 965-3908

9

10                  **UNITED STATES DISTRICT COURT**

11                 **NORTHERN DISTRICT OF CALIFORNIA**

12                      **SAN JOSE DIVISION**

13  SECURITIES AND EXCHANGE           Case No. 5:12-CV-03237-EJD
    COMMISSION,
14                                    **PLAINTIFF SECURITIES AND**
                  Plaintiff,          **EXCHANGE COMMISSION'S**
15                                    **POINTS AND AUTHORITIES IN**
           vs.                        **SUPPORT OF MOTION FOR**
16                                    **SUMMARY JUDGMENT**
    SMALL BUSINESS CAPITAL CORP.;     **AGAINST DEFENDANT MARK**
17  MARK FEATHERS; INVESTORS PRIME    **FEATHERS**
    FUND, LLC; and SBC PORTFOLIO
18  FUND, LLC,                        Date:      June 28, 2013
                                      Time:      9:00 a.m.
19                Defendants.         Place:     Courtroom 4, 5th Floor
                                                 (Hon. Edward J. Davila)
20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................... 2

   A.   Defendant Feathers Managed IPF And SPF Through SBCC ................................ 2

   B.   There Can Be No Dispute That Feathers Caused The Funds To
        Transfer Millions Of Dollars In Cash To SBCC Beginning In 2009 ................... 2

        1.   Feathers Used The "Due From" To Take Cash From
             The Funds To Pay SBCC's Operating Expenses And
             To Manage The Funds' Yields .................................................................. 3

   C.   Feathers Did Not Disclose That Cash From The Funds Was
        Being Taken To Pay SBCC's Expenses .................................................................. 5

        1.   The Funds' Offering Documents, And Feathers' Requests
             For Approval, Did Not Disclose SBCC's Borrowing From IPF ............... 5

             a)   May 2010 Letter To Investors ......................................................... 5

             b)   June 2010 IPF Offering Circular ..................................................... 5

             c)   August 2010 Letter To Investors ..................................................... 6

             d)   January 2011 IPF Offering Documents ........................................... 7

        2.   The SPF Offering Documents Do Not Disclose That
             SPF Was Making Unsecured Loans To SBCC ......................................... 9

   D.   The Funds' Auditor Required Reversal Of Organization Or
        Syndication Expenses ............................................................................................. 9

   E.   Investors Did Not Know That Feathers Was Borrowing Millions
        From IPF, And Would Have Considered That Information Material .................. 12

   F.   Feathers Caused The Funds To Sell Assets Between The Funds
        At A Premium To Generate "Management Fees" ................................................ 13

   G.   Feathers Caused The Funds To Make Distributions In Excess
        Of Fund Profits ..................................................................................................... 14

III.    ARGUMENT ..................................................................................................... 15

A.      Defendants Violated The Antifraud Provisions Of The
        Federal Securities Laws ...................................................................... 15

        1.      Defendants Made Material Misrepresentations Or
                Omissions.................................................................................. 16

        2.      Feathers Acted With Scienter .................................................. 20

B.      Defendants Violated The Broker-Dealer Registration Provisions........................ 22

C.      Feathers Is Liable As A Control Person Of SBCC, IPF, And SPF...................... 22

D.      The Court Should Grant All The Relief Request By The Commission................ 23

        1.      A Permanent Injunction Is Needed .......................................... 23

        2.      The Court Should Order Disgorgement And Prejudgment
                Interest....................................................................................... 23

        3.      The Court Should Impose A Third Tier Civil Penalty
                Of $300,000 .............................................................................. 24

IV.     CONCLUSION................................................................................................. 25

# TABLE OF AUTHORITIES

Page

## CASES

*Aaron v. SEC*
    446 U.S. 680 (1980)........................................................................... 20

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986)........................................................................... 15

*Basic Inc. v. Levinson*
    485 U.S. 224 (1988)........................................................................... 16

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)........................................................................... 15

*Ernst & Ernst v. Hochfelder*
    425 U.S. 185 (1976)........................................................................... 20

*Hanon v. Dataproducts Corp.*
    976 F.2d 497 (9th Cir. 1992) ........................................................... 16

*Herman & MacLean v. Huddleston*
    459 U.S. 375 (1983)........................................................................... 20

*Hollinger v. Titan Capital Corp.*
    914 F.2d 1564 (9th Cir. 1990) ......................................................... 20

*SEC v. Abacus International Holding Corp.*
    2001 WL 940913 (N.D. Cal. August 16, 2001)................................ 24

*SEC v. Burns*
    816 F.2d 471 (9th Cir. 1987) ........................................................... 20

*SEC v. CMKM Diamonds, Inc.*
    635 F. Supp. 2d 1185 (D. Nev. 2009) ............................................. 24

*SEC v. Coates*
    137 F. Supp. 2d 413 (S.D.N.Y. 2001)............................................. 24

*SEC v. Cochran*
    214 F.3d 1261 (10th Cir. 2000) ....................................................... 20

*SEC v. Dain Rauscher, Inc.*
    254 F.3d 852 (9th Cir. 2001) ........................................................... 16

*SEC v. Fehn*
97 F.3d 1276 (9th Cir. 1996) ............................................................. 16, 23

*SEC v. First City Fin. Corp., Ltd.*
890 F.2d 1215 (D.C. Cir. 1989) ............................................................ 24

*SEC v. First Pacific Bancorp*
142 F.3d 1186 (9th Cir. 1998) ............................................................. 24

*SEC v. Hansen*
1984 WL 2413 (S.D.N.Y. Apr. 6, 1984)................................................ 22

*SEC v. Interlink Data Network*
1993 WL 603274 (C. D. Cal. Nov. 15, 1993)........................................ 22

*SEC v. J.T. Wallenbrock*
440 F.3d 1109 (9th Cir. 2006) ....................................................... 23, 24

*SEC v. Kenton Capital, Ltd.*
69 F. Supp. 2d 1 (D.D.C. 1998) .......................................................... 22

*SEC v. Kiselak Capital Group, LLC*
2011 U.S. Dist. LEXIS 107624 (N.D. Tex. Sept. 20, 2011).................... 24

*SEC v. Koracorp Indus., Inc.*
575 F.2d 692 (9th Cir. 1978) ............................................................... 23

*SEC v. Manor Nursing Centers, Inc.*
458 F.2d 1082 (2d Cir. 1972)............................................................... 24

*SEC v. Marker*
427 F. Supp. 2d 583 (M.D. Fla. 2006) ................................................. 24

*SEC v. Merrill Scott & Assocs., Ltd.*
2011 WL 5834271 (D. Utah Nov. 21, 2011) ......................................... 20

*SEC v. Murphy*
626 F.2d 633 (9th Cir. 1980) ......................................................... 16, 23

*SEC v. Palmisano*
135 F.3d 860 (2d Cir. 1998)................................................................. 24

*SEC v. Phan*
500 F.3d 895 (9th Cir. 2007) ............................................................... 16

*SEC v. Platforms Wireless*
617 F.2d 1072 (9th Cir. 2010) ....................................................... 16, 23

*SEC v. Rana Research, Inc.*
    8 F.3d 1358 (9th Cir. 1993) .................................................................. 16

*SEC v. TLC Invs. and Trade Co.*
    179 F. Supp. 2d 1149 (C.D. Cal. 2001) .............................................. 20

*SEC v. Todd*
    642 F.3d 1207 (9th Cir. 2011) .............................................................. 23

*TSC Indus., Inc. v. Northway, Inc.*
    426 U.S. 438 (1976) ................................................................................ 16

*Vernazza v. SEC*
    327 F.3d 851 (9th Cir. 2003) ................................................................ 20

## **FEDERAL STATUTES**

**Securities Act of 1933**

Section 17(a)
    [15 U.S.C. § 77q(a)] ............................................................................. 15

Section 17(a)(1)
    [15 U.S.C. § 77q(a)(1)] .................................................................... 16, 20

Section 17(a)(2)
    [15 U.S.C. § 77q(a)(2)] ......................................................................... 16

Section 17(a)(3)
    [15 U.S.C. § 77q(a)(3)] ......................................................................... 16

Section 20(d)
    [15 U.S.C. § 77t(d)] .............................................................................. 24

**Securities Exchange Act of 1934**

Section 3(a)(4)
    [15 U.S.C. § 78c(a)(4)] ......................................................................... 22

Section 10(b)
    [15 U.S.C. § 78j(b)] ................................................................... 15, 16, 20

Section 15(a)(1)
    [15 U.S.C. 78o(a)(1)] ............................................................................ 22

Section 20(a)
    [15 U.S.C. § 78t(a)] .......................................................................... 22, 23

Section 21(d)
    [15 U.S.C. § 78u(d)] ................................................................. 23

Section 21(d)(3)(A)
    [15 U.S.C. § 78u(d)(3)(A)] ....................................................... 24

Section 21(d)(3)(B)
    [15 U.S.C. § 78u(d)(3)(B)] ....................................................... 24

## <u>FEDERAL REGULATIONS</u>

17 C.F.R. § 230.405 ..................................................................... 23

Rule 10b-5
    [17 C.F.R. § 240.10b-5] ...................................................... 15, 16

## <u>FEDERAL RULES OF CIVIL PROCEDURE</u>

Fed. R. Civ. P. 56(c) ................................................................... 15

I.      **INTRODUCTION**

Plaintiff Securities and Exchange Commission ("Commission") moves for summary judgment against defendant Mark Feathers ("Feathers") because the evidence establishes that defendant Feathers violated the federal securities laws in connection with the offer and sale of securities in two mortgage funds Feathers managed:  Investors Prime Fund, LLC ("IPF") and SBC Portfolio Fund, LLC ("SPF") (collectively, the "Funds").  Feathers managed the Funds through his company, co-defendant Small Business Capital Corp. ("SBCC").

The evidence shows that the Funds were not generating enough income to pay any management fees to SBCC, to pay all of the Funds' expenses, and to pay the high returns investors were promised in the offering documents of the Funds.  So, beginning in 2009 through June 2012, Feathers caused IPF to loan at least $5,263,479, and caused SPF to loan at least $690,868, to his management company, SBCC.  These loans were unsecured, and the Funds could not even assess their collectability for the Funds' auditor.  Feathers used the cash taken under the guise of these prohibited loans, which Feathers and others referred to as the "due from" manager or "note receivable from fund manager," to pay the expenses of SBCC, and to reduce the expenses of the Funds – and thus falsely inflate the reported income and yield of the Funds – to ensure that he maintained returns at 7.5% for IPF and 9-10% for SPF.  In fact, if the amounts recorded as the "due from" were actually netted against reported income, the Funds operated at a loss in 2009, 2010, and 2011.  Then, in the first half of 2012, Feathers used a second device – the sale of assets at a premium between the Funds to generate "income" – and then caused SPF to pay $922,927 of those "premiums" to SBCC as "management fees," contrary to the advice of the Funds' independent auditor.

There can be no dispute that, in so doing, Feathers violated the federal securities laws by making material misrepresentations and omissions in the offering documents.  There was no disclosure in the Funds' offering documents to investors that Feathers was causing IPF and SPF to make unsecured loans to SBCC, or that the Funds could not assess the collectability of those loans.  In fact, the Funds' offering documents represented through at least mid-2011 that the Funds would not make any loans to SBCC that were not secured by real estate, and that the Funds would only make loans secured by real estate, with conservative loan-to-value ratios.  The large and growing unsecured loans

to SBCC violated these provisions of the offering documents. Feathers' misrepresentations were so blatant that in one of the offering documents he affirmatively misrepresented that there were no loans to the manager, even though he was well aware of the "due from." There is no question that these misrepresentations and omissions were materially false and misleading.

The Commission respectfully requests that the Court grant its motion for summary judgment; issue a permanent injunction enjoining Feathers from violating the federal securities laws; order Feathers to pay disgorgement of $12 million, which represents a reasonable approximation of the loss to investors, with prejudgment interest thereon from the date of the receivership; and assess a $300,000 civil penalty against Feathers.

## II.   STATEMENT OF FACTS

### A.   Defendant Feathers Managed IPF And SPF Through SBCC

There is no question that defendant Feathers controlled the management company, SBCC, and the two funds, IPF, and SPF. Feathers founded SBCC, IPF, and SPF, and managed them from at least January 1, 2009 through the receivership in June 2012. (*See* Declaration of Mark Feathers dated May 16, 2013 (Dkt. No. 466) at ¶ 2.) According to the offering documents of IPF and SPF issued beginning in 2007, Feathers was "a Director, the Chief Executive Officer and the Designated Broker of Record of the Manager, SB Capital [SBCC]." (*See, e.g.*, Bulgozdy Dec., Ex.182 at p. 9 (SBCC011656); Ex. 173 at p. 21 (SBCC007063).) The offering documents for IPF and SPF identified SBCC as the "sole manager" of the Funds with the "sole authority" to manage the affairs of the Funds. (*See, e.g., id.,* Ex. 173 at p. 16 (SBCC007058); Ex. 184 at p. 9 (SBCC011756).)

Consistent with that "sole authority," Feathers and his spouse, Natalie Taaffe Feathers, were the only signatories on the bank accounts of SBCC, IPF, and SPF. (*Id.*, Ex. 218 (Dep. 35:20-37:7).) In addition, Feathers has conceded that he approved the offering documents before they were provided to investors, and that he was "the final authority on the approval of offering documents." (Bulgozdy Dec., Ex. 219 (Dep. at 401:20-23).)

### B.   There Can Be No Dispute That Feathers Caused The Funds To Transfer Millions Of Dollars In Cash To SBCC Beginning In 2009

There can be no dispute that Feathers caused the Funds to transfer millions of dollars to

SBCC, and that SBCC owed the Funds millions of dollars at the time the Receiver was appointed. The audited financial statements of IPF for 2010 and 2009 show that SBCC owed $1.85 million to IPF as of December 31, 2010.  (Spiegel Dec., Ex. 27 at p. 2 (SBCC002969).  Draft audited financial statements for IPF for 2011 show that SBCC owed $4,863,479 to IPF as of December 31, 2011. (*Id*., Ex. 46 at p. 15.)  IPF's general ledger records additional cash transfers from IPF's bank accounts to SBCC of $400,000 in early 2012.  (Mitchell Dec., Ex. 220 at A-00882-3.)  These records of IPF establish that SBCC owed IPF at least $5,263,479.

The audited financial statements of SPF for 2010 and 2009 show that SBCC owed  $707,464 to SPF as of December 31, 2010.  (Spiegel Dec., Ex. 28 at p. 2 (SBCC004893).)  Draft audited financial statements for SPF for 2011 show that SBCC owed $690,868 as of December 31, 2011. (*Id*., Ex.47 at p. 2.)  SPF's general ledger records additional cash transfers from SPF's bank accounts to SBCC totaling $922,927 in the first five months of 2012 for management fees. (Mitchell Dec., Ex. 221 at A-01322.)  These records of SPF establish that SBCC had received at least $1,613,795 from SPF.

A summary of cash transfers recorded in the general ledgers of SPF and IPF confirms that Feathers caused substantial cash transfers from the Funds to SBCC.  From 2009 through the date of the Receivership, cash transfers from the Funds to SBCC total at least $7,497,402.51, with the majority of the transfers being large, round-numbered amounts.  (*See* Mitchell Dec., ¶ 4, Ex. 220 at A-00789-90, A-00882-3; Ex. 221 at A-01212-3.)

### 1.   Feathers Used The "Due From" To Take Cash From The Funds To Pay SBCC's Operating Expenses And To Manage The Funds' Yields

Feathers used the cash he transferred from the Funds to SBCC under guise of the "due from" or "manager's note" to pay SBCC's expenses and to manage the yield of the Funds.  David Gruebele was a consultant employed by Feathers and his companies from late 2009 through June 2012, who provided bookkeeping and similar services.  (Greubele Dec., ¶ 4.)  According to Gruebele, Feathers used the "due from" manager for two purposes.  First, as a means of providing cash to SBCC from the Funds to pay for SBCC's operations because SBCC was not earning any net management fees from the Funds under the terms of the offering documents.  (*Id*., ¶ 9.)  Second, to

the extent that the Funds' net income was below the amount necessary to pay the target yield after deducting actual Fund expenses, then Feathers directed that expenses moved to the "due from" or "manager's note" rather than being recorded as an expense of the Funds.  This had the effect of converting the excess expenses into an "asset" of the Funds and increasing net income.  (*Id*.)

Contemporaneous evidence corroborates Gruebele's testimony.  (*See, e.g.*, Gruebele Dec., Exs. 56, 69, 73, 74.)  A September 2011 email exchange states that SBCC needed approximately $225,000 in cash to pay September 2011 expenses, and lists nine items.  The first four items are obligations of SBCC:  (1) interest on the "due from" SBCC to SPF, (2) interest on the "due from SBCC to IPF, (3) interest on Loan 300001 – a loan from IPF to SBCC; and (4) interest on Loan 65 – another loan from IPF to SBCC.  (Gruebele Dec., ¶¶ 14, 15, 16, 17, Exs. 56, 73.)  The remaining items – payroll, Amex, Citibank, rents, and "misc," were also expenses incurred by SBCC.  (*Id*., ¶ 16.)  This email exchange confirms that cash taken from the Funds was used to pay SBCC's expenses.

Further evidence that the amounts of cash Feathers took from the Funds and transferred to SBCC were to pay SBCC's expenses is found by looking at the overall financial performance of SBCC.  In 2009, SBCC incurred a deficit of $427,754 (Bulgozdy Dec., Ex. 218 (Dep at 274:11 to 275:5)), which was more than covered by the approximately $1.5 million in cash that Feathers caused the Funds to transfer to SBCC that year.  In 2010, SBCC had a deficit of $1,420,795 (*id*., Ex. 218 (Dep. at 280:23-281:12)), which approximates the $1.575 million in cash that Feathers caused the Funds to transfer to SBCC that year.  A detailed income and expense statement for SBCC for 2011 and the first quarter of 2012 shows that SBCC incurred a deficit, before payment of management fees, of approximately $3.6 million, which corresponds to the approximately $4.25 million in cash that Feathers caused the Funds to transfer to SBCC during roughly the same 15-month period.[1]

---

[1]     In an effort to force the Commission to file this motion under seal, Feathers recently filed a motion for a protective order over the "financial information" of SBCC.  The Commission has opposed this motion to conceal its filings from the public.  However, in view of the pending motion, the Commission has not included SBCC financial documents, such as the P&L that provides evidence to support this fact, or SBCC ledgers and checks that show Feathers moving cash from the Funds to SBCC, and then from SBCC to Feathers.  This Commission reserves the right to file this relevant and admissible evidence after the Court rules on Feathers' motion.

C.     **Feathers Did Not Disclose That Cash From The Funds Was Being Taken To Pay SBCC's Expenses**

Feathers did not disclose that he was using money "borrowed" from the Funds to pay SBCC's expenses, and evidence from investors establishes that they did not know Feathers was borrowing money from the Funds, and would have considered that information to be material.

1.     **The Funds' Offering Documents, And Feathers' Requests For Approval, Did Not Disclose SBCC's Borrowing From IPF**

There is no language in IPF's offering documents, or in Feathers' numerous requests to investors for authority to alter the terms of those documents, that discloses that Feathers was causing IPF to lend millions of dollars to SBCC in an unsecured loan, or that IPF could not even assess the collectability of the loan during the audit of its 2010 financial statements.

a)     **May 2010 Letter To Investors**

On or about May 24, 2010, Feathers sent a letter to IPF investors that proposed a number of changes to IPF's offering circular and operating agreement.  (Morris Dec., Ex. 136 (BM0001).) Among the requested changes was:  "Increase permissible syndication expenses to two percent of fund capital."  Feathers described the proposed amendment as follows:

> With the fund's notable performance history and recent acquisition of a license enabling note guarantees, the fund will have broader appeal to more investors. Rather than instituting investment "load" fees to securities broker-dealers to attract capital, such as other funds do at typically five to ten percent of fund capital, we would prefer to see fund capital grow through more affordable increased regional marketing effort.  Syndication fees (expenses related to increasing the fund's capital base) are capitalized over a period of time, and we expect these to be fully offset by higher gross revenues and more effective coverage of fixed expenses relating to managing the fund.

(*Id*.)  There is nothing in this letter that discloses that Feathers and SBCC had been borrowing, or were planning on borrowing, substantial amounts from IPF in an unsecured loan.

b)     **June 2010 IPF Offering Circular**

On or about June 9, 2010, Feathers and SBCC began using a revised offering circular for IPF.  (Bulgozdy Dec., Ex. 175.)[2]  As had prior IPF offering circulars, the June 2010 Offering

---

[2]     Feathers testified that the date on the face of the offering circular generally reflected the date when they began using it.  (*Id*., Ex. 219 (Dep  at 403:8-16).)

Circular represented that there would be "No Loans to Manager:" "No loans will be made by the Fund to the Manager or to any of its affiliates, except for any financing extended as part of a sale of real estate owned or loans purchased as a result of foreclosure. (See "Conflicts of Interest – Sale of Real Estate Owned to Affiliates.")" (Bulgozdy Dec., Ex. 175 at p. 15 (SBCC010367).) This language expressly states that IPF would not make unsecured loans to SBCC, such as the "due from" or "manager's note."

With regard to expenses of the Fund and compensation to SBCC, the 2010 Offering Circular identified certain expenses that IPF will pay – its own annual audit, LLC tax, tax return preparation, protective advances and the costs to own and maintain real property, if any is acquired in foreclosure.[3] The Offering Circular stated that "*all other expenses will be borne by the Manager, including rent, salaries, business insurance, utilities, marketing, and other similar operational expenses*." (*Id*., Ex. 175 at p. 1 (SBCC010353) (emphasis added).) In a section titled "Compensation to Manager and Its Affiliates in the "Terms of the Offering," Feathers and SBCC disclosed a new "Manager's Administrative Fee," while at the same time representing that the expenses to be paid by the Fund were limited. (*Id*., Ex. 175 at p. 22 (SBCC010374).)

### c)   August 2010 Letter To Investors

On or about August 15, 2010, Feathers sent a letter to IPF investors. (Morris Dec., Ex. 130.) Feathers wrote that he was asking for "concurrence" in a modification of the IPF operating agreement "to initiate beneficial financial and tax planning for the fund." (*Id*.) Request No. 1, titled "Fund change in Tax and Accounting Treatment," stated:

> Change a portion of organizational & syndication accruals which have been, or may be, incurred, up to 1% of the fund's maximum capitalization ($100MM), from a capitalized asset to a receivable from fund manager. This will eliminate a substantial portion of the tax schedule amortization of these expenses and increase fund member earnings. The receivable would be reduced annually over a period of five years from fund manager contributions, and also generate additional interest earnings to the fund at the Preferred yield of 7.5%. A similar measure has already been reviewed by our CPA's and approved and implemented by investors in our other managed fund, SBC Portfolio Fund, LLC.

---

[3]      Feathers admitted that IPF did not own any foreclosed properties. (Bulgozdy Dec., Ex. 219 (Dep. at 458:21-459:17).)

(Morris Dec., Ex. 130.)[4]

This August 2010 letter did not disclose that SBCC had been borrowing cash from IPF in an unsecured loan, or request approval, or ratification, of unsecured loans to SBCC to pay its operating expenses. Nor did investors understand it to do so. (Morris Dec. ¶ 13.) Indeed, it purports to be presenting a tax issue for consideration by the investors.

### d) <u>January 2011 IPF Offering Documents</u>

On or about January 28, 2011, Feathers caused IPF to issue another version of its offering circular and operating agreement. (Bulgozdy Dec., Exs. 177, 180.) Feathers increased the maximum amount of the offering from $100 million to $250 million – although the total assets of IPF as of December 31, 2010 were about $16 million. Feathers used the increase in the maximum amount of the offering as a reason to increase the allowed amount of the "due from" up to $1.5 million. (*See, e.g.*, Gruebele Dec., Ex. 112 ("Also per member approval and as outlined within the updated (and DOC approved) operating agreement, we have an allowance to go up to 1% of $150MM (and therefore up to $1.5MM) of IPF's managr's [sic] distributions into a due-from-manager fund asset.").)

Feathers also revised the disclosure titled "Fund Expenses" in the "Summary of the Offering" to add a sentence: "The Fund will incur salary expenses for the work of personnel related to loan investments on Federally guaranteed loans." (Bulgozdy Dec., Ex. 177 at p. 1 (SBCC006966).) Feathers added a new disclosure in the "Summary" captioned "Tax and Accounting Treatment." Under that heading, IPF stated:

> The Manager can change a portion of organizational and syndication accruals which have been, or may be, incurred in the year 2010 and afterwards, and separate from any similar prior year's accruals, up to 1% of the Fund's maximum capitalization of $250,000,000, from a capitalized asset to a receivable from the Manager. This will eliminate substantial portion of the tax schedule amortization of these expenses and increase earnings. The receivable will be reduced annually over a period of five years from Manager contributions, and also generate additional interest earnings to the Fund at the preferred yield of 7.5%.

---

[4]     On or about January 25, 2011, a substantially different version of this letter was sent to IPF's outside auditors. (Spiegel Dec., ¶ 55, Ex. 25.) The Funds' auditor states that to the best of his knowledge, neither he nor his firm reviewed or approved any such measure for SPF. (*Id.*, ¶ 55.)

(*Id.*, at p. 2 (SBCC006968).)  On its face, this disclosure concerns "tax and accounting treatment" of "organizational and syndication *accruals*."  It does not generally authorize large and unsecured borrowings from IPF by SBCC.[5]

Feathers also revised the disclosure about compensation to the Fund manager captioned "Manager's Administrative Fee" to eliminate the 1% allowance that had been added in 2010:

> The only expense [sic] borne by the Fund are the cost of its annual audit, tax return preparation, LLC tax, protective advances on loans and the cost to own and maintain real estate, if acquired in foreclosure and the salaries of staff involved in work concerning federally guaranteed loan originations.

(*Id.*, Ex. 177, at p. 24 (SBCC006989).)

IPF's 1/2011 Offering Circular contained other disclosures and representations relevant to this action.  The "Fund Objectives" continued to be make or invest "primarily in government guaranteed loans secured by first deeds of trust on commercial real estate located primarily in California."  (*Id.*, at p. 1 (SBCC006966).)  This was reiterated in a section captioned "Mortgage Loan Portfolio."  (*Id.* at p. 2 (SBCC006967).)  The "Use of Proceeds" section disclosed that 98% of the proceeds from the offering would be used for mortgage loans, while 2% would be used for "organizational expenses."[6]  (*Id.* at p. 28 (SBCC006993).)  Finally, in a section captioned "Operations to Date," IPF provided information on its returns and the composition of its loan portfolio, but did not disclose that IPF had loaned $1.85 million to SBCC as of December 31, 2010, in an unsecured receivable.  (*See* Bulgozdy Dec., Ex. 177 at pp. 20-23 (SBCC006985-89).)

There is nothing in this IPF Offering Circular that disclosed that IPF was making unsecured loans to SBCC, that Feathers was causing IPF to violate the "No Loans to Manager" representation, or that the Fund was incurring substantial expenses that were not reflected as either expenses, or accruals, on its financial statements.

---

[5]   This representation does not authorize the $1.85 million "due from" accrued through the end of 2010.  In fact, IPF reported accrued "capitalized costs" of $199,167 for 2010.  (Spiegel Dec., Ex. 27 at p. 2 (SBCC002969).)  Thus, there was at most $199,167 of accruals that could be changed for "tax and accounting treatment" in 2010.

[6]   IPF raised approximately $8.4 million during 2010 in offering proceeds.  (Spiegel Dec., Ex. 27 at p. 5 (SBCC002972).)  Two percent of $8.4 million is $170,000, which is substantially less than the approximately $3 million that Feathers caused IPF to lend SBCC in 2011.

**2.** **The SPF Offering Documents Do Not Disclose That SPF Was Making Unsecured Loans To SBCC**

Like the IPF offering documents, the SPF offering documents also prohibit loans to the manager, except for those secured by real estate.  (*See* Bulgozdy Dec., Ex. 182 at p. 7 (SBCC011654); Ex. 184 at p. 7 (SBCC011754); Ex. 185 at p. 8 (SBCC011721).)  However, the Court need not parse through the language of the SPF offering documents to determine whether they included disclosures about SPF's unsecured loans to SBCC, because Feathers, SBCC, and SPF have all admitted that the loan to SBCC violated the terms of SPF's offering documents.  The 2009 audited financial statements of SPF reported that SPF had advanced $534,736 to SBCC during 2009, which was recorded as an asset on the balance sheet as "Due from Fund Manager."  (Spiegel Dec., ¶ 43, Ex. 16 at p. 2 (SBCC004451).)  In the Notes to the Financial Statements, SPF stated:

> *The receivable from the fund manager is in violation of the Fund's operating agreement and offering circular.*  Subsequent to December 31, 2009, the Fund Manager is in the process of obtaining approval from the Fund members.

(*Id*. at p. 11 (SBCC004460) (emphasis added).)

SPF's 2010 audited financial statements reported that SPF had advanced a total of $707,464 to SBCC.  In the Notes to the Financial Statements, SPF stated that the receivable from SBCC was "*prohibited* by the Fund's operating agreement and offering circular."  (*Id*., Ex. 28 at p. 14 (SBCC004905) (emphasis added).)  In addition, SPF disclosed that it failed to account for the "note receivable from Manager" in accordance with generally accepted accounting principles ("GAAP").  (*Id*.)  In a management representation letter dated March 22, 2011, signed by Feathers, he confirmed the accuracy of these statements.  (*Id*., Ex. 58.)  These are unambiguous admissions that there was nothing in SPF's offering documents that allowed it to make unsecured loans to SBCC, and that the "due from" was "prohibited" by the offering documents.  There cannot be any dispute that the SPF offering documents did not disclose the loans to SBCC.

**D.** **The Funds' Auditor Required Reversal Of Organization Or Syndication Expenses**

In late 2009, Feathers had undertaken a project to have the Funds reimburse SBCC for various operating expenses by reclassifying the expenses as organizational or syndication costs, and proposed

1    that these be recorded as capitalized assets of the Funds.  (Gruebele Dec., ¶¶ 5, 6, Ex. 3.)

2          During the audit of IPF's 2009 financial statements, IPF's auditor, Jeffrey Spiegel,

3    identified the items that had been categorized by Feathers as organization costs or syndication costs,

4    and had several exchanges with Feathers about how IPF was recording cash expenditures and

5    classifying them as organization or syndication costs.  (Spiegel Dec., ¶¶ 16, 22, 23, 24, 25, 26, Exs.

6    3, 4, 5, 6.)  As Spiegel explained to Feathers:  "The problem is that some of the items you are

7    capitalizing do not appear correct."  (*Id.*, Ex. 5 at SAC00000945.)

8          IPF's auditors required SBCC and IPF to reclassify many of the organization and

9    syndication costs because they were not expenses of the Fund, but rather were expenses of the

10   manager.  (Gruebele Dec., ¶ 7; Spiegel Dec. ¶¶ 16, 34, Ex. 49.)  In addition, the auditor required

11   SBCC to repay certain expenses.  (Gruebele Dec., ¶ 7.)  By the end of the audit process,

12   approximately $300,000 of syndication costs were allowed, and Feathers and SBCC had created a

13   "receivable" owed by SBCC to IPF that was recorded as an asset of IPF.  (*Id.*)  The auditor's work

14   paper noted that the balance "represents money that the Fund advanced to the Fund Manager," that

15   "the Fund Manager is not allowed to take out loans/advances against the Fund," and that Feathers

16   had assured the auditor that the amount would be "repaid during the 2010 year."  (Spiegel Dec., ¶¶

17   34, 35, Ex. 49.)

18         The Funds' auditor then turned to completion of the audit of SPF's 2009 financial statements,

19   and found that Feathers had caused SPF to disburse $534,736 that had been categorized as

20   management fees and capitalized assets.  (*Id.*, ¶ 39.)  The auditor questioned these expenditures, and

21   Feathers informed SPF's auditor that he was going to get approval to change the terms of the

22   offering to allow him to capitalize the expenditures.  (*Id.*, ¶¶ 39, 40, 41, Exs. 13, 14.)  However, the

23   Funds' auditor continued to analyze Feathers' capitalization of syndication costs, and determined

24   that syndication costs could not be capitalized as an asset, but should be recorded as a reduction of

25   the Members' Equity.  (*Id.*, ¶ 32.)  The auditor determined that IPF needed to restate its 2009

26   financial statements to reverse the $300,000 that had been capitalized as a syndication expense, and

27   explained this to Feathers.  Feathers stated that he preferred that the restatement reclassify the

28   syndication costs to the "due from manager," as he did also for SPF.  (*Id.*)  SPF's auditors completed

the audit of its 2009 financial statements, required SBCC and SPF to reclassify $534,736 in cash

expenditures, and required SPF to disclose in the Notes to the Financial Statements that the "due

from" was in violation of the offering documents.  (*Id*., ¶ 43, 44, Exs. 16, 53.)

      After the SPF audited financial statements for 2009 were issued, IPF retained Spiegel to

prepare a quarterly compilation for IPF and its subsidiary, Small Business Capital, LLC ("SBC

LLC").  In connection with that work, the auditor learned that at least $170,000 had been added to

the organizational costs of IPF, and communicated concerns about this to Feathers.  (*Id*., ¶ 48, Ex.

18.)  In response, Feathers stated that he had "[taken] it upon myself to send a motion to investors

to change the operating agreement to re-categorize up to $1 MM FY 2010 accrued

syndication/organizational expenses into a receivable from Fund Manager.  This would be paid

back over a period of 5 years, and would also have an interest rate paid to fund members of 7.5%."

(Spiegel Dec., ¶ 49, Ex. 19.)  IPF's outside auditor replied:  "I am not sure getting approval after the

fact is proper.  Generally, that should be done prior to taking money."  (*Id*.)

      At the end of 2010, the amount that IPF had loaned to SBCC under the "due from" had

grown to well over $1 million, and the "due from" SBCC to SPF had also grown.  Spiegel informed

Feathers that he could not issue an unqualified, or "clean," audit opinion because of the large growth

of the "due from."  (*Id*.)  Spiegel presented Feathers with three options:  (1) Feathers and SBCC

could pay the "due from" in full before the audit was completed; (2) Feathers and SBCC could

provide a documented assessment of the collectability of the "due from" so that an appropriate loss

allowance could be established for the note; or (3) the outside auditor would have to issue a qualified

opinion.  (*Id*.)  Feathers refused to provide a documented assessment of collectability, and elected to

have the Funds' outside auditor issued qualified audit opinions on the 2010 financial statements of

IPF and SPF.  (*Id*., ¶ 62.)  Feathers informed Spiegel that he only provided investors with audited

financial statements if a Fund member requested them.  (Spiegel Dec., ¶ 62.)

      Feathers knew that setting up a loss allowance would result in an expense against net

income, which would negatively impact the Funds' performance and yields.[7]  Setting up a loss

---

[7]      (*See* Gruebele Dec., Ex. 100 (Feathers instructs Gruebele to reverse expense for loan loss
and record it as an accrual to a new "due from" to put "net income at or above the amount needed

allowance for the "due from" in 2010 would have had a substantial negative impact on the reported net income, and hence yield, of IPF and SPF.  For example for 2010, IPF would have needed to record an expense of $1,444,377, which would have wiped out the reported net income of $852, 686.  (*See* Spiegel Dec., ¶ 64.)  SPF would have needed to record an expense of $707,464, which would completely wipe out reported net income of $333,453.  (*Id.*, ¶ 65.)  The Funds' auditors issued qualified opinions for both IPF's December 31, 2010 and 2009 Audited Financial Statements, (Spiegel Dec., ¶ 57, Ex. 27), and SPF.  (*Id.*, ¶ 59, Ex. 28.)

The note receivable from SBCC was again an issue between Feathers and the Funds' auditor during the audit of the Funds' 2011 financial statements.  (Spiegel Dec., ¶¶ 75-80, Exs. 38, 39, 40, 41, 42, 43.)  Spiegel required an opinion from counsel for IPF "that the transactions are compliant with the OC and the operating agreement."  (*Id.*, ¶ 75, Ex. 38.)  Feathers initially balked, but eventually agreed to obtain an opinion from counsel for IPF.  On or about April 24, 2012, the Funds' independent outside auditor received a letter addressed to Feathers from the Fund's outside counsel which stated in no uncertain terms that Feathers' failure to disclose SBCC's borrowing from IPF was "highly misleading" and did "not comply with the offering documents."  (Spiegel Dec., ¶ 81, Ex. 44; *see also* Bulgozdy Dec. Exs. 192, 218 (Dep. 415:16-453:6).)

**E.** **Investors Did Not Know That Feathers Was Borrowing Millions From IPF, And Would Have Considered That Information Material**

The evidence shows that investors had no idea that Feathers was causing IPF and SPF to lend millions of dollars to SBCC to pay expenses.  Although information about the loans appeared in the audited financial statements, Feathers did not provide copies of the audited financial statements to investors unless they were specifically requested.  (Bulgozdy Dec., Ex. 219 (Dep. 397:1-7; Spiegel Dec., ¶ 62.)

For example, Bob Morris is an investor in IPF and SPF.  (Morris Dec., ¶¶ 5-9.)  In 2010, Mr. Morris received numerous requests from Feathers to approve changes to the operating agreements for IPF and SPF.  At no time did Mr. Morris understand that he was being asked to

for the 7.5% preferred yield, I believe."); Spiegel Dec., ¶ 63.)

approve SBCC borrowing money from IPF or SPF, and he did not understand that he was being asked to ratify prior borrowing from the two Funds.  (*Id*., ¶ 13.)  Mr. Morris never saw audited financial statements for IPF or SPF, and neither Feathers nor anyone else at SBCC ever disclosed to him that SBCC was borrowing money from IPF and SPF.  (*Id*., ¶ 17.)  Mr. Morris would have considered such information to be material, since if he had known about such loans, he would have inquired why such borrowings were necessary, would have been concerned about the safety of his investment, about management's integrity, and about management's competence, and would have likely withdrawn his investment.  (*Id*., ¶¶ 17-20.)

Barbara Bushee is an investor in IPF who invested on January 5, 2011.  (Bushee Dec., ¶ 5.)  Ms. Bushee received a request in December 2011 from Feathers to change the operating agreement for IPF, and did not understand that she was being asked to ratify any prior borrowing.  (*Id*., ¶ 7.)  Ms. Bushee never saw audited financial statements for IPF, and did not know about the receivable from SBCC to IPF.  However, Ms. Bushee would have considered the information to be material because if she had known about it, she would have likely withdrawn her investment in IPF.  (*Id*., ¶ 8.)

## F.  Feathers Caused The Funds To Sell Assets Between The Funds At A Premium To Generate "Management Fees"

In early 2012, Feathers orchestrated the sale of assets between the various funds he managed (including IPF, SPF, and SCMF) at a premium, and then caused the premium to be paid to SBCC as a management fee.  (*See, e.g.*, Bulgozdy Dec., Ex. 218 (Dep. at 237:2-9); Gruebele Dec., ¶ 21, 22, Exs. 104, 105, 109.)  As Feathers concedes, the "books and ledgers of the funds show loan sales and premiums."  (Bulgozdy Dec., Ex. 218 (Dep. at 236:14-237:9).)  At his deposition, Feathers conceded that there was no real market for the loans that he was selling at a premium between the funds because they were so "unique" that "most lenders were not that interested," although he went on to claim that there was a large market for participations  (Bulgozdy Dec., Ex. 219 (Dep. at 240:6-243:19).)

In early 2012, Feathers discussed with the Funds' outside auditor, Spiegel, that he was selling loans from one fund to another at a "premium."  Spiegel informed Feathers that he would not approve the recording of any such premiums from such transactions and would require the Funds to reverse

any premiums booked in such related party transactions.  (Spiegel Dec. ¶ 90, 74, Ex. 37.)

In the letter from IPF's counsel to Feathers dated April 24, 2012 and copied to Spiegel, IPF's counsel also raised concerns about Feathers selling loans between the Funds and "possibly generating phantom income."  (Spiegel Dec., Ex. 44.)  IPF's counsel advised Feathers to cease the sales of loans to related parties "until full disclosure is made of the related party transactions and a strong evidentiary record is established as to the pricing of such transfers."  (*Id.*)  However, Feathers caused sales at the two largest premiums in mid-May 2012.  (*See* Gruebele Dec., Ex. 109; Table 2, below.)

Table 1 shows the dates of loan sales by SPF to other entities controlled by Feathers, value of the loan, premium, and payment of management fees by SPF to SBCC in the first half of 2012. (*See* Mitchell Dec., ¶ 5.)

| Table :  Loan Sales by SPF at a Premium in First Half of 2012 | | | | |
|---|---|---|---|---|
| Loan Name | Date of Sale/ Payment of Fee | Loan Value Sold | Premium | Management Fee |
| Kato | 2/17/2012 | $284,985.67 | $94,995.22 | $95,000.00 |
| Sherwin | 2/16/2012 | $82,271.12 | $27,423.71 | |
| Giarfa | 2/17/2012 | $106,732.14 | $35,577.38 | $60,000.00 |
| Edge | 3/12/2012 | $1,178,500.00 | $46,669.00 | $46,669.00 |
| Auto Spa | 3/12/2012 | $796,000.00 | $25,989.00 | $25,989.00 |
| Senese | 3/30/2012 | 3,250,000.00 | $123,825.00 | $123,825.00 |
| Aung | 4/11/2012 | $231,375.00 | $81,444.00 | $81,444.00 |
| Sunshine[8] | 5/18/2012 | 1,089,150.00 | $500,000.00 | $315,000.00 |
| Milliken | 5/23/2012 | $3,395,000.00 | $169,750.00 | $175,000.00 |
| **TOTAL** | | | | **$922,927.00** |

## G.    Feathers Caused The Funds To Make Distributions In Excess Of Fund Profits

Feathers instructed his employees that he wanted to maintain monthly payments to investors in IPF at a return of approximately 7.5% per annum, and to SPF investors at a return of approximately 9-10% per annum, each month, without regard to the Funds' net income.  (Greubele Dec., ¶ 11.)  From time to time, Feathers was advised that IPF or SPF had distributed more to investors than the Funds' income at that point in time.  (*Id.*)  In response, Feathers generally assured

---

[8]     SPF purchased the Sunshine loan from a third party on May 16, 2012 for $1,089,150.00, and then sold it on May 18, 2012 to IPF for a $500,000 premium.  (*See* Mitchell Dec., Ex. 222.)

his employees that additional income was going to be generated in the near future from new transactions that would balance the over-distribution.  (*Id.*)

For example, in October 2010, Feathers was informed that IPF had distributed $300,000 more to investors than net income to date.  (*Id.*, ¶ 12, Ex. 76.)  In early 2011, Feathers was informed that IPF and SPF had each paid more to investors in returns than net income year-to-date.  (*Id.*, ¶ 13, Ex. 80.)  In addition, SBCC generated internal reports that showed when the Funds were over-distributing.  (Gruebele Dec., ¶ 10, Ex. 79.)  These "mortgage pool statements" provided a detailed balance sheet (assets and liabilities) and transactions year-to-date.  (*Id.*)  Where the "mortgage pool evaluation" summary showed a negative partner's equity, it meant that expenses and distributions year-to-date to shareholders exceeded the net income of the fund.  (*Id.*)

## III.   ARGUMENT

Summary judgment against Feathers on all counts alleged in the Commission's complaint is warranted by the evidence.  Summary judgment is appropriate when the pleadings, affidavits, and other supporting papers demonstrate that there is no genuine issue of material fact, and the moving party is entitled to prevail as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The opposing party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (internal quotations omitted).  An issue is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Here, Feathers cannot create any issues of fact that would preclude summary judgment.

### A.   Defendants Violated The Antifraud Provisions Of The Federal Securities Laws

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), prohibits fraud in the offer or sale of securities, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, prohibit fraud in connection with the purchase or sale of any security.  To establish a *prima facie* case, the Commission must prove by a preponderance of the evidence four basic elements: (1) a material misrepresentation, omission of material fact, or other fraudulent device; (2) in connection with the purchase, offer, or sale of a security; (3) with the requisite mental

1  state; and (4) by means of interstate commerce. *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir.

2  2007); *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993). Violations of Section

3  17(a)(1), Section 10(b), and Rule 10b-5 require scienter, while violations of Sections 17(a)(2) and

4  17(a)(3) require a showing of negligence. *SEC v. Phan*, 500 F.3d at 907-08; *SEC v. Dain Rauscher,*

5  *Inc.*, 254 F.3d 852, 856 (9th Cir. 2001).

6  There can be no dispute that the interests in the Funds were securities, and that Feathers was

7  using means and instrumentalities of interstate commerce. The only remaining question is whether

8  Feathers made material misrepresentations or omissions with the requisite intent. The facts

9  establish that he did.

10  **1.    Defendants Made Material Misrepresentations Or Omissions**

11  The facts establish that Feathers made material misrepresentations or omissions in

12  connection with the offer or sale of securities of IPF and SPF. Violations of the antifraud

13  provisions require that a defendant's misstatements and omissions concern material facts. *Basic*

14  *Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438,

15  449 (1976). A fact is material if there is a substantial likelihood that a reasonable investor would

16  consider it important in making an investment decision. *See TSC Indus., Inc.*, 426 U.S. at 449; *SEC*

17  *v. Platforms Wireless*, 617 F.3d 1072, 1092 (9th Cir. 2010). Liability arises not only from

18  affirmative representations but also from failures to disclose material information. *SEC v. Dain*

19  *Rauscher*, 254 F.3d at 855-56. The antifraud provisions impose "'a duty to disclose material facts

20  that are necessary to make disclosed statements, whether mandatory or volunteered, not

21  misleading.'" *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting *Hanon v.*

22  *Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992)). *See also SEC v. Murphy*, 626 F.2d 633,

23  653 (9th Cir. 1980).

24  **Misstatements regarding Fund loans to SBCC**. The most significant misrepresentation is

25  Feathers' representation that there would be "No Loans to Manager" other than certain loans

26  secured by real property, while Feathers was causing the Funds to loan millions of dollars to SBCC

27  on an unsecured basis, and when the Funds, Feathers, and SBCC could not, or would not, assess the

28  collectability of the receivable. The representation that there would be "No Loans to Manager" was

consistently made from before 2009 through most of 2011.[9]

There can be no dispute that the representation that there would be "no loans to manager" other than those secured by real estate was false and misleading. Nothing in the offering materials revealed that Feathers was causing the Funds to lend money to SBCC. The offering materials do not disclose the amount that had been borrowed by SBCC at any specific time, or that SBCC was continuing to borrow cash from the Funds. There can be no dispute that Feathers was causing IPF and SPF to make unsecured loans to the manager, SBCC.

The misrepresentation was also material. The loans allowed Feathers to conceal the Funds' true net income, performance, and yield by removing expenses from the Funds' income statement, and converting them into Fund "assets" of dubious value. Two investors have stated that they had no idea Feathers was causing the Funds to lend money to SBCC, and that if they had, they would have considered the information important and likely withdrawn their money. (Morris Dec., ¶¶ 17-20; Bushee Dec., ¶ 8.)

SPF's audited financial statements explicitly stated that the unsecured loans to SBCC violated the Fund's offering terms. SPF's 2009 and 2010 financial statements admit that the receivable from SBCC was "in violation of" and "prohibited by" SPF's offering documents. (Spiegel Dec., Ex. 16 at p. 11 SBCC004460), Ex. 28 at p. 14 (SBCC004905).) Feathers confirmed this in his management representation letter to SPF's auditors in March 2011. (*Id*., Ex. 58 at p. 3.) IPF's 2010 audited financial statements also stated that the "receivable from the Fund manager was prohibited by the Fund's operating agreement and offering circular, which has been amended and approved by the Department of Corporations in November 2010." (*Id*., Ex. 27 at p. 14 (SBCC002981.) Feathers confirmed this in the management representation letter he signed, dated March 22, 2011. (*Id*., Ex. 29.) However, the audited financial statements were not sent to

---

[9]      The representation was made in IPF's 2008 Offering Circular (Bulgozdy Dec., Ex. 172 at p. 8 (SAC00006712)); IPF's 2009 Offering Circular (id., Ex. 173 at p. 15 (SBCC007057)); IPF's 2010 Offering Circular (*id*., Ex. 175 at p. 15 (SBCC010367)); and IPF's 1/2011 Offering Circular (*id*., Ex. 177 at p.18 (SBCC006983)). This representation was also made in SPF's 2007 PPM (*id*., Ex. 182 at p. 7 (SBCC011654)); SPF's 2009 PPM (*id*., Ex. 184 at p. 7 (SBCC011754)); SPF's January 2011 PPM (*id*., Ex. 185 at p. 8 (SBCC011721)); and SPF's August 2011 PPM (*id*., Ex. 188 at p. 8 (SBCC011566)).

1    investors, and Feathers only made available information investors were entitled to when they asked

2    him for it.  (Bulgozdy Dec., Ex. 219 (Dep. 397:1-7); Spiegel Dec., ¶ 62; Morris Dec. ¶ 17; Bushee

3    Dec., ¶ 8.)

4         **Misstatements regarding conservative lending standards.**  The unsecured receivable

5    owed by SBCC to the Funds was also contrary to representations made by the Funds about their

6    conservative lending standards.  The disclosures stated that all loans were secured by deeds of trust

7    and the Funds used conservative 65% or 75%  loan-to-value guidelines.  IPF represented that it

8    would invest in "loans secured by first deed of trust encumbering commercial and income-

9    producing residential real estate" *(e.g.*, Bulgozdy Dec., Ex. 173 (IPF 2009 Offering Circular) cover

10   page (SBCC007038)), and SPF represented it would invest in loans "secured by first and second

11   deeds of trust."  (*Id*., Ex. 184 (SPF 2009 PPM) at p. 1 (SBCC011748).)  SPF represented that it

12   would invest in loans where the "loan-to-value" ratio would not exceed 75% of the value of the

13   security property, (*id*., Ex. 184 at p. 6 (SBCC011753), and IPF represented it used a more

14   conservative 65% loan-to-value ratio.  (*Id*., Ex. 175 (IPF 2010 Offering Circular) at p. 14

15   (SBCC010366).)  These representations are all materially false and misleading because the "due

16   from" or "manager's notes" were not secured by any real property, and there was no loan-to-value

17   ratio for these unsecured loans.

18        Feathers caused the Funds to make material misrepresentations about their "Operations to

19   Date" in the offering documents, and to omit material information about the unsecured receivable that

20   SBCC owed IPF and SPF.  For example, in the 1/2011 IPF Offering Circular section, IPF represented

21   "100%" of its loans were secured by "First Trust Deeds," as required by the terms of the offering.

22   (Bulgozdy Dec., Ex. 177 at p. 22 (SBCC006987.)  This was materially false because as of December

23   31, 2010, IPF had loaned at least $1.85 million to SBCC in an unsecured loan, which represented

24   over 11% of IPF's total assets.  Similarly, in SPF's January 2011 PPM, in a chart titled "Portfolio

25   Characteristics as of December 31, 2010," for the category "Percentage of loans by dollar amount that

26   are outstanding to the Manager or Affiliates," Feathers and SPF stated:  "0%."  (Bulgozdy Dec., Ex.

27   185 at p. 9 (SBCC011722).)  This was materially false and misleading because as of December 31,

28   2010, SBCC owed SPF $707,464, which represented over 18% of SPF's total assets.

**Misrepresentations about Member Returns.** Feathers caused the Funds to pay Member Returns in excess of net profits of the Funds. The IPF offering documents represented that investors would be paid a "Member Preferred Return" allocated from "Fund profits." (*See, e.g.*, Ex. 173 at p. 1 (SBCC007043).) According to the IPF offering documents: "Monthly profits will be allocated among the Members as of the last day of each month in accordance with their respective capital account balances as of such date. Each month, profits will be allocated entirely to Members…" (*Id.* at p. 31 (SBCC007073).) Similarly, the SPF offering documents represented that investors would be "allocated a proportionate share of Fund income during any month." (*See, e.g.*, Ex. 184 at pp. 5, 24 (SBCC011752, SBCC011771).) IPF and SPF represented that returns would be paid from profits, and indeed, investors believed the Funds were profitable. (*See* Morris Dec., Bushee Dec.)

There can be no question that Feathers knew the Funds were paying returns to investors that had no relation to net profits, based on Feathers' claim that the entire amount of the "due from" – over $6 million, represents actual and legitimate expenses of IPF and SPF. If Feathers is correct, then over the period from 2009 through 2011, IPF reported a combined net income of $2,597,784, while over the same period of time Feathers admittedly caused at least $4,863,479 of expenses of IPF to be recorded as an "asset" in the Note Receivable from Fund Manager. (*See* Spiegel Dec., Exs. 27, 46 at p. 15.) Similarly, SPF reported a combined net income of $852,827, while over the same period Feathers caused at least $690,868 of expenses of SPF to be recorded as an "asset." (*Id*., Exs. 28, 47.) Greubele stated that Feathers used the "due from" to manage the yield of the Funds. (Gruebele Dec., ¶ 9.) In fact, Feathers instructed his staff on how to use the "due-from-manager fund asset" to manage earnings: "As necessary we may have to use up much or all of this amount as necessary [sic] to ensure hitting our yield target to investors of 7.5% (compounded). I want to have everything buttoned up for Spiegel ahead of time." (*Id*., Ex. 112.)

These misrepresentations and omissions were material because they described a conservative investment with returns paid from profits, secured by real estate, with a responsible manager, which was contrary to the actual performance of the Funds. There is a material difference between a manager being paid out of profits, and a manager being paid out of investor money.

Misrepresentations regarding the use of investors' funds are material. *See SEC v. Cochran*, 214 F.3d 1261, 1268 (10th Cir. 2000). A reasonable investor "would consider it important to know [his] funds were being misappropriated and used for purposes other than those stated when solicited." *SEC v. Merrill Scott & Assocs., Ltd.*, Case No. 02-cv-39-TC, 2011 WL 5834271, at *11 (D. Utah Nov. 21, 2011) (citing *SEC v. TLC Invs. and Trade Co.*, 179 F. Supp. 2d 1149, 1153 (C.D. Cal. 2001)).

## 2.   <u>Feathers Acted With Scienter</u>

Section 17(a)(1) of the Securities Act, and Section 10(b) of the Exchange Act require a showing of scienter. *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980). Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Ninth Circuit, scienter may be established by a showing of recklessness. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990); *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003). Recklessness may be inferred from circumstantial evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91, n.30 (1983); *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987).

There is abundant evidence that Feathers acted with a high level of scienter, and was reckless in his management of the Funds. As shown by the 2009 and 2010 SPF financial statements, and the 2010 IPF financial statements – which Feathers reviewed and approved – he knew that the offering documents "prohibited" the loans to SBCC from the Funds, and that the loans were made "in violation of" the terms of the offering documents. Rather than refraining from the prohibited conduct, Feathers continued causing the Funds to advance even more cash to SBCC.

Feathers' ongoing effort to obtain "approval" from the investors also shows his intent to deceive. The 2010 letters to investors in IPF and SPF do not disclose that Feathers had caused the Funds to make prohibited loans. Instead, Feathers put forth a change in "tax and accounting treatment" that bears no relationship to the prohibited loans and provided no disclosure that Feathers had caused SBCC, IPF, and SPF to violate the terms of the offering documents. While the term "note receivable" appears in the letters, by describing the issue as pertaining to "accruals" and characterizing it as relating to "tax and accounting," Feathers was engaging in deliberate obfuscation.

Feathers' decision to cause the Funds not to present the "note receivable" in accordance

with GAAP in the Funds' 2010 financial statements is further evidence of his deliberate intent to deceive. To present the "note receivable" in accordance with GAAP, Feathers merely had to assess and document SBCC's ability to repay the large amounts owed to the Funds. Failing that, GAAP required that the Funds set up an allowance equal to the full value of the receivable, which would create an expense against income. For both Funds, this would have eliminated reported net income and resulted in a reported loss for the year. Such an adjustment would have been readily apparent to investors on their Forms K-1, which would show that the Funds had made payments in excess of net income and returned capital. Rather than provide accurate Forms K-1 to investors, Feathers deliberately chose to accept a qualified audit opinion – despite his role as a fiduciary – since he did not intend to show the financial statements to investors.

More evidence of Feathers' scienter is found in the large, round-number cash transfers he caused the Funds to make to SBCC that are not tied to any specific expenses of the Funds. Indeed, the large, round-number cash transfers are not identified to any specific expenses of the Funds, and do not tie to expenses recorded on the books and records of the Funds, or expenses reported in the financial statements of the Funds. In fact, the cash transfers are tied to the liquidity needs of SBCC.[10]

Still more evidence corroborates that Feathers used the "due from" as a device to disguise the true financial performance of the Funds, in a continuing effort to mislead investors. Indeed, Feathers explained how he intended to use the "due from" to manipulate the Funds' earning in a December 2010 email to his staff, which explains how he intends to use the "due-from-manager fund asset" to absorb expenses "to ensure hitting our yield." (Spiegel Dec., Ex. 112.) It was no secret to those who worked for SBCC that Feathers used the "due from" to pay the operating expenses of SBCC, and to manage the yield of the Funds. (*See, e.g.*, Gruebele Dec., ¶ 9.)

Finally, there is substantial evidence that Feathers disregarded advice from the Funds' auditor and attorney, which provides additional evidence that he had a high level of scienter. For example, the Funds' auditor advised Feathers that the auditor would not allow the Funds to recognize any income from sales of loans between the Funds. The Funds' attorney advised

---

[10]    The Commission reserves the right to introduce as evidence general ledgers of SBCC with substantiate this fact, after Feathers' application for protective order is resolved.

Feathers in writing to "cease" selling loans between the Funds.  Nonetheless, Feathers proceeded to sell at least nine loans at a premium in the first half of 2012, and caused almost a million dollars in cash equal to the so-called premiums to be transferred from SPF to SBCC as "management fees."  Rather than relying on advice from professionals, Feathers disregarded such advice when it did not allow him to do what he wanted.

### B.     Defendants Violated The Broker-Dealer Registration Provisions

Section 15(a)(1) of the Exchange Act requires brokers or dealers who "effect any transaction in, or induce or attempt to induce the purchase or sale of, any security" through interstate commerce to be registered with the Commission or, if the broker or dealer is a natural person, to be associated with a registered broker or dealer that is not a natural person.  Section 3(a)(4) of the Exchange Act defines the term "broker" to include "any person engaged in the business of effecting transactions in securities for the account of others."  *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 13 (D.D.C. 1998); *accord SEC v. Interlink Data Network*, 1993 WL 603274, at *10 (C. D. Cal. Nov. 15, 1993).  Activities that may indicate a person is a broker includes, among other things, whether that person is an employee of the issuer, received commissions, is selling securities of other issuers, and is an active finder of investors.  *See SEC v. Hansen*, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984) (citations omitted).

Here, Feathers and SBCC are the sole managers of the issuers, IPF and SPF.  Feathers and SBCC employed investor representatives who were paid a salary and a commission for sales of securities of IPF and SPF.  (*See, e.g.*, Bulgozdy Dec., Ex. 175 at p. ii (SBCC010349).)  Feathers and SBCC actively solicited new investments in IPF and SPF.  (Morris Dec., ¶¶ 2-5, Ex. 131; Bulgozdy Dec., Exs. 215, 216.)  Moreover, Feathers and SBCC have been selling IPF and SPF securities regularly for years, with sales of at least $46 million of securities of these Funds.  (*See* Receiver's Preliminary Forensic Accounting Report (Dkt. No. 171) at pp. 2, 5.)

### C.     Feathers Is Liable As A Control Person Of SBCC, IPF, And SPF

While the evidence establishes that Feathers is primarily liable for violations of the securities laws, he is also liable as a control person under Exchange Act Section 20(a), 15 U.S.C. § 78t(a).  Under that provision, a defendant may be held liable for securities violations if: (1) there is

a violation of the Exchange Act; and (2) the defendant directly or indirectly controls any person liable for the violation. *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011). "Control" is "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract or otherwise." *Id.* at n.4, quoting 17 C.F.R. § 230.405. The definition of the "person" who may be deemed "controlled" under Section 20(a) includes a company. *SEC v. Todd*, 642 F.3d at 1223. Here, Feathers admits that he controlled SBCC, IPF, and SPF. There is no factual issue of his liability under Section 20(a) as a control person.

### D.    The Court Should Grant All The Relief Request By The Commission

#### 1.    A Permanent Injunction Is Needed

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), provide that upon proper showing, a permanent injunction shall be granted in enforcement actions brought by the Commission. That burden is met when the evidence establishes a reasonable likelihood of a future violation of the securities laws. *SEC v. Murphy*, 626 F.2d at 633; *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978); *SEC v. Fehn*, 97 F.3d at 1295-96. Factors to be considered include the degree of scienter involved; the isolated or recurrent nature of the infractions; the defendant's recognition of the wrongful nature of his conduct; the likelihood that, based on the defendant's occupation, future violations might occur; and the sincerity of the defendant's assurances against future violations. *Id.* Here, a permanent injunction is necessary and appropriate because Feathers acted with a high level of scienter, his conduct extended over a period of years, he has not recognized the wrongful nature of his conduct, and he has not provided any assurances against future violations.

#### 2.    The Court Should Order Disgorgement And Prejudgment Interest

It is well recognized in the Ninth Circuit that a district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable. *SEC v. Platforms Wireless*, 617 F.3d at 1096; *SEC v. J.T. Wallenbrock*, 440 F.3d 1109, 1113 (9th Cir. 2006); *SEC v. First Pacific Bancorp*,

142 F.3d 1186, 1191 (9th Cir. 1998); *SEC v. Kiselak Capital Group, LLC*, 2011 U.S. Dist. LEXIS 107624 (N.D. Tex. Sept. 20, 2011) (noting "the final judgment that [defendant] owes is intended to disgorge the losses of investors wronged by [defendant]").[11]  Disgorgement normally includes prejudgment interest to insure that wrongdoers do not profit from their illegal conduct.  *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972).

In this case, the Receiver has provided a reasonable approximation of the investor losses causally connected to the defendants' violations, which is $12 million.  (Receiver's Preliminary Forensic Accounting (Dkt. No. 171) at p. 14.)  Prejudgment interest from the date of the Receivership to June 28, 2013 is $333,303.94.  Accordingly, the Commission requests that the Court order defendant Feathers to disgorge $12,333,303.94.

### 3.    The Court Should Impose A Third Tier Civil Penalty Of $300,000

Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3)(A) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(A), provide that the Commission may seek, and the Court may impose, civil monetary penalties for securities violations. Three "tiers" of penalties may be imposed in an amount "determined by the court in light of the facts and circumstances."  *See, e.g.*, Section 21(d)(3)(B) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(B).  Congress enacted civil penalty provisions to achieve the dual goals of punishment of the individual violator and deterrence of future violations.  *SEC v. Marker*, 427 F. Supp. 2d 583, 592 (M.D. Fla. 2006), *citing SEC v. Coates*, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001); *SEC v. Palmisano*, 135 F.2d 860, 866 (2d Cir. 1998).  The factors used to determine the appropriateness of an injunction are helpful when assessing penalties. *SEC v. Abacus International Holding Corp.*, 2001 WL 940913, *5 (N.D. Cal. August 16, 2001).

For the same reason that a permanent injunction is needed, imposition of a substantial civil penalty is appropriate.  The Commission recommends that the maximum third-tier statutory penalty of $150,000 be assessed against Feathers in connection with his violations of the federal securities

---

[11]    In calculating disgorgement, the Commission need only show a reasonable approximation of profits or investor losses causally connected to the violation, and the amount of disgorgement should include all gains flowing from the illegal activities.  *J.T. Wallenbrock*, 440 F.3d at 1113-14 (quotations omitted).  The defendant bears the burden of proving a more reasonable figure if he contends it is unreasonable.  *SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1189 (D. Nev. 2009); *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989).

laws in the offer and sale of IPF, and the maximum third-tier statutory penalty of $150,000 be

assessed against Feathers in connection with his violations of the federal securities laws in the offer

and sale of SPF, for a total penalty of $300,000.

**IV.   <u>CONCLUSION</u>**

The Commission's motion for summary judgment against defendant Mark Feathers should

be granted.


DATED:  May 23, 2013                          Respectfully submitted,



                                             */s/ John B. Bulgozdy*_____
                                             John B. Bulgozdy
                                             Lynn M. Dean
                                             Susan F. Hannan
                                             Attorneys for Plaintiff
                                             SECURITIES AND EXCHANGE COMMISSION

**PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

[X]   U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th
        Floor, Los Angeles, California 90036-3648
        Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

   On May 23, 2013 I caused to be served the document entitled **PLAINTIFF SECURITIES
AND EXCHANGE COMMISSION'S POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT MARK
FEATHERS** on all the parties to this action addressed as stated on the attached service list:

[ ]   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and
        mailing today following ordinary business practices.  I am readily familiar with this
        agency's practice for collection and processing of correspondence for mailing; such
        correspondence would be deposited with the U.S. Postal Service on the same day in the
        ordinary course of business.

[X]   **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of
        the addressee as stated on the attached service list.

[ ]   **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United
        Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a
        facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles,
        California.

[ ]   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the
        electronic mail address as stated on the attached service list.

[X]   **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF
        system, which effects electronic service on counsel who are registered with the CM/ECF
        system.

[ ]   **FAX:**  By transmitting the document by facsimile transmission. The transmission was
        reported as complete and without error.

   I declare under penalty of perjury that the foregoing is true and correct.


Date: May 23, 2013                              */s/ Sarah A. Mitchell*
                                                Sarah A. Mitchell

**<u>SEC v. SMALL BUSINESS CAPITAL CORP,et al.</u>**
**United States District Court – Northern District of California**
**San Jose Division**
**Case No. 5:12-CV-03237-EJD**
**LA-4141**


<u>SERVICE LIST</u>


Mark Feathers (*via Messenger*)
1520 Grant Rd.
Los Altos, CA 94024
Email: *markfeathers@sbcglobal.net*
***Pro Se Defendant Mark Feathers***

David Zaro, Esq. (*via ECF*)
Allen Matkins Leck Gamble Mallory & Natsis LLP
515 S. Figueroa Street, 9th Floor
Los Angeles, CA 90071
Email:  *dzaro@allenmatkins.com*
***Attorney for Receiver Thomas Seaman over Defendants Small Business Capital***
***Corp.; Investors Prime Fund, LLC; And SBC Portfolio Fund, LLC***