1    JOHN B. BULGOZDY (Cal. Bar No. 219897)
     Email:  bulgozdyj@sec.gov
2    LYNN M. DEAN (Ca. Bar. No. 205562)
     Email: deanl@sec.gov
3    SUSAN F. HANNAN (Cal. Bar No. 97604)
     Email:  hannans@sec.gov
4
     Attorneys for Plaintiff
5    Securities and Exchange Commission
     Michele Wein Layne, Regional Director
6    John W. Berry, Regional Trial Counsel
     5670 Wilshire Boulevard, 11th Floor
7    Los Angeles, California 90036
     Telephone:  (323) 965-3998
8    Facsimile: (323) 965-3908

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                        SAN JOSE DIVISION

12

13   SECURITIES AND EXCHANGE              Case No. 5:12-CV-03237-EJD
     COMMISSION,
14                                        **DECLARATION OF JEFFREY SPIEGEL**
15                Plaintiff,

16         vs.

17   SMALL BUSINESS CAPITAL CORP.;
     MARK FEATHERS; INVESTORS PRIME
18   FUND, LLC; and SBC PORTFOLIO FUND,
     LLC,
19
                  Defendants.
20

21

22

23

24

25

26

27

28

**DECLARATION OF JEFFREY SPIEGEL**

I, Jeffrey Spiegel, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a resident of the State of California. I have personal knowledge of each matter set forth below, and if called as a witness, I could and would competently testify to the facts stated herein.

2.      I am a Certified Public Accountant licensed by the State of California. I am the Principal of Spiegel Accountancy Corp. ("SAC"), Certified Public Accountants. SAC was licensed with the State of California Board of Accountancy in May 2009. SAC provides auditing, accounting, taxes, and consulting services. SAC has its offices in Walnut Creek, California.

3.      Prior to the formation of SAC, I was a Principal of Schoenholz & Spiegel, LLP, Certified Public Accountants. Schoenholz & Spiegel ceased operations in 2009, when I formed SAC.

4.      I have been licensed as a Certified Public Accountant in the State of California since 1982.

5.      Investors Prime Fund, LLC ("IPF") had been a client of Schoenholz & Spiegel, and continued as a client of SAC. Mark Feathers was the manager of IPF through his company, Small Business Capital Corp. ("SBCC"). Schoenholz & Spiegel audited the financial statements of IPF for the year ended December 31, 2008. SAC was engaged to audit the financial statements of IPF for the years ended December 31, 2009; December 31, 2010; and December 31, 2011.

6.      SBC Portfolio Fund, LLC ("SPF") had also been a client of Schoenholz & Spiegel and continued as a client of SAC. Mark Feathers was the manager of SPF through his company, SBCC. Schoenholz & Spiegel audited the financial statements of SPF for the year ended December 31, 2008. SAC was engaged to audit the financial statements of SPF for the years ended December 31, 2009; December 31, 2010; and December 31, 2011.

1       7.      SBC Senior Commercial Mortgage Fund, LLC ("SCMF") was organized in

2   September 2011. Mark Feathers was the manager of SCMF through his company, SBCC. SAC

3   was engaged to perform an audit of SCMF for the year ended December 31, 2011.

4       8.      Small Business Capital, LLC ("SBC LLC") was organized in April 2010. During

5   2010, SBC LLC received a Small Business Administration ("SBA") license. Under the SBA

6   license, SBC LLC was required to provide the SBA with quarterly compiled financial statements

7   and annual audited financial statements. SAC was engaged to prepare quarterly compilations

8   and to perform annual audits of SBC LLC beginning in or around July 2010.

9       9.      SAC was not engaged to audit, tax, or accounting services for SBCC, the manager

10   of IPF, SPF, and SCMF (collectively, the "Funds"). SAC did not have visibility into the

11   financial performance of SBCC. SAC did not have access to ledgers, QuickBooks accounts,

12   bank accounts, or other financial information of SBCC.

13       10.     The Funds used two types of software for record keeping purposes, QuickBooks

14   and ABS Mortgage Office software. QuickBooks is general accounting software that is used to

15   maintain a general ledger and prepare various financial statements, such as balance sheets and

16   profit and loss statements, based on the general ledger. ABS Mortgage Office is software

17   designed for loan servicing and investor account balance tracking. The Funds used the mortgage

18   servicing software available from ABS to keep track of loans made by the Funds and investors'

19   ownership of the Funds. SBCC personnel entered loan data (date of loan, interest rate, etc.) for

20   each of the loans in the various Funds into the ABS software, as well as investor data. The ABS

21   software then kept track of monthly accrued interest and loan balances. The QuickBooks entries

22   must be reconciled with the ABS balances in order for the software to provide accurate

23   information. It was my understanding that SBCC could use the ABS software to allocate the net

24   income or loss for each month to the investors in each of the Funds.

25       11.     Through my work for the Funds, I was aware that SBCC and Mr. Feathers had

26   issues with maintaining accurate books and records for the Funds. During the audit of the

27   Funds' 2008 financial statements, the auditor noted that the Funds had reconciliation issues with

28   receivables, contributions, and distributions. In 2009, I learned that Feathers and SBCC were

having issues with the California Department of Real Estate ("DRE") in connection with an audit of SBCC's loan servicing trust account. Around the same time, I learned that SBCC had failed to file appropriate threshold reports with the DRE.

12.     At the end of 2009, Mark Feathers and SBCC terminated two individuals, Claire Delgado and Christine Corso, who had been performing bookkeeping and record keeping for SBCC and the Funds. SBCC and Mark Feathers retained David Gruebele as a consultant to assist with the DRE audit. I had a professional relationship with Mr. Gruebele, and knew that he operated a mortgage investment fund which my firm had audited. I knew that Mr. Gruebele was familiar with QuickBooks and ABS Mortgage Office software. In early 2010, in connection with the audit of the 2009 financial statements of IPF and SPF, Mr. Gruebele interfaced with SAC personnel on behalf of IPF, SPF, and SBCC. In early 2010, Mark Feathers and SBCC also retained an individual named Carmen Pelenska to assist with bookkeeping. Ms. Pelenska also interfaced with SAC personnel on behalf of IPF, SPF, and SBCC.

13.     On or about September 21, 2009, SAC was engaged to perform an audit of the 2009 financial statements of IPF. When SAC is engaged to perform an audit, it typically issues an audit engagement letter. The purpose of the engagement letter is to identify the objectives of the engagement, define the responsibilities of management and of the auditor, and define the limitations of the engagement. Exhibit 1 attached hereto is a true and correct copy of the audit engagement letter, dated September 21, 2009, from SAC to Mark Feathers, IPF, accepted by Mark Feathers, CEO, SBCC, Fund Manager, on September 24, 2009 (SAC00001784-86). This is a document produced from the files of SAC. At around the same time, SAC was also engaged to audit the 2009 financial statements of SPF.

14.     During the course of the audit, SAC personnel were provided with, among other documents, a document titled: "Investors Prime Fund, LLC, Profit & Loss, January through September 2009" (SAC00002661), a true and correct copy of which is attached hereto as Exhibit 2. This document was provided to SAC by SBCC and IPF, and was produced from the files of SAC.

15.     SAC's audit of IPF's 2009 financial statements revealed that there continued to be issues with the accuracy of IPF's books and records. During the audit, SAC found that balances generated by the ABS software did not reconcile with balances generated by the QuickBooks software. I understood that Mr. Gruebele and Ms. Pelenska undertook substantial accounting to reconcile, adjust, and reclassify the books and records of IPF and SPF in early 2010.

16.     During the audit of IPF, SAC found that there had been substantial cash expenditures in 2009 from the accounts of IPF that were either disbursed directly to SBCC or were disbursed to third parties, and which were classified as either organization costs or syndication costs by IPF when we began our audit. These totaled approximately $556,000. During the course of the audit, SAC required IPF to reclassify approximately $127,768 as expenses, including amounts for accounting and bookkeeping service, advertising, legal fees, consulting and contractors, and insurance. SAC required approximately $89,155 to be reclassified as SBA license costs. Approximately $300,000 remained in syndication costs. Finally, approximately $55,622 was reclassified as the "Due from Fund Manager."

17.     The Funds' offering documents expressly limited the expenses that would be paid by the Fund. For example, in the Summary of Offering in the January 28, 2011 IPF Offering Circular, IPF and SBCC made the following disclosure about Fund Expenses:

> The Fund will pay for its own annual audit, LLC tax, tax return preparation, protective advances and the costs to own and maintain real property, if any is acquired in foreclosure. The Fund will incur salary expenses for the work of personnel related to loan investments on Federally guaranteed loans. All other expenses will be borne by the Manager, including rent, salaries, business insurance, utilities, marketing, and other similar operational expenses.

*See* Exhibit 26 at SAC00000619. To the best of my recollection, the June 2009 IPF Offering Circular did not include a disclosure on Fund Expenses in the Summary of Offering. It contained a disclosure under the heading Compensation to Manager and its Affiliates, which included the Manager's Subordinate Profits Interest, Origination and Loan Documentation Fees,

1  and Reimbursement of Expenses to Manager.  The section entitled Reimbursement of Expenses
2  to Manager provided:  "The Manager shall be entitled to reimbursement from the Fund for all
3  out-of-pocket organization and syndication expenses and all operating and administrative
4  expenses of the Fund."  To the extent that the Fund made reimbursements to the manager for
5  operating and administrative expenses of the Fund, these would be recorded as expenses of the
6  Fund that would decrease net income.

7      18.    The Funds' offering documents disclosed that the Funds' manager was not
8  entitled to an annual fee based on assets under management, but rather was entitled to
9  compensation based on a "waterfall" arrangement under which investors would be paid from net
10  profits up to a preferred rate of return, and after the investors were paid their return, the manager
11  was entitled to retain all additional profits from the Funds' operation.  For example, the
12  Summary of Offering Section in the January 28, 2011 IPF Offering Circular disclosed under the
13  heading "Compensation to Manager and Its Affiliates," that:

14      The Manager shall be entitled to retain Fund profits to the extent such profits exceed the
15      Member Preferred Return payable to Members.  The Manager and its affiliates will also
16      receive fees and other compensation from the Fund and the borrowers on Fund Loans.
17      (See "Compensation to Manager and Its Affiliates.")

18  *See* Exhibit 26 at SAC00000620.  To the best of my recollection, similar or identical language
19  appeared in the June 2009 IPF Offering Circular.

20      19.    The particular classification assigned to a cash expenditure determines how it
21  impacts the financial statements.  For example, a cash expenditure to pay an expense such as
22  salaries, management fees, marketing, rent, or other operational items is generally recorded as a
23  current expense, which is then netted against current income or revenue in the calculation of a
24  net profit.  Such an expenditure of cash to pay expenses would appear on a profit and loss
25  statement, as an expense that decreases net income.

26      20.    An expenditure of cash to purchase an asset, or to pay for an item which is
27  capitalized such as syndication costs or organization costs, does not impact the profit and loss
28  statement and does not impact net income.  Such an expenditure only impacts the balance sheet.

1    21.    I recall that at some point in 2008, I had conversations with Mr. Feathers on the

2    topic of syndication costs. Generally, we discussed whether syndication costs could be

3    capitalized. I recall that Mr. Feathers was going to discuss the topic with his attorneys, Stein &

4    Lubin.

5    22.    In early 2010, during the course of the audit of IPF's 2009 financial statement, I

6    had several exchanges with Mark Feathers about how IPF was recording certain cash

7    expenditures and classifying them as organization or syndication costs. In the course of

8    explaining SAC's objections to items that had been recorded as organization costs, I believe that

9    SAC explained to Mr. Feathers that organization costs are generally limited to certain costs of

10    incorporation incurred during the first year of an entity's operation. I recall generally that I had

11    discussions about syndication costs with Mr. Feathers. I recall that Mr. Feathers' position was

12    that syndication costs included ongoing marketing costs.

13    23.    In early 2010, during the course of the audit of IPF's 2009 financial statements, a

14    number of emails were exchange between Mr. Feathers and SBCC personnel, and me and SAC

15    personnel, on the issue of syndication costs. For example. On March 18, 2010 10:42 pm, David

16    Gruebele sent an email to me and others with the subject: "IPF Board Minutes." Mr. Gruebele

17    wrote: "I have attached the board meeting minutes that can address the strategy issues and the

18    syndication expense path. I am still assembling the balance of the working papers for you to

19    validate the syndication expenses taken at the end of the year." Mr. Gruebele attached two sets

20    of minutes of the Board of IPF. A true and correct copy of the email and attachments is attached

21    hereto as Exhibit 3 (SAC00000950-953).

22    24.    On or about March 22, 2010 8:25 pm, Mark Feathers sent an email to me with the

23    subject: "IPF audit completion." In that email, Mr. Feathers wrote: "We were within our o.c.

24    allowances for syndication expenses and I'd like to move beyond this." Mr. Feathers expressed

25    an interest in the audit being completed so that K-1 tax forms could be issued to IPF investors.

26    Finally, Mr. Feathers directed that we would "deal with SBC PF audit work separately, thanks."

27    I responded to Feathers' email on March 23, 2010 5:53 am, and stated: "I am not sure I

28    understand o.c. allowances? I thought there was some issue related to the capitalization, we need

1  to resolve and not just accept it?" I explained that capitalization of an expenditure affected the
2  tax return and suggested that we talk the next day. A true and correct copy of this email
3  exchange is attached hereto as Exhibit 4 (SAC00000948-949).

4      25.    On or about March 23, 2010 6:22 pm, Mark Feathers sent an email to me with the
5  subject: "audit/tax status." Feathers wrote: "Jeff I'm hearing overtures yet through Dave
6  Gruebele about Dan [Rollins, an SAC employee] going to Stein & Lubin about financial
7  statement review for IPF. We do not have S&L as our legal counsel, can you please make sure
8  that any work goes to Dennis Doss? Also I have provided considerable background support for
9  the syndication line item issue, we should be on solid footing on this issue, and it is outlined very
10  specifically within our offering circula [sic]." Mr. Feathers proposed to meet at my offices at 2
11  pm the next day to discuss these issues. I responded in an email sent March 24, 2010 1:54 am, in
12  which I stated:

13      Mark, I do not think the issue is that you can do some capitalization of costs. The
14      problem is that some of the items you are capitalizing do not appear correct. Since our
15      butts are on the line by signing the financials, we are not going to just sign off on
16      something that does not appear correct and an investor might take issue to. I do not
17      understand capitalization of management fees and would need to look at the other items
18      to list what looks strange. If I step back and, as an investor in another fund, look at it and
19      say, would I have an issue with this, the answer would be yes. So, we have to get clarity
20      on what really constitutes syndication costs that are capital versus those that are truly
21      operating. As for filing amended returns, they do not have the K-1 so I am not sure how
22      they filed? So, 2 is good, let's talk tomorrow and go over the details.

23  A true and correct copy of this email exchange is attached hereto as Exhibit 5 (SAC00000945-
24  947).

25      26.    A short time later on March 24, 2010 at 2:12 am, I sent another response to Mr.
26  Feathers' email. A true and correct copy of this email is attached hereto as Exhibit 6
27  (SAC00000942-43).

28

1    27.    My staff received emails from Mr. Feathers in which he expressed his view on

2    other items that arose during the audit. For example, on March 1, 2010 8:02 pm, Mr. Feathers

3    sent an email to Dan Rollins, one of my personnel working on the IPF audit, about the subject

4    "IPF Loan Loss Reserve." Mr. Feathers explained that he created a loan loss reserve in the

5    amount of $150,000 based on 2% of new capital that was invested into IPF during 2009. A true

6    and correct copy of this email is attached hereto as Exhibit 7 (SAC00001672). This document

7    was produced from the files of SAC.

8    28.    On or about April 13, 2010 5:22 pm, David Gruebele sent an email to me and

9    others with the subject "IPF Representation Letter to Spiegel 04-13-10," with an attached pdf

10   file. The attached document is a letter dated March 31, 2010, from Mark Feathers, President,

11   IPF, to Spiegel Accountancy. This is the management representation letter that was provided to

12   SAC so that it could issue the 2009 IPF audited financial statements. The attachment is referred

13   to by auditors as a management representation letter, and contains certain representations of

14   management upon which an auditor relies in completing an audit and issuing an audit opinion on

15   a company's financial statements. A true and correct copy of this email and attachment is

16   attached hereto as Exhibit 8 (SAC00000915-918).

17   29.    A true and correct copy of the December 31, 2009 and 2008 Audited Financial

18   Statements of IPF, dated March 31, 2009, is attached hereto as Exhibit 9 (SBCC002949-2965).

19   These financial statements were issued on April 15, 2010. The March 31, 2009 date on the

20   Independent Auditors' Report appears incorrect, because the financial statements were issued in

21   2010. The 2009 Audited Financial Statement of IPF show that in 2009, IPF expended $300,000

22   in cash on "Syndication Costs," $55,622 in cash on a "Due from Fund Manager," and $89,155 in

23   cash for "SBA License Costs." These cash expenditures are shown on IPF's Statement of Cash

24   Flows (SBCC002955). Each of these cash expenditures is recorded as an asset on IPF's Balance

25   Sheet (SBC002952). These cash expenditures, which total $444,777, do not appear on IPF's

26   Statement of Income (SBCC002953).

27   30.    The Notes to the Financial Statement explain the increase in capitalized costs, in

28   Note 4, Capitalized Costs, Net. That Note states, in part: "Under the terms of the Offering

1   Circular, the fund manager is entitled to reimbursement from the Fund for all out-of-pocket
2   organization and syndication expenses. The Offering Circular allows for a total reimbursement
3   of 5% of the total Fund capitalization to a maximum of $500,000. To date the Fund has
4   reimbursed the Manager a total of $383,929 for organization and syndication costs."
5   (SBC002960). The Notes to the Financial Statement are written by management, and reviewed
6   by the auditor. This explanation of the terms of the IPF offering circular stated Mr. Feathers'
7   view of the terms of the offering circular.

8          31.    In connection with the preparation of this declaration, I reviewed the June 11,
9   2009 IPF Offering Circular, which would have been the operative document during 2009. The
10  Offering Circular was for a maximum offering of $100 million. In the Use of Proceeds section,
11  the Offering Circular disclosed that Organizational and Syndication Expenses for the maximum
12  offering could total $500,000, or "0.5%" of the total $100 million offering. The statement in the
13  Notes for the 2009 IPF Financial Statements was incorrect, to the extent that it stated that
14  reimbursement was allowed for up to "5%" of the total offering. The total of $500,000 was
15  correct, if $100 million had been raised. At the time of the audit, SAC did not identify the error
16  in the statement of percentage in the Notes to Financial Statements. I believe that at the time, as
17  a quick check of reasonableness, I applied "5%" to the Members' Equity of $10 million, and
18  determined that the total organization and syndication costs of approximately $383,929 appeared
19  reasonable.

20         32.    Between the date when SAC issued the IPF 2009 audited financial statements
21  (April 15, 2010) and the date when SAC issued the SPF 2009 audited financial statements (July
22  14, 2010), SAC determined that syndication costs should not be capitalized as an asset, but
23  should be recorded as a reduction of the Members' Equity. SAC determined that IPF needed to
24  restate its 2009 financial statements in order for SAC to maintain our unqualified audit opinion.
25  For this reason, SAC did not allow SPF to capitalize syndication costs on its 2009 audited
26  financial statements. I explained the issues to Mr. Feathers at or about this time, and that the
27  restatement would reduce Members' Equity. Mr. Feathers preferred that the restatement
28  reclassify the syndication costs to the "Due from Manager." During the audit of IPF's 2010

1  financial statements, IPF restated the 2009 financial statements, and the syndication costs of
2  approximately $300,000 were reclassified to the Note Receivable from Fund Manager.

3      33.     The Notes to the Financial Statement explain the "Due from Fund Manager" as
4  follows in Note 7, Related Party Transactions: "As of December 31, 2009, the Fund issued a
5  note receivable to the Fund Manager in the amount of $55,622. This resulted from the Fund
6  Manager's decision to waive the 2009 management fees. These amounts will either be
7  reimbursed by the Fund Manager or be offset against the 2010 management fees due the Fund
8  Manager." (SBC002962). In addition, in Note 7, under the sub-heading "Operating Expenses,"
9  IPF stated: "For the year ended December 31, 2009, the Fund Manager elected to waive without
10  recourse, all the fund management fees." (*Id.*)

11      34.     Attached hereto as Exhibit 49 is a true and correct copy of a work paper from the
12  audit of IPF's 2009 financial statements on "Due from Fund Manager LS." (no bates number).
13  The Auditor's Notes on the work paper state: "Balance represents money that the Fund
14  advanced to the Fund Manager. Per inquiry of Mark Feathers, (Fund Manager) balance is non-
15  interest bearing and will be repaid during the 2010 year. Since it is more of an advance rather
16  than a note agreement, no note agreement exists. Per review of the Company's offering circular
17  [], the Fund Manager is not allowed to take out loans/advances against the Fund. Auditor will
18  note this on the respective management letter." In addition, the amount of the balance of the
19  "Due from Manager" recorded in the 2009 audited financial statements of IPF was not material
20  on a dollar basis under our auditing standards.

21      35.     During the discussions I had with Mark Feathers in 2010 about the creation of the
22  "Due from Fund Manager" on the 2009 IPF audited financial statements, Feathers assured me
23  that he and SBCC would not borrow any more money from IPF. Feathers also assured me that
24  the "Due from Manager" would be paid down quickly, and would not be in existence at the end
25  of 2010.

26      36.     In connection with the audit of IPF's 2009 financial statements, SAC assembled
27  various accounting work papers. Exhibit 10 attached hereto is a true and correct copy of the
28  SAC's Engagement Memo and Risk Assessment (SAC00001797-1801), which is a work paper

1  that SAC prepared in connection with the audit of IPF's 2009 financial statement. This is a
2  document produced from the files of SAC.

3      37.      Attached hereto as Exhibit 11 is a true and correct copy of an audit work paper for
4  the audit of IPF's 2009 financial statements, titled 'CX-3.2: Engagement Team Discussion"
5  (SAC00001748-49). To the best of my knowledge, this work paper accurately reflects the
6  preliminary findings of the audit manager and auditor in charge. This is a document produced
7  from the files of SAC.

8      38.      Attached hereto as Exhibit 12 is a true and correct copy of an IPF Profit & Loss,
9  January through December 2009 (SAC00002649), which was part of our audit work papers for
10 the 2009 audit. This document appears to have been printed from IPF's QuickBook software.
11 This document was produced from the files of SAC.

12     39.      After the IPF financial statements were issued, SAC continued working on the
13 audit of SPF's 2009 financial statements. In the course of the audit of SPF, SAC found that
14 during 2009 Mr. Feathers and SBCC had caused SPF to disburse approximately $534,736 in
15 cash, which consisted of (1) $63,780 recorded as a management fee expense; (2) $455,841
16 recorded as capitalization of contract, an asset; and (3) $15,115 for a vehicle net of depreciation,
17 which was also recorded as an asset. As these items came to light during the audit, Mr. Feathers
18 informed SAC personnel that he was obtaining approval from SPF investors to change the terms
19 of the Private Placement Memorandum ("PPM").

20     40.      On or about June 22, 2010 10:17 am, Mark Feathers sent an email to John Paul
21 Lapid, and others, on the subject "IPF quarterly requirement." Mr. Feathers wrote: "also today I
22 hope to have confirmation very shortly of the concurrence/approval by SBC Portfolio Fund
23 investors to the proposed ppm changes." Mr. Lapid replied to that email on June 22, 2010 5:49
24 pm. A true and correct copy of an email string containing these emails is attached hereto as
25 Exhibit 13 (SAC00000906-908). This document was produced from the files of SAC.

26     41.      In an email Feathers sent to me and others on June 27, 2010 3:36 pm, on the
27 subject "sbc portfolio fund receivable," Feathers wrote: "The fund members agreed to the
28 proposal to re-categorize synd & organization to fund receivable from fund manager (5 year

period). I'm on vacation now in Arizona with family; will send copies of approval info. shortly by email." John Paul Lapid responded with specific requests for additional documentation, including approval from SPF investors allowing the receivable, which would include the nominal amount of $534,736 as well as the pay back terms and interest rate, and other information to corroborate Mr. Feathers' statement. A true and correct copy of this email exchange is attached hereto as Exhibit 14 (SAC000000898-899).

42.     On or about July 14, 2010 4:06 pm, Claire Thomas, one of my employees, sent an email to Mark Feathers, which was a continuation in a chain with the subject "Small Business Capital, LLC, Accounting Matters." A true and correct copy of this email change is Exhibit 15 hereto. In that July 14, 2010 email, Ms. Thomas informed Mr. Feathers that SAC was issuing the financials for SPF "today." (SAC00000881).

43.     SAC issued the SPF December 31, 2009 Audited Financial Statements under cover of an Independent Auditors' Report dated June 23, 2010. A true and correct copy of these financial statements is attached hereto as Exhibit 16 (SBCC04448-462). The 2009 financial statements showed that Feathers and SBCC had caused SPF to advance $534,736 to SBCC during 2009, which was recorded as an asset on the balance sheet "Due from Fund Manager" (SBCC004451). The Statement of Cash Flows shows that $519,622 in cash was used for "Issuance of Receivable from Fund Manager" (SBCC004454). In the Notes to the Financial Statements, in Note 6, Related Party Transactions, SPF stated: "The receivable from the fund manager is in violation of the Fund's operating agreement and offering circular. Subsequent to December 31, 2009, the Fund Manager is in the process of obtaining approval of this receivable from the Fund members." (SBCC004460). The "Receivable from Manager" represented approximately 18% of SPF's total assets.

44.     The audit work papers show that the "Receivable from Manager" was the result of: (1) reclassifying the $63,780 recorded as a management fee expense to the Receivable from Manager because no management fees should have charged during the year because the Fund only earned a 6.9% instead of a 7.5%; a true and correct copy of the work paper showing this adjustment is attached hereto as Exhibit 50; (2) reclassifying $455,841 recorded as capitalization

1    of contract because the expenditures associated with this entry were not in accordance with the
2    offering circular; a true and correct copy of the work paper showing this adjustment is attached
3    hereto as Exhibit 51; and (3) reclassifying $15,115 for a vehicle net of depreciation because the
4    Fund manager was not abiding by the offering circular by purchasing a vehicle with the Funds'
5    money; a true and correct copy of the work paper showing this adjustment is attached hereto as
6    Exhibit 52. A true and correct copy of the work paper consolidating these adjustments is
7    attached hereto as Exhibit 53.

8        45.      SAC asked Mr. Feathers and SBCC to repay these amounts to SPF. Mr. Feathers
9    chose to have these expenditures recorded as a "Receivable from Manager." At the time, Mr.
10   Feathers assured me that he and SBCC would repay this receivable. Mr. Feathers also told me
11   that he and SBCC would not borrow any additional amounts from SPF. Mr. Feathers also told
12   me that he was going to get approval from his investors to repay the receivable over a five year
13   period.

14        46.      On June 23, 2010 9:37 am, Mark Feathers sent an email to John Paul Lapid, of
15   SAC, and to David Gruebele, with the subject: "Small Business Capital, LLC, Accounting
16   Matters." In that email, Mr. Feathers discussed the "due from" SBCC to IPF: "Sometime in the
17   next quarter, I'll submit for member approval to carry a manager's due-to-fund of up to .25% of
18   maximum fund capitalization ($250,000) to carry over into the first quarter of 2011, at which
19   time it would be paid off." (SAC00000885). Several emails then follow in a chain. A true and
20   correct copy of this email chain is attached hereto as Exhibit 15 (SAC00000881-886).

21        47.      On or about July 29, 2010, there was an email exchange between Mark Feathers
22   and SAC employees on the subject of "SBC financials." A true and correct copy of an email
23   string containing these emails is attached hereto as Exhibit 17 (SAC00000851-53). This
24   document was produced from the files of SAC.

25        48.      In August 2010, staff of SAC prepared a compiled financial statement for IPF and
26   SBC LLC. In preparing that compilation, SAC noted that at least $170,000 had been added to
27   organizational costs of IPF, and sent an email to Mark Feathers and others on August 5, 2010
28   3:35 pm. An email exchange ensued. On August 9, 2010 7:54 am, I sent an email to Mr.

1  Feathers which stated: "Mark, I think we need to understand exactly what the $180k was for and
2  need to see some support to account for this properly or we will run into trouble when year end
3  arrives when we audit." Mr. Feathers responded: "There's a lot of documentation available Jeff
4  in the form of consulting agreements & fees. Carmen can provide you with all of the
5  substantiation that it's directly related to acquisition of the license." This document was
6  produced from the files of SAC. A true and correct copy of this email exchange is attached
7  hereto as Exhibit 18 (SAC00000812-818).

8  49.     On August 22, 2010 12:13 pm, Mark Feathers sent an email to me and others on
9  the subject "IPF expenses/categorizations." Feathers wrote: "I understand you and David
10  Gruebele, while talking in early August about the interim f/s for Small Business Capital, LLC,
11  also had some discussions on expense accounting treatment for IPF. Coincidentally a few days
12  before that I took it upon myself to send a motion to investors to change the operating agreement
13  to re-categorize up to $1MM FY 2010 accrued syndication/organizational expenses into a
14  receivable from Fund Manager. This would be paid back over a period of 5 years, and would
15  also have an interest rate paid to the fund members of 7.5%." Feathers continued in the email to
16  explain that he anticipated fund revenues would be "strong and consistent, enough so to pay to
17  investor the 7.5% preferred yield, as well as continue paying down prior accruals on a timely
18  basis. The fund will also generate sufficient profits to the fund manager for us to comfortably
19  pay down the due-from-manager on a 5 year schedule." I responded to the email, in part: "I am
20  not sure that getting approval after the fact is proper. Generally, that should be done prior to
21  taking money." A true and correct copy of this document is attached hereto as Exhibit 19
22  (SAC000000787-788).

23  50.     On or about July 29, 2010, Carmen Pelenska at SBCC sent an email to Claire
24  Thomas of SAC re "SBC LLC financials" which contained attachments including draft IPF
25  financial statements as of June 30, 2010. A true and correct copy of the email and attachments is
26  attached hereto as Exhibit 20 (SAC00000839-850). This document was produced from the files
27  of SAC.

28

51.     On or about September 16, 2010, SAC was engaged to perform an audit of IPF for the year ended December 31, 2010. A true and correct copy of the audit engagement letter is attached hereto as Exhibit 21 (SAC00002879-82). This letter was produced from the files of SAC. Mr. Feathers accepted the audit engagement letter on November 15, 2010.

52.     SAC was provided with a balance sheet and profit and loss for IPF for the period January through October 2010, which appears to have been printed on November 18, 2010. The balance sheet shows that the "Due Fr SB Capital Fund Mgr" had a balance of $1,175,952.83 as of October 31, 2010. A true and correct copy of these financial statements is attached hereto as Exhibit 22 (SAC00006466-468). The documents were produced from the files of SAC. The documents were originally provided to SAC by SBCC and IPF.

53.     SAC was provided with a balance sheet for IPF as of December 31, 2010, which appears to have been printed on January 17, 2011. This IPF balance sheet shows that the "LT Rec –Fund Mgrs Organ. Invst" was $1,500,000.00. A true and correct copy of this document is attached hereto as Exhibit 23 (SAC00006472). The document was produced from the files of SAC. The documents were originally provided to SAC by SBCC and IPF.

54.     On December 22 and 23, 2010, there was an email exchange between John Paul Lapid of SAC and Carmen Pelenska of SBCC, which was copied to Mark Feathers and David Gruebele. A true and correct copy of this email string is attached hereto as Exhibit 24 (SAC00000697-699). This document was produced from the files of SAC.

55.     On or about January 25, 2011 6:52 pm, David Greubele sent an email to John Paul Lapid of SAC and others on the subject of "IPF Proxy vote on manager due from Aug-2010." Mr. Gruebele included attachments with this email. I recognize that this email was sent to two SAC employees. A true and correct copy of this email is attached hereto as Exhibit 25 (G00520-528). I have reviewed the August 16, 2010 letter, and under Request No. 1, Mr. Feathers stated: "A similar measure has been already been reviewed by our CPA's and approved and implemented by investors in our other managed fund, SBC Portfolio Fund, LLC." To the best of my knowledge, neither I nor SAC reviewed or approved any such measure for SPF. In

1  that regard, I note that for 2009, SAC caused SPF to reclassify certain organization costs because
2  they were not permitted under the terms of the offering documents.

3      56.    On or about February 23, 2011, David Gruebele sent an email to me and others on
4  the subject: "IPF updated offering circular, operating agreement, permit" with attachments. A
5  true and correct copy of this email is attached hereto as Exhibit 26 (SAC00000608-683).

6      57.    On or about March 22, 2011, SAC released the December 31, 2010 and 2009
7  Audited Financial Statements for IPF (SBC002966-84). In the Independent Auditor's Report,
8  SAC discussed Note 11 of the financial statements, stating: "the Fund is unable to assess the
9  collectability of the note receivable from fund manager and thus cannot reasonably determine
10 whether an allowance for loss is necessary which reflects a departure from generally accepted
11 accounting principles. In our opinion, the carrying value of the note receivable from fund
12 manager may require an allowance for loss which would adequately reflect fair value and
13 conform to accounting principles accepted in the United States of America. The effects on the
14 financial statements of the preceding practice are not reasonably determinable." Such a
15 statement in an Auditor's Report is referred to as a qualification. When such a qualification is
16 contained in an Auditor's Report, it means that the auditor has issued a "qualified opinion." A
17 true and correct copy of the IPF Audited Financial Statements for December 31, 2010 and 2009
18 is attached hereto as Exhibit 27.

19     58.    In the Notes to IPF's Financial Statements, SBCC and IPF disclosed in Note 11
20 that: "The receivable from the Fund manager was prohibited by the Fund's operating agreement
21 and offering circular, which has been amended and approved by the Department of Corporations
22 in November 2010."

23     59.    On or about March 22, 2011, SAC released the December 31, 2010 and 2009
24 Audited Financial Statements for SPF (SBC004890-4907). In the Independent Auditor's Report,
25 SAC discussed Note 7 of the financial statements, stating: "the Fund is unable to assess the
26 collectability of the note receivable from fund manager and thus cannot reasonably determine
27 whether an allowance for loss is necessary which reflects a departure from generally accepted
28 accounting principles. In our opinion, the carrying value of the note receivable from fund

1  manager may require an allowance for loss which would adequately reflect fair value and
2  conform to accounting principles accepted in the United States of America. The effects on the
3  financial statements of the preceding practice are not reasonably determinable." Such a
4  statement in an Auditor's Report is referred to as a qualification. When such a qualification is
5  contained in an Auditor's Report, it means that the auditor has issued a "qualified opinion." A
6  true and correct copy of the SPF Audited Financial Statements for December 31, 2010 and 2009
7  is attached hereto as Exhibit 28.

8      60.    The financial statements and notes are statements made by the issuer, in this case,
9  IPF and SPF. IPF and SPF are responsible for the numbers set forth in the financial statements,
10  and are responsible for the statements made in the Notes to Financial Statements. As an
11  independent auditor, SAC is responsible for auditing the content and issuing a report thereon.

12      61.    In connection with the 2010 audit, I had several conversations with Mr. Feathers
13  about the "due from" SBCC to IPF and SPF. We discussed that the Note Receivable from Fund
14  Manager had grown and was a substantial asset of IPF and SPF. I told Mr. Feathers that SAC
15  could not issue an unqualified, or "clean," audit opinion on the financial statements of IPF or
16  SPF with the large growth in the "due from" or Note Receivable from Fund Manager. I told Mr.
17  Feathers that he had three options: first, Mr. Feathers and SBCC could pay the "due from" in full
18  before the audit was completed and financial statements were issued, in which case it would no
19  longer be an issue. Second, Mr. Feathers and SBCC could provide me with a documented
20  assessment of the collectability of the "due from" so that an appropriate loss allowance could be
21  established for the Note, if needed. Mr. Feathers and SBCC refused to provide any documented
22  assessment on the collectability of the Note Receivable from Fund Manager, or an estimate of an
23  appropriate loss allowance. Instead, as he had done since the note receivables were created after
24  2009, Mr. Feathers assured me that SBCC would soon be making more than enough money to
25  retire the Notes Receivable to SPF and IPF in short order. Third, if Mr. Feathers did not take
26  either of the first two steps, then I told Mr. Feathers that SAC would have to issue a qualified
27  opinion on the financial statements of IPF and SPF.

28

62.    Mr. Feathers elected to have SAC issue qualified audit opinions on the 2010 financial statements of IPF and SPF. I knew that Mr. Feathers and SBCC were fiduciaries of IPF and SPF, and as such, had a fiduciary duty to the Funds and their investors. I recall that Mr. Feathers informed me that he only gave out copies of audited financial statements of the Funds if a Fund member asked for them.

63.    Based upon my working relationship with Mr. Feathers, I believe he understood that setting up an allowance for a loss on the Notes Receivable from Fund Manager would impact the net income of SPF and IPF. In order to set up such a loss allowance, an expense against income would be recorded in the amount of the loss allowance. Such an expense would reduce the reported income of IPF and SPF.

64.    For SAC to have provided an unqualified opinion on the financial statements of IPF and SPF for 2010, IPF and SPF would have had to set up a loss allowance equal to the full amount of their respective Notes Receivable from Fund Manager. This is because neither IPF nor SPF, nor SBCC nor Mr. Feathers, was able to provide any information on the collectability of the Note Receivable from Fund Manager. Under GAAP, if no estimate can be made as to the collectability of a receivable, then a company must set up a reserve for the entire amount of the receivable. For IPF's 2010 audited financial statements to have been issued in accordance with GAAP, IPF needed to set up an allowance for losses for the "Note Receivable from Fund Manager" in the full amount of the $1,850,000 balance of the receivable at year end 2010. In addition, the restated 2009 audited financial statements of IPF would need to include an allowance for losses for the "Note Receivable from Fund Manager" in the full amount of the $405,623 restated amount. To set up these allowances, IPF would take an expense against income of $405,623 in the restated 2009 financial statements, and an expense against income of $1,444,377 for 2010.

65.    For SPF's 2010 audited financial statements to have been issued in accordance with GAAP, SPF needed to set up an allowance for losses for the "Note Receivable from Fund Manager" in the full amount of the $707,464 balance of the receivable at year end 2010, by

1  taking an expense against income in that amount.  Again, this is because SAC was not provided
2  with any information on the collectability of the receivable.

3  66.  In 2011, SBCC and IPF provided to SAC the management representation letter
4  for the audit of the 2010 financial statements of IPF.  (SAC00002854-856).  A true and correct
5  copy of this letter is attached hereto as Exhibit 29.  This document was produced from the files
6  of SAC.  It was provided to SAC by Mr. Feathers, SBCC, and IPF.

7  67.  On or about March 23, 2011, I was copied on an email from David Gruebele to
8  Claire Thomas, who was an employee of SAC, on the subject: "2010 SBC PF draft audit with
9  markups for Spiegel Review – 3-22-11 and Rep letter."  (SAC00000597-601).  This email string
10  pertains to SPF.  SBCC and Feathers were not able to provide any information to SAC during the
11  course of the audit of the 2010 financial statements of SPF to support Mr. Feathers' prior
12  statements to me that members of SPF had approved changes to the operating agreement to allow
13  the manager, SBCC, to borrow money from SPF and create the Note Due from Fund Manager,
14  or otherwise create a "note receivable" for accrued organization or syndication expenses.  A true
15  and correct copy of this email string is attached hereto as Exhibit 30.  This document was
16  produced from the files of SAC.

17  68.  Attached hereto as Exhibit 31 is a true and correct copy of an email string,
18  between October 29 and November 1, 2010, on the subject of "SBC LLC Compilation."
19  (SAC00000735-742).

20  69.  In late 2011, SBCC and IPF engaged SAC to audit the financial records of IPF for
21  the year ended December 31, 2011.  A true and correct copy of the engagement letter is attached
22  hereto as Exhibit 32 (SAC00007786-90).

23  70.  In late 2011, SBCC and SPF engaged SAC to audit the financial records of SPF
24  for the year ended December 31, 2011.  A true and correct copy of the engagement letter is
25  attached hereto as Exhibit 33 (SAC00008327-31).

26  71.  On or about November 1, 2011 4:13 pm, David Gruebele sent me an email on the
27  subject "Natalie is checking on par pricing differential."  (SAC00000387).  A true and correct
28  copy of this email is attached hereto as Exhibit 34.

1    72.    On or about February 16, 2012 10:45 am, Mark Feathers sent an email to me and
2    others on the subject "plans of action – summary" (no bates number). I produced this document
3    to the SEC from my email archive. A true and correct copy of this email, which consists of two
4    pages, is attached hereto as Exhibit 35.

5    73.    On or about February 24, 2012, I exchanged several emails with Mark Feathers
6    on the subject "another agenda item." (G00693-95). The subject was payment of a "premium"
7    when loans were sold between IPF and SPF. A true and correct copy of this email string is
8    attached hereto as Exhibit 36.

9    74.    On or about February 27, 2012, Mark Feathers forwarded me an email string and
10   we then exchanged emails on the subject "Non Bank Lender Application." (G00676-680). The
11   email exchange between Mr. Feathers and me pertained to the payment of a "premium" when
12   loans were sold between IPF and SPF. A true and correct copy of this email string is attached
13   hereto as Exhibit 37.

14   75.    Beginning on February 27, 2012 and continuing to February 28, 2012, Mark
15   Feathers and I exchanged emails on the subject "IPF manager's note" (no bates number). I
16   produced this document to the SEC from my email archive. In the original email, Mr. Feathers
17   asked Mr. Gruebele to provide "the authorized disbursement schedule in 2011 for the manager's
18   note in IPF – we also need the minutes of the meetings authorizing the disbursements." In
19   response, I informed Mr. Feathers that SAC required promissory notes and interest calculations,
20   and a letter from IPF's attorney "that the transactions are compliant with the OC and operating
21   agreement." Mr. Feathers replied, in part: "The OC clearly outlines the managers note approval,
22   the dollar amounts, etc.,, [sic] and the draw process in 2011 was no different than in prior years.
23   The mechanics of the draw process were never formulated in detail in the o.c. or the o.a. It
24   might all be moot, as we are in the paydown process down. [sic]" In response, I replied that
25   SAC would not sign off on the audit without a statement from IPF's attorney about the
26   Manager's Note. A true and correct copy of this email exchange is attached hereto as Exhibit 38.

27   76.    In another email exchange on February 27 and 28, 2012, on the subject of the
28   "IPF manager's note" (no bates number), I asked Mr. Feathers if he would like to discuss the

1   issue, or if he preferred that SAC withdraw from the engagement. This email was produced from

2   my email archive. A true and correct copy of this email exchange is attached hereto as Exhibit

3   39.

4         77.     In another email exchange on February 27 and 28, 2012, on the subject of the

5   "IPF manager's note" (no bates number), I emphasized the seriousness of my request to have a

6   legal opinion on the manager's note. This email was produced from my email archive. A true

7   and correct copy of this email exchange is attached hereto as Exhibit 40.

8         78.     On or about February 28, 2012 5:30 am, I was copied on an email from Mark

9   Feathers to others on the subject "fund audit work progress." (G00053). A true and correct copy

10   of this email is attached hereto as Exhibit 41.

11         79.     On or about February 28, 2012 5:37 am, Mark Feathers sent an email to me on the

12   subject "misc" (no bates number). In this email, Mr. Feathers provided information on loans

13   funded by his various entities in 2012, in the context of the manager's note. Mr. Feathers wrote:

14   "The margin between the yield to investors and the ROE is such that all fund manager

15   operational expenses are well covered, and the notes will be paid as agreed during their

16   outstanding period, and either amortized or paid in full at the maturity periods authorized in the

17   PPM and OC's. I appreciate your paying attention to the manager's note, and I can discuss

18   further with you in your offices tomorrow if you like." This email was produced from my email

19   archives. A true and correct copy of this email is attached hereto as Exhibit 42. During the

20   period from 2010 through at least the date of this email, as SAC objected to the growth in the

21   receivables from SBCC to the Funds, Mr. Feathers continually assured SAC that SBCC would

22   stop increasing the amount of the receivables, and Mr. Feathers talked about how the Funds'

23   lending operations were successful and growing. In addition, after Mr. Feathers set up a five-

24   year repayment date, Mr. Feathers continually assured me that SBCC would repay the full

25   amount of the receivables within that period, and often projected that the receivables from SBCC

26   would be paid off much sooner.

27         80.     On or about February 28, 2012 5:45 am, Mark Feathers sent me an email on the

28   subject "IPF manager's note" (no bates number). Mr. Feathers informed me that he had asked

1   the Funds' attorney to provide a letter on the manager's note for IPF. This email was produced

2   from my email archives. A true and correct copy of this email is attached hereto as Exhibit 43.

3       81.    On or about April 24, 2012, I received a copy of a letter from Doss Law,

4   addressed to Mark Feathers, IPF, re "Management Practices and Disclosure Issues"

5   (SAC00007900-01). A true and correct copy of that letter is attached hereto as Exhibit 44. I

6   understood that this letter was in response to my request, as the independent auditor of IPF, for a

7   letter from counsel for IPF concerning the Note Receivable from Manager, or the "due from."

8       82.    On or about March 8, 2012 7:13 am, Mark Feathers sent me an email on the

9   subject "sb capital private placement" (G00674). A true and correct copy of this email is

10   attached hereto as Exhibit 45.

11       83.    At the time that the Receiver was appointed in June 2012, SAC had not completed

12   its audit of IPF because we were waiting on responses from IPF concerning open items and

13   additional required audit documentation. In addition, SAC was instructed by Mr. Feathers and

14   IPF to change the basis of reporting from GAAP to income tax basis. SAC had reviewed a draft

15   consolidated financial statement for IPF that was prepared on a tax basis. SAC never finalized

16   the audit and did not release the financial statements. SAC did provide a tax return to IPF, which

17   was subject to amendment if there were any changes after SAC completed its audit work. A true

18   and correct copy of the draft consolidated financial statements for IPF and its subsidiary, SBC

19   LLC, for the year ended December 31, 2011, is attached hereto as Exhibit 46.

20       84.    On or about June 4, 2012, Mr. Feathers provided to SAC a copy of a letter to

21   investors in IPF, with attachments, concerning a proposal by SBCC to change IPF's Operating

22   Agreement to permit its financial statements to be prepared only on an income tax basis, and

23   would relieve IPF of the requirement to prepare GAAP financial statements. A true and correct

24   copy of this letter, consisting of six pages, is attached hereto as Exhibit 54.

25       85.    On or about June 18, 2012, Mr. Feathers provided SAC with a document to show

26   that IPF investors had consented to the proposed change from GAAP accounting to income tax

27   accounting for IPF's financial statements. A true and correct copy of this document, consisting

28   of eight pages, is attached hereto as Exhibit 55.

86. At the time that the Receiver was appointed in June 2012, SAC had not completed its audit of SPF because we were waiting on responses from SPF concerning open items and additional required audit documentation. SAC had reviewed a draft financial statement for SPF. SAC did provide a tax return for SPF, which was subject to amendment if there were any changes after SAC completed its audit work. SAC never finalized the audit and did not release the financial statements. A true and correct copy of the draft financial statements for SPF for the year ended December 31, 2011, is attached hereto as Exhibit 47.

87. At the time that the Receiver was appointed in June 2012, SAC had also not completed its audit of SCMF because we were waiting for SCMF to finally approve the audited financial statements for release. SAC had reviewed a draft financial statement for SCMF. SAC did provide a tax return for SCMF. SAC never finalized the audit and did not release the financial statements. A true and correct copy of the draft financial statements for SCMF for the year ended December 31, 2011, are attached hereto as Exhibit 48.

88. During the course of our audits of IPF, SAC was aware that IPF had made two loans to the manager, SBCC, secured by real property. One of these loans was referred to as Loan 65, and was secured by property in San Leandro, California. The other was Loan 30001, and was secured by property referred to as Whiskey Junction. I have been informed that the original loans on these properties were held by IPF, and that the borrowers defaulted and IPF then transferred the property to SB Capital. I have been informed that IPF then made Loans 65 and 30001 to SB Capital, the proceeds of which were used to pay off the outstanding, non-performing loans from the original borrowers. I was not aware that Loans 65 and 30001 were essentially real estate owned of IPF. Based on our audit, it appeared from the books and records of IPF that the original loans had been paid off as agreed, and there was no apparent connection between those original loans and Loans 65 and 30001.

89. In connection with the preparation of this declaration, I have been shown emails showing that Mr. Feathers and SBCC transferred funds from the Funds' accounts to SBCC's operating account to pay expenses of SBCC, which included interest on the Manager's Note to IPF, the Manager's Note to SPF, Loan 65, and Loan 30001. This interest income was then

1  included in the income of IPF. I did not know that Mr. Feathers and SBCC were using money

2  taken from the Funds to make payments of SBCC's obligations to IPF and SPF. Because SAC

3  did not audit or provide services for SBCC, I did not have any visibility into SBCC's financial

4  transactions. I would not have allowed SAC to sign off on financial statements which included

5  such transactions, if I had known they were occurring. A true and correct copy of one such email

6  that I was shown, dated September 22, 2011, is attached hereto as Exhibit 56.

7       90.    In early 2012, Mr. Feathers discussed with me selling loans from one of the funds

8  to another fund at a "premium." I informed Mr. Feathers that SAC would not approve the

9  recording of any such "premiums" from such transactions. Mr. Feathers continually tried to

10 provide me with information to support his view that such transactions were acceptable. In

11 response, I informed him that he would need independent, third-party evidence to establish fair

12 market value in such related transactions, and that without such competent evidence, SAC would

13 require reversal of any premiums booked in such related party transactions.

14      91.    In connection with SAC's audit of SPF's 2009 financial statements, Mr. Feathers

15 and SPF provided SAC with a management representation letter, dated June 23, 2010. A true

16 and correct copy of this letter is attached hereto as Exhibit 57.

17      92.    In connection with SAC's audit of SPF's 2010 financial statements, Mr. Feathers

18 and SPF provided SAC with a management representation letter, dated March 22, 2011. A true

19 and correct copy of this letter is attached hereto as Exhibit 58.

20

21      I declare under penalty of perjury under the laws of the United States of America that the

22 foregoing is true and correct.

23      Executed this 24th day of April, 2013 at *Walnut Creek*, California.

24

25      _____

    Jeffrey Spiegel

26

27

28