# EXHIBIT 26

| | |
|---|---|
| **From:** | David Gruebele <DG@secondangel.net> |
| **Sent:** | Wednesday, February 23, 2011 12:50 AM (GMT) |
| **To:** | Jeffrey Spiegel <jeff@spiegelcorp.com>; Claire Thomas <claire@spiegelcorp.com> |
| **Subject:** | FW: IPF updated offering circular, operating agreement, permit |
| **Attach:** | DOC Permit.pdf; Offering Circular.pdf; Operating Agreement.pdf |

Please see attached.


DG


Description: \\SASERVER\Users\davidgruebele\My Documents\My Pictures\Logo's\SAB
Logo1.JPG <http://www.secondangel.net/>

Private Portfolio Lenders and Alternative Investments


David Gruebele
Principal & Portfolio Manager

Second Angel Bancorp / Second Angel Funds I, II
10217 Fair Oaks Blvd, Suite B
Fair Oaks, CA 95628
<http://maps.yahoo.com/py/maps.py?Pyt=Tmap&addr=10217+Fair+Oaks+Blvd%2C+Suite+D&csz
=Fair+Oaks%2C+CA+95628&country=us>

dg@secondangel.net <mailto:dg@secondangel.net>

tel:
fax:
mobile:

916-863-7300 main
916-863-1123
408-398-8475


Want to always have my latest info?
<https://www.plaxo.com/add_me?u=25770262005&src=client_sig_212_1_banner_join&invite
=1&lang=en>

Want a signature like this?
<http://www.plaxo.com/signature?src=client_sig_212_1_banner_sig&lang=en>


Second Angel Blog <http://secondangelbancorp.wordpress.com/>

David's LinkedIn Profile <http://www.linkedin.com/in/gruebele>

**SAC00000608**
**Exhibit 26-1**

From: mark@sbcapital.com [mailto:mark@sbcapital.com]
Sent: Monday, February 07, 2011 1:37 PM
To: Jeffrey Spiegel; JP Lapid
Cc: natalie@sbcapital.com; peter@sbcapital.com; David Gruebele;
mmurphy@sbcapital.com
Subject: IPF updated offering circular, operating agreement, permit


IPF investors approved several changes to the operating agreement in the last half
of 2010.  These included approval to purchase financial institution stock and
convert organizational fees incurred into a "due from" fund manager.


Our request to the CA Dept. of Corps. for a post-effective amendment came back
recently from our fund attorneys; please find attached the most current IPF
operating agreement, offering circular, and permit.


Thanks,


Mark


Mark Feathers

CEO, SB Capital


Founder & Managing Member of:


Investors Prime Fund, LLC, a California Public Offering Investment Fund

Small Business Capital, LLC - National SBA Licensed Lending Company

SBC Portfolio Fund, LLC - Reg D Private Placement Investment Fund




419 S. San Antonio Rd., Suite 213
Los Altos, CA 94022
(650) 559-5601 ph.   x. 106
(650) 559-5661 fax


CONFIDENTIALITY DISCLOSURE

This e-mail is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. The foregoing name, telephone number, facsimile number and email information is provided to the recipient for informational purposes only and is not intended to be the signature of the sender for purposes of binding the sender or SB Capital or any client of the sender or the firm, to any contract or agreement under the Uniform Electronic Transaction Act or any similar law. Thank you for your courtesy and cooperation.

**OFFERING CIRCULAR**                                    **FOR CALIFORNIA RESIDENTS ONLY**

# INVESTORS PRIME FUND, LLC
**$250,000,000 of Membership Interests ("Units")**
**$5,000 per Unit**
**Minimum Investment: $25,000 (5 Units)**

Investors Prime Fund, LLC (the "**Fund**") is a California limited liability company formed May 17, 2005 and operating since June 2006 whose sole manager is Small Business Capital Corp., a California corporation doing business as SB Capital (the "**Manager**"). The Fund is engaged in the business of investing primarily in government guaranteed loans secured by first deeds of trust encumbering commercial real estate located primarily in California. Fund loans will be selected and arranged by the Fund through its national Small Business Lending Company license. Fund loans will also be serviced by the Manager, SB Capital. (See "The Manager and Its Affiliates.") The Fund may invest up to 5% of the Maximum Offering Amount ($12,500,000) into acquiring a controlling interest in an FDIC insured state or nationally chartered financial institution, yet to be located.

Investors purchasing Units will become non-managing members in the Fund ("**Members**") pursuant to the Sixth Amended and Restated Operating Agreement for the Fund attached hereto as Exhibit A (the "**Operating Agreement**"). Members will be allocated all profits each year until they receive a preferred investment return for that year (the "**Member Preferred Return**") equal to the greater of 7.5% per annum ("Compounded Return") or the prevailing prime interest rate, as published in the Wall Street Journal, adjusted monthly. All profits exceeding the Member Preferred Return may be retained by the Manager. (See "Terms of the Offering – Member Preferred Return.") Investors have the option, exercisable upon subscription for Units, to receive monthly distributions of income from Fund operations, or to allow their proportionate share of Fund income to compound and be reinvested by the Fund for their accounts. (See "Terms of the Offering – Election to Receive Monthly Cash Distributions.") All Fund income will be taxed to Members (other than tax-exempt entities) as ordinary income, regardless whether it is distributed in cash or reinvested. (See "Federal Income Tax Consequences.")

An investment in the Fund is illiquid and subject to substantial restrictions on withdrawal. (See "Summary of Operating Agreement – Withdrawal from Fund.") This offering also involves certain ERISA considerations that should be considered, by tax-exempt employee benefit plans. (See "Federal Income Tax Consequences" and "ERISA Considerations.")

The initial minimum purchase of Units is $25,000 (5 Units at $5,000 per Unit). The maximum of the offering may be increased by the Manager at any time. Units will be offered and sold directly by the Manager and employees of the Manager or its affiliates. The Manager, in its sole discretion, may pay selling commissions or other compensation based upon the sale of Units to third party broker-dealers; however, any such commissions or compensation shall be payable by the Manager and not the Fund. There is no firm commitment to purchase or sell any of the Units.

**THIS OFFERING INVOLVES SIGNIFICANT RISKS, DESCRIBED IN DETAIL IN THIS OFFERING CIRCULAR. See "Risk Factors" beginning on page 6 for certain factors investors should consider before buying Units.**

**Compensation will be paid to the Manager, who is subject to certain conflicts of interest. (See "Risk Factors," "Compensation to Manager" and "Conflicts of Interest.") Prospective purchasers of Units should read this Offering Circular in its entirety.**

**SOME OR ALL OF THE LOANS INVESTED IN BY THE COMPANY WILL BE GUARANTEED BY A FEDERAL GOVERNMENT AGENCY.**

**MANAGER:**

SB CAPITAL
*419 S. San Antonio Rd., Suite 213*
*Los Altos, California 94022*
*(650) 559-5601*
*www.PrimeFund.com*
*The date of this Offering Circular is January 28, 2011*

SAC00000613
Exhibit 26-4

THESE SECURITIES ARE BEING OFFERED AND SOLD ONLY TO RESIDENTS OF THE STATE OF CALIFORNIA PURSUANT TO A PERMIT GRANTED BY THE CALIFORNIA COMMISSIONER OF CORPORATIONS. THE COMMISSIONER OF CORPORATIONS DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF THESE SECURITIES, NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OF THE INFORMATION SET FORTH HEREIN.

THE SALE OF UNITS COVERED BY THIS OFFERING CIRCULAR HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), IN RELIANCE UPON THE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS PROVIDED FOR UNDER SECTION 3(a)(11) OF THE ACT AND RULE 147 THEREUNDER RELATING TO INTRASTATE OFFERINGS.

ACCORDINGLY, THESE UNITS ARE BEING OFFERED SOLELY TO CERTAIN SELECTED RESIDENTS OF CALIFORNIA AND NON-U.S. CITIZENS WHO ARE RESIDENTS OF A FOREIGN NATION, WHO MEET THE SUITABILITY STANDARDS DESCRIBED HEREIN, AND THIS DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY WITH RESPECT TO ANY OTHER PERSON. FURTHERMORE, FOR A PERIOD OF NINE MONTHS FROM THE TERMINATION OF THIS OFFERING, NO UNITS MAY BE SOLD OR OTHERWISE TRANSFERRED EXCEPT TO PERSONS WHO WERE ELIGIBLE TO PURCHASE UNITS IN THE INITIAL OFFERING.

THIS OFFERING CIRCULAR DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY IN ANY STATE OTHER THAN THE STATE OF CALIFORNIA OR WITH RESPECT TO ANY PERSON WHO IS NOT EITHER A BONA FIDE CALIFORNIA RESIDENT OR A NON-U.S. CITIZEN WHO IS A RESIDENT OF A FOREIGN NATION, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY WITH RESPECT TO ANY PERSON EXCEPT THOSE PARTICULAR PERSONS WHO SATISFY THE SUITABILITY STANDARDS DESCRIBED HEREIN. (SEE "INVESTOR SUITABILITY STANDARDS.")

ii

SAC00000614
Exhibit 26-5

THERE IS NO MARKET FOR UNITS AND NONE IS EXPECTED TO DEVELOP IN THE FUTURE. SUMS INVESTED IN THE FUND ARE ALSO SUBJECT TO SUBSTANTIAL RESTRICTIONS ON WITHDRAWAL AND TRANSFER, AND THE UNITS OFFERED HEREBY SHOULD BE PURCHASED ONLY BY INVESTORS WHO HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT.

NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS OFFERING CIRCULAR, AND ANY SUCH INFORMATION OR REPRESENTATIONS SHOULD NOT BE RELIED UPON. ANY PROSPECTIVE PURCHASER OF UNITS WHO RECEIVES ANY SUCH INFORMATION OR REPRESENTATIONS SHOULD CONTACT THE MANAGER IMMEDIATELY TO CHECK ITS ACCURACY. NEITHER THE DELIVERY OF THIS OFFERING CIRCULAR NOR ANY SALES HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE FUND SINCE THE DATE HEREOF.

PROSPECTIVE PURCHASERS SHOULD NOT REGARD THE CONTENTS OF THIS OFFERING CIRCULAR OR ANY OTHER COMMUNICATION FROM THE FUND AS A SUBSTITUTE FOR CAREFUL AND INDEPENDENT TAX AND FINANCIAL PLANNING. EACH POTENTIAL INVESTOR IS ENCOURAGED TO CONSULT WITH HIS OWN INDEPENDENT LEGAL COUNSEL, ACCOUNTANT AND OTHER PROFESSIONAL WITH RESPECT TO THE LEGAL AND TAX ASPECTS OF THIS INVESTMENT AND WITH SPECIFIC REFERENCE TO HIS OWN TAX SITUATION, PRIOR TO SUBSCRIBING TO A MEMBERSHIP INTEREST IN THE FUND.

SAC00000615
Exhibit 26-6

## TABLE OF CONTENTS

SUMMARY OF THE OFFERING ........................................................................................ 1

INVESTOR SUITABILITY STANDARDS ....................................................................... 3

TERMS OF THE OFFERING ............................................................................................ 3

    Minimum-Maximum Capitalization; Formation of the Fund ......................................... 4

    Purchase of Units; Subscription Agreements; Admission to the Fund ........................... 4

    Use of Subscriptions to Pay Pending Withdrawal Requests ........................................... 4

    Member Preferred Return ............................................................................................... 5

    Election to Receive Monthly Cash Distributions ........................................................... 5

    Restrictions on Transfer ................................................................................................. 5

RISKS FACTORS ............................................................................................................... 6

    Risks Related to the Fund's Business ............................................................................ 7

    Risks Related to the Manager ...................................................................................... 10

    Risks Related to Ownership of the Units ..................................................................... 11

FORWARD-LOOKING STATEMENTS ......................................................................... 13

FUND BUSINESS AND LENDING ................................................................................. 14

    General ......................................................................................................................... 14

    Lending Standards And Policies .................................................................................. 14

    Credit Evaluations ....................................................................................................... 16

    Loan Servicing ............................................................................................................ 16

    Sale of Loans ............................................................................................................... 16

FUND MANAGEMENT AND LOAN SERVICING ....................................................... 16

    Loan Servicing ............................................................................................................ 16
    Fund Accounting Procedures ....................................................................................... 17

OPERATIONS TO DATE .................................................................................................. 18

    Prime Rate and Member Preferred Return ................................................................... 18

    Average Annual Investment Yield ............................................................................... 19
    Portfolio Performance .................................................................................................. 19
    Loan Defaults and Loan Losses ................................................................................... 19
    REO Properties and Losses .......................................................................................... 20
    Loan Loss Reserve ....................................................................................................... 20
    Portfolio Diversification and Concentrations ............................................................... 20
    Lien Priority Concentrations ........................................................................................ 20
    Security Property Classification Concentrations ........................................................... 20
    Security Property Location Concentrations ................................................................... 21

THE MANAGER AND ITS AFFILIATES ....................................................................... 21

SAC00000616
Exhibit 26-7

The Manager ...................................................................................................................... 21

SBC Portfolio Fund, LLC ................................................................................................. 22

**COMPENSATION TO MANAGER AND ITS AFFILIATES** .................................................. **22**

Manager's Subordinated Profits Interest .......................................................................... 22

Origination and Loan Documentation Fees ...................................................................... 22

Reimbursement of Expenses to Manager .......................................................................... 22

**FIDUCIARY RESPONSIBILITY OF THE MANAGER** ...................................................... **23**

**CONFLICTS OF INTEREST** ................................................................................................. **23**

Loan Origination Fees, Renewal and Forbearance Fees ................................................... 23

Other Funds or Businesses ................................................................................................ 24

Lack of Independent Legal Representation ....................................................................... 24

Sale of Defaulted Loans or Real Estate Owned to Affiliates ........................................... 25

**ERISA CONSIDERATIONS** ................................................................................................. **25**

**USE OF PROCEEDS** ............................................................................................................. **26**

**FEDERAL INCOME TAX CONSEQUENCES** ...................................................................... **26**

Taxation of Undistributed Fund Income (Individual Investors) ....................................... 26

Distributions of Income .................................................................................................... 27

Property Held Primarily for Sale; Potential Dealer Status ............................................... 27

Tax Returns ....................................................................................................................... 27

Portfolio Income ............................................................................................................... 27

Unrelated Business Taxable Income ................................................................................. 28

**CERTAIN LEGAL ASPECTS OF FUND LOANS** ............................................................... **28**

Foreclosure ........................................................................................................................ 29

Anti-Deficiency Legislation .............................................................................................. 29

**SUMMARY OF OPERATING AGREEMENT** ...................................................................... **30**

Rights and Liabilities of Members .................................................................................... 30

Capital Contributions ........................................................................................................ 30

Rights, Powers and Duties of Manager ............................................................................. 30

Profits and Losses ............................................................................................................. 31

Cash Distributions ............................................................................................................. 31

Meetings ............................................................................................................................ 32

Accounting and Reports .................................................................................................... 32

Amendment of the Agreement ........................................................................................... 32

Withdrawal from Fund ....................................................................................................... 32

Limitations on Transferability .......................................................................................... 33

v

SAC00000617
Exhibit 26-8

Term of Fund ..................................................................................................................... 33

Winding Up ........................................................................................................................ 34

Merger with Other Business Entities ................................................................................. 34

**PLAN OF DISTRIBUTION** ................................................................................................. **34**

**LEGAL MATTERS** ................................................................................................................ **34**

**ADDITIONAL INFORMATION AND UNDERTAKINGS** ................................................ **34**

**COMMISSIONER'S RULE 260.141.11** ............................................................................... **35**

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | – | Operating Agreement |
| Exhibit B | – | Subscription Agreement and Power of Attorney |

vi

SAC00000618

Exhibit 26-9

# SUMMARY OF THE OFFERING

The following information is only a brief summary of the offering, and is qualified in its entirety by the information appearing elsewhere in this Offering Circular. A thorough examination of the entire Offering Circular is recommended.

Fund Objectives .................................... Investors Prime Fund, LLC (the "Fund") is a California limited liability company formed for the purpose of making or investing primarily in government guaranteed loans secured by first deeds of trust on commercial real estate located primarily in California. Some or all of the Fund's note investments will have loan guarantees issued by the U.S. Small Business Administration. Up to 5% of the Maximum Offering Amount ($12,500,000) may be invested to acquire a controlling interest in an FDIC insured state or nationally chartered financial institution that will become an additional source of capital to assist the fund in financing federally guaranteed note investments. The Units offered hereby represent membership interests in the Fund.

Member Preferred Return .................... Fund profits will first be allocated entirely to the Members each year up to the amount of the Member Preferred Return, which is the greater of 7.5% per annum or the prime rate, which is adjusted monthly. Any profits exceeding the Member Preferred Return may be retained by the Manager. (See "Terms of the Offering – Member Preferred Return.")

Fund
Expenses................................ The Fund will pay for its own annual audit, LLC tax, tax return preparation, protective advances and the costs to own and maintain real property, if any is acquired in foreclosure. The Fund will incur salary expenses for the work of personnel related to loan investments on Federally guaranteed loans. All other expenses will be borne by the Manager, including rent, salaries, business insurance, utilities, marketing, and other similar operational expenses

Capitalization ...................................... A maximum of $250,000,000 (subject to increase by the Manager).

Establishment of a Subscription         When the Fund cash levels are high because of note payoffs
Trust Account for Short Term           and/or new Member contributions, the Manager, at its sole
Holding of New Member                 discretion, may place new contributions for a short period into an
Contributions ............................         FDIC insured subscription trust account, managed by the Manager for up to 30 days, until such time as new note investments are ready for funding and the capital can be transferred to the Fund without reducing earnings.

1

SAC00000619

Exhibit 26-10

Term of the Fund ................................. Indefinite.  (See "Summary of Operating Agreement – Term of Fund.")

Manager, Loan Originator and
Loan Servicer ....................................... SB Capital, 419 S. San Antonio Rd., Suite 213, Los Altos, CA 94022, (650) 559-5601.

Prior Experience ................................... The Manager has substantial prior experience in the commercial mortgage industry, including originating investment notes which have federal guarantees of loan repayment.  (See "Manager and its Affiliates.")

Compensation to Manager
and Its Affiliates .................................. The Manager shall be entitled to retain Fund profits to the extent such profits exceed the Member Preferred Return payable to Members.  The Manager and its affiliates will also receive fees and other compensation from the Fund and the borrowers on Fund Loans.  (See "Compensation to Manager and Its Affiliates.")

Suitability Standards ............................. Units are offered exclusively to investors who are California residents (or who are non-U.S. citizens that reside in a foreign nation) and who meet certain minimum standards of income and/or net worth, with a minimum investment of $25,000.  (See "Investor Suitability Standards.")

Mortgage Loan Portfolio ...................... Fund loans will be secured primarily by government guaranteed first deeds of trust on commercial and income-producing residential real estate located primarily in California.  Loans will be made while this offering is continuing.   (See "Lending Standards and Policies.")

Cash Distributions ................................ Choice of (1) regular monthly cash distributions of Fund income, or (2) income credited to capital account and retained by the Fund for further investment.  An investor may elect to switch from one of these options to the other only upon 90 days' notice to the Manager; provided, however, that investors may elect to switch from distributions to compounding only if there is then in effect a qualification permit issued by the California Department of Corporations for this offering.  The Manager reserves the right to commence making cash distributions at any time to previously compounding ERISA investors in order for the Fund to remain exempt from the ERISA plan asset regulations.  (See "ERISA Considerations" and "Summary of Operating Agreement.")

2

Withdrawal........................................... Investors have no right to demand withdrawals from the Fund for twelve (12) months days after investment; thereafter, investors have a limited right to withdraw from the Fund. The Fund may utilize money from new subscriptions to fund withdrawals. (See "Summary of Operating Agreement – Withdrawal from Fund" and "Risk Factors – Risks Related to Ownership of Units.") The Manager shall have the right to redeem a Member's Units, at its sole discretion, if it believes it is in the Fund's best interest.

Restrictions on Transfers ..................... There are substantial restrictions on transferability of Units under federal and state securities laws and under the Operating Agreement. (See "Terms of Offering – Restrictions on Transfer" and "Risk Factors – Risks Related to Ownership of Units.")

Liquidity.............................................. There is no public market for Units and none is expected to develop in the foreseeable future, and the withdrawal of invested capital is limited by Fund cash flow and other restrictions. (See "Risk Factors – Risks Related to Ownership of Units.")

Reports to Investors ............................. Annual reports, including audited financial statements, provided at the Investor's request.

Risks ................................................... An investment in Units is subject to certain risks which should be carefully evaluated before an investment in Units is made. (See "Risk Factors.")

Voting ................................................. Investors will have no right to vote on matters concerning the Fund, except as required by law.

Conflicts of Interest............................. The Fund's business operations will be managed by the Manager, which has and will have certain conflicts of interest. (See "Conflicts of Interest.")

Tax and Accounting Treatment ....... The Manager can change a portion of organizational and syndication accruals which have been, or may be incurred in the year 2010 and afterwards, and separate from any similar prior year's accruals, up to 1% of the Fund's maximum capitalization of $250,000,000, from a capitalized asset to a receivable from the Manager. This may eliminate substantial portion of the tax schedule amortization of these expenses and increase earnings. The receivable will be reduced annually over a period of 5 years from Manager contributions, and also generate additional interest earnings to the Fund at the preferred yield of 7.5%.

## INVESTOR SUITABILITY STANDARDS

To purchase an Interest in the Fund, an investor must meet certain eligibility and suitability standards, some of which are set forth below, and must execute a Subscription Agreement in the form attached hereto as Exhibit B. By executing the Subscription Agreement, an investor makes certain representations and warranties, upon which the Manager will rely in accepting subscriptions. Read the Subscription Agreement carefully. Each investor must represent in writing that such investor is either a bona fide

SAC00000621
Exhibit 26-12

resident of the State of California or a non-U.S. citizen who resides in a foreign nation (or if the investor is a trust, corporation or other entity, that the principal office of such trust, corporation or other entity is located in California or a foreign nation). In addition:

     1.     Each Investor must have either (a) a net worth (exclusive of home, furnishings and automobiles) of at least $250,000 and an annual gross income of at least $65,000; or (b) a net worth (exclusive of home, furnishings and automobiles) of at least $500,000; and

     2.     The amount of each Investor's investment in Units offered hereby must not exceed 10% of such Investor's net worth (exclusive of home, furnishings and automobiles).

If the investor is an ERISA Plan (such as a pension or profit sharing plan, Individual Retirement Account, or 401(k) plan), the foregoing requirements must be met by either the ERISA Plan itself or, if the investment is being made on behalf of a plan participant who has the power to direct the investment on his or her behalf, by the plan participant for whose account the investment is being made.

If the investor is a fiduciary account other than an ERISA Plan (such as a family trust or a custodial account for the benefit of a minor), the foregoing suitability standards may be met by any of the following: (i) by all beneficiaries of the account; (ii) by the trustee or custodian if that person is the donor of the funds for investment; or (iii) by the donor of the funds for investment if the only beneficiaries of the fiduciary account are the donor's ancestors, descendants or spouse.

# TERMS OF THE OFFERING

This offering is made to a limited number of qualified investors to purchase Units in the Fund. The initial minimum subscription is $25,000. Thereafter, Units may be purchased for $5,000 per Unit.

## Minimum-Maximum Capitalization; Formation of the Fund

The Fund has a maximum capitalization of $250,000,000; however, the maximum may be increased by the Manager at any time.

The Fund was formed on May 17, 2005 upon the filing of the Articles of Organization with the Office of the California Secretary of State; however, the Fund did not begin doing business (i.e., making or investing in mortgage loans) until June 26, 2006 when the minimum capitalization of $500,000 was reached. This offering may also be terminated at the option of the Manager at any time, but in no event later than one year from the date of this Offering Circular, unless a renewal offering permit is thereafter issued by the California Commissioner of Corporations.

## Purchase of Units; Subscription Agreements; Admission to the Fund

An investor may invest in and become a Member of the Fund by completing the Subscription Agreement and Power of Attorney attached hereto as Exhibit B (the "Subscription Agreement") and delivering the executed Subscription Agreement to the Manager, together with the purchase price payable for Units. Units may be purchased for cash at $5,000 per Unit with an initial minimum investment of $25,000 (5 Units). This minimum investment amount may be amended or waived at the sole discretion of the Manager on a case-by-case basis at any time.

Subscription Agreements from prospective investors will be accepted or rejected by the Manager promptly after receipt. The Manager reserves the right to reject any subscription submitted for any reason. If accepted, an investor will become a Member and the investor's entire investment shall be

SAC00000622
Exhibit 26-13

deposited into the Fund, provided that, however, the Manager may in its discretion hold an investor's subscription funds in a non-interest bearing account until all, or any portion, of such investor's subscription funds are required by the Fund to invest in a mortgage loan, to create appropriate reserves or to pay organizational expenses. (See "Use of Proceeds.")

Subscription Agreements are non-cancelable and irrevocable and subscription funds are non-refundable for any reason, except upon the consent of the Manager.

Investors who become Members of the Fund and existing Members making additional capital contributions other than on the first day of a calendar month shall be allocated a prorated share of the profits (or losses) for that month based upon the days during the month that the investor was a Member.

### Use of Subscriptions to Pay Pending Withdrawal Requests

Subscription amounts transferred into the Fund may be utilized by the Manager for any proper Fund purpose, including funding mortgage loan investments, creating appropriate reserves or paying Fund expenses. Additionally, the Manager may accept subscriptions for the purpose of fulfilling Members' withdrawal requests if at the time of receipt of a subscription there is a "waiting list" for withdrawals from the Fund. (See "Summary of Operating Agreement – Withdrawal from Fund" and "Risk Factors – Risks Related to Ownership of the Units.") Investors should ask the Manager about length or aggregate amount of the then-current waiting list for withdrawals if that information would be a factor in determining whether to invest in Units.

### Member Preferred Return

Members have the prior right to receive all Fund profits during each calendar year, up to an amount equal to the Member Preferred Return. The Member Preferred Return is the greater of 7.5%[1] per annum or the United States "prime rate" as published in the Wall Street Journal. (See "Operations to Date – Member Preferred Return".)

The Member Preferred Return is calculated based on investors' capital account balances as of the end of each month, and is cumulative during each calendar year but is non-cumulative from year to year. (See "Summary of Operating Agreement – Profits and Losses" and "- Cash Distributions.") The Member Preferred Return is not guaranteed by the Fund or the Manager or anyone else. If Fund profits allocated to Members for any calendar year are less than the Member Preferred Return, the deficiency will not accumulate or be paid from any profits earned in subsequent years.

### Election to Receive Monthly Cash Distributions

Upon subscription for Units, an investor must elect whether to receive monthly cash distributions from the Fund or to allow his or her earnings to compound for the term of the Fund. An investor may elect to switch from compounding to monthly distributions upon 90 days' prior notice to the Manager. In addition, if there is in effect a permit issued by the California Commissioner of Corporations qualifying this offering, an investor may switch from receiving monthly distributions to compounding and reinvesting earnings upon 90 days' prior notice to the Manager. Notwithstanding the foregoing, the Manager reserves the right, at any time, to immediately commence making monthly cash distributions to ERISA plan investors who previously compounded earnings in order to ensure that the Fund remains

---

[1] The 7.5% return referred to in this Offering Circular assumes investors will elect automatic reinvestment of their earnings and is a product of the resulting compounding. Investors electing to receive cash distributions monthly will have a slightly lower return.

SAC00000623
Exhibit 26-14

exempt from the Plan Asset Regulations pursuant to the "significant participation" exemption. (See "ERISA Considerations.") If the Manager determines that, due to subsequent events affecting Fund profits, prior distributions made to electing Members exceed the actual profits allocable to them, the Manager may cease making distributions to those Members until they have been allocated profits equal to the monthly distributions that they have received.

Income allocable to investors who elect to compound their earnings will be retained by the Fund for investing in further mortgage loans or other proper Fund purposes. The income from these further loans will be allocated among all investors; however, investors who compound will be credited with the Member Preferred Return on larger capital account balances because the capital accounts of those investors will increase over time.

## Restrictions on Transfer

As a condition to this offering of Units, restrictions have been placed upon the ability of investors to resell or otherwise dispose of any Units purchased hereunder, including without limitation the following:

(1)     No Member may resell or otherwise transfer any Units without the prior written consent of the Manager, which may be withheld in its sole discretion. (See "Summary of Fund Agreement – Limitations on Transferability.")

(2)     Units may not be sold or transferred without the prior written consent of the California Commissioner of Corporations, except as permitted by the Commissioner's Rules. (See "Commissioner's Rule 260.141.11" below.)

(3)     During the period that Units are being offered and sold and for a period of nine months from the date of the last sale of Units, no Units may be sold or otherwise transferred to any person who is not a bona fide resident of the State of California.

Legends substantially in the forms set forth below will be placed upon all instruments or certificates evidencing ownership of Units in the Fund stating that the Units have not been registered under the Securities Act of 1933, as amended, and setting forth the foregoing limitations on resale, and notations regarding these limitations shall be made in the appropriate records of the Fund with respect to all Units offered hereby. The foregoing steps will also be taken in connection with the issuance of any new instruments or certificates for any Units which are presented to the Manager for transfer during the nine-month period described in subparagraph (3) above.

Certificates shall bear the following legends:

THE MEMBERSHIP UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT").     SUCH UNITS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON AT ANY TIME IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT COVERING SUCH UNITS UNDER THE ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE FUND TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED. IN ADDITION, IN NO EVENT MAY UNITS BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO ANY PERSON WHO IS NOT A RESIDENT OF CALIFORNIA FOR A PERIOD OF NINE MONTHS FROM THE DATE OF THE LAST SALE THEREOF BY THE FUND.

6

IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN OR TO RECEIVE ANY CONSIDERATION THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED BY THE COMMISSIONER'S RULES.

# RISKS FACTORS

Any investment in the Units involves a significant degree of risk and is suitable only for investors who have no need for liquidity in their investments or who can bear the loss of their entire investment. When analyzing this offering, prospective investors should carefully consider the following risks and other factors, in addition to those discussed under the captions "Compensation to Manager," "Conflicts of Interest," and "Federal Income Tax Consequences." If any of these risks actually occur, the business, financial condition and operating results of the Fund could be materially adversely affected.

## RISKS RELATED TO THE FUND'S BUSINESS

### The Fund will be subject to risks related to commercial mortgage loans.

Most of Fund's loans will have repayment guarantees of a portion of, or all of, loan principal and interest, which are issued by the U.S. Small Business Administration ("SBA") under the Fund's non-bank lending license which has been issued to it by SBA.

### The real estate market experienced declines in property values.

During the present real estate market decline, the most dramatic and well-publicized declines in property values (and the largest loan losses) have occurred in the single-family residential sector and may continue to decline in some parts of the country. However, other property categories have also experienced declines in value and a slow-down in sales. The fact that a substantial portion of the Fund's loan portfolio will be secured by commercial, industrial and multi-family residential properties does not insulate the Fund from the risk of loan losses resulting from declines in property values generally. If the market value of property securing Fund loans continues to decline significantly or declines below the amount of a Fund loan on such property, borrowers may have difficulty paying or refinancing the loan or selling the property, causing losses to the Fund and investors.

### Fund loans will be concentrated in the California real estate market.

The Fund's loans will be made and secured by properties concentrated in California and, therefore will be dependent upon the continued demand for office and other commercial property in that region. The Fund's revenue and the value of its loan portfolio may be disproportionately affected if California's local economy and real estate markets suffer greater adverse impacts than the economies and real estate markets in other regions or nationally due to local industry slowdowns and layoffs, changing demographics and other factors that result in oversupply of, or reduced demand for, commercial properties in the region.

### The Fund could suffer defaults on the loans in its portfolio and may have to foreclose on the underlying real estate collateral.

The Fund is in the business of lending money and, as such, takes the risk of defaults by borrowers and other risks faced by lenders. Some Fund loans might provide for monthly payments of interest only and be entirely due and payable in ten years or less. Thus, the borrower might have to make a large "balloon"

SAC00000625
Exhibit 26-16

payment of principal due at the end of the term. Some borrowers are unable to repay such loans out of their own funds and are compelled to refinance or sell the property. Fluctuations in interest rates and the unavailability of mortgage funds could adversely affect the ability of borrowers to refinance their loans at maturity or to sell the underlying property.

If the borrower defaults, the Fund may be forced to purchase the property at a foreclosure sale. If the Fund cannot quickly sell such property, and the property does not produce any significant income, the Fund's profitability might be adversely affected. Further, the property's condition might deteriorate by the time the Fund obtains possession of the property.

### In a foreclosure, the Fund may not be able to recover its full investment.

California state laws and the manner in which the Fund's security interest in the security property is enforced may preclude the Fund from recovering any deficiency from the borrower if the Fund cannot recover its investment from the real property security. Under provisions of California law applicable to all real estate loans, if the real property security proves insufficient to repay amounts owing to the Fund, the Fund may have a right to recover any deficiency from the borrower, although that remedy is seldom used. (See "Certain Legal Aspects of Fund Loans.") While the Fund in many cases will obtain personal guaranties which may be enforced to collect any deficiency balance, such collection may require the Fund to incur litigation expenses and recovery will depend on the collectability of a judgment from the guarantors at the time the judgment is obtained. The Fund will have federal guarantees on some or all of its note investments to protect its investment, up to 90% loss coverage in the event of default.

The recovery of sums advanced by the Fund in making or investing in loans and protecting its security may also be delayed or impaired by the operation of the federal bankruptcy laws. Any borrower has the ability to delay a foreclosure sale by the Fund for a period ranging from several months to several years simply by filing a petition in bankruptcy, which automatically stays any actions to enforce the terms of the loan. The length of this delay and the costs associated with it may cause losses on some Fund investments.

### The Fund will be operating in a highly competitive business.

Due to the nature of the Fund's business, its profitability will depend to a large degree upon the future availability of secured loans. The Fund will compete with other non-bank lenders, institutional lenders and others engaged in the mortgage lending business, including banks and savings institutions, many of which have greater financial resources and experience than the Fund. If these companies increase their marketing efforts to include the Fund's market of borrowers, or if additional competitors enter these markets, the Fund may be forced to reduce its interest rates and fees in order to maintain or expand market share. Any reduction in interest rates or fees charged could have an adverse impact on the Fund's liquidity and profitability.

### If the Fund cannot collect all of the principal and interest due on its loans, the Fund's ability to earn a profit or to fund withdrawals will be impaired.

The Fund's liquidity is dependent on, among other things, payments by borrowers of principal and interest on Fund loans. The Manager will continually monitor the delinquency status of the Fund's loan portfolio and promptly institute collection activities on delinquent accounts but these efforts may ultimately prove unsuccessful. Loan repayments are also likely to be affected by economic conditions in the real estate market. Any failure by the Fund, for any reason, to collect nearly all of the principal and interest on Fund loans will substantially impair the Fund's ability to operate successfully.

8

SAC00000626
Exhibit 26-17

*A decline in the demand for, or increase in the risks of, real estate financing will impair the Fund's ability to make loans or could jeopardize repayment.*

A variety of factors affect the demand for real estate financing, including, without limitation, economic cycles, demand for and availability of new development and construction, competitive pressures, the availability and cost of labor and materials, changes in costs associated with real estate ownership, changes in consumer preferences, demographic trends and the availability of mortgage financing. The Fund will be directly and materially affected by the same risks faced by borrowers as well as those inherent to the commercial and residential real estate development and construction industries. Recently, the U.S. has experienced significant deterioration in certain sectors of the real estate, credit and mortgage markets which may negatively impact the Fund's ability to make suitable real estate loans. Any reduction in the cash flows, income of or financial condition of commercial and residential real estate borrowers by reason of any of the aforementioned factors or others may significantly impair their ability to repay the Fund, which would increase the possibility that delinquencies would occur, that the Fund would incur losses and that Members would lose some or all of their investment in the Units.

*The Fund's business entails risks related to the ownership of real property.*

When the Fund acquires any equity in real property by direct investment, foreclosure or otherwise, the Fund is exposed to the risks of liability incident to real property ownership or tenancy. Owners of real property may be subject to liability for injury to persons and property occurring on the real property or in connection with the activity conducted thereon, as well as liability for failure to comply with governmental regulations. The Fund intends to insure against such risks as soon if and when it acquires real property in foreclosure.

*The Fund may suffer from uninsured losses.*

The Manager will require comprehensive title, fire and casualty insurance on the properties securing the Fund's loans. At the Manager's discretion, the Manager may also require earthquake insurance, but will not generally do so. However, there are certain types of losses (generally of a catastrophic nature) which are either uninsurable or not economically insurable, such as losses due to war, floods, mudslides or other acts of God. Should any such disaster occur, or if casualty insurance is allowed to lapse through oversight, the Fund could suffer losses.

*There are risks of government action if the Manager or the Fund does not comply with all applicable laws and regulations.*

While the Manager will use its best efforts to comply with all local, state and federal lending regulations applicable to it and to the Fund, there is the possibility of governmental action to enforce any alleged violations of such lending laws which may result in legal fees, damage awards or fines and penalties. The Fund intends to avoid residential, owner-occupied loans where the possibility of a violation of the law is much higher than with other loans.

*Lenders run the risk of being responsible for environmental liabilities.*

Under current federal and state law, the owner of real property contaminated with toxic or hazardous substances (including a mortgage lender that has acquired title through foreclosure) may be liable for all costs associated with any remedial action necessary to bring the property into compliance with applicable environmental laws and regulations. This liability may arise regardless of who caused the contamination or when it was caused.

9

SAC00000627
Exhibit 26-18

Even if the Fund does not foreclose on a contaminated site, the mere existence of hazardous substances on the property may depress the market value of the property such that the loan is no longer adequately secured.

A lender's best protection against environmental risks is to thoroughly inspect and investigate the property before making or investing in a loan. The Manager will take certain precautions to avoid environmental problems, such as not making or investing in loans secured by properties known or suspected to have (or to be likely to have) environmental problems. Where deemed appropriate by the Manager prior to making a loan, the Fund will engage an environmental inspection firm to conduct a "Phase I" review of the property. However, due to the nature of many types of environmental contamination, the possibility of the existence of toxic substances may not be apparent from a site visit, and a Phase I review may not reveal the extent or all types of contamination. As a result, it is possible that a security property could have toxic contamination not known to the Manager at the time of making the subject loan.

### *Fund will make government guaranteed note investments*

In November 2009 the Members voted by majority to allow Fund capital to be used for the purchase of a Federal Government Small Business Lending Company license which allows for guarantees on a substantial portion of the Fund's future note investments on commercial properties. The license purchase was approved by the federal government on April 1st, 2010, with immediate purchase of the license from the prior licensee. The license allows for guarantees of up to 90% against any losses of Fund note investments made through the fund's wholly owned subsidiary & license holder, Small Business Capital, LLC. The Fund is required to maintain minimum ongoing capital levels to keep the license in good standing, and to demonstrate the ability to service the guaranteed notes within its investment portfolio. Fund note investments may reflect LTV's (loans to value) of up to 90% on these note investments, which is a higher LTV then the Fund would generally make without a federal guarantee. The average LTV of federally guaranteed note investments in the portfolio will be maintained at 75% or less and of the Fund's other note investments at 65% or less LTV.

### *The Fund will face risks of litigation.*

The Manager will act in good faith and use reasonable judgment in selecting borrowers and making and managing the loans. However, as a lender, the Manager and the Fund are exposed to the risk of litigation by a borrower for any allegations by the borrower (warranted or otherwise) regarding the terms of the loans or the actions or representations of the Manager in making, managing or foreclosing on the loans. It is impossible for the Manager to foresee what allegations may be brought by a specific borrower. The Manager will use its best efforts to avoid litigation if, in the Manager's judgment, the circumstances warrant an alternative resolution. If an allegation is brought and/or litigation is commenced against the Fund or the Manager, the Fund will incur legal fees and costs to respond to the allegations and to defend any resulting litigation. If the Fund is required to incur such fees and costs, this could have an adverse effect on Fund profitability.

The Fund will face risks associated with having a controlling interest in a state or nationally charted financial institution.

Up to 5% of the Maximum Offering Amount ($12,500,000) may be used to acquire a controlling interest in an FDIC insured state or nationally chartered financial institution, yet to be located.. FDIC insured financial institutions are highly regulated. If they fail to meet the capitalization requirements of regulatory authorities or otherwise fail to comply with regulatory law, they may be seized and resold at a loss to the shareholders of the bank. The following is a summary of some of the risks unique to banks:

10

(a)   Loan Defaults. The capital markets continued to experience difficult conditions through 2009 and into 2010, decreasing home prices and increasing delinquencies and foreclosures negatively impacted the credit performance of mortgage and construction loans and resulted in significant write-downs of assets by many financial institutions. The resulting economic pressure on consumers and businesses and the lack of confidence in the financial markets have adversely affected the banking business, financial condition, results of operations and share price and may continue to do so. Some banks may experience increases in foreclosures, delinquencies and customer bankruptcies.

Commercial and industrial loans generally carry larger loan balances and can involve a greater degree of financial and credit risk than other loans. Any significant failure to pay on time by customers would hurt Fund's earnings. The increased financial and credit risk associated with these types of loans are a result of several factors, including the concentration of principal in a limited number of loans and borrowers, the size of loan balances, the effects of general economic conditions on income-producing properties and the increased difficulty of evaluating and monitoring these types of loans.

(b)   Interest Rates. Changes in monetary policy, including changes in interest rates, could influence not only the interest a bank receives on loans and investment securities and the amount of interest it pays on deposits and borrowings, but such changes could also affect: (1) a bank's ability to originate loans and obtain deposits; (2) the fair value of the bank's financial assets and liabilities, including securities portfolio; and (3) the average duration of the bank's interest-earning assets. Any substantial, unexpected, prolonged change in market interest rates could have a material adverse affect on Fund's financial condition and results of operations.

(c)   Loan Loss Reserve. A bank maintains an allowance for loan losses to cover probable and incurred loan losses. Every loan a bank make carries a certain risk of non-repayment, and various assumptions and judgments are made about the collectability of the bank's loan portfolio including the creditworthiness of the borrowers and the value of the real estate and other assets serving as collateral for the repayment of loans. Through a periodic review and consideration of the loan portfolio, bank management determines the amount of the allowance for loan losses. The Manager cannot fully predict the amount or timing of losses or whether the loss allowance will be adequate in the future. If the assumptions prove to be incorrect, the allowance for loan losses may not be sufficient to cover losses inherent in the bank's loan portfolio, resulting in additions to the allowance.

(d)   Capital. A bank is required by federal regulatory authorities to maintain adequate levels of capital to support its operations.   In addition, a bank may elect to raise additional capital to support its business or to finance acquisitions, if any, or it may otherwise elect or be required to raise additional capital.   A bank's ability to raise additional capital, if needed, will depend on conditions in the capital markets, economic conditions and a number of other factors, many of which are outside of a bank's control, and on its financial performance. Accordingly, there can be no assurance that a bank can raise additional capital if needed or on terms acceptable to the bank.   If it cannot raise additional capital when needed, it may have a material adverse effect on its financial condition, results of operations and prospects.

(e)   Legislative or Regulatory Changes.   The financial services industry is extensively regulated. A bank is subject to extensive state and federal regulation, supervision and

11

legislation that govern almost all aspects of its operations. Laws and regulations may change from time to time and are primarily intended for the protection of consumers, depositors and the deposit insurance funds. The impact of any changes to laws and regulations or other actions by regulatory agencies may negatively impact a bank or its ability to increase the value of its business.

(f)     Dodd-Frank Act.  On July 21, 2010, President Obama signed into law the Dodd-Frank Wall Street Reform Act ("Dodd-Frank Act"). The Dodd-Frank Act imposes new restrictions and an expanded framework of regulatory oversight for financial institutions, including depository institutions. Because the Dodd-Frank Act requires various federal agencies to adopt a broad range of regulations with significant discretion, many of the details of the new law and the effects they will have on a bank will not be known for months or even years.

Many provisions of the Dodd-Frank Act will not be implemented immediately and will require interpretation and rule making by federal regulators. While the ultimate effect of the Dodd-Frank Act on a bank's operations cannot be determined yet, the law is likely to result in increased compliance costs and fees paid to regulators, along with possible restrictions on a bank's operations.

Acquisition of a controlling interest in a national bank or savings institution may make the Fund a bank holding company. The Dodd-Frank Act and existing law will impose new requirements on the Fund, which could affect its lending and investment policies as well as impose more federal regulation of the Fund. That could also increase the compliance costs of the Fund.

(g)     The FDIC projects higher premiums to be necessary because financial institution failures resulting from the depressed market conditions have depleted and may continue to deplete the deposit insurance fund and reduce its ratio of reserves to insured deposits. The FDIC, in an effort to avoid larger increases in the premiums, has already taken action to collect FDIC premiums for the next three years in advance. If any additional assessments or large premium increases occur in the future, such actions would negatively affect a bank's financial condition and results of operation.

## RISKS RELATED TO THE MANAGER

*The Members must rely on the Manager for the success of the Fund*

The Fund currently owns a number of loans. However, future loans in which the proceeds of this offering will be invested have not yet been determined, and Members will have no opportunity to review potential Fund loans. The Manager will participate in all decisions with respect to the management of the Fund, including the determination as to what loans to make or purchase, and the Fund is dependent to a substantial degree on their continued services. In the event of the dissolution death, retirement or other incapacity of the Manager or its principal, Mark Feathers, the business and operations of the Fund may be adversely affected.

12

SAC00000630
Exhibit 26-21

*The Members will not have the ability to control the day to day operations of the Fund or to control the Manager. It will be difficult to remove the Manager.*

The Members will have a limited voice in the management decisions of the Fund and can exercise only a very limited amount of control over the Manager. The Members have only the voting rights set forth in the Operating Agreement or required by California law. A vote of a majority of the outstanding Units is required to remove the Manager. Because there may be a significant number of Members holding Units, and Members may have differing opinions with respect to a course of action to take respecting the Fund, it may be difficult, time consuming and costly to solicit adequate votes to remove the Manager.

*The Manager is not required to devote its full time to the business of the Fund.*

The Manager is not required to devote its full time to the Fund's affairs, but only such time as the affairs of the Fund may reasonably require. Each of the principals of the Manager has ongoing businesses outside of and in addition to the business of the Fund.

*The Manager is subject to conflicts of interest.*

There are several areas in which the interests of the Manager will conflict with those of the Fund, which should be carefully considered. (See "Conflicts of Interest.")

*Members of the Fund will have no claim to the fees payable to the Manager.*

The Fund and its borrowers will pay certain fees and compensation to the Manager. (See "Compensation to Manager.") These fees will be owed as incurred. Even if the Fund is unsuccessful in generating sufficient income to cover its operations, it will have no claim against the Manager for a refund of such fees.

## RISKS RELATED TO OWNERSHIP OF THE UNITS

*There is no market for the Units, and transfer of the Units could be severely restricted by law or market conditions.*

There is no public market for the Units and none is expected to develop in the future. Even if a potential buyer could be found, the transferability of Units is also restricted by the provisions of the Securities Act of 1933, as amended, and Rule 144 thereunder, and by the provisions of the Operating Agreement. (See "Terms of the Offering – Restrictions on Transfer.") Any sale, transfer or encumbrance of Units also requires the prior written consent of the Manager, which may be withheld in its sole discretion. Furthermore, Members will have only limited rights to redeem Units or withdraw from the Fund or to otherwise obtain the return of their invested capital. Therefore, all purchasers of Units must be capable of bearing the economic risks of this investment with the understanding that their interest in the Fund may not be liquidated by resale, and should expect to hold their Units for an undetermined period of time, and should understand that such inability to sell or withdraw "on demand" will subject an investment in Units to any losses the Fund may experience during such period.

*The Fund will be taxed as a "Partnership" and the Members will be taxed as "Partners."*

The Fund will elect to be treated as a partnership for federal income tax purposes. Any favorable federal tax treatment presently available with respect to the Fund could be affected by any changes in tax laws that may result through future Congressional action, tax court or other judicial decisions, or interpretations of the Internal Revenue Service. IN VIEW OF THE FOREGOING, PROSPECTIVE

SAC00000631
Exhibit 26-22

MEMBERS ARE URGED TO REVIEW THE "FEDERAL INCOME TAX CONSEQUENCES" SECTION CAREFULLY AND TO CONSULT THEIR OWN TAX COUNSEL.

*The Units are not insured or guaranteed by any government agency or public entity.*

Although some or all Fund loans will be guaranteed in whole or part by the United States Government the Units themselves are not insured or guaranteed by the Federal Deposit Insurance Corporation (FDIC), the Securities Investor Protection Corporation (SIPC) or any other governmental agency or public entity, in contrast to certificates of deposit or accounts offered by banks, savings and loan associations or credit unions. Members in the Fund will be dependent on the Manager's ability to effectively manage the Fund's business to generate sufficient cash flow for the repayment of Members' capital and the generation of any profit. If Fund cash flow proves inadequate, investors could lose part or all of their investments.

*The Fund will not set aside any funds to satisfy requests for withdrawals or redemptions from the Fund. A new investor's subscription may be used in whole or in part to fund withdrawals or redemptions.*

The Manager will not create or contribute funds to a separate account in order to fund requests for withdrawal from the Fund and redemption of an investor's Units. Because funds are not set aside periodically to fund such withdrawals, Members must rely on cash flow from operations and funds from the sale of Units to satisfy withdrawal requests. Money received from the sale of Units may be used in whole or in part, at the discretion of the Manager, to fund such withdrawal and redemption requests. To the extent cash flow from operations and the sale of Units is not sufficient to fund withdrawal requests received by the Fund at any time, an Unit which is unredeemed will remain subject to Fund operations, which may include Fund losses. Furthermore, an investor may be admitted to the Fund at a time when there is a waiting list to withdraw, making it likely that such investor will not be able to withdraw quickly upon being admitted and therefore will remain subject to the Fund's operating results, which may include losses.

*Fluctuations in interest rates pose risks to the Fund's business.*

Mortgage interest rates are subject to abrupt and substantial fluctuations, but the purchase of Units is a relatively illiquid investment. (See above, "No Market for Units.") If prevailing interest rates rise above the average interest rate being earned by the Fund's loan portfolio, investors may wish to liquidate their investment in order to take advantage of higher returns available from other investments but may be unable to do so.

*Investment delays carry risk.*

There may be a delay between the time a subscription is submitted by a prospective investors and the time the Fund accepts such subscription and the investor becomes a Member. There may also be a delay between acceptance into the Operating Account and funding a loan. During these periods of delay, the proceeds may be invested in interest bearing accounts, short-term certificates of deposit, money-market funds or other liquid assets which will not yield as high a return as the anticipated return to be earned on Fund loans. The length of these delays may adversely affect the overall investment return to Members.

*Members may be obligated to return certain impermissible distributions.*

Members are not required to contribute any additional capital to the Fund beyond their investment to pay any debts of the Fund. Under California law, however, limited liability companies such as the Fund are

14

SAC00000632
Exhibit 26-23

prohibited from making distributions to their members if following such distribution the limited liability company would be unable to pay its debts or following such distribution the company's total liabilities would exceed its total assets. Members receiving such distributions may be obligated to return the distribution but only if such member had actual knowledge of the impropriety of the distribution at the time it was made. Consequently, to the extent that a return of a Member's capital contribution is deemed a distribution, a Member may be required under certain circumstances to return such distributions to the Fund to discharge the Fund's liabilities to creditors who extended credit to the Fund during the period such capital contribution was held by the Fund.

***The Units are risky and speculative investments and if you cannot afford to lose your entire investment, you shouldn't invest.***

Prospective investors should be aware that the Units are risky and speculative investments suitable only for investors of adequate financial means. If you cannot afford to lose your entire investment, you should not invest in the Units. If the Fund accepts an investment, you should not assume that the Units are a suitable and appropriate investment for you.

***Investors have not been independently represented in the formation of the Fund.***

Investors in the Fund have not been represented by independent counsel in its organization, and the attorneys who have performed services for the Fund have also represented the Manager. Thus, conflicts of interest between the Fund and the Manager may not have been addressed as vigorously as in an arms-length transaction. (See "Conflicts of Interest.")

# FORWARD-LOOKING STATEMENTS

This Offering Circular contains forward-looking statements within the meaning of federal securities law. Words such as "may," "will," "expect," "anticipate," "believe," "estimate," "continue," "predict," or other similar words, identify forward-looking statements. Forward-looking statements appear in a number of places in this Offering Circular, including, without limitation, the "Use of Proceeds," "Business" and "Business and Lending - Lending Standards and Policies" sections, and include statements regarding the Fund's intent, belief or current expectation about, among other things, trends affecting the markets in which the Fund will operate, its business, financial condition and strategies. Although the Fund believes that the expectations reflected in these forward-looking statements are based on reasonable assumptions, forward-looking statements are not guarantees of future performance and involve risks and uncertainties. Actual results may differ materially from those predicted in the forward-looking statements as a result of various factors, including those set forth in the "Risk Factors" section of this Offering Circular. If any of the events described in "Risk Factors" occur, they could have an adverse effect on the Fund's business, financial condition and results of operations. When considering forward-looking statements, prospective investors should keep these Risk Factors in mind as well as the other cautionary statements in this Offering Circular. Prospective investors should not place undue reliance on any forward-looking statement. The Fund is not obligated to update forward-looking statements.

# FUND BUSINESS AND LENDING

### FDIC Insured Financial Institution

The Fund may acquire a controlling interest in a state or national, FDIC insured financial institution. The Manager believes that such an acquisition would enable the Fund to participate in loans with the institution it controls, increasing the volume of loans of the type the Fund is able to do and lowering its cost of funds. A target financial institution designated for a fund controlling interest would have

15

$100,000,000 or less in total assets and $10,000,000 or less in capital. The target bank must have sufficient Tier 1 capital to be considered "well capitalized" for regulatory purposes. The target bank must either be profitable in the most recent quarter or have a reasonable expectation of doing so after acquisition. The acquisition of a controlling interest in a financial institution may make the Fund a bank holding company for federal regulatory purposes.

## Lending

The Fund will engage in the business of purchasing loans secured by first deeds of trust that encumber commercial real estate located primarily in California, and up to 20% of fund managed capital outside of California. All Fund loans will be selected by the Manager pursuant to guidelines set forth in the "Lending Standards and Policies" section below.

The Fund staff will select and arrange Fund loans. The Manager may earn points, not to exceed 3% of loan principal, on loans which it arranges for the Fund and on some loans, or portion of loans, which the manager chooses to sell on behalf of the Fund. (See "Compensation to Manager" and "Conflicts of Interest.") Borrowers generally will borrow from the Fund an amount sufficient to pay the points to the Manager, which becomes part of the loan balance to be repaid by the borrower. (See "Use of Proceeds.") All of the promissory notes and deeds of trust evidencing Fund loans will list the Fund as the initial lender or will be assigned to the Fund upon purchase of the loan. The Fund will earn income from the interest on such loans, and from the payment of late fees, prepayment penalties and other fees which may be charged to borrowers.

The Fund may rely primarily on the value of the real property securing loans to protect its investment, but it also investigates the ability of the borrower to repay the loan. To determine the value of the real property, the Fund will conduct a Market Value Analysis to determine the fair market value of real property used to secure loans made by the Fund (see "Business and Lending - Lending Standards and Policies," below, for the definition of Market Value Analysis), and in most cases, the Market Value Analysis is accurate.

## Lending Standards and Policies

### General Standards for Mortgage Loans

The Fund will engage in the business of making primarily federally guaranteed loans secured by first deeds of trust that encumber commercial real estate located primarily in California or, in some cases, investing in notes secured by such properties or loans in other states. All Fund loans will be secured by first deeds of trust on commercial or industrial real estate collateral. The Fund will not make construction loans or loans secured by leasehold interests.

The Manager will seek to evaluate loans quickly in order to complete the underwriting process in one to two weeks. Many borrowers are willing to pay higher interest rates for a lender's ability to close quickly on such loans, which may not conform to an institutional lender's strict credit and income documentation guidelines, but which will meet Federal underlining guidelines to qualify for loan guarantees.

The Manager has adopted conservative lending policies, which are outlined below, relying primarily on making loans at a conservative loan-to-value ratio (65% or less, collectively within the portfolio) and on the borrower's equity in the underlying real estate. For federally guaranteed loans, the Fund may consider a loan-to-value ratio as high as 90% aggregate LTV, however the average LTV of federally guaranteed note investments in the portfolio will be maintained at 75% or less and of the Fund's other note investments at 65% or less LTV.

16

SAC00000634
Exhibit 26-25

Some or all of the Fund's loans will be guaranteed by a governmental agency. The Fund will select loans for investment pursuant to a strict set of guidelines set forth below, which guidelines are designed to set standards for the quality of the real property security given for the loans.

1.   Priority of Mortgages.   Fund loans will be secured by first deeds of trust (i.e., senior to any other encumbrances on the security property). Fund loans may be senior to a second loan to the borrower made or guaranteed by the United States Small Business Administration which will be junior to the Fund's encumbrance (i.e., a second deed of trust).

2.   Geographic Area of Lending Activity.   Most Fund loans will be secured by deeds of trust on properties located in California, but the Fund may also invest in loans secured by real property in other states if such loans otherwise satisfy the underwriting criteria described herein. Less than 20% of the proceeds of this offering will be used to invest in loans secured by properties outside California.

3.   Loan-to-Value Ratios.   The average amount of the Fund's loans without a Federal guarantee will not exceed 65% of the value of the security property based upon an appraisal performed by an independent California certified appraiser. The loan-to-value ratio of a given loan may be increased if, in the sole discretion of the Manager, a given loan is supported by credit adequate to justify a higher loan-to-value ratio.

The foregoing loan-to-value ratios will not apply to purchase-money financing offered by the Fund to sell any real estate owned through foreclosure ("**REO Properties**") or to refinance an existing loan that is in default at the time of maturity. In such cases, the Manager shall be free to accept any reasonable financing terms that it deems to be in the best interests of the Fund, in its sole discretion.

4.   Terms of Loans.   The term of Fund loans will vary at the discretion of the Manager. Fund loans will generally have a term of between three months and twenty-five years (federally guaranteed loans). Some Fund loans will not be fully amortizing or will be only partially amortizing or provide for monthly payments of interest only with a "balloon payment" at the end of the term (especially if the loan is for a term of five or less years).

5.   Escrow Conditions.   Some Fund loans will be purchased either (a) through an escrow account handled by the Manager or a qualified title insurance or escrow company, or (b) directly from the original funding source (not through an escrow) after due diligence has been performed on the loan to demonstrate that the borrower and real estate meet all of the underwriting standards set forth herein. All loans purchased will require the following:

(a)   Satisfactory title insurance coverage will be demonstrated for all loans, with the title insurance policy assigned to the Fund as the insured and providing title insurance in an amount not less than the principal amount of the loan. Title insurance insures only the validity and priority of the Fund's deed of trust, and does not insure the Fund against loss by reason of other causes, such as diminution in the value of the security property, over-appraisals, borrower's defaults, etc.

(b)   Satisfactory fire and casualty insurance will be demonstrated for all loans (except for unimproved property), which insurance will be assigned to the Fund as loss payee in an amount equal to the principal amount of the Fund's loan. (See "Risk Factors – Uninsured Losses.")

(c)   Because of the generally low loan to value ratio of Fund loans and because there are no owner-occupied residential mortgages in the Fund, the Manager does not intend to arrange for mortgage insurance, which would afford some protection against loss if the Fund foreclosed on a loan and there were insufficient equity in the security property to repay all sums owed.

17

SAC00000635
Exhibit 26-26

(d)     The Fund shall receive assignments of all beneficial interest in any documents related to each Loan purchased. Fund investments in Loans will not be held in the name of the Manager or any other nominee.

6.     <u>No Loans to Manager</u>.  No loans will be made by the Fund to the Manager or to any of its affiliates, except for any financing extended as part of a sale of real estate owned or loans purchased as a result of foreclosure. (See "Conflicts of Interest – Sale of Real Estate Owned to Affiliates.")

7.     <u>Purchase of Loans from Affiliates</u>.  Existing loans funded or acquired by the Manager or its affiliates may be purchased by the Fund. The Fund may also purchase loans from third parties. All loans purchased by the Fund must satisfy the lending guidelines described above. Generally, the purchase price to the Fund for any such loan will not exceed the par value of the note or its fair market value, whichever is lower, but the Manager may purchase loans for a premium if the Manager believes the total purchase price is fair and reasonable and in the best interest of the Fund.

8.     <u>Loan Diversification</u>.  No Fund loan (or Fund interest in a loan) will exceed 20% of total Fund capital at the time of the loan.

9.     <u>Reserve Fund</u>.  A contingency reserve fund may be retained for the purpose of covering unexpected cash needs of the Fund, if the Manager believes it to be in the best interests of the Fund. The amount of this reserve fund, if any, would be established by the Manager and may vary from time to time. This reserve fund may be held in bank accounts, money market accounts, or other assets which allow for timely access to the funds. The Manager does not intend to make any adjustments for loan losses or bad debt reserves; however, the Manager's interest in net profits of the Fund is subordinate to the monthly profits payable to the Members. As such, loan losses to the Fund will be borne by the Manager prior to affecting allocations of Fund income to the Members. In addition, the Fund may create loan loss reserves out of its income. These reserves are not liquid nor tax deductible, but an accounting allocation of a portion of the Fund's profits to the possibility of losses on loans.

10.     <u>Leverage.</u>     The Fund may borrow funds in the ordinary course of business to support the Fund's future note investments.

## Credit Evaluations

The Manager will consider the income level and general creditworthiness of a borrower, and any guarantor, to determine a borrower's ability to repay the Fund loan according to its terms. The Manager will also consider whether a borrower has sufficient equity in the security property to satisfy the loan-to-value ratios described above.

## Sale of Loans

The Fund will invest in mortgage loans for investment and does not anticipate engaging in real estate operations in the ordinary course of business (except as may be required if the Fund forecloses on a property on which it has invested in a mortgage loan and takes over ownership and management of the property); however, the Fund may sell mortgage loans or portions of loans when the Manager determines that it appears to be advantageous for the Fund to do so, based upon then current interest rates, the length of time that the loan has been held by the Fund, and the overall investment objectives of the Fund.

18

SAC00000636
Exhibit 26-27

# FUND MANAGEMENT AND LOAN SERVICING

The Manager will have the sole authority to manage the affairs of the Fund and will have the sole authority to: (i) identify loans to be made or purchased by the Fund; (ii) monitor and assess loan portfolio performance and set the Fund's accounting procedures; (iii) oversee loan servicing and make loan enforcement decisions; and (iv) otherwise direct the day-to-day operations of the Fund. Members will have limited rights to vote on or direct the actions of the Fund and must rely upon the Mangers to make decisions in the best interests of the Fund. (See "Risk Factors--Risks Related to the Manager.")

## Loan Servicing

It is anticipated that all Fund loans will be "serviced" (i.e., loan payments will be collected and other administrative services performed) by the Manager. The Manager may be compensated for such loan servicing activities. (See "Compensation to Manager.")

Borrowers will make loan payments in arrears, i.e., with respect to the preceding month, and will be instructed to mail their checks or money orders to the Manager for deposit in the Manager's trust account to be maintained at a financial institution selected by the Manager. (See "Certain Legal Aspects of Fund Loans.")

## Fund Accounting Procedures

The Managers shall, in consultation with the Fund's accountants, be responsible for determining the accounting policies and procedures of the Fund. In connection therewith, the Managers will assess the Fund's portfolio at intervals determined by the Managers to be reasonable in light of current market conditions in order to account for or recognize any impairment to the loans comprising the Fund's portfolio or to otherwise comply with generally accepted accounting principals ("GAAP"). The preparation of financial statements in compliance with GAAP requires the Manager to make certain estimates and assumptions about the Fund's assets, liabilities, revenues and expenses at the time such financial statements are prepared. This includes the Manager's periodic assessment and valuation of the Fund's loan portfolio and the impairment of fund loans and REO Properties as further described below. Consequently, the valuations set forth in the "Operations to Date" section of this Offering Circular reflect the Manager's best estimates at the date stated and a material change to such estimates may occur subsequent to such date.

To assess the risk of losses that may be incurred on loans held by the Fund, the Manager undertakes periodic evaluations of the Fund's loan portfolio on a loan-by-loan basis. Loans are assessed for various risk factors including payment history, current economic conditions, collateral type, initial loan to value ratios, current estimated loan-to-value ratios and any other factor that might affect the full recoverability of a Fund loan balance. Delinquent loans are assessed based upon the length of the delinquency and the potential that the Fund will not collect all amounts due from a borrower under the loan through payment or through recovery of the full loan balance from the value of the security property.

The Fund's current accounting policy is to cease to accrue interest (for purposes of calculating earnings) on any loan that is delinquent for a period of three months unless the Manager determines, in its reasonable judgment, that all amounts due under the loan are likely to be recovered in a reasonable time period ("**Non-Accrual Status**"). Further payments received on Fund loans that have been placed on Non-Accrual Status will be accounted for by the Fund on a cash rather than accrual basis until loan payments are again being received by the Fund on a current basis. If events or circumstances relating to a loan (on Non-Accrual Status or otherwise) cause the Manager, in its reasonable judgment, to have serious doubts about the full recovery of the entire loan balance due from a borrower or the collateral for the loan, the

19

SAC00000637
Exhibit 26-28

Manager may categorize such loan as "impaired" (an **Impaired Loan**"). In such event, the Manager will attempt to assess the potential loss that may be realized by the Fund in connection with the Impaired Loan and whether a loan loss reserve should be established to reflect that assessment.

In the event that real estate is acquired by the Fund through foreclosure or by deed in lieu of foreclosure (an "**REO Property**") the REO Property is initially recorded at its fair market value less estimated costs required for sale of the property. To the extent the REO Property's fair market value less costs of sale is less than the carrying value of the loan the REO Property previously secured, the amount of such difference is charged against any allowance for loan losses established by the Manager if necessary. (See "Operations to Date – Portfolio Performance".)

ALL OF THE FUND'S ACCOUNTING POLICIES INCLUDING THOSE RELATED TO IMPAIRED LOANS, NON-ACCRUAL STATUS AND THE FUND'S LOAN LOSS RESERVE ARE MADE IN CONSULTATION WITH THE FUND'S ACCOUNTANTS IN CONFORMITY WITH GENERALLY ACCEPTED ACCOUNTING PROCEDURES. THE MANAGER MAY, IN CONSULTATION WITH THE FUND'S ACCOUNTANTS, REVISE ANY FUND ACCOUNTING POLICY AT ANY TIME WITHOUT THE APPROVAL OF, OR NOTICE TO, ANY OF THE MEMBERS.

# OPERATIONS TO DATE

The Fund began doing business (i.e., investing in mortgage loans) June 26, 2006 when the minimum 100 Units (i.e., $500,000) were sold. Information regarding the Fund's performance and its current loan portfolio is set forth below. Additional financial information and information regarding the Fund's operations is set forth in the Fund's 2009 Audited Financial Statements attached hereto as Exhibit C.

### Prime Rate and Member Preferred Return

Members have the prior right to receive all Fund profits during each calendar year, up to an amount equal to the Member Preferred Return. The Member Preferred Return is the greater of 7.5% per annum or the United States "prime rate" as published each month in the Wall Street Journal ("**Prime Rate**"). The Prime Rate is an index or foundation rate used by lending institutions (including traditional banks, credit unions, etc.) for pricing various short-term loan products. The Prime Rate published in the Wall Street Journal is determined by polling the ten largest banks in the United States and when seven of the top ten banks adjust their prime rate the Prime Rate will be adjusted in the publication. It is generally accepted that the Prime Rate utilized by U.S. banks is determined by adding 300 basis points (or 3.00 percentage points) to the Federal Funds Target Rate set by the Federal Open Markets Committee ("**FOMC**") and, consequently Prime Rate adjustments historically correspond to the periodic adjustments to the Federal Funds Target Rate made by the FOMC.[2]

The Member Preferred Return is calculated based on investors' capital account balances as of the end of each month based upon the then current Prime Rate, and is cumulative during each calendar year but is non-cumulative from year to year. The following table indicates the prime rate and corresponding Member Preferred Return payable since inception[3]:

| Applicable Prime Rate Periods | Prime Rate | Member Preferred |
|---|---|---|

---

[2] Information regarding the Prime Rate and The Wall Street Journal's publishing requirements and policies taken from The Wall Street Journal Online at www.WSJprimerate.us.
[3] Based upon Prime Rate historical information published by The Wall Street Journal as of April 26, 2010 at www.WSJprimerate.us.

SAC00000638
Exhibit 26-29

|  |  | Return |
|---|---|---|
| Inception – June 28, 2006 | 8.00% | 8.00% |
| June 29, 2006 – September 17, 2007 | 8.25% | 8.25% |
| September 18, 2007 – October 30, 2007 | 7.75% | 7.75% |
| October 31, 2007 – December 10, 2007 | 7.50% | 7.50% |
| December 11, 2007 – January 21, 2008 | 7.25% | 7.50% |
| January 22, 2008 – January 29, 2008 | 6.50% | 7.50% |
| January 30, 2008 – March 17, 2008 | 6.00% | 7.50% |
| March 18, 2008 – April 29, 2008 | 5.00% | 7.50% |
| April 30, 2008 – October 7, 2008 | 4.50% | 7.50% |
| October 8, 2008 – October 28, 2008 | 4.00% | 7.50% |
| October 29, 2008 – December 15, 2008 | 4.00% | 7.50% |
| December 16, 2008 – Present | 3.25% | 7.50% |

**Average Annual Investment Yield**

The average net annual investment yields paid to the Members for each year since inception are as follows:

| Year | Average Annual Net Yield |
|---|---|
| 2006 | 8.60%<br>(June 30 – December 31) |
| 2007 | 8.25% |
| 2008 | 8.63% |
| 2009 | 6.50% |
| 2010 (to date) | 7.20% |

A portion of the returns paid to the Members resulting in the above referenced yields included amounts that exceeded the Member Preferred Returns as set forth above and consisted of Fund profits otherwise payable to, but waived by, the Manager and re-allocated to investors. The Manager has no obligation to waive such amounts in the future. (See "Terms of the Offering – Member Preferred Return" and "Summary of Operating Agreement – Profits and Losses".)

**Portfolio Performance**

As of December 31, 2010, the Fund had not incurred any actual loan losses. The number of Impaired Loans, REO Properties and loans on Non-Accrual Statue including the estimated losses associated

SAC00000639
Exhibit 26-30

therewith are set forth below. All information is current as of September 30, 2010. (See "Fund Management and Servicing – Fund Accounting Procedures" for the definitions of Non-Accrual Status, Impaired Loans and REO Properties.)

**Loan Defaults and Loan Losses**

| Default Status | Number of Loans | Aggregate Principal Balance | Aggregate Estimated Loss | Percentage of Fund Capital |
|---|---|---|---|---|
| Non-Accrual Status | 0 | $0 | $0 | 0.0% |
| Impaired Loans | 0 | $0 | $0 | 0.0% |
| TOTAL: | 0 | $0 | $0 | 0.0% |

**REO Properties and Losses**

In 2010, the Fund foreclosed on no loans.

**Loan Loss Reserve**

The Manager may establish a loan loss reserve ("**Loan Loss Reserve**") for the purpose of recognizing over time the loan losses that the Fund could potentially incur over the life of the Fund. Such a Loan Loss Reserve would recognize potential losses by incurring charges against monthly Fund income in an amount deemed necessary by the Manager to accumulate an adequate Loan Loss Reserve in light of existing loan losses and the risk of potential loan losses in the future.

**Portfolio Diversification and Concentrations**

As of December 31, 2010, the Fund had a total capitalization of $15,436,440 with outstanding loan investments in 15 mortgage loans in an aggregate principal amount of $9,898,462. The average size of a Fund loan as of December 31, 2010 was approximately $659,857 with average interest rates on Fund loans 7.6% and maturity dates ranging from one to 25 years.

As of December 31, 2010, the Fund's loans were diversified as follows (based upon principal balance):

**Lien Priority Concentrations**

| Lien Priority | Aggregate Principal Amount of Loans | Percentage of Total Loan Principal |
|---|---|---|
| First Trust Deeds | $9,898,462 | 100% |
| TOTAL: | $9,898,462 | 100% |

SAC00000640
Exhibit 26-31

**Security Property Classification Concentrations**

| Type of Property | Aggregate Principal Amount of Loans | Percentage of Total Loan Principal |
|---|---|---|
| Residential (non-owner occupied) | $0 | 0% |
| Commercial/Industrial Property | $9,898,462 | 100% |
| Mixed-use property | $0 | 0% |
| Unimproved land | N/A | N/A |
| | | |
| TOTAL: | $9,898,462 | 100.0% |

**Security Property Location Concentrations**

| Property Location by County | Aggregate Principal Amount of Loans | Percentage of Total Loan Principal |
|---|---|---|
| Alameda County, California | $2,942,501.52 | 29.73% |
| Santa Clara County, California | $1,688,948.23 | 17.06% |
| Napa County, California | $1,152,086.00 | 11.64% |
| San Mateo County, California | $2,736,031.52 | 27.64% |
| San Francisco County, California | $531,757.85 | 5.37% |
| San Joaquin County, California | $659,150.00 | 6.66% |
| Contra Costa, California | $187,987.77 | 1.90% |
| TOTAL: | $9,898,462.89 | 100% |

A copy of the Fund's audited financial statements as of December 31, 2009 are available from the Fund Manager. Further details about the Fund's loan portfolio are included in those financial statements.

PAST PERFORMANCE IS NOT A GUARANTY OF FUTURE RESULTS. THE FOREGOING DISCUSSION IS NOT A PREDICTION OF FUTURE FUND RESULTS.

## THE MANAGER AND ITS AFFILIATES

The Manager will manage and direct the affairs of the Fund. The Manager, formerly known as 504 First Lending Mortgage Corp., dba Los Altos Mortgage & Investment, was incorporated in 2004. Since 2004, the Manager has arranged more than 150 mortgage loans in the aggregate principal amount of $250,000,000.00. Manager will act as the underwriter and servicing agent in connection with loans funded by the Fund. The Manager is majority owned and operated by its Director and Chief Executive Officer, Mark Feathers.

**Mark Feathers** currently is a Director and the Chief Executive Officer of Manager. Mr. Feathers has an extensive background in commercial and investment real estate and real estate lending. He has worked at

23

SAC00000641
Exhibit 26-32

the senior management level for various FDIC insured state and national financial institutions, with a particular focus on government guaranteed loan products. Prior to founding SB Capital and Investors Prime Fund, LLC, Mr. Feathers was employed as a Manager of Commercial Real Estate Lending at United American Bank where he was responsible for  managing commercial loan originations and servicing for the bank and assisted in pre-opening capital raising efforts and formulating loan policies and credit products marketing strategy. Mr. Feathers received his Masters Degree in Business Administration in 1991 from Golden Gate University in San Francisco, and his Bachelors Degree in Finance in 1985 from Pennsylvania State University. In between his periods of degree work, Mark served with distinction as an Officer in the United States Navy. He has received the Armed Forces Expeditionary medal, the Pacific Fleet Best Sales and Service Award and several other service commendations.

**Peter Eberle** currently is the Senior Vice President of Manager and manages business development at the Lafayette office with over 19 years experience in the financial services industry. He was a Vice President at Goldman Sachs and was a Registered Investment Advisor. Peter was a Lead Market Maker on the Pacific Exchange and served on Goldman Sachs US Equity Risk Management Committee. Peter was raised, in Orinda, California where he attended Miramonte High School and later studied Economics at UC Berkeley.

## SBC Portfolio Fund, LLC

The Manager is also the sole Manager of SBC Portfolio Fund, LLC, a California limited liability company ("**Fund II**"), a mortgage fund that has operated since July of 2007. Membership interests in Fund II are offered pursuant to the exemption from federal registration contained in Section 4(2) of the Securities Act of 1933 and Regulation D promulgated thereunder and under Section 25102(f) and 25102.1 of the California Corporate Securities Law of 1968; As of December 31st, 2010, Fund II had a total capitalization of approximately \$3,800,000 invested in 7 loans. The Manager will continue to offer membership interests in Fund II to new investors and will continue to make loans while this offering is continuing. (See "Conflicts of Interest – Other Funds or Businesses")

# COMPENSATION TO MANAGER AND ITS AFFILIATES

The following discussion summarizes the forms of compensation to be received by the Manager and its affiliates. With the exception of the Manager's subordinated profits interest, all of the amounts described below will be received regardless of the success or profitability of the Fund. None of the following compensation was determined by arm's-length negotiations. The Manager retains the rights to terminate all or any portion of its business relationship with the Fund at any time, in which event the Fund would seek to retain one or more other firms to perform the various services to be rendered by the Manager as described below.

**Manager's Administrative Fee.** The only expense borne by the Fund are the cost of its annual audit, tax return preparation, LLC tax, protective advances on loans and the cost to own and maintain real estate, if acquired in foreclosure and the salaries of staff involved in work concerning federally guaranteed loan originations.

## Manager's Subordinated Profits Interest

The Manager shall receive subordinated monthly distributions from the Fund in amounts equal to the remainder of funds available for distribution after all Fund expenses and all allocations of Member Preferred Return for have been made to the Members. The distributions to the Manager are in recognition of the services it performs as the servicer of Fund loans and as the Manager of the Fund, generally.

24

SAC00000642
Exhibit 26-33

**Origination and Loan Documentation Fees**

The Manager and its affiliates will receive origination and loan sale premiums payable by the borrowers and other investors on Fund loans arranged by the Manager and its affiliates. The Manager and its affiliates may also be entitled to receive loan processing, servicing and documentation fees associated with loans arranged by Manager and its affiliates. Such fees will payable by the borrowers on Fund loans at prevailing industry rates depending on market conditions.

## FIDUCIARY RESPONSIBILITY OF THE MANAGER

Under California law, the fiduciary duties of a manager to the limited liability company and to its members are those of a partner to a partnership and to the partners of a partnership. Accordingly, a manager is accountable to a limited liability company as a fiduciary, which means that a manager is required to exercise good faith and integrity with respect to company affairs. This fiduciary duty is in addition to those other duties and obligations of, and limitations on, the Manager which are set forth in the Operating Agreement. The Fund's business operations and affairs will be managed entirely by the Manager, which is subject to certain conflicts of interest. (See "Conflicts of Interest.")

The Fund has not been separately represented by independent legal counsel in its formation or in its dealings with the Manager, and Members must rely on the good faith and integrity of the Manager to act in accordance with the terms and conditions of this offering.

The Manager must, on demand, give to any Member or his legal representative true and complete information concerning all company affairs. Each Member or his legal representative has the right to inspect and copy the Company books and records upon reasonable request during normal business hours. Notwithstanding the foregoing, the Manager may, in its discretion, require a member requesting investor lists or other similar information to execute a non-disclosure agreement with respect to such information in order to limit the use of the disclosed information to a proper purpose.

The Operating Agreement provides that the Manager shall have no liability to the Fund for losses resulting from errors in judgment or other acts or omissions, unless the Manager is guilty of fraud, bad faith or willful misconduct. The Operating Agreement also provides that the Fund shall indemnify the Manager against liability and related expenses (including reasonable attorneys' fees and costs) incurred in dealing with the Fund, Members or third parties, so long as no fraud, bad faith or willful misconduct on the part of the Manager is involved. Therefore, Members may have a more limited right of action then they would have absent these provisions in the Operating Agreement. A successful indemnification of the Manager or any litigation that may arise in connection with the Manager's indemnification could deplete the assets of the Fund. Members who believe that a breach of the Manager's fiduciary duty has occurred should consult with their own counsel.

## CONFLICTS OF INTEREST

The following is a list of the important areas in which the interests of the Manager will conflict with those of the Fund. The Members must rely on the general fiduciary standards which apply to a general partner of a limited partnership to prevent unfairness by the Manager or an affiliate of the Manager in a transaction with the Fund. The Fund has not been represented by separate legal counsel in connection with its formation or its dealings with the Manager. (See "Fiduciary Responsibility of the Manager.") Except as may arise in the normal course of the relationship, there are no transactions presently contemplated between the Fund and its Manager (or its affiliates) other than those listed below.

SAC00000643
Exhibit 26-34

## Loan Origination Fees, Premiums from Loan Sales, Renewal and Forbearance Fees

None of the compensation set forth under "Compensation to Manager and Its affiliates" was determined by arms' length negotiations. It is anticipated that the loan origination fees, loan sale fees, renewal and forbearance premiums charged to borrowers by the Manager will average between 0% – 5% of the principal amount of each loan, but may be higher or lower depending upon market conditions. An increase in such charges may affect the interest rates that borrowers will be willing to pay the Fund, thus reducing the overall rate of return to Fund. Conversely, if the Manager reduced the loan origination fees, renewal and forbearance fees charged by it, a higher rate of return might be obtained for the Fund. This conflict of interest will exist in connection with every Fund loan transaction; however, any reduction in the rate of interests received by the fund above the Member Preferred Return will be borne by the Manager. The Manager will earn compensation from two sources: (i) its subordinated profits interest; and (ii) the loan premiums that it collects with loan sales or participations. Such compensation is not affected by whether the loan proves to be a good investment for the Fund. Therefore, the Manager may be motivated to close loans using Fund monies that are risky or otherwise not in the best interests of the Fund, in order to earn its loan points, especially if the profits earned by the Fund are insufficient to pay the Manager a substantial profits interest and such commissions become the Manager's primary or sole source of compensation earned from the Fund. Members must rely generally upon the fiduciary duties of the Manager to protect their interests. The Fund will generally charge borrowers interest at the rate generally prevailing in the geographical areas where the security property is located for loans to comparable borrowers of similar size, duration and security.

The Manager has the right to retain the services of other firms, in addition to or in lieu of the Manager, to perform origination services, loan servicing and other activities in connection with the Fund's loan portfolio that are described in this Offering Circular.

## Other Funds or Businesses

The Manager is also the Manager of Fund II, another mortgage Fund, and in the future may sponsor other funds formed to conduct business similar to that of the Fund. If these other funds have funds to invest at the same time as the Fund, there will then exist conflicts of interest on the part of the Manager as to whether to offer a particular loan opportunity to the Fund or to these other funds. The Manager will decide which loans are appropriate for funding by the Fund or by such other funds after consideration of all relevant factors, including the size of the loan, portfolio diversification, and amount of uninvested funds, but such decisions will not be subject to review or approval by Members.

The Manager may engage for its own account, or for the account of others, in other business ventures, similar to that of the Fund or otherwise, and neither the Fund nor any Member shall be entitled to any interest therein.

The Fund will not have independent management and it will rely on the Manager for the operation of the Fund. The Manager will devote only so much time to the business of the Fund as is reasonably required. The Manager will have conflicts of interest in allocating management time, services and functions between its existing business interests other than the Fund and any future partnerships which it may organize as well as other business ventures in which it may be involved. The Manager believes it has sufficient time and resources to be fully capable of discharging their responsibilities to all such entities.

## Lack of Independent Legal Representation

The Fund has not been represented by independent legal counsel to date. The use by the Manager and the Fund of the same counsel in the preparation of this Offering Circular and the organization of the Fund

26

SAC00000644
Exhibit 26-35

may result in the lack of independent review. Additionally, counsel for the Manager and the Fund have not represented the interests of individual Members and will not do so in the future. Prospective investors who desire legal advice in connection with this investment must consult with their own attorney for legal advice.

### Sale of Defaulted Loans or Real Estate Owned to Affiliates

In the event a Fund loan goes into default or the Fund becomes the owner of any real property by reason of foreclosure on a Fund loan, the Manager's first priority will be to arrange the sale of the loan or property for a price that will permit the Fund to recover the full amount of its invested capital plus accrued but unpaid interest and other charges, or so much thereof as can reasonably be obtained in light of current market conditions. In order to facilitate such a sale, the Manager may arrange a sale to persons or entities controlled by or affiliated with the Manager (e.g., to another entity formed by the Manager or its affiliates), for the express purpose of acquiring defaulted loans or foreclosure properties from lenders such as the Fund. The Manager will be subject to conflicts of interest in arranging such sales since it will represent both parties to the transaction. For example, the Fund and the potential buyer will have conflicting interests in determining the purchase price and other terms and conditions of sale. The Manager's decision will not be subject to review by any outside parties.

The Manager shall undertake to resolve these conflicts by setting a purchase price for each defaulted loan or property which is not less than any of the following: (i) the independently appraised value of such loan or property, if any, at the time of sale; (ii) the amount of any third party offer already received, if any; or (iii) the total amount of the Fund's investment in the property. The Fund's investment is deemed to include without limitation the following: the unpaid principal amount of the loan upon which the Fund foreclosed, all unpaid interest accrued to the date of foreclosure, expenditures made to protect the Fund's interest in the property such as payments to senior lienholders and for insurance and taxes, all costs of foreclosure (including attorneys fees actually incurred to prosecute the foreclosure or to obtain relief from stays in bankruptcy), and any advances made by or on behalf of the Fund for any of the foregoing. A portion of the purchase price may be paid by the affiliate executing a promissory note in favor of the Fund, secured by a deed of trust on the property being sold. The total loan-to-value ratio for the property (including the Fund's note and any senior liens) will not exceed 90% of the appraised value of the property, and the note will otherwise contain terms and conditions comparable to those that would be contained in notes executed by third parties.

## ERISA CONSIDERATIONS

The Employee Retirement Income Security Act of 1974 ("ERISA") contains strict fiduciary responsibility rules governing the actions of "fiduciaries" of employee benefit plans. It is anticipated that some Members will be corporate pension or profit-sharing plans and Individual Retirement Accounts, or other employee benefit plans that are subject to ERISA. In any such case, the person making the investment decision concerning the purchase of Units will be a "fiduciary" of such plan and will be required to conform to ERISA's fiduciary responsibility rules. Persons making investment decisions for employee benefit plans (i.e., "fiduciaries") must discharge their duties with the care, skill and prudence which a prudent man familiar with such matters would exercise in like circumstances. In evaluating whether the purchase of Units is a "prudent" investment under this rule, fiduciaries should consider all of the risk factors set forth above. Fiduciaries should also carefully consider the possibility and consequences of unrelated business taxable income (see "Federal Income Tax Consequences."), as well as the percentage of plan assets which will be invested in the Fund insofar as the diversification requirements of ERISA are concerned. An investment in the Fund is relatively illiquid, and fiduciaries must not rely on an ability to convert an investment in the Fund into cash in order to meet liabilities to plan participants who may be entitled to distributions. DUE TO THE COMPLEX NATURE OF ERISA,

27

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT HIS OWN TAX ADVISOR OR PENSION CONSULTANT TO DETERMINE THE APPLICATION OF ERISA TO HIS OR HER PROSPECTIVE INVESTMENT.

The Fund will limit subscriptions for Units from ERISA plan investors such that, immediately after each sale of Units, ERISA plan investors will hold less than 25% of the total outstanding membership interests in the Fund.

Fiduciaries of plans subject to ERISA are required to determine annually the fair market value of the assets of such plans as of the close of any such plan's fiscal year. Although the Manager will provide annually upon the written request of a Member an estimate of the value of the Units based upon, among other things, outstanding mortgage investments, it may not be possible to value the Units adequately from year to year, because there will be no market for them.

## USE OF PROCEEDS

The proceeds from the sale of Units offered hereby will be used approximately as set forth below. The figures set forth below are only estimates, and actual use of proceeds will vary.

| | Minimum Offering | Percentage | Maximum Offering | Percentage |
|---|---|---|---|---|
| Organizational Expenses | $10,000 | 2% | $5,000,000 | 2% |
| Mortgage Loans[1] | $490,000 | 98% | $245,000,000 | 98.0% |
| TOTAL | $500,000 | 100.0% | $250,000,000 | 100.00% |

Footnotes:

[1]     Loan origination fees and loan referral fees paid to the Manager or its affiliates may be paid by borrowers out of the proceeds of loans made by the Fund. Thus, a portion of the proceeds from the sale of Units, which will be used by the Fund to fund its loans, may indirectly be paid to the Manager or its affiliates in the form of loan origination fees, but will ultimately be repaid to the Fund by the borrowers. (See "Compensation to Manager and Its Affiliates.")

## FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain relevant federal income tax considerations resulting from an investment in the Fund, but does not purport to cover all of the potential tax considerations applicable to any specific purchaser. Prospective investors are urged to consult with and rely upon their own tax advisors for advice on these and other tax matters with specific reference to their own tax situation and potential changes in applicable law. The Fund will not seek, and therefore will not obtain, an opinion of counsel as to any tax consequences intended to result from an investment in the Fund.

### Taxation of Undistributed Fund Income (Individual Investors)

Under the laws pertaining to federal income taxation of limited liability companies that are treated as partnerships, no federal income tax is paid by the Fund as an entity. Each individual member reports on his federal income tax return his distributive share of Fund income, gains, losses, deductions and credits, whether or not any actual distribution is made to such member during a taxable year. Depending on the Member's own tax situation, a Member may not be able to deduct his distributive share of certain Fund expenses. Each individual member partner may deduct his distributive share of Fund losses, if any, to the extent of the tax basis of his Units at the end of the Fund year in which the losses occurred. The

SAC00000646
Exhibit 26-37

characterization of an item of profit or loss will usually be the same for the member as it was for the Fund. Since individual members will be required to include Fund income in their personal income without regard to whether there are distributions of Fund income, such investors will become liable for federal and state income taxes on Fund income even though they have received no cash distributions from the Fund with which to pay such taxes.

## Distributions of Income

To the extent cash distributions exceed the current and accumulated earnings and profits of the Fund, they will constitute a return of capital, and each Member will be required to reduce the tax basis of his Units by the amount of such distributions and to use such adjusted basis in computing gain or loss, if any, realized upon the sale of Units. Such distributions will not be taxable to Members as ordinary income or capital gain until there is no remaining tax basis, and, thereafter, will be taxable as gain from the sale or exchange of the Units.

## Property Held Primarily for Sale; Potential Dealer Status

The Fund has been organized to invest in loans primarily secured by deeds of trust on real property. However, if the Fund were at any time deemed for federal tax purposes to be holding one or more Fund loans primarily for sale to customers in the ordinary course of business (a "dealer"), any gain or loss realized upon the disposition of such loans would be taxable as ordinary gain or loss rather than as capital gain or loss. The federal income tax rates for ordinary income are higher than those for capital gains. In addition, income from sales of loans to customers in the ordinary course of business would also constitute unrelated business taxable income to any investors which are tax-exempt entities. Under existing law, whether or not real property is held primarily for sale to customers in the ordinary course of business must be determined from all the relevant facts and circumstances. The Fund intends to invest in Loans and hold the Fund loans for investment purposes only, and to dispose of Fund loans, by sale or otherwise, at the discretion of the Manager and as consistent with the Fund's investment objectives. It is possible that, in so doing, the Fund will be treated as a "dealer" in mortgage loans, and that profits realized from such sales will be considered unrelated business taxable income to otherwise tax-exempt investors in the Fund.

## Tax Returns

Annually, the Fund will provide the Members and Economic Interest Owners sufficient information from the Fund's informational tax return for such persons to prepare their individual federal, state and local tax returns. The Fund's informational tax returns will be prepared by certified public accountants selected by the Manager.

## Portfolio Income

The Fund's primary source of income will be interest, which is ordinarily considered "portfolio income" under the Code. Similarly, Temporary Regulations issued by the Internal Revenue Service in 1988 (Temp. Reg. § 1.469-2T(f)(4)(ii)) confirmed that net interest income from an equity-financed lending activity such as the Fund will be treated as portfolio income, not as passive income, to Members. Therefore, investors in the Fund will not be entitled to treat their proportionate share of Fund income as "passive income," against which passive losses (such as deductions from unrelated real estate investments) may be offset.

Moreover, if the Fund's income is considered portfolio income, then Fund expenses, including the loan servicing fees and asset management fees payable by the Fund to the Manager will not serve to reduce the Fund's own net taxable income, but will instead be separately passed through to Members for inclusion

SAC00000647
Exhibit 26-38

on their individual tax returns as an investment expense. This means that such expenses may not be tax deductible by Members who do not itemize deductions on their income tax returns, or who do not exceed certain thresholds applicable to the deductibility of such expenses, or who are subject to the alternative minimum tax.

## Unrelated Business Taxable Income

Units may be offered and sold to certain tax exempt entities (such as qualified pension or profit sharing plans) that otherwise meet the investor suitability standards described elsewhere in this Offering Circular. (See "Investor Suitability Standards.") Such tax exempt entities generally do not pay federal income taxes on their income unless they are engaged in a business which generates "unrelated business taxable income," as that term is defined by Section 513 of the Code. Under the Code, tax exempt purchasers of Units may be deemed to be engaged in an unrelated trade or business by reason of interest income earned by the Fund. Although interest income (which will constitute the primary source of Fund income) ordinarily does not constitute an item of unrelated business taxable income, this exclusion does not apply to the extent interest income is derived from "debt-financed property." The Fund may also realize unrelated business taxable income by reason of profits earned from the resale or lease of properties acquired through foreclosure that are encumbered by senior mortgage loans. However, unrelated business income is taxable only to the extent such income from all sources exceeds $1,000 per year. The remainder of a tax exempt investor's income will continue to be exempt from federal income taxes to the extent it complies with other applicable provisions of law, and the mere receipt of unrelated business income will not otherwise affect the qualification of an IRA or ERISA plan under the Code.

Rents from real property and gains from the sale or exchange of property are also excluded from unrelated business taxable income, unless the property is held primarily for sale to customers or is acquired or leased in certain manners described in Section 514(c)(9) of the Code. Therefore, unrelated business taxable income may also be generated if the Fund operates or sells at a profit any property that has been acquired through foreclosure on a Fund loan, but only if such property (1) is deemed to be held primarily for sale to customers, or (2) is acquired from or leased to a person who is related to a tax-exempt investor in the Fund.

The trustee of any trust that purchases Units in the Fund should consult with his tax advisors regarding the requirements for exemption from federal income taxation and the consequences of failing to meet such requirements, in addition to carefully considering his fiduciary responsibilities with respect to such matters as investment diversification and the prudence of particular investments.

## CERTAIN LEGAL ASPECTS OF FUND LOANS

Fund loans will be secured either by a mortgage or deed of trust. The deed of trust formally has three parties: a debtor-trustor, a third-party grantee called the "trustee," and the lender-creditor called the "beneficiary." The trustor grants the property, irrevocably until the debt is paid, "in trust, with power of sale" to the trustee to secure payment of the obligation. The trustee's authority is governed by law, the express provisions of the deed of trust and the directions of the beneficiary. In some states, a mortgage is the form of security instrument used to secure a real property loan. A mortgage has two parties: a borrower called the "mortgagor" and the lender called the "mortgagee." The mortgagor gives the mortgagee a lien on the property as security for the loan or, in some states, the mortgagor conveys legal title of the property to the mortgagee until the loan is repaid but retains equitable title and the right of possession to the property so long as the loan is not in default. The Fund will be the beneficiary under all deeds of trust and the mortgagee under all mortgages securing Fund loans.

30

## Foreclosure

Most of the Fund's loans will be secured directly or indirectly by a deed of trust, the most commonly used real property security device in California. Foreclosure of a deed of trust is accomplished in most cases by a nonjudicial trustee's sale under the power-of-sale provision in the deed of trust. Prior to such sale, the trustee must record a notice of default and send a copy to the trustor, to any person who has recorded a request for a copy of a notice of default and notice of sale, to any successor in interest to the trustor and to the beneficiary of any junior deed of trust. If the default is not cured within 90 days after the filing of the notice of default, then at least 20 days before the trustee's sale, notice of sale must be posted in a public place and published once a week over such period. A copy of the notice of sale must be posted on the property, and sent to the trustor, to each person who has requested a copy, to any successor in interest to the trustor and to the beneficiary of any junior deed of trust, at least 20 days before the sale. The trustor or any person having a junior lien or encumbrance of record may, until five business days prior to the date of a scheduled foreclosure date, cure the default by paying the entire amount of the debt then due, exclusive of principal due only because of acceleration upon default, plus costs and expenses actually incurred in enforcing the obligation and statutorily limited attorney's and trustee's fees. Following the sale, neither the debtor-trustor nor a junior lienor has any right of redemption, and the beneficiary may not obtain a deficiency judgment against the trustor.

A judicial foreclosure (in which the beneficiary's purpose is usually to obtain a deficiency judgment where otherwise unavailable) is subject to most of the delays and expenses of other lawsuits, sometimes requiring up to several years to complete. Following a judicial foreclosure sale, the trustor or his successors in interest will have certain rights to redeem the property, unless the creditor waives any right to a deficiency. The Fund generally will not pursue a judicial foreclosure to obtain a deficiency judgment, except where, in the sole discretion of the Manager, such a remedy is warranted in light of the time and expense involved.

## Anti-Deficiency Legislation

California has four principal statutory prohibitions which limit the remedies of a beneficiary under a deed of trust. Two statutes limit the beneficiary's right to obtain a deficiency judgment against the trustor following foreclosure of a deed of trust, one based on the method of foreclosure and the other on the type of debt secured. Under one statute, a deficiency judgment is barred where the foreclosure was accomplished by means of a nonjudicial trustee's sale. It is anticipated that all of the Fund's loans will be enforced by means of a nonjudicial trustee's sale, if foreclosure becomes necessary. Under the other statute, a deficiency judgment is barred in any event where the foreclosed deed of trust secured a "purchase money" obligation, i.e., a promissory note evidencing a loan used to pay all or a part of the purchase price of a residential property occupied, at least in part, by the purchaser. This restriction will not apply to Fund loans which will not be secured, owner-occupied residential property.

Another statute, commonly known as the "one form of action" rule, requires the beneficiary to exhaust the security under the deed of trust by foreclosure before bringing a personal action against the trustor on the promissory note. The fourth statutory provision limits any deficiency judgment obtained by the beneficiary following a judicial sale to the excess of the outstanding debt over the fair market value of the property at the time of sale, thereby preventing a beneficiary from obtaining a large deficiency judgment against the debtor as a result of low bids at the judicial sale. Other matters, such as litigation instituted by a defaulting borrower or the operation of the federal bankruptcy laws, may have the effect of delaying enforcement of the lien of a defaulted loan and may in certain circumstances reduce the amount realizable from sale of a foreclosed property.

SAC00000649

Exhibit 26-40

# SUMMARY OF OPERATING AGREEMENT

The following is a summary of the Third Amended and Restated Operating Agreement for the Fund (the "**Operating Agreement**"), and is qualified in its entirety by the terms of the Operating Agreement itself. Potential investors are urged to read the entire Operating Agreement which is set forth as Exhibit A to this Offering Circular.

## Rights and Liabilities of Members

The rights, duties and powers of Members are governed by the Operating Agreement and the Beverly-Killea Limited Liability Company Act set forth in Chapter 3, Title 2.5 of the California Corporations Code (the "**Act**") and the discussion herein of such rights, duties and powers is qualified in its entirety by reference to such Agreement and Act.

Investors who become Members in the Fund in the manner set forth herein will not be responsible for the obligations of the Fund and will be liable only to the extent of their agreed upon capital contributions. Members may be liable for any return of capital plus interest if necessary to discharge liabilities existing at the time of such return. Any cash distributed to Members may constitute, wholly or in part, return of capital.

Members will have no control over the management of the Fund except that, with the consent of the Manager, Members representing a majority of the outstanding Fund Membership interests may approve or disapprove any of the following matters: (a) dissolution and termination of the Fund; (b) merger or consolidation of the Fund with one or more other entities; (c) amendment of the Operating Agreement; and (d) removal of the Manager and election of a successor manager. In addition, upon the cessation of the Manager for any reason (such as the withdrawal or resignation of the Manager), a majority in interest of the Members may elect a replacement manager to continue the business of the Fund. Members representing 10% of the Membership interests may call a meeting of the Fund.

## Capital Contributions

Units in the Fund will be sold in minimum increments of $5,000 per Unit, and no person may initially acquire Units in an amount less than $25,000 (i.e., 5 shares). For purposes of meeting this minimum investment requirement, a person may cumulate Units he or she purchases individually with Units purchased by his or her spouse. To purchase Units an investor must deliver to the Fund a Subscription Agreement in the form attached to this Offering Circular as Exhibit B, together with his or her cash contribution. The Manager will be the initial member of the Fund and will contribute the sum of $1,000 to the Fund. The Manager may, but is not obligated to, contribute additional sums to the Fund to meet the minimum subscription of $500,000 for this offering or for other reasons.

## Rights, Powers and Duties of Manager

Subject to the right of the Members to vote on specified matters, the Manager will have complete charge of the business of the Fund. The Manager is not required to devote full time to Fund affairs but only such time as is required for the conduct of Fund business. The Manager acting alone has the power and authority to act for and bind the Fund.

The Manager is granted the special power of attorney of each Member for the purpose of executing the documents which the Members have expressly agreed to execute and deliver or which are required to be executed, delivered and/or filed under applicable law.

SAC00000650
Exhibit 26-41

The Manager will receive substantial compensation in connection with its management of the Fund. (See "Compensation to Manager and Its affiliates.")

## Profits and Losses

Profits and losses for the Fund will be calculated monthly, on an annualized basis, based upon information available to the Manager at the time of such allocation. Monthly profits will be allocated among the Members as of the last day of each month in accordance with their respective capital account balances as of such date. Each month, profits shall be allocated entirely to the Members until they have been allocated the Member Preferred Return for that year to date, and all profits in excess of that amount may be allocated to the Manager. To the extent the Fund's profits in any given month are less than the Member Preferred Return for such month, any unpaid Member Preferred Return will accrue in favor of the Members on a non-compounded basis and shall be payable from subsequent monthly profits earned by the Fund (if any) in the same calendar year.

Profit and loss allocations will be reconciled at the end of each year in connection with the Fund's annual audit. In the event it is determined after the end of any year that, by reason of subsequent events or otherwise, the Manager has received monthly distributions of profits for such year that exceed the amounts to which the Manager was entitled by reason of the subordination of such profits to the Member Preferred Return, then the Manager shall promptly reimburse the Fund for the amount of such overpayment(s) which shall then be reallocated and distributed to the Members. The Manager shall not owe any interest on such sums so long as the overpayments were made in good faith.

The Member Preferred Return is not guaranteed by the Fund, the Manager or any other party, and also is non-cumulative from year to year. If profits allocated to Members for any calendar year are less than the aggregate Member Preferred Return accrued during such year, the deficiency shall not accumulate or be payable from profits earned by the Fund in any subsequent year.

Upon transfer of Fund Units (if permitted under the Operating Agreement and applicable law), profit and loss will be allocated to the transferee beginning with the next succeeding calendar month.

## Cash Distributions

Upon subscription for Units, an investor must elect whether to receive monthly cash distributions from the Fund or to allow his or her earnings to compound for the term of the Fund. Investors who elect to change this election must give the Manager 90 days' prior written notice. Investors who elect to receive distributions may change this election in order to begin compounding earnings only if there is in effect a permit issued by the California Department of Corporations. Earnings allocable to investors who elect to compound their earnings will be retained by the Fund for making or investing in further mortgage loans or other proper Fund purposes. The earnings from these further loans will be allocated among all investors; however, investors who compound will be credited with an increasingly larger amount of Member Preferred Return, because their capital accounts (upon which their Member Preferred Return will be calculated) will increase over time. Cash available for distribution is equal to the net income during the calendar month determined on the accrual basis in accordance with generally accepted accounting principles, less deductions for such cash reserves as the Manager reasonably determines are necessary for the protection, preservation and enforcement of Fund assets.

Promptly after the end of each calendar month, the Fund will distribute to those Members electing to receive monthly distributions an amount of cash equal to their proportionate share of the Fund's cash available for distribution, until the Member has received cash distributions in an amount equal to his or her accrued Member Preferred Return for that calendar year. Fund income allocable to the remaining

33

SAC00000651
Exhibit 26-42

Members who elected to compound earnings will be credited to their capital accounts, which will have the effect of slightly increasing their percentage interests in subsequent Fund income.

If at any time the Manager determines that, due to subsequent events, distributions previously paid to electing Members exceed the profits actually allocated to them, the Manager may discontinue making monthly distributions to those Members until they have been allocated profits equal to the monthly distributions that they have received.

## Meetings

The Manager, or Members representing 10% of the outstanding membership interests, may call a meeting of the Fund. Unless the notice otherwise specifies, all meetings will be held at the office of the Fund. Members may vote in person or by proxy at the Fund meeting. A majority of the membership interests will constitute a quorum at Fund meetings.

## Accounting and Reports

The Manager will cause to be prepared an annual report of the Fund's operation, which shall be audited by an independent accounting firm and furnished to the Members at their request. The Members will also be furnished such detailed information as is reasonably necessary to enable them to complete their own tax returns within 90 days after the end of the year. Any Members may inspect the books and records of the Fund at all reasonable times and upon reasonable prior notice to the Manager.

## Amendment of the Agreement

The Operating Agreement may be amended by the Manager alone (with respect to certain matters), or upon the vote of Members holding a majority of the outstanding membership interests.

## Withdrawal from Fund

An existing Member has no right to withdraw from the Fund or to obtain the return of all or any portion of sums paid for the purchase of Units (or reinvested earnings with respect thereto) for at least twelve months after the date such Units are purchased. After twelve (12) months, existing Members may withdraw all or part of their capital accounts from the Fund by giving the Manager at least thirty (30) days' prior written notice, subject to the restrictions discussed below.

New Members who will purchase Units after the date of this Offering Circular may withdraw as a Member of the Fund and may receive a return of capital provided that the following conditions have been met: (a) the Member has been a Member of the Fund for a period of at least twelve (12) months; and (b) the Member provides the Fund with a written request for a return of capital at least thirty (30) days prior to such withdrawal. The Fund will use its best efforts to honor requests for a return of capital subject to, among other things, the Fund's then existing cash flow, financial condition, and prospective loans. Notwithstanding the foregoing, the Manager may, in its sole discretion, waive such withdrawal requirements if a Member is experiencing undue hardship. The Manager shall have the right to redeem a Member's Units, at its sole discretion, if it believes it is in the Fund's best interest.

The amount that a withdrawing Member will receive from the Fund is based on the withdrawing Member's capital account. A capital account is a sum calculated for tax and accounting purposes, and may be greater than or less than the fair market value of such investor's membership Interest in the Fund. The fair market value of a Member's interest in the Fund will generally be irrelevant in determining

34

SAC00000652
Exhibit 26-43

amounts to be paid upon withdrawal, except to the extent that the current fair market value of the Fund's loan portfolio is realized by sales of existing loans (which sales are not required to be made).

The Fund may elect not to establish a reserve from which to fund withdrawals and, accordingly, the Fund's capacity to return a Member's capital account is restricted to the availability of Fund cash flow, as determined in good faith by the Manager. For this purpose, cash flow is considered to be available only after all current Fund expenses have been paid (including compensation to the Manager and its affiliates), adequate reserves have been established to meet anticipated Fund expenses, to satisfy outstanding loan commitments and to fund approved loans, and adequate provision has been made for the payment of all monthly cash distributions on a pro rata basis which must be paid to Members who elected to receive such distributions upon subscription for Units.

The Fund is not required to allow withdrawal or redemption of more than 20% of the Fund's aggregate outstanding capital accounts during any 12-month period unless the Manager decides otherwise at the Manager's sole discretion.

If current cash flow of the Fund is inadequate to return a Member's capital account immediately, the Fund is not required to liquidate any Fund loans prior to maturity for the purpose of liquidating the capital account of a withdrawing Member and is merely required to continue paying whatever cash flow is available to withdrawing Members until their outstanding withdrawal requests have been satisfied on a first-come, first-served basis; provided that the Manager has the right to accord priority to the withdrawal requests of deceased Members and ERISA plan investors.

Upon dissolution and termination of the Fund, a five-year winding-up period is provided for liquidating the Fund's loan portfolio and distributing cash to Members. Due to high prevailing interest rates or other factors, the Fund could suffer reduced earnings (or losses) if a substantial portion of its loan portfolio remains and must be liquidated quickly at the end of such winding-up period. Members who complete a withdrawal from the Fund prior to any such liquidation will not be exposed to this risk. Conversely, if prevailing interest rates have declined at a time when the loan portfolio must be liquidated, unanticipated profits could be realized by those Members who remain in the Fund until its termination.

## Limitations on Transferability

The Operating Agreement places substantial limitations upon transferability of membership interests. Any transferee (including a donee) must be a person or entity which would have been qualified to purchase an Interest in this offering and a transferee may not become a substituted Member without the consent of the Manager. A transferee who does not become a substituted Member will own an economic interest which entitles him or her only to the share of income or return of capital to which the transferor would be entitled. Economic interest holders will have no voting or inspection rights.

In addition to the restrictions imposed by the Operating Agreement, the California Commissioner of Corporations has imposed additional restrictions on transferability as set forth in Commissioners Rule 260.141.11 which is set forth below.

## Term of Fund

The Fund will continue indefinitely until dissolved and terminated by the Manager alone or by the vote of Members holding a majority of the outstanding membership interests with the concurrence of the Manager.

SAC00000653
Exhibit 26-44

### Winding Up

Upon dissolution of the Fund, the Manager will wind up the Fund's affairs as follows: (1) no new loans will be made or purchased; and (2) the Manager or its successor will liquidate the Fund's remaining assets as promptly as is consistent with obtaining the fair current value thereof, either by sale to third parties or by collecting loan payments under the terms of the loan. All funds received by the Fund shall be applied and promptly distributed in accordance with the Act and the Operating Agreement.

In the event the Fund dissolves at a time when there are outstanding unfulfilled withdrawal requests, such withdrawal requests will be of no further force or effect and all Members will thereafter be entitled to receive their pro rata portion of all remaining liquidating distributions of the Fund in accordance with their respective outstanding capital account balances.

### Merger with Other Business Entities

The Manager, upon the prior written consent of a majority interest of the Members, will have the right to merge the Fund with one or more other business entities (of which the Manager may be a sponsor or cosponsor).

## PLAN OF DISTRIBUTION

Fund Units will be offered and sold by the Fund, with respect to which commissions or fees may be paid to the Manager or their employees. The Manager may also retain the services of independent securities dealers or finders to locate prospective investors, who may receive selling commissions or finders' fees on the gross proceeds of their sales in amounts negotiated on a case-by-case basis, but any such commissions will be paid by the Manager or its affiliates and will not be borne by the Fund. There is no firm commitment to purchase any Units, and there is no assurance that the maximum amount of this offering will be received.

## LEGAL MATTERS

The Manager has retained legal counsel to advise it in connection with the preparation of this Offering Circular and the Operating Agreement, as well as the offer and sale of the Units offered hereby. Such counsel has not been retained to provide legal services in connection with the drafting of any of the loan documents, the negotiation or closing of any Fund loans, the servicing or enforcement of any Fund loan, providing tax advice or preparing any federal or state tax returns, or the determination of the Fund's accounting procedures or internal operations. Moreover, such legal counsel has not represented the interests of the investors in connection with this offering. Investors purchasing Units in the Fund that wish to obtain the benefit of review by legal counsel on their behalf must retain their own attorneys to do so.

## ADDITIONAL INFORMATION AND UNDERTAKINGS

The Manager will undertake to make available to each offeree every opportunity to obtain any additional information from the Fund or the Manager necessary to verify the accuracy of the information contained in this Offering Circular, to the extent that they possess such information or can acquire it without unreasonable effort or expense. This additional information includes, without limitation, all the organizational documents of the Fund, and all other documents or instruments relating to the operation and business of the Fund and material to this offering and the transactions contemplated and described in this Offering Circular.

SAC00000654
Exhibit 26-45

## COMMISSIONER'S RULE 260.141.11

In addition to the various restrictions on the transfer of Units imposed by the Operating Agreement and state and federal securities laws generally, no Interest may be sold or transferred or any consideration received therefor without the prior written consent of the California Commissioner of Corporations, except as provided in the Commissioner's Rules. Commissioner's Rule 260.141.11 is set forth below in its entirety.

### §260.141.11. Restriction on Transfer

(a)     The issuer of any security upon which a restriction on transfer has been imposed pursuant to Sections 260.102.6, 260.141.10 or 260.534 shall cause a copy of this section to be delivered to each issuee or transferee of such security at the time the certificate evidencing the security is delivered to the issuee or transferee.

(b)     It is unlawful for the holder of any such security to consummate a sale or transfer of such security, or any interest therein, without the prior written consent of the Commissioner (until this condition is removed pursuant to Section 260.141.12 of these rules), except:

(1)     to the issuer;

(2)     pursuant to the order or process of any court;

(3)     to any person described in Subdivision (i) of Section 25102 of the Code or Section 260.105.14 of these rules;

(4)     to the transferor's ancestors, descendants or spouse, or any custodian or trustee for the account of the transferor or the transferor's ancestors, descendants, or spouse; or to a transferee by a trustee or custodian for the account of the transferee or the transferee's ancestors, descendants or spouse;

(5)     to holders of securities of the same class of the same issuer;

(6)     by way of gift or donation inter vivos or on death;

(7)     by or through a broker-dealer licensed under the Code (either acting as such or as a finder) to a resident of a foreign state, territory or country who is neither domiciled in this state to the knowledge of the broker-dealer, nor actually present in this state if the sale of such securities is not in violation of any securities law of the foreign state, territory or country concerned;

(8)     to a broker-dealer licensed under the Code in a principal transaction, or as an underwriter or member of an underwriting syndicate or selling group;

(9)     if the interest sold or transferred is a pledge or other lien given by the purchaser to the seller upon a sale of the security for which the Commissioner's written consent is obtained or under this rule not required;

(10)     by way of a sale qualified under Sections 25111, 25112, 25113, or 25121 of the Code, of the securities to be transferred, provided that no order under Section 25140 or Subdivision (a) of Section 25143 is in effect with respect to such qualification;

37

(11)     by a corporation to a wholly owned subsidiary of such corporation, or by a wholly owned subsidiary of a corporation to such corporation;

(12)     by way of an exchange qualified under Section 25111, 25112, or 25113 of the Code, provided that no order under Section 25140 or Subdivision (a) of Section 25143 is in effect with respect to such qualification;

(13)     between residents of foreign states, territories or countries who are neither domiciled nor actually present in this state;

(14)     to the State Controller pursuant to the Unclaimed Property Law or to the administrator of the unclaimed property law of another state;

(15)     by the State Controller pursuant to the Unclaimed Property Law or to the administrator of the unclaimed property law of another state if, in either such case, such person (i) discloses to potential purchasers at the sale that transfer of the securities is restricted under this rule, (ii) delivers to each purchaser a copy of this rule, and (iii) advises the Commissioner of the name of each purchaser;

(16)     by a trustee to a successor trustee when such transfer does not involve a change in the beneficial ownership of the securities; or

(17)     by way of an offer and sale of outstanding securities in an issuer transaction that is subject to the qualification requirement of Section 25110 of the Code but exempt from that qualification requirement by subdivision (f) of Section 25102; provided that any such transfer is on the condition that any certificate evidencing the security issued to such transferee shall contain the legend required by this section.

(c)     The certificates representing all such securities subject to such a restriction on transfer, whether upon initial issuance or upon any transfer thereof, shall bear on their face a legend, prominently stamped or printed thereon in capital letters of not less than 10 point size, reading as follows:

> "IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED IN THE COMMISSIONER'S RULES."

SAC00000656
Exhibit 26-47

THE LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST UNITS
REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE
SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE
CALIFORNIA CORPORATE SECURITIES LAW OF 1968, AS AMENDED. SUCH
UNITS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR
HYPOTHECATED TO ANY PERSON AT ANY TIME WITHOUT SUCH
REGISTRATION AND QUALIFICATION OR AN OPINION OF COUNSEL
SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT
SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED. THERE ARE
OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFER, AS SET FORTH IN THE
OPERATING AGREEMENT.

IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY,
OR ANY INTEREST THEREIN OR TO RECEIVE ANY CONSIDERATION
THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF THE
COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT
AS PERMITTED BY THE COMMISSIONER'S RULES.

## SIXTH AMENDED AND RESTATED OPERATING AGREEMENT

### OF

### INVESTORS PRIME FUND, LLC

This SIXTH AMENDED AND RESTATED OPERATING AGREEMENT
("**Agreement**") is made and entered into effective as of January 28, 2011 by and among Small
Business Capital Corp., and such other persons as may be added pursuant to the terms hereof
("**Members**").

### RECITALS

A.      On May 17, 2005, Articles of Organization for Investors Prime Fund, LLC (the
"**Company**") were filed with the California Secretary of State.

B.      The Company was previously governed by that certain Operating Agreement of
the Company dated January, 2006 ("**Original Agreement**"), which Original Agreement was
amended and restated pursuant to that certain First Amended and Restated Operating Agreement
dated February 27, 2006 (the "**First Restated Agreement**") and that certain Second Amended
and Restated Operating Agreement dated March 12, 2007 (the "**Second Restated Agreement**")
and that certain Third Amended and Restated Operating Agreement dated April 23, 2009 (the
"**Third Restated Agreement**") and that certain Fourth Amended and Restated Operating
Agreement dated May 3, 2010 (the "**Fourth Restated Amendment**") and that certain Fifth
Amended and Restated Operating Agreement dated November 5, 2010 (the "**Fifth Restated
Amendment**").

C.      The parties now desire to adopt and amend and restate the Forth Restated
Agreement for the Company on the terms and conditions set forth herein.

SAC00000657
Exhibit 26-48

## AGREEMENT

**NOW, THEREFORE,** the parties by this Agreement set forth the operating agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement, which Agreement shall amend, restate and replace the Third Restated Agreement in its entirety.

## ARTICLE I
## DEFINITIONS

Unless stated otherwise, the terms set forth in this Article I shall, for all purposes of this Agreement, have the meanings as defined herein:

1.1    "Affiliate" shall mean, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such Person, (iii) any officer, director or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee or holder of ten percent (10%) or more of the voting securities of any Person described in clauses (i) through (iii) of this sentence.

1.2    "Agreement" shall mean this Operating Agreement, as the same may hereafter be amended from time to time.

1.3    "Articles" shall mean the Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

1.4    "Bankruptcy" shall mean:  (a) the filing of an application by a Member for, or his or her consent to, the appointment of a trustee, receiver, or custodian of his or her other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within 90 days; or (e) the failure by a Member generally to pay his or her debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his or her inability to pay his or her debts as they become due.

1.5    "Capital Account" shall mean, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

(a)    To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits, and any items in the nature of income or gain (from unexpected adjustments, allocations or distributions) that are specially allocated to a Member and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company property distributed to such Member.

SAC00000658
Exhibit 26-49

(b)     To each Member's Capital Account there shall be debited the amount of cash, such Member's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated to a Member and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company.

(c)     In the event any interest in the Company is transferred according to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(d)     In the event the Gross Asset Values of the Company assets are adjusted pursuant to Section 1.9, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the aggregate net adjustment as if the Company recognized gain or loss equal to the amount of such aggregate net adjustment.

(e)     The provisions of this Section 1.5 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such regulations. In the event it is necessary to modify the manner in which the Capital Accounts are computed in order to comply with such regulations, the Manager shall make such modifications. The Manager shall adjust the amounts debited or credited to the Capital Accounts with respect to (i) any property contributed to the Company or distributed to any Member and (ii) any liabilities that are secured by such contributed or distributed property or that are assumed by the Company in the event the Manager shall determine that such adjustments are necessary or appropriate pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv). The Manager shall also make any adjustments that are necessary or appropriate to maintain equality between the aggregate Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, and are otherwise in accordance with   Regulations Section  1.701-1(b)(2)(iv)(q).   The Manager shall also make appropriate modifications if unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

1.6     "Cash Available for Distribution" shall mean an amount of cash equal to the Company's Profits allocable to the Members for any applicable period as determined in accordance with generally accepted accounting principles, less such amounts as the Manager deems appropriate to reserve for the preservation, protection and recovery of the Company's assets.

1.7     "Code" shall mean the Internal Revenue Code of 1986, as amended, and corresponding portions of any subsequent federal revenue laws.

1.8     "Company" shall mean Investors Prime Fund, LLC, a California limited liability company.

1.9     "Company Minimum Gain" shall have the meaning ascribed to the term "Company Minimum Gain" in the Regulations Section 1.704-2(d).

SAC00000659
Exhibit 26-50

1.10    "Depreciation" shall mean, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis.

1.11    "Economic Interest" shall mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of the Company.

1.12    "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

1.13    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

1.14    "Fiscal Year" shall mean a calendar year ending December 31.

1.15    "Gross Asset Value" shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Company;

(b)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times:  (i) the contribution of more than a de minimis amount of money or other property to the Company by a new or existing Member as consideration for an interest in the Company; (ii) the distribution by the Company to either a withdrawing or continuing Member of more than a de minimis amount of interests in the Company; and (iii) the termination of the Company for federal income tax purposes pursuant to Code Section 708(b)(1)(B); and

(c)    If the Gross Asset Value of an asset has been determined or adjusted pursuant to subsection (a) or (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

1.16    "Majority Interest of the Members" shall mean one or more Percentage Interests of Members, or a specified group of Members, which taken together exceed 50% of the aggregate of all Percentage Interests, or of all Percentage Interests held by such specified group of Members, on the first day of the current calendar month.

SAC00000660
Exhibit 26-51

1.17    "Manager" shall mean Small Business Capital Corp., a California corporation, or any successor manager appointed pursuant to the terms of this Agreement. The Manager shall also be deemed a Member of the Company for legal, tax and accounting purposes with respect to its allocable and distributable share of Company Profits and Cash Available for Distribution, notwithstanding that it may not otherwise be included in the defined term of "Member" set forth herein.

1.18    "Members" shall mean the purchasers of Units admitted to the Company as Members, and "Member" shall mean any one of the Members.

1.19    "Membership Interest" shall mean a Member's entire interest in the Company and all rights, benefits and privileges pertaining thereto.

1.20    "Net Assets Under Management" means the total Company's capital, including cash, notes (at book value), real estate owned (at book value), accounts receivable, advances made to protect loan security, unamortized organizational expenses and any other Company assets valued at fair market value, less Company liabilities.

1.21    "Percentage Interest" shall mean the respective percentage interest of a Member determined as of any day by dividing a Member's current Capital Account by the total outstanding Capital Accounts of all Members.

1.22    "Person" shall mean both natural and legal persons, including any unincorporated association or entity, as the context may require.

1.23    "Preferred Return" shall mean an amount equal to a compounded simple return on the balance of each Member's Capital Account outstanding from time to time at a rate equal to the greater of: (i) 7.5% per annum; or (ii) the applicable Prime Rate. The Preferred Return shall accrue during each Fiscal Year only to the extent the Company has Profits in such Fiscal Year, and shall be payable to Members as specified in this Agreement only from Cash Available for Distribution and shall not create a debt of the Company or the Manager to any Member to the extent that such Profits or case are not available for allocation or distribution, nor shall such payments constitute "guaranteed payments" within the meaning of Code Section 707(c). The Preferred Return shall be cumulative during each Fiscal Year but shall be non-cumulative from one Fiscal Year to the next; therefore, if Profits during a Fiscal Year are less than the aggregate Preferred Return for that Fiscal Year, such deficiency shall not accumulate and shall not be paid or allocated from Profits in any subsequent year.

1.24    "Prime Rate" shall mean the "prime rate" published in the Wall Street Journal on the last business day of each month, and such published rate shall be the Prime Rate used for calculating the Preferred Return during the following calendar month.

1.25    "Profits" and "Losses" shall mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

SAC00000661
Exhibit 26-52

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.22 shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.22, shall be subtracted from such taxable income or loss;

(c)     Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value; and

(d)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with Section 1.9 hereof.

(e)     Notwithstanding any other provision of this Section 1.22, any items in the nature of income or gain or expenses or losses, which are specially allocated, shall not be taken into account in computing Profits or Losses.

1.26    "Units" shall mean the Membership Interests in the Company issued to Members upon their admission to the Company.

## ARTICLE II
## ORGANIZATION OF THE COMPANY

2.1    Formation.  The parties hereto hereby agree to form a limited liability company, pursuant to the provisions of the Beverly-Killea Limited Liability Company Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time (the "Act").

2.2    Name.  The name of the Company shall be "Investors Prime Fund, LLC," unless and until changed by the Manager with notice to all Members.

2.3    Place of Business.  The principal place of business of this Company shall be located at 419 S. San Antonio Rd., Suite 213, Los Altos, CA 94022, until changed by designation of the Manager, with notice to all Members.

2.4    Purpose.  The primary purpose of this Company shall be to make and invest in loans to members of the general public secured by deeds of trust on real property and to do any and all things relating or incidental thereto.  In addition, up to 5% ($12,500,000) of the LLC's maximum permitted offering ($250,000,000) may be used to acquire a controlling interest within FDIC insured federally regulated depository institutions, yet to be determined.

SAC00000662
Exhibit 26-53

2.5     Term.  The Company shall be deemed to be formed and its term shall commence as of the day the Articles are filed with the California Secretary of State, and shall continue indefinitely until dissolved and terminated pursuant to the provisions of this Agreement or by operation of law.

2.6     Power of Attorney.  Each of the Members irrevocably constitutes and appoints the Manager as his true and lawful attorney-in fact, with full power and authority for him, and in his name, place and stead, to execute, acknowledge, publish and file:

(a)     This Agreement, the Articles, and any amendments or cancellation thereof required under the laws of the State of California;

(b)     Any certificates, instruments and documents, including, without limitation, fictitious business name statements, as may be required by, or may be appropriate under, the laws of any state or other jurisdiction in which the Company is doing or intends to be business; and

(c)     Any documents which may be required to effect the continuation of the Company, the admission of an additional or substituted Member, the amendment of this Agreement, or the dissolution and termination of the Company.

2.7     Nature of Power of Attorney.  The foregoing grant of authority is a special power of attorney coupled with an interest, is irrevocable, and shall survive the death of the undersigned or the delivery of an assignment by the undersigned of a Membership Interest, provided that where the assignee thereof has been approved by the Manager for admission to the Company as a substituted Member, the Power of Attorney shall survive the delivery of such assignment for the sole purpose of enabling the Manager to execute, acknowledge and file any instrument necessary to effect such substitution.

## ARTICLE III
## THE MANAGER

3.1     Management by the Manager, Generally.  Subject to any provisions of the Articles and this Agreement relating to actions required to be approved by the Members, if any, the business, property and affairs of the Company shall be managed and all powers of the Company shall be exercised by or under the direction of the Manager.  In addition to the general management authority provided under this Section and without in any way limiting the generality of the foregoing, the Manager shall have all necessary powers to manage and carry out the purposes, business and affairs of the Company, including, without limitation, the power to exercise and to authorize and direct the Company's or its officers (if any) to exercise, on behalf and in the name of the Company, all of the powers described in California Corporations Code Section 17003, including, without limitation, the following powers and authority:

(a)     To expend Company funds in furtherance of the business of the Company and to acquire and deal with assets upon such terms as it deems advisable, from Affiliates and other persons;

SAC00000663
Exhibit 26-54

(b)    To offer additional Units for sale from time to time to determine the terms of the offering of Units, including the price thereof and the amount of discounts allowable or commissions to be paid and the manner of complying with applicable law;

(c)    To employ, at the expense of the Company, such agents, employees, independent contractors, attorneys and accountants as the Manager deems reasonable and necessary for any Company purpose;

(d)    To effect necessary insurance for the proper protection of the Company, the Manager or Members;

(e)    To prosecute, defend, pay, collect, compromise, arbitrate, or otherwise adjust any and all claims or demands of or against the Company;

(f)    To bind the Company in all transactions involving the Company's property or business affairs, including the preparation and execution of all loan documents and the purchase and sale of notes;

(g)    To amend this Agreement with respect to the matters described in Subsections 12.4(a) through (g) below;

(h)    To determine the accounting method or methods to be used by the Company, which methods may be changed at any time by written notice to all Members;

(i)    To open accounts in the name of the Company in one or more banks, savings and loan associations or other financial institutions or money market funds, and to deposit Company funds therein, subject to withdrawal upon the signature of the Manager or any person authorized by the Manager;

(j)    To sell from time to time all or any portion of the Company's assets, or any undivided or beneficial interests therein, including without limitation the securitization, offer and sale of senior participating interests in the Company's mortgage loan portfolio, all upon such terms and conditions as the Manager shall deem appropriate in its sole business judgment; and

(k)    To retain such advisors and professionals, execute all instruments and documents and do all other things necessary or appropriate in the judgment of the Manager to effectuate any of the foregoing.

3.2    <u>Fiduciary Duty</u>.    The Manager shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Company, and the Manager shall not employ such funds or assets in any manner except for the exclusive benefit of the Company.

3.3    <u>Allocation of Time to Company Business</u>.    The Manager shall not be required to devote full time to the affairs of the Company but shall devote whatever time, effort and skill the Manager may deem to be reasonably necessary for the conduct of the Company's business.    The Manager may engage in any other businesses including businesses related to or competitive with the Company.

SAC00000664
Exhibit 26-55

3.4     Exculpation and Indemnification.   Neither the Manager, nor its agents or Affiliates or the shareholders, officers, directors, employees or agents of such agents or Affiliates, shall have any liability whatsoever to the Company or to any Member for any loss suffered by the Company or any Member which arises out of any action or inaction of the Manager, its agents or Affiliates or the shareholders, officers, directors, employees or agents of such agents or Affiliates, so long as the Manager or such other Person, in good faith, determined that such course of conduct was in the best interests of the Company and did not constitute fraud, bad faith or willful misconduct. The Manager and its agents or Affiliates and the shareholders, officers, directors, employees and agents of such agents or Affiliates and the employees and agents of the Company shall be entitled to be indemnified and held harmless by the Company, at the expense of the Company, against any loss, expense, claim or liability (including reasonable attorneys' fees, which shall be paid as incurred) resulting from the assertion of any claim or legal proceeding relating to the performance or nonperformance of any act concerning the activities of the Company, including claims or legal proceedings brought by a third party or by Members, on their own behalf or as a Company derivative suit, so long as the party to be indemnified determined in good faith that such course was in the best interests of the Company and did not constitute fraud, bad faith or willful misconduct; provided, that any such indemnity shall be paid solely from the assets of the Company. Nothing herein shall prohibit the Company from paying in whole or in part the premiums or other charge for any type of indemnity insurance in which the Manager or other agents or employees of the Manager or its agents or Affiliates or the Company are indemnified or insured against liability or loss arising out of their actual or asserted misfeasance or nonfeasance in the performance of their duties or out of any actual or asserted wrongful act against, or by, the Company including, but not limited to, judgments, fines, settlements and expenses incurred in the defense of actions, proceedings and appeals therefrom.

3.5     Removal of the Manager; Election of Successor Manager.   Any Manager may be removed upon the following terms and conditions:

(a)     The Manager may be removed by the written consent of a Majority Interest of the Members. Members may exercise such right by presenting to the Manager a written notice, which shall be executed by a Majority Interest of the Members and their signatures acknowledged, to the effect that the Manager is removed effective on the date set forth in such notice.

(b)     Concurrently with delivery of such notice or within ninety (90) days thereafter by written notice similarly given, a Majority Interest of the Members may also designate a successor Manager.

(c)     Substitution of a new Manager shall be effective upon written acceptance of the duties and responsibilities of Manager by the new Manager. Upon effective substitution of the new Manager(s), this Agreement shall remain in full force and effect except for the change in the Manager(s) and the business of the Company shall be continued by the new Manager(s).

3.6     Retirement by Manager.   The Manager may withdraw ("retire") from the Company upon not less than six months written notice of same to the Members. In the event that the Manager retires, the Members shall elect a successor manager by a Majority Interest of the Members.

SAC00000665
Exhibit 26-56

## ARTICLE IV
## THE MEMBERS – CAPITAL CONTRIBUTIONS

4.1     Capital Contributions of Members.   The Members shall each contribute to the capital of the Company an amount equal to Five Thousand Dollars ($5,000) for each Unit subscribed for.  The initial minimum subscription is Twenty Five Thousand Dollars ($25,000) (5 Units) (including subscriptions from entities of which such Member is the sole beneficial owner). The total initial capitalization of the Company shall be a maximum of $250,000,000; provided, however, the Manager reserves the right to issue additional Membership Interests from time to time in the future without approval of the Members.  The capital contributions of Members shall be made by cash or check.

4.2     Admission to Company; Subscription Account.   At the Manager's discretion, subscription funds received by the Manager from Persons for the purchase of Units shall not earn interest for the subscribing Member and shall be placed by the Company into a segregated subscription account at a bank or savings association selected by the Manager.  Subscribers for Membership Interests whose subscription funds are placed in the subscription account shall not be admitted to the Company as Members until such time as all or a portion of their subscription funds are transferred to the Company.  Subscription funds received by the Company shall be held in a non-interest bearing deposit account until being transferred to the Company.  When the Company has located a suitable lending opportunity, and only if funds are not available in the Company to fund such loan (after making reasonable allowances for loss and contingency reserves), then funds from the subscription account shall be transferred to the Company for the purpose of purchasing or funding the loan, at which time Units will be issued and the subscribing Person will be admitted to the Company as a Member.  The Manager has the right to admit only a portion of an investor's subscription funds at any given time; however, in no case will the Manager admit less than the required minimum subscription of an investor.   Generally, subscription funds shall be considered for transfer to the Company on a first-in, first-out basis; however, the Manager reserves the right to admit non-ERISA plan investors before ERISA plan investors in order for the Company to remain exempt from the application of Title 29 of the Code of Federal Regulations Part 2510 relating to the definition of plan assets for purposes of ERISA (the "**ERISA Plan Asset Regulations**.")  In the event only a portion of a subscribing Person's funds are required to fund a loan acquisition, then all or a portion of funds invested by such subscribing Person shall be transferred to the Company at the same time and new Units shall be issued therefor.  Any subscription funds remaining in the subscription account after the expiration of sixty (60) days from the date any such subscription funds were first received by the Manager shall be returned to the subscribing Person. When the Fund cash levels are high because of note payoffs and/or new Member contributions, the Manager, at its sole discretion, may place new contributions for a short period into an FDIC insured subscription trust account, managed by the Manager for up to 30 days, until such time as new note investments are ready for funding and the capital can be transferred to the Fund without reducing earnings.

4.3     Election to Compound Earnings or Receive Cash Distributions.   Upon subscription for Units, a subscribing Person will elect whether to receive monthly cash distributions from the Company or to allow his or her earnings to compound.  A Member may elect to switch from compounding earnings to receiving monthly cash distributions, or vice versa, upon 90 days' notice to the Manager; provided, however, that a Member may only change

SAC00000666
Exhibit 26-57

from receiving cash distributions to compounding earnings if there is then in effect a permit issued by the California Department of Corporations for the offering of Units; and provided further, that such Member shall have received the most current version of the Company's Offering Circular. Notwithstanding the foregoing, the Manager at any time shall have the right to immediately commence making monthly distributions to one or more ERISA plan Members who previously had elected to compound earnings if necessary in order for the Company to remain exempt from the application of the ERISA Plan Asset Regulations. Income allocable to Members who elect to compound their earnings will be retained by the Company for purposes of making or investing in further mortgage loans or for other proper Company purposes, and the amount of such allocable income will be credited to their Capital Accounts.

4.4    No Participation in Management. Except as expressly provided herein, the Members shall take no part in the conduct or control of the Company business and shall have no right or authority to act for or bind the Company. Economic Interest Owners shall have no voting rights whatsoever. Manager shall have the right to redeem a Member's Units at its sole discretion, if it believes it is in the Company's best interest.

4.5    Rights and Powers of Members. A Majority Interest of the Members shall have the right to vote upon, and to approve or disapprove, the following matters, and no others, all of which matters shall also require the prior written consent of the Manager:

(a)    dissolution and termination of the Company;

(b)    amendment to this Agreement, provided that this Subsection (b) shall not apply to the matters set forth in Section 12.4 below, with respect to which matters the Manager alone may amend this Agreement without the vote of the Members;

(c)    merger or consolidation of the Company pursuant to Section 9.3 below; and

(d)    removal of the Manager and election of a successor Manager, in the manner and subject to the conditions described in Sections 3.6 and 3.7 above.

4.6    Meetings. No regular meetings of Members are required to be held, but meetings of Members may be called, noticed and held, and voting procedures shall be followed in accordance with the provisions of Section 17104 of the Act.

4.7    Limited Liability of Members. Units are non-assessable, and no Member shall be personally liable for any of the expenses, liabilities, or obligations of the Company or for any of the losses thereof beyond the amount of such Member's agreed upon Capital Contribution to the Company and such Member's share of any undistributed net income and gains of the Company; provided, that each Member shall remain liable to return to the Company any distributions that such Member is obligated to return pursuant to Section 17254 of the Act.

SAC00000667
Exhibit 26-58

# ARTICLE V
## PROFITS AND LOSSES, PRIME RETURN GUARANTY; CASH DISTRIBUTIONS

5.1     Profits and Losses.

(a)     Unless otherwise allocated in accordance with the special allocation provisions of Section 5.5 below, Profits shall be allocated on a monthly basis in the following order of priority:

(i)     First, Profits shall be allocated entirely to the Members in accordance with their respective Percentage Interests until each Member has been allocated Profits pursuant to this Section 5.1(a) in an amount equal to such Member's accrued Preferred Return as of such date;

(ii)     Thereafter, all remaining Profits for such month shall be allocated 100% to the Manager.

(b)     Unless otherwise allocated in accordance with the special allocation provisions of Section 5.7, below, Losses shall be allocated on a monthly basis entirely to the Members in accordance with their respective Percentage Interests.

(c)     In the event that Units are purchased by a Member or any Membership Interest is increased or decreased prior to the last day of any calendar month, then Profits or Losses realized during such month shall be prorated in proportion to the number of days during such month that the Members' Capital Accounts were outstanding on a weighted average basis.

5.2     Monthly Cash Distributions.  Cash Available for Distribution shall be distributed only to those Members who elect in writing to receive such distributions during the term of the Company in accordance with Section 4.3.  Cash Available for Distribution to such electing Members shall be distributed as soon as practicable after the end of each calendar month, and shall be distributed among such electing Members in proportion to their respective Percentage Interests.  Cash Available for Distribution that would otherwise be distributable to the other non-electing Members shall be retained by the Company for use in its business operations and shall be credited to such Members' Capital Accounts.  In addition, an amount of cash equal to the Manager's allocable share of Profits during any month shall also be distributed monthly to the Manager.  Notwithstanding the forgoing, if at any time prior to the end of the Company's Fiscal Year the Manager determines, in its reasonable judgment, that due to subsequent events distributions previously made pursuant to this Section 5.2, exceed adjusted Profits earned by the Members and the Manager for that Fiscal Year, the Manager may discontinue making monthly cash distributions to the Members and/or the Manager unless and until the Company's Profits equal or exceed the monthly distributions previously made to the Members and the Manager hereunder.

5.3     Reconciliation.  In the event it is determined after the end of any Fiscal Year that by reason of subsequent events or otherwise, the Manager has received monthly cash distributions for such Fiscal Year that exceed the amounts to which the Manager was entitled by reason of the subordination of the Manager's interest in Profits to the Member Preferred Return pursuant to Section 5.1(a) above, then the Manager shall promptly reimburse the Company for

SAC00000668
Exhibit 26-59

the amount of such excess, which shall be reallocated and distributed to the Members in accordance with Section 5.1(a). The Manager shall not owe any interest on such amounts so long as the excess distributions were made in good faith.

5.4     Cash Distributions Upon Dissolution. Upon dissolution and termination of the Company, all Cash Available for Distribution shall thereafter be distributed to Members in accordance with the provisions of Article IX below.

5.5     Special Allocation Rules.

(a)     For purposes of this Agreement, a loss or allocation (or item thereof) is attributable to non-recourse debt which is secured by Company property to the extent of the excess of the outstanding principal balance of such debt (excluding any portion of such principal balance which would not be treated as an amount realized under Code Section 1001 and Paragraph (a) of Code Section 1.001 2 if such debt were foreclosed upon) over the adjusted basis of such property. This excess is herein defined as "Minimum Gain" (whether taxable as capital gain or as ordinary income) as more explicitly set forth in Treasury Regulation 1.704-1(b)(4)(iv)(c). Notwithstanding any other provision of Article V, the allocation of loss or deduction (or item thereof) attributable to non-recourse debt which is secured by Company property will be allowed only to the extent that such allocation does not cause the sum of the deficit Capital Account balances of the Members receiving such allocations to exceed the minimum gain determined at the end of the Company taxable year to which the allocations relate. Any Member with a deficit Capital Account balance resulting in whole or in part from allocations of loss or deduction (or item thereof) attributable to non-recourse debt which is secured by Company property shall, to the extent possible, be allocated income or gain (or item thereof) in an amount not less than the minimum gain at a time no later than the time at which the minimum gain is reduced below the sum of such deficit capital account balances. This Section is intended and shall be interpreted to comply with the requirements of Treasury Regulation Section 1.704-1(b)(4)(iv)(e).

(b)     In the event any Member receives any adjustments, allocations or distributions, not covered by Section 5.5(a), so as to result in a deficit Capital Account, items of Company income and gain shall be specially allocated to such Members in an amount and manner sufficient to eliminate the deficit balances in their Capital Accounts created by such adjustments, allocations or distributions as quickly as possible. This Section shall operate a qualified income offset as utilized in Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

(c)     The Manager can change a portion of organizational accruals which have been, or may be incurred in the year 2010 or later, and separate from any prior year's accruals, up to 1%, or $2,500,000 of the Fund's maximum capitalization of $250,000,000, from a capitalized asset to a receivable from the Manager. This amount is in addition to any prior year's accruals for organizational expenses. This will eliminate substantial portion of the tax schedule amortization of these expenses and increase earnings. The receivable will be reduced annually over a period of 5 years from Manager contributions, and also generate additional interest earnings to the Fund at the preferred yield of 7.5%.

SAC00000669
Exhibit 26-60

## ARTICLE VI
## ACCOUNTING AND REPORTS

6.1     <u>Books and Records</u>.  The Manager shall cause the Company to keep the following books and records, which shall be maintained at the Company's principal place of business and shall be available for inspection and copying by, and at the sole expense of, the Members (but not Economic Interest Holders), or their duly authorized representatives, during reasonable business hours:

(a)     A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

(b)     A current list of the full name and business or residence address of the Manager;

(c)     A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

(d)     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(e)     A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

(f)     Copies of the financial statements of the Company, if any, for the six most recent Fiscal Years; and

(g)     The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years.

6.2     <u>Financial Reports and Returns</u>.  The Manager shall cause to be prepared and distributed to each Member the following:

(a)     Within one hundred twenty (120) days after the end of each Fiscal Year of the Company, an annual report which shall contain a balance sheet of the Company as of the end of each Fiscal Year, an income statement and a report of the activities of the Company during such Fiscal Year, including a statement of changes in financial position for that Fiscal Year, which financial statements shall be audited by an independent certified public accounting firm in accordance with generally accepted accounting principles.

(b)     Within ninety (90) days after the end of each Fiscal Year of the Company, such other information which the Members may need for preparation of their federal income tax returns.

SAC00000670
Exhibit 26-61

6.3     <u>Tax Matters Partner</u>.  In the event the Company is subject to administrative or judicial proceedings for the assessment or collection of deficiencies for federal taxes or for the refund of overpayments of federal taxes arising out of a Member's distributive share of profits, the Manager shall act as the Tax Matters Partner ("**TMP**") and shall have all the powers and duties assigned to the TMP under Sections 6221 through 6232 of the Code and the Treasury Regulations thereunder.  The Members agree to perform all acts necessary under Section 6231 of the Code and Treasury Regulations thereunder to designate the Manager as the TMP.

## ARTICLE VII
## TRANSFER OF COMPANY INTERESTS

7.1     <u>Restrictions on Transfers</u>.  Notwithstanding any provision to the contrary contained herein, the following restrictions shall apply to any and all proposed sales, assignments or transfers of Membership Interests and Economic Interests, and any proposed sale, assignment or transfer in violation of same shall be void ab initio:

(a)     No Member shall make any transfer or assignment of all or any part of his Membership Interest without the prior written consent of the Manager, which consent may be withheld in the sole discretion of the Manager.

(b)     No Member shall make any transfer or assignment of all or any part of his Economic Interest without the prior written consent of the Manager, which consent shall not be unreasonably withheld.

(c)     No Member shall make any transfer or assignment of all or any part of his Membership Interest or Economic Interest if said transfer or assignment would, when considered with all other transfers during the same applicable twelve-month period, cause a termination of the Company for federal or California state income tax purposes.

(d)     No Member shall be entitled to sell, assign, transfer or convey his Membership Interest or Economic Interest to any person or entity other than a bona fide resident of the State of California for a period of nine months after the termination of the offering of Membership Interests pursuant to which such Membership Interest (or the Membership Interest associated with such Economic Interest) was acquired.

(e)     No Member shall be entitled to sell, assign, transfer or convey his Membership Interest or Economic Interest to any Person unless such transfer complies with Section 260.141.11 of the Rules of the California Commissioner of Corporations if such Section of such Rules is applicable at the time of the proposed transfer.

(f)     Instruments evidencing a Membership Interest or Economic Interest shall bear and be subject to a legend condition in substantially the following form:

THE UNITS REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED NOR HAVE THEY BEEN QUALIFIED UNDER THE CALIFORNIA CORPORATE SECURITIES LAW OF 1968, AS AMENDED.  SUCH UNITS MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED TO

SAC00000671
Exhibit 26-62

ANY PERSON AT ANY TIME WITHOUT SUCH REGISTRATION AND QUALIFICATION, OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED. THERE ARE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFER, AS SET FORTH IN THE OPERATING AGREEMENT.

IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN OR TO RECEIVE ANY CONSIDERATION THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED BY THE COMMISSIONER'S RULES.

7.2    <u>Transfer of Membership Interests and Substitution</u>.  No assignee of the whole or any portion of a Membership Interest in the Company shall have the right to become a substituted Member in place of his assignor unless the following conditions are first met:

(a)    The assignor shall designate such intention in the instrument of assignment;

(b)    The written consent of the Manager to such substitution shall be obtained, which consent may be withheld in the sole discretion of the Manager and which, in any event, shall not be given if the Manager determines that such sale or transfer may jeopardize the continued ability of the Company to qualify as a "partnership" for federal income tax purposes or that such sale or transfer may jeopardize the status of the original sale of said interest pursuant to the non public and intrastate offering exemptions from registration or qualification under the Securities Act of 1933, as amended (the "1933 Act") or the California Corporate Securities Law of 1968, as amended (the "1968 Law");

(c)    The instrument of assignment shall be in a form and substance satisfactory to the Manager;

(d)    The assignor and assignee named therein shall execute and acknowledge such other instruments as the Manager may deem necessary to effectuate such substitution, including but not limited to a power of attorney with provisions more fully described in this Agreement;

(e)    The assignee shall accept, adopt and approve in writing all of the terms and provisions of this Agreement as the same may have been amended;

(f)    Such assignee shall pay or, at the election of the Manager, obligate himself to pay all reasonable expenses (including reasonable attorneys' fees) not exceeding $500 connected with such substitution; and

(g)    The Company has received, if requested, a legal opinion in form and substance satisfactory to the Manager that such transfer will not violate the registration

SAC00000672
Exhibit 26-63

provisions of the 1933 Act or the qualification requirements of the 1968 Law, which opinion shall be furnished at the Member's expense.

7.3     Repurchase of Membership Rights Upon Transfer of Economic Interest. Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company, for a purchase price equal to $0.001 (1/10th cent) per Unit of Membership Interest, the Economic Interest of which has been transferred, all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member. Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member is not unreasonable under the circumstances existing as of the date hereof.

For example, if a Member who holds five Units of Membership Interest assigns the Economic Interests pertaining to two Units in accordance with this Article VII, and if the transferee is not admitted as a substituted Member for any reason, such transferee shall hold the two Units of Economic Interest so transferred as an Economic Interest Owner and the transferring Member shall sell the balance of the rights associated with those two Units to the Company for the sum of Two Dollars ($2.00) and the transferring Member shall retain three Units of Membership Interest.

## ARTICLE VIII
## WITHDRAWAL FROM COMPANY

8.1     Withdrawal by Members. No Member shall have the right to withdraw from the Company, receive cash distributions or otherwise obtain the return of all or any portion of his Capital Account balance except as provided below and except for monthly distributions of Cash Available for Distribution, if any, to which such Member may be entitled pursuant to Section 5.4 above. A Member has no right to withdraw from the Fund or to obtain the return of all or any portion of sums paid for the purchase of Units (or reinvested earnings with respect thereto) for at least twelve (12) months after the date such Units are purchased. After twelve (12) months, Members may withdraw all or part of their capital accounts from the Fund, subject, however, to the following limitations:

(a)     An existing Member desiring to withdraw from the Company shall give written notice of same ("**Notice of Withdrawal**") to the Manager, and such Member's Capital Account as of the date of such notice shall be liquidated and distributed to such Member as soon as reasonably practical, but in no event less than thirty (30) days, subject to subsections (c), (d) and (e) below.

SAC00000673
Exhibit 26-64

(b)     New Members who will purchase Units after the date of this Offering Circular may withdraw as a Member of the Fund and may receive a return of capital provided that the following conditions have been met: (a) the Member has been a Member of the Fund for a period of at least twelve (12) months; and (b) the Member provides the Fund with a written request for a return of capital at least thirty (30) days prior to such withdrawal. The Fund will use its best efforts to honor requests for a return of capital subject to, among other things, the Fund's then existing cash flow, financial condition, and prospective loans. Notwithstanding the foregoing, the Manager may, in its sole discretion, waive such withdrawal requirements if a Member is experiencing undue hardship.

(c)     Furthermore, commencing with the end of the calendar month in which such Notice of Withdrawal is given, any current Prime Return allocable to the Capital Account (or portion thereof) being withdrawn shall also be distributed in cash to the withdrawing Member in the manner provided in Section 5.4 above.

(d)     A Member's Capital Account will be returned to a withdrawing Member, subject to the following limitations:

(i)     The Company will not establish a reserve from which to fund withdrawals and, accordingly, the Company's capacity to return a Member's Capital Account is restricted to the availability of Company cash flow in any given calendar quarter as determined in good faith by the Manager. For this purpose, cash flow is considered to be available only after all current Company expenses have been paid (including compensation to the Manager and its Affiliate) and provision has been made for maintaining adequate reserves to meet anticipated Company expenses and payment of all monthly cash distributions on a pro rata basis which must be paid to Members who elected to receive such distributions upon subscription for Units. The Company shall not be obligated to sell or liquidate any mortgage loans prior to maturity for the purpose of generating funds to liquidate the Capital Accounts of withdrawing Members.

(ii)    If current cash flow is inadequate to promptly liquidate all Capital Accounts with respect to which Notices of Withdrawal have been received, then the priority of distributions among withdrawing Members shall be determined by the chronological order in which their respective Notices of Withdrawal were received by the Manager; provided, that the Manager shall have the discretion to accord priority to Notices of Withdrawal received from Deceased Members and ERISA Plan Investors as described in Section 8.1(e) below.

(e)     In no event shall the Fund be required to liquidate the Capital Accounts of Withdrawing Members to the extent that the aggregate distributions paid to all withdrawing Members during any twelve-month period would exceed an amount equal to twenty percent (20%) of the aggregate Capital Accounts of all Members at the beginning of such period.

(f)     Notwithstanding any provision herein to the contrary, the Company may give priority to the return of the Capital Accounts of certain Members, as follows:

(i)     Upon the death of the sole beneficiary of a corporate pension or profit-sharing plan, Individual Retirement Account or other employee benefit plan subject to ERISA or upon the death of a Member (the "**Deceased Member**"), the return of such Deceased

SAC00000674
Exhibit 26-65

Member's Capital Account may be given priority over the return of other withdrawing Members' Capital Accounts, in the Manager's sole and absolute discretion, but such priority liquidation shall be limited to $50,000 per calendar quarter.

(ii)     The Manager, in its sole and absolute discretion, shall also have the right at any time to immediately return all or a portion of the Capital Account of one or more ERISA plan investors (the "**ERISA Plan Investors**") in order to ensure that the Company remains exempt from the ERISA Plan Asset Regulations.  The return of such ERISA Plan Investors' Capital Accounts shall have priority over the return of all other withdrawing Members' Capital Accounts, including those of Deceased Members.

(g)     Notwithstanding the foregoing, the Capital Account of a withdrawing Member shall remain subject to adjustment as described in Section 1.5 above until it is fully liquidated.  Any reduction in a Capital Account by reason of an allocation of Losses, if any, shall reduce all subsequent liquidation payments proportionately.  In no event shall any Member receive cash distributions upon withdrawal from the Company if the effect of such distribution would be to create a deficit in such Member's Capital Account.

8.2     Effect of Dissolution.  If at any time there are outstanding unfulfilled Notices of Withdrawal from a Majority Interest of the Members, the Manager shall have the right, but not the obligation to deem that to constitute a vote by the Members to dissolve the Company pursuant to Section 9.1 and to concur with such vote.  If the Company dissolves pursuant to Section 9.1 below at a time when any Members who have previously given Notices of Withdrawal have not yet received the return of their respective full Capital Accounts, then in such event the winding up provisions of Section 9.2 below shall apply and the distribution provisions of Subsection 9.2(c) shall be controlling, such that liquidation payments shall thereafter be made proportionately to all Members pursuant to Subsection 9.2(c) and no further payments shall be made pursuant to Subsection 8.1(a) above.

## ARTICLE IX
## DISSOLUTION OF THE COMPANY; MERGER OF THE COMPANY

9.1     Events Causing Dissolution.  The Company shall dissolve upon occurrence of the earlier of the following events:

(a)     The vote (including a deemed vote pursuant to Section 8.2 above) of a Majority Interest of the Members to dissolve, with the concurrence of the Manager; or

(b)     An entry of a decree of judicial dissolution pursuant to Section 17351 of the California Corporations Code.

9.2     Winding Up.  Upon the occurrence of an event of dissolution, the Company shall not immediately be terminated, but shall continue until its affairs have been wound up.  Upon dissolution of the Company, unless the business of the Company is continued as provided above, the Manager will wind up the Company's affairs as follows:

(c)     No new loans shall be made or purchased;

SAC00000675
Exhibit 26-66

(d)     Except as may be agreed upon by the Manager and a Majority Interest of Members in connection with a merger or consolidation described in Section 9.3, the Manager shall liquidate the assets of the Company as promptly as is consistent with recovering the fair market value thereof, either by sale to third parties (including the Manager or Affiliate) or by servicing the Company's outstanding loans in accordance with their terms; provided, however, the Manager shall liquidate all Company assets for the best price reasonably obtainable in order to completely wind up the Company's affairs within five years after the date of dissolution;

(e)     Except as may be agreed upon by the Manager and a Majority Interest of Members in connection with a merger or consolidation described in Section 9.3, all sums of cash held by the Company as of the date of dissolution (including liquid assets which shall be converted to cash), together with all sums of cash received by the Company during the winding up process from any source whatsoever, shall be applied and promptly distributed to the Members in proportion to the positive balances in their respective outstanding Capital Accounts, but only after all the Company's debts have been paid or otherwise adequately provided for.

(f)     Upon the completion of the liquidation of the Company and distribution of liquidation proceeds, the Manager shall cause to be filed a Certificate of Dissolution as required by the Act and shall furnish to each of the Members a statement setting forth the receipts and disbursements of the Company during such liquidation, the amount of proceeds from such liquidation distributed with respect to Company Interests and the amount of proceeds paid or distributed to Members.

9.3     Merger or Consolidation of the Company.   The Company may be merged or consolidated with one or more other entities, which may be Affiliates of the Company, provided that the principal terms of any such merger or consolidation are first approved by the Manager and by the affirmative vote of a Majority Interest of the Members.   In any such merger or consolidation, the Company may be either a disappearing or surviving entity.

## ARTICLE X
## TRANSACTIONS BETWEEN THE COMPANY, THE MANAGER AND AFFILIATES

10.1     Loan Origination Fees.   In consideration for their services rendered in connection with locating, underwriting, negotiating and closing loan investments by the Company, the Manager or its affiliate shall be entitled to receive loan origination, renewal or forbearance fees, or "points," which shall be payable solely by the borrower, directly or indirectly, and not by the Company.   In the event any such commissions, fees or points are paid by borrowers to the Company, the Company shall pay to the Manager compensation for its services as Manager an amount equal to all commissions, fees or points received by the Company from the borrowers of such loans.

10.2     Sale of Loans to Manager or Affiliate.   The Company may sell existing loans to the Manager or its Affiliate, but only so long as the Company receives net sales proceeds from such sale in an amount equal to the total unpaid balance of principal, accrued interest and other charges owing under such loan, or the fair market value of such loan, whichever is greater. Notwithstanding the foregoing, the Manager shall be under no obligation to purchase any loans from the Company or to guarantee any payments under any Company loan.

SAC00000676
Exhibit 26-67

10.3    Sale of Real Estate to the Manager or its Affiliate.  In the event the Company becomes the owner of any real property by foreclosure on a Company loan, the Company may sell such property to the Manager or an Affiliate of the Manager provided:

(a)    No foreclosed property will be sold to the Manager or an Affiliate thereof unless the Manager has first used its best efforts to sell any property at a fair price on the open market for at least ninety (90) days.

(b)    In the event any property is sold to the Manager or its Affiliate, the net purchase price must be no less favorable to the Company (taking into account any avoided commissions or other cost savings) than (i) the independently appraised value of such Property, if any, at the time of sale, (ii) any bona fide third-party offer received, if any, at the time of sale, or (iii) no less than the total amount of the Company's "investment" in the property.   The Company's investment includes, without limitation, the following:  the unpaid principal amount of the Company's loan, unpaid interest accrued to the date of foreclosure, expenditures made to protect the Company's interest in the property such as payments to senior lienholders and for insurance and taxes, costs of foreclosure (including attorneys' fees actually incurred to prosecute the foreclosure or to obtain relief from stays in bankruptcy), and any advances made by the Manager, if any, on behalf of the Company for any of the foregoing.

(c)    Neither the Manager nor any of its Affiliates would receive a real estate commission in connection with such a sale.

10.4    Reimbursement of Manager for Certain Expenses.    The Manager shall be reimbursed by the Company for all organizational and operating expenses incurred on behalf of the Company, including without limitation, out of pocket general and administrative expenses of the Company, accounting and audit fees, legal fees and expenses, postage, and preparation of reports to Members.

## ARTICLE XI
## ARBITRATION

11.1    Arbitration.  Any action to resolve any controversy or claim arising out of or related to this Agreement, or the breach hereof, however characterized, shall be resolved through a binding, non-public arbitration before an adjudicator selected as provided in this Article XI.

11.2    Demand for Arbitration.  Any party desiring to bring any action under this Agreement shall give written notice to the other party, which notice shall state with particularity the nature of the dispute and the demand for relief, making specific reference by paragraph number and title, if applicable, of the provisions of this Agreement pertaining to the dispute.

11.3    Appointment of Arbitrator. The parties shall endeavor to agree, within thirty (30) days of the above-described notice, upon a mutually acceptable adjudicator to resolve the dispute.  The adjudicator shall be a single former judge of the Superior Court or the Court of Appeal of the State of California or member in good standing with the California State Bar currently employed by or associated with the office of JAMS, Inc. ("JAMS") located in or nearest to Palo Alto, California.  If the parties cannot agree upon the adjudicator within such thirty (30)-day period, then JAMS, in its sole discretion, shall provide a list of three adjudicators

SAC00000677
Exhibit 26-68

with the qualifications set forth above. Within ten (10) days of JAMS providing the above-described list, each of the parties shall be entitled to strike one name from the list and so notify JAMS. JAMS, in its sole discretion, thereafter shall select as adjudicator any one of the persons remaining on the list, and the person so selected shall thereafter serve as adjudicator. If for any reason JAMS is unable or unwilling to make such an appointment, either party may apply to the Superior Court of the State of California in and for the County of Santa Clara for appointment of any former judge of the Superior Court or the Court of Appeal of the State of California to serve as adjudicator. The appointment of an adjudicator, whether by JAMS or by the Superior Court pursuant to the foregoing, shall be made, and the adjudicator shall serve, without further objection from either party, except on the ground of conflict of interest, if any, pursuant to the same rules that would apply if the former judge were serving as an active member of the Superior Court or Court of Appeal.

11.4    Hearing. The hearing shall take place at a mutually acceptable location in Palo Alto, California and shall be conducted pursuant to the provisions of the California Arbitration Act commencing with California Code of Civil Procedure Section 1280, the rules and procedures established by JAMS, and such other rules and procedures as may be determined by the adjudicator; provided, however, that: (1) at the hearing, any relevant evidence may be presented by either party, and the formal rules of evidence applicable to judicial proceedings shall not govern; and (2) discovery between the parties prior to the arbitration hearing shall be limited to the mutual exchange of relevant documents. Interrogatories, requests for admissions, and depositions of witnesses shall not be permitted.

11.5    Arbitration Award. In resolving the dispute, the adjudicator shall apply the pertinent provisions of this Agreement without departure therefrom in any respect, and the adjudicator shall not have the power to change any of the provisions of the Agreement. The adjudicator shall try all of the issues, including any issues that may be raised concerning arbitrability of the dispute, subject-matter and personal jurisdiction, and any and all other issues, whether of fact or of law, and shall hear and decide all motions and matters of any kind. The adjudicator shall not be required to prepare a written statement of decision as to any interlocutory decision, but at the conclusion of the arbitration shall prepare a written statement of decision thereon which shall be final and binding upon the parties, and upon which judgment may be entered in accordance with applicable law in any court having jurisdiction thereof. Any interlocutory decisions by the adjudicator likewise shall be final and binding, except that the adjudicator shall have the power to reconsider such.

11.6    Costs of Arbitration. The prevailing party in any dispute regarding or arising out of this Agreement shall be entitled to an award of its reasonable attorneys' fees in addition to any other relief to which it is entitled.

11.7    WAIVERS. THE PARTIES HEREBY FREELY WAIVE THE RIGHT TO TRIAL BY JUDGE OR JURY, THE RIGHT TO APPEAL, FULL PRETRIAL DISCOVERY AND APPLICATION OF THE RULES OF EVIDENCE.

SAC00000678
Exhibit 26-69

## ARTICLE XII
## MISCELLANEOUS

12.1   Covenant to Sign Documents.  Without limiting the power of attorney granted by Sections 2.8 and 2.9 above, each Member covenants, for himself and his successors and assigns, to execute, with acknowledgement or verification, if required, any and all certificates, documents and other writings which may be necessary or expedient in the creation of the Company and the achievement of its purposes, including, without limitation, all such filings, records or publications necessary or appropriate in the judgment of the Manager to comply with the applicable laws of any jurisdiction in which the Company shall conduct its business.

12.2   Notices.  Except as otherwise expressly provided for in this Agreement, all notices which any Member may desire or may be required to give any other Member shall be in writing and shall be deemed duly given when delivered personally or when deposited in the United States mail, first class postage prepaid, addressed to the Member's address as shown in the books of the Company pursuant to written notification to the Manager.  Notices to the Manager or to the Company shall be delivered to the Company's principal place of business, as set forth in Section 2.3 above or as hereafter charged as provided herein.

12.3   Right to Engage in Competing Business.  Nothing contained herein shall preclude any Member from purchasing or lending money upon the security of any other property or rights therein, or in any manner investing in, participating in, developing or managing any other venture of any kind, without notice to the other Members, without participation by the other Members, and without liability to them or any of them.  Each Member waives any right he may have against the Manager for capitalizing on information received as a consequence of the Manager's management of the affairs of this Company.

12.4   Amendment.  This Agreement is subject to amendment by the affirmative vote of a Majority Interest of the Members with the written concurrence of the Manager. Notwithstanding anything to the contrary contained in this Agreement, the Manager shall have the right to amend this Agreement, without the vote or consent of any of the Members, when:

(a)   There is a change in the name of the Company or the amount of the contribution of any Member;

(b)   A person is substituted as a Member;

(c)   An additional Member is admitted;

(d)   A person is admitted as a successor or additional Manager in accordance with the terms of this Agreement;

(e)   There is a change in the character of the business of the Company;

(f)   There is a false or erroneous statement in this Agreement; or

(g)   A change in this Agreement is required in order that it shall accurately represent the agreement among the Members.

SAC00000679
Exhibit 26-70

12.5    Governing Law.  This Agreement shall be governed by and shall be interpreted and enforced in accordance with the substantive laws of the State of California.

12.6    Entire Agreement.  This Agreement constitutes the entire agreement between the parties and supersedes any and all prior agreements and representations, either oral or in writing, between the parties hereto with respect to the subject matter contained herein.

12.7    Waiver.  No waiver by any party hereto of any breach of, or default under, this Agreement by any other party shall be construed or deemed a waiver of any other breach of or default under this Agreement, and shall not preclude any party from exercising or asserting any rights under this Agreement with respect to any other breach or default.

12.8    Severability.  If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

12.9    Captions.  Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference an in no way define, limit, extend or describe the scope of this Agreement.

12.10    Number and Gender.  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and the word "person" shall include a natural person, firm, partnership, corporation, trust, association of other form of legal entity.  Any consent or action required or permitted to be given or made by a Manager may be given or made by any Manager.

12.11    Counterparts.  This Agreement may be executed in counterparts, any or all of which may be signed by the Manager on behalf of the Members as their attorney-in-fact.

12.12    Legal Representation.

(a)    Counsel to the Company may also be counsel to the Manager or any Affiliate of the Manager.  The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules"). Each Member acknowledges that Company counsel does not represent any Member and Company counsel shall owe no duties directly to any Member.  Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and the Manager (and its Affiliates), on the other hand, then each Member agrees that Company counsel may represent either the Company or such Manager (or his Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

(b)    Each Member further acknowledges that Company counsel has represented only the interests of the Manager and not the Members in connection with the

SAC00000680
Exhibit 26-71

formation of the Company and the preparation and negotiation of this Agreement, and each Member acknowledges that it has been afforded the opportunity to consult with independent counsel with regard thereto.

SAC00000681
Exhibit 26-72

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands the day and year first above written.

**MANAGER**:                          SMALL BUSINESS CAPITAL CORP.,
                                      a California corporation dba SB Capital


                                      By:_____
                                            Mark Feathers, President



**MEMBERS**:                          _____
                                      Mark Feathers, President of Small Business Capital
                                      Corp., as Attorney-In-Fact for the persons listed on
                                      Schedule A attached hereto

SAC00000682
Exhibit 26-73

## SCHEDULE A

### MEMBERS

### Name and Address

98540002/342120v4

SAC00000683
Exhibit 26-74

# EXHIBIT 27

**Investors Prime Fund, LLC**

December 31, 2010 and 2009

AUDITED
Financial Statements



SPIEGEL ACCOUNTANCY CORP
CERTIFIED PUBLIC ACCOUNTANTS

2033 North Main Street, Suite 365 ▪ Walnut Creek, CA 94596-3722 ▪ Phone (925) 977-4000 ▪ Fax (925) 977-4015

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002966

Exhibit 27-1

Investors Prime Fund, LLC and Subsidiary
Table of Contents
Years Ended December 31, 2010 and 2009

|  | Page |
|---|---|
| Independent Auditors' Report | 1 |
| Consolidated Balance Sheets | 2 |
| Consolidated Statements of Income | 3 |
| Consolidated Statements of Changes in Members' Equity | 4 |
| Consolidated Statements of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6 - 15 |
| Supplementary Schedule I - Loan Concentrations and Characteristics | 16 |

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002967

Exhibit 27-2

## SPIEGEL ACCOUNTANCY CORP

### Independent Auditors' Report

To the Fund Members
Investors Prime Fund, LLC and Subsidiary
Los Altos, California

We have audited the accompanying consolidated balance sheets of Investors Prime Fund, LLC and Subsidiary as of December 31, 2010 and 2009, and the related consolidated statements of income, changes in members' equity and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Fund's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Fund's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and the significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As more fully described in Note 11 to the financial statements, the Fund is unable to assess the collectability of the note receivable from fund manager and thus cannot reasonably determine whether an allowance for loss is necessary which reflects a departure from generally accepted accounting principles. In our opinion, the carrying value of the note receivable from fund manager may require an allowance for loss which would adequately reflect fair value and conform to accounting principles accepted in the United States of America. The effects on the financial statements of the preceding practice are not reasonably determinable.

In our opinion, except for the effects of not assessing the collectability of the note receivable from fund manager, as discussed in the preceding paragraph, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Investors Prime Fund, LLC and Subsidiary as of December 31, 2010 and 2009, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

Our audit was conducted for the purpose of forming an opinion on the basic financial statements taken as a whole. The supporting information included in supplementary schedule is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

Walnut Creek, California
March 22, 2011

Spiegel Accountancy Corp.
Certified Public Accountants

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002968

Exhibit 27-3

Investors Prime Fund, LLC and Subsidiary
Consolidated Balance Sheets

|  | | December 31, | | |
|---|---|---|---|---|
|  | | 2010 | | 2009 |
| **ASSETS** | | | | |
| Current Assets | | | | |
| Cash | $ | 2,827,941 | $ | 2,249,572 |
| Premium Receivable on Sale of Mortgages | | 236,160 | | - |
| Interest and Other Receivable | | 107,506 | | 49,779 |
| Mortgage Loans Held for Sale | | 2,361,600 | | - |
| Current Portion of Mortgage Loans Receivable | | 5,011,737 | | 6,101,798 |
| Prepaid Expenses | | 174,624 | | 13,886 |
| Total Current Assets | | 10,719,568 | | 8,415,035 |
| Mortgage Loans Receivable, Net of Current Portion | | 2,525,126 | | 2,023,794 |
| Note Receivable from Fund Manager | | 1,850,000 | | 405,623 |
| Capitalized Costs, Net | | 199,167 | | 42,460 |
| SBA License | | 750,000 | | 113,459 |
| Total Assets | $ | 16,043,861 | $ | 11,000,371 |
| **LIABILITIES AND MEMBERS' EQUITY** | | | | |
| Liabilities | | | | |
| Accounts Payable | $ | 58,200 | $ | 49,296 |
| Income Taxes Payable | | 7,700 | | - |
| Line of Credit | | 500,000 | | - |
| Total Liabilities (All Current) | | 565,900 | | 49,296 |
| Total Members' Equity | | 15,477,961 | | 10,951,075 |
| Total Liabilities and Members' Equity | $ | 16,043,861 | $ | 11,000,371 |

See Notes to Financial Statements

-2-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002969

Exhibit 27-4

Investors Prime Fund, LLC and Subsidiary
Consolidated Statements of Income

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2010 | 2009 |
| Revenue: | | |
| Premium on Sale of Mortgages | $    791,870 | $              - |
| Mortgage Interest Income | 674,388 | 725,733 |
| Loan Servicing and Packaging Fees | 24,839 | - |
| Total Revenue | 1,491,097 | 725,733 |
| Operating Expenses: | | |
| Advertising and Marketing | 70,456 | - |
| Bank Charges | 1,516 | 1,117 |
| Consulting | 77,027 | 66,698 |
| Insurance | 8,663 | 25,940 |
| Lender Services | 12,464 | - |
| Licenses and Fees | 3,191 | 3,165 |
| Loan Packaging Fees | 15,500 | - |
| Miscellaneous Fees | 14,377 | 6,336 |
| Office Salaries | 248,039 | - |
| Payroll Taxes | 16,285 | - |
| Professional Fees | 116,293 | 44,922 |
| Provision for Loan Losses | - | - |
| Total Operating Expenses | 583,811 | 148,178 |
| Income from Operations | 907,286 | 577,555 |
| Other Income (Expense): | | |
| Amortization | (44,421) | (58,617) |
| Interest Income | 2,597 | 965 |
| Interest Expense | (3,476) | (1,385) |
| Income before Income Taxes | 861,986 | 518,518 |
| Provision for Income Taxes | 9,300 | 3,300 |
| Net Income | $    852,686 | $    515,218 |

See Notes to Financial Statements

-3-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002970

Exhibit 27-5

Investors Prime Fund, LLC and Subsidiary
Consolidated Statements of Changes in Members' Equity
Years Ended December 31, 2010 and 2009

|  | Total Members' Equity |
|---|---|
| Beginning Balance, January 1, 2009 | $ 7,851,396 |
| Contributions and Reinvested Earnings | 5,502,911 |
| Withdrawals | (2,625,187) |
| Distributions | (331,944) |
| Net Income | 515,218 |
| Ending Balance, December 31, 2009, As Originally Reported | 10,912,394 |
| Prior Period Adjustment | 38,681 |
| Balance at December 31, 2009, As Restated | 10,951,075 |
| Contributions and Reinvested Earnings | 8,498,899 |
| Withdrawals | (3,974,185) |
| Distributions | (850,514) |
| Net Income | 852,686 |
| Ending Balance, December 31, 2010 | $ 15,477,961 |

See Notes to Financial Statements

-4-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002971

Exhibit 27-6

Investors Prime Fund, LLC and Subsidiary
Consolidated Statements of Cash Flows

| | Years Ended December 31, | |
| | 2010 | 2009 |
|---|---|---|
| Cash Flows From Operating Activities: | | |
| Net Income | $ 852,686 | $ 515,218 |
| Adjustment to Reconcile Net Income to Net | | |
| Cash Provided by Operating Activities: | | |
| Amortization Capitalized Costs | 44,421 | 58,658 |
| (Increase) Decrease in Operating Assets: | | |
| Premium Receivable on Sale of Mortgages | (236,160) | - |
| Interest and Other Receivable | (57,727) | 72,800 |
| Prepaid Expenses | (160,738) | (23,886) |
| Increase (Decrease) in Operating Liabilities: | | |
| Accounts Payable | 8,904 | 49,295 |
| Due to Related Fund | - | (35,852) |
| Distribution Payable | - | (28,970) |
| Income Taxes Payable | 7,700 | (2,500) |
| Net Cash Provided by Operating Activities | 459,086 | 604,763 |
| Cash Flows From Investing Activities: | | |
| Issuing of Mortgage Loans Receivable | (11,485,067) | (4,747,090) |
| Collection of Mortgage Loans Receivable | 9,712,196 | 3,077,029 |
| Loaned to Fund Manager | (1,444,377) | (355,623) |
| Capitalized Costs | (201,128) | - |
| SBA License Costs | (636,541) | (89,154) |
| Net Cash Used in Investing Activities | (4,054,917) | (2,114,838) |
| Cash Flows From Financing Activities: | | |
| Borrowings on Business Line of Credit | 500,000 | - |
| Members' Contributions | 8,498,899 | 5,502,911 |
| Withdrawals of Members' Contributions | (3,974,185) | (2,625,187) |
| Members' Distributions | (850,514) | (331,944) |
| Net Cash Provided by Financing Activities | 4,174,200 | 2,545,780 |
| Net Increase in Cash | 578,369 | 1,035,705 |
| Cash - Beginning | 2,249,572 | 1,213,867 |
| Cash - Ending | $ 2,827,941 | $ 2,249,572 |
| Supplemental Disclosure of Cash Flow Information: | | |
| Cash Paid During the Year for: | | |
| Income Taxes | $ 6,800 | $ 3,300 |

See Notes to Financial Statements

-5-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002972

**Exhibit 27-7**

Investors Prime Fund, LLC and Subsidiary
Notes to Consolidated Financial Statements
Years Ended December 31, 2010 and 2009

## NOTE 1 - SUMMARY OF ORGANIZATION AND SIGNIFICANT ACCOUNTING POLICIES

### Organization

Investors Prime Fund, LLC (the "Fund") was organized as a California limited liability Fund under the Beverly-Killea Limited Liability Act on May 17, 2005 and has a December 31 year-end. The Fund is managed by Small Business Capital Corp, Inc., a California corporation doing business as SB Capital, (the "Manager"). The fund was organized to engage in the business of making or investing in loans secured by deeds of trust encumbering primarily California commercial real estate. The Fund receives certain operating and administrative services from the Manager, some of which are not reimbursed to the Manager. The Fund's financial position and results of operations might be different absent this relationship with the Manager.

In April 2010, Small Business Capital, LLC (the wholly owned "Subsidiary"), a California limited liability Fund, was formed. During 2010 the Subsidiary received Small Business Administration ("SBA") Licensing. SBA Licensing allows the Subsidiary to re-underwrite a portion of their mortgage loan portfolio with government backed programs. These government backed programs will guarantee a portion of the Fund's mortgage loan portfolio.

### Term of the Fund

The Fund will continue indefinitely until dissolved and terminated by the Manager alone or by the vote of Members holding a majority of the outstanding membership interests with the concurrence of the Manager.

### Use of Estimates

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of certain assets and liabilities at the date of the financial statements and reported amounts of revenue and expenses during the reported period. Accordingly, the actual amounts could differ from those estimates.

### Principles of Consolidation

The consolidated financial statements include the accounts of the Fund and its wholly owned subsidiary. Inter Fund transactions and balances have been eliminated in consolidation.

-6-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002973

**Exhibit 27-8**

Investors Prime Fund, LLC and Subsidiary
Notes to Consolidated Financial Statements
Years Ended December 31, 2010 and 2009

NOTE 1 -  SUMMARY OF ORGANIZATION AND SIGNIFICANT ACCOUNTING
POLICIES (CONTINUED)

Income Taxes

The Fund, with the consent of its members, has elected to be a partnership under the Internal Revenue Code and a similar section of the state Code. The members of a partnership are taxed on their proportionate share of the Fund's taxable income. Therefore, no provision or liability for federal income taxes has been included in these financial statements. The Fund is however, required to pay state franchise fees for each LLC and state LLC gross receipt fees that have been reflected in the financial statements.

Revenue Recognition

Mortgage interest on notes is recorded as income when earned. Premium on sale of mortgage loans is recorded as income when the contract for sale is executed. Loan servicing fees on the principal amount of Fund loans are earned monthly as the loans are serviced. Loan packaging fees are earned upon loan origination. Loan origination fees are not allowed by SBA and thus not charged or recorded.

Mortgage Loans Held For Sale and Receivable

Mortgage loans generally are stated at their outstanding unpaid principal balance with interest thereon being accrued as earned. If the probable ultimate recovery of the carrying amount of a loan, with due consideration for the fair value of collateral, is less than amounts due according to the contractual terms of the loan agreement and the shortfall in the amounts due are not insignificant, the carry amount of the investment shall be reduced to the present value of future cash flows discounted at the loan's effective interest rate. If a loan is collateral dependent, it is valued at the estimated realizable value of the related collateral.

If events and or changes in circumstances cause management to have serious doubts about the further collectibility of the contractual payments, a loan categorized as impaired will continue to accrue interest until the collateral securing the loan is foreclosed on. Any subsequent payments on impaired loans are applied to reduce the outstanding loan balances including previously accrued interest and advances. Management did not consider any loans to be impaired as of or for the years ended December 31, 2010 and 2009. The Fund had no amounts due on loans past due 90 days or more in principal or interest as of December 31, 2010 and 2009.

-7-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002974

Exhibit 27-9

Investors Prime Fund, LLC and Subsidiary
Notes to Consolidated Financial Statements
Years Ended December 31, 2010 and 2009

NOTE 1 –   SUMMARY OF ORGANIZATION AND SIGNIFICANT ACCOUNTING
POLICIES (CONTINUED)

Allowance for loan losses

Loans and the related accrued interest are analyzed on a periodic basis for recoverability.
Delinquencies are identified and followed as part of the loan system. A provision is made
for loan losses to adjust the allowance for loan losses to an amount considered by
management to be adequate, with due consideration to collateral value, to provide for
unrecoverable loans and receivables, including impaired loans, accrued interest and
advances on loans. The Fund writes off uncollectible loans and related receivables
directly to the allowance account once it is determined that the full amount is not
collectible. Since its inception, the Fund has not written off any loans; no allowance for
loan loss is considered necessary by Fund management at December 31, 2010 and 2009.

Fair Value Measurements

Fair value is defined as the exchange price that would be received for an asset or paid to
transfer a liability in the principal or most advantageous market for the asset or liability in
an orderly transaction between market participants on the measurement date. The Fund
determines the fair values of its assets and liabilities based on a fair value hierarchy that
includes three levels of outputs that may be used to measure fair value (Level 1, Level 2 and
Level 3). Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets
or liabilities that the Fund has the ability to access at the measurement date. An active
market is a market in which transactions occur with sufficient frequency and volume to
provide pricing information on an ongoing basis. Level 2 inputs are inputs other than quoted
prices that are observable for the asset or liability, either directly or indirectly. Level 3
inputs are unobservable inputs for the asset or liability. Unobservable inputs reflect the
Fund's own assumptions about the assumptions that market participants would use in
pricing the asset or liability (including assumptions about risk).

The Fund does not record loans at fair value on a recurring basis but uses fair value
measurements of collateral security in the determination of its allowance for loan losses.
The fair value for real estate owned and impaired secured loans is determined using the
sales comparison, income and other commonly used valuation approaches.

-8-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002975

**Exhibit 27-10**

Investors Prime Fund, LLC and Subsidiary
Notes to Consolidated Financial Statements
Years Ended December 31, 2010 and 2009

NOTE 1 -   SUMMARY OF ORGANIZATION AND SIGNIFICANT ACCOUNTING
POLICIES (CONTINUED)

Fair Value Measurements (Continued)

The following methods and assumptions were used to estimate the fair value of assets and liabilities:

(a)     Mortgage loans receivable and held for sale (Level 2). For loans in which a specific allowance is established based on the fair value of the collateral, the Fund records the loan as nonrecurring Level 2 if the fair value of the collateral is based on an observable market price or a current appraised value. If an appraised value is not available or the fair value of the collateral is considered impaired below the appraised value and there is no observable market price, the Fund records the loan as nonrecurring Level 3.

NOTE 2-    FUND PROVISIONS

The Fund is a California limited liability Fund.  The rights, duties and powers of the members of the Fund are governed by the operating agreement and Chapter 3, Title 2.5 of the California Corporate Code.  The description of the Fund's operating agreement contained in these financial statements provides only general information.  Member should refer to the Fund's operating agreement and offering circular for a more complete description of the provisions.

The Manager is in complete control of the Fund business, subject to the voting rights of the members on specified matters.  The Manager acting alone has the power and authority to act for and bind the Fund.

Members representing a majority of the outstanding Fund membership interest may take the following actions with the prior written consent of the Manager: (i) dissolve or terminate the LLC; (ii) amend the LLC operating agreement; or (iii) merge or consolidate with one or more other LLC's.

The Manager may be removed by the written consent of Members representing a majority of the outstanding membership interests of the Fund.

Profits and Losses

Profits and losses accrued during any calendar month are allocated among the members as of the last day of each month in accordance with their capital account balances as of such date; provided, however, that Fund profits paid to members shall be the "Preferred Return" which is the higher of prime rate, or 7.5% compounded (the "floor rate"); and all profits in excess of the Prime Return shall be retained by the Manager.

-9-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002976

Exhibit 27-11

Investors Prime Fund, LLC and Subsidiary
Notes to Consolidated Financial Statements
Years Ended December 31, 2010 and 2009

NOTE 2-     FUND PROVISIONS (CONTINUED)

Liquidity, capital withdrawals and early withdrawals

There is no public market for units of the Fund and none is expected to develop in the foreseeable future. There are substantial restrictions on transferability of membership interests. Any transferee must be a person with the same qualifications as the original member and a transferee may not become a substituted member without the consent of the Manager.

A member may withdraw from the Fund after 365 days, however, the right to sell shares and realize a return on capital is available under limited circumstances until the termination of the Fund. The Manager maintains the discretion to honor members' requests to withdraw on a more accelerated basis.

The Fund will not establish a reserve from which to fund withdrawals and, accordingly, the Fund's capacity to return a Member's capital account is restricted to the availability of Fund cash flow.

The Fund is not required to liquidate any Fund loans prior to maturity for the purpose of liquidating the capital account of a withdrawing member. The Fund is merely required to continue paying whatever cash flow is available to withdrawing members, who are entitled to receive their liquidation payments in the order that their requests were received.

Election to receive distribution

The Manager may, at its discretion, agree to provide cash distributions to a member in the amount and frequency as is mutually agreed upon.

Reinvestment

Members have the option to compound their proportionate share of the Fund's monthly earnings.

NOTE 3 -     CASH CONCENTRATION

The Fund maintains cash in various financial institutions. These institutions are members of the Federal Deposit Insurance Corporation. As such, funds are insured based on Federal Reserve limits. The Fund has not experienced any losses in the past and Management believes it is not exposed to significant credit risk on the current account balances. Uninsured cash held at banks was $1,658,444 and $1,235,739 at December 31, 2010 and 2009, respectively.

-10-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002977

Exhibit 27-12

Investors Prime Fund, LLC and Subsidiary
Notes to Consolidated Financial Statements
Years Ended December 31, 2010 and 2009

NOTE 4 –   CAPITALIZED COSTS, NET

Capitalized Costs as shown in the summary below represent Fund disbursements for expenditures incurred during the organization and structuring of the fund and its subsidiary and costs of raising long term capital investments. These costs are amortized on a straight line basis over the estimate period that the fund will benefit from the incurred costs. Under the terms of the Offering Circular, the fund manager is entitled to reimbursement from the Fund for all out-of-pocket organization and restructuring expenses. The Offering Circular allows for a total reimbursement of 5% of the total Fund capitalization to a maximum of $500,000. To date the Fund has reimbursed the Manager a total of $383,929 for organization and syndication costs.

|  | 2010 | 2009 |
|---|---|---|
| Organization Costs | $    238,430 | $     33,929 |
| Restructuring Costs | 51,670 | 51,670 |
| Total Capitalized Costs | 290,100 | 85,599 |
| Accumulated Amortization | (90,933) | (43,139) |
| Total Capitalized Costs, Net | $    199,167 | $     42,460 |

**Organization Costs** – These were incurred when the fund and its subsidiary were first organized and represent legal fees and the costs associated with the initial Fund offering and acquisition of the SBA license.

**Restructuring Costs** – These were incurred when the fund separated from its previous manager restructured into the current fund. These costs represent legal fees and expenditures related to revisions in the offering circular and management agreement.

Amortization charged to fund operations for the years ended December 31, 2010 and 2009 was $44,421 and $54,948, respectively.

NOTE 5–   U.S. SMALL BUSINESS ADMINISTRATION LICENSING

The Fund has obtained U.S. Small Business Administration ("SBA") Licensing. SBA Licensing allows the Fund to re-underwrite a portion of their mortgage loan portfolio with government backed programs. These government backed programs will guarantee a portion of the Fund's mortgage loan portfolio. The Fund purchased the SBA license for $750,000 on April 7, 2010.

-11-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002978

Exhibit 27-13

Investors Prime Fund, LLC and Subsidiary
Notes to Consolidated Financial Statements
Years Ended December 31, 2010 and 2009

NOTE 6 -   MORTGAGE LOANS HELD FOR SALE

Mortgage loans held for sale at December 31, 2010 consisted of the 90% portion of 2 mortgage loans receivable for which sale contracts had been executed. Sale proceeds of $2,597,760 on these contracts were received in January 2011.

NOTE 7 -   MORTGAGE LOANS RECEIVABLE

|  | 2010 | 2009 |
|---|---|---|
| Mortgage Loans Receivable consist of notes to individuals and legal entities, secured by deeds of trust, bearing interests at various rates ranging from 6.00% to 10.75% per annum, partially or fully amortized. These notes are due on various dates ranging from March 31, 2010 to January 1, 2036. | $   7,536,863 | $   8,125,592 |
| Less: Current Portion of Mortgage Loans Receivable | 5,011,737 | 2,023,794 |
| Mortgage Loans Receivable, Net of Current Portion | $   2,525,126 | $   6,101,798 |

NOTE 8 -   LINE OF CREDIT

The Fund has a line of credit at December 31, 2010 with a bank. The line is secured by substantially all of the Fund's assets, bears interest at 3.25% per annum and was paid off in January 2011.

NOTE 9 -   FAIR VALUE MEASUREMENTS

The following table represents the Fund's fair value hierarchy for its assets measured at fair value on a recurring basis.

As of December 31, 2010:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Mortgage Loans Held for Sale | $        - | $2,361,600 | $        - | $2,361,600 |
| Mortgage Loans Receivable | - | 7,536,863 | - | 7,536,863 |
| | $        - | $9,898,463 | $        - | $9,898,463 |

-12-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002979

Exhibit 27-14

Investors Prime Fund, LLC and Subsidiary
Notes to Consolidated Financial Statements
Years Ended December 31, 2010 and 2009

NOTE 9 -    FAIR VALUE MEASUREMENTS (CONTINUED)

As of December 31, 2009:

|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Mortgage Loans Receivable | $    - | $8,125,592 | - | $8,125,592 |
|  | $    - | $8,125,592 | $    - | $8,125,592 |

NOTE 10 -    RELATED PARTY TRANSACTIONS

Origination and Loan Documentation Fees

The Manager will receive origination fees on Fund loans arranged by the Manager. Origination fees are anticipated to average between 0.0% and 3.0% of the principal amount of each loan. The Manager may also be entitled to receive loan processing and documentation fees on mortgage loans receivable. These fees are paid directly by the borrowers and are not expenses of the Fund.

Management fees

The Manager shall receive subordinated monthly distributions from the Fund in amounts equal to the remainder of funds available for distribution after all allocations of the higher of Prime Rate, or 7.5% (the "floor rate") has been made first to the members, and after payment of Fund expenses. Management has elected to waive the receipt of management fees during the year ended December 31, 2010 and 2009.

Loan Packaging Fees

Loan packaging fees are earned by the Fund upon loan origination. The Fund contracts with the Manager of IPF to perform loan packaging services at a price equal to the fees earned. Loan packaging fees and related expense totaled $15,500 for the period from April 5, 2010 (Inception) through December 31, 2010.

Note Receivable from Manager

The Fund does not account for its note receivable from Manager in accordance with generally accepted accounting principles (GAAP), which would require the Fund to assess the carrying value of the note receivable for fair value impairment due to the unsecured nature of the note and the lack of certainty of cash flows of the Manager. The Fund carries the note at the full value of the cash advanced to the Manager under the note.

-13-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002980

Exhibit 27-15

Investors Prime Fund, LLC and Subsidiary
Notes to Consolidated Financial Statements
Years Ended December 31, 2010 and 2009

NOTE 11 -   RELATED PARTY TRANSACTIONS (CONTINUED)

Note Receivable from Manager (Continued)

As of December 31, 2010, $1,850,000 has been advanced to the Fund manager under the promissory note agreement. The note is unsecured, and bears an interest rate of 7.5% per annum beginning on January 1, 2011. Payment of interest is due quarterly beginning on March 31, 2011 with all principal due on or before January 1, 2016. The receivable from the Fund manager was prohibited by the Fund's operating agreement and offering circular, which has been amended and approved by the Department of Corporations in November 2010.

Mortgage Loans Receivable

The Fund has two mortgage loans receivable from the Manager as of December 31, 2010 and 2009 in the amounts of $1,559,150 and $1,500,000, respectively. The loans are secured by real property and bear interest at 7.56 – 8.5%, interest is paid monthly and principal is due on January 31, 2012.

NOTE 12 -   EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 ("ERISA)

Some of the investors purchasing membership interests are employee benefit plans, including Individual Retirement Accounts, which are subject to ERISA. Persons making the investment decisions for such ERISA investors are deemed to be "fiduciaries" of such investors and must discharge their duties with care, skill and prudence which a prudent person would exercise under the circumstances.

Normally an investment in an equity interest of an entity, such as a membership interest in the Funds, will be deemed a "plan asset" of the ERISA investor, but the underlying assets of the entity will not be deemed plan assets.  However, if (i) the equity interests are not publicly-offered securities, (ii)the entity is not one of several types of "operating companies" defined by ERISA regulations, and (iii) investments by ERISA investors exceeds 25% of the value of the class of equity interest, then the underlying assets of the entity may be deemed "plan assets", with the entity deemed a "fiduciary" with respect to the ERISA investors.

NOTE 13 -   RECLASSIFICATIONS

Certain reclassifications have been made to the prior year financial statements in order to conform to the classifications used in the current year. These reclassifications have no effect on the prior year net income.

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002981

**Exhibit 27-16**

Investors Prime Fund, LLC and Subsidiary
Notes to Consolidated Financial Statements
Years Ended December 31, 2010 and 2009

NOTE 14 -    PRIOR PERIOD ADJUSTMENT

Retained earnings at the end of 2009 were understated by $38,681 and have been adjusted to reflect corrections of an error in the capitalization of syndication fees and the related amortization expense.

It has been determined that the syndication fees previously capitalized are the responsibility of the Fund Manager and not expenses of the Fund. The effect of the restatement is to decrease syndication fees and increase to note receivable from Manager by $350,000. In addition, the $38,681 of accumulated amortization relating to the syndication fees previously capitalized has been reversed thereby decreasing amortization expense by $38,681 in the prior year and increasing retained earnings by $38,681.

NOTE 15 -    SUBSEQUENT EVENT

The Fund has evaluated subsequent events through March 22, 2011, the date the financial statements were available to be issued.

-15-

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002982

**Exhibit 27-17**

Supplementary Schedule

See Notes to Financial Statements

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002983

**Exhibit 27-18**

**Supplementary Schedule I – Loan Concentrations and Characteristics**
**For the Years Ended December 31, 2010 and 2009**

The loans are secured by recorded deed of trust.  Outstanding loan characteristics are as follows as December 31:

|  | | 2010 | | 2009 |
|---|---|---|---|---|
| Number of secured loan outstanding | | 15 | | 11 |
| Total secured loans outstanding | $ | 9,898,463 | $ | 8,125,592 |
| Average secured loan outstanding | $ | 659,898 | $ | 738,691 |
| Average secured loan as percent of total | | 6.7% | | 9.1% |
| Average secured loan as percent of members' equity | | 4.3% | | 6.7% |
| Largest secured loan outstanding | $ | 2,042,502 | $ | 1,878,497 |
| Largest secured loan as percent of total | | 20.6% | | 23% |
| Largest secured loan as percent of members' equity | | 13.2% | | 17% |
| Number of counties where security is located | | 7 | | 7 |
| Largest percentage of loans in one county | | 29.7% | | 40% |

The following categories of secured loans were held at December 31:

|  | | 2010 | | 2009 |
|---|---|---|---|---|
| First trust deeds | $ | 9,898,463 | $ | 8,125,592 |
| Loans by type of security: | | | | |
| Commercial | $ | 8,740,358 | $ | 5,925,592 |
| Non - Owner Residential | | 1,158,105 | | 2,200,000 |
| | $ | 9,898,463 | $ | 8,125,592 |

FOIA: CONFIDENTIAL TREATMENT Requested by Small Business Capital Corp.
c/o DLA PIPER US LLP 2000 Avenue of the Stars, 4th Flr North Tower, Los Angeles CA 90067

SBCC002984

**Exhibit 27-19**