Natalie Feathers

1520 Grant Rd., Los Altos, CA 94024

Ph. 650-961-2382

TO:     Clerk of the Court

David Zaro, Esq., as Counsel to the Receiver, Thomas A. Seaman

July 23rd, 2014

RE:     SEC V. SMALL BUSINESS CAPITAL CORP., et al CV12-03237-EJD

**NATALIE FEATHERS' OBJECTION TO RECEIVER AND PROFESSIONAL'S SIXTH FEE REQUEST (COURT DOCKETS 923, 924 & 925)**

I have reviewed Thomas Seaman's and his Professional's sixth fee request. I do not believe the Court should approve their request for the following reasons.

1. In his fee request, the Receiver states that "59%" (Court Docket 923, page 9, line 3), or almost two-thirds of his fees of $244,024 for a three month period of time (not including the fees of his counsel) is for "loan servicing". By his own admission Seaman is primarily a loan servicer. A small portfolio of less than sixty loans is typically managed by one full time employee in a bank at a salary of less than $150,000 per year, as compared to Seaman's request for $244,024 for one quarter. Seaman attempts to obscure his 400% mark-up by stating that his fee represents 1.5% of "gross disbursements" (*id*, page 1, line 24) **Monies given under the Court's Orders to fund investors, and that they already owned, and most of which was already on their balance sheet on the day of Seaman's arrival as a so-called "licensed CPA" (Court Docket 6, Page 3, line 1), has no valid basis of comparison for Seaman to use in his request.**

2. The Receiver's gross billing amounts increase, rather than decrease, despite the loan portfolio steadily diminishing in size over the past two years. **This is despite the Receiver's Court submissions over the past two years stating repeatedly that there would likely be decreases in billings not increases.**

3. There continues to be a very close correlation, almost 1:1, between the interest and loan servicing incomes of the assets of the Receivership Estate and the fee requests of the Receiver and his Professional. **The Receiver's attitude and philosophy always seems to be one of "any income of the Receivership Estate assets in any billing cycle is the amount that I will ask for".** The Court should take note that even two years into this legal action the Receivership Estate's mortgage and outside loan servicing assets built through the efforts of SB Capital, and not of Seaman, continue to generate millions of dollars of revenue per year.

4. The Receiver for two years now, up to and including this latest fee request, continues to compare his expense structure with that of the entities of the Receivership Estate when they were actively originating SBA loans to try to justify his fees, even though the Court should recognize that he is comparing apples to oranges only for Seaman's benefit.

5. On page 4 of his report, lines 3 – 5, *clearly for self-serving purposes and with no evidentiary support to it,* the Receiver states that the "Receivership Entities loan servicing" shows that they were "unconcerned" about unpaid property taxes. As of June 2012, the time of seizure, to my knowledge the SBA loan portfolios had nowhere near the twenty two borrowers that the Receiver states were late on payments of their real estate taxes after December 2013. The Receiver also offers his conjecture with a reference that this lack of

concern was because the loans had "sufficient collateral" (*id*, pg. 4, line 5). Nowhere does the Receiver offer any evidentiary support for his statement that the Receivership Entities were "unconcerned".

6. The Receiver makes reference that many borrowers "were" behind in providing financial statements (*id*, page 4, line 9). He does not show what period he is referencing, however. Facts in this situation are that SB Capital ceased servicing the SBA loan portfolios in June of 2012. At that time, borrowers were current or loan files properly reflected timely requests for items such as current financial statements. If borrowers are now behind, this is clearly during the watch of the Receiver, not SB Capital, which is now two years and two audit and tax cycles removed from servicing these loans. Facts show that the funds originated their first SBA 7(a) loan in mid-2010, and were placed into receivership twenty six months later. So, the Receiver has now serviced the fund's SBA loans for twenty five months as compared to SB Capital's twenty six months (from time of SBA licensing in April 2010). If there are servicing issues of the Receivership Estate's SBA loan portfolios, then these are of the Receiver's making.

7. On page 4, lines 12 – 17 of his fee request, the Receiver only shows his poor loan servicing record with a comparison of late fees of "$287.25" collected in total by SB Capital in 2012, compared to late fees the Receiver has collected of "$35,855.27"*since* he was appointed. In other words, he has collected more than 100x as much in late fees as SB Capital collected. The Court should take note here, however, that per SBA standard operating procedures, there is no discretion or latitude of SBA servicers to waive borrower late fees. So what is apparent here is that under the Receiver's loan servicing, borrowers have now been late **100 times more frequently** than they were while SB Capital serviced the SBA loan portfolios of the investment funds. The Receiver fails to recognize that late fees are a contrary indicator to good servicing.

8. The Receiver references in his report, page 5, lines 19 – 26, the he prepared and filed a quarterly accounting report of the Brokers Trust Accounting for 2012 in the first quarter of 2014. The problem with this matter is that under California Bureau of Real Estate guidelines (the Receiver should take note, also, that there is no longer a California "Department" of Real Estate for a year now) the Trust Accounting for 2012 was due early in 2013, and not in 2014. The Receiver factually misstates to the Court that California Bureau of Real Estate guidelines by stating that 2012 Brokers Trust Accounting reports were due" in the first quarter of 2014".

9. Page 5, lines 27 – 28, the Receiver states that he worked on 2012 "pre-receiver" tax returns for "SB Capital Corporation". However, the Receiver assumed control of this entity in June of 2012. Making reference that 2012 was "pre-receiver" is very factually incorrect, since the Receiver actually "managed" SB Capital **for more than 50%** of 2012. There appears to have been only one tax return filed for SB Capital for 2012, and not a "pre-receiver" tax return along with a "post-reciever" tax return. It is exactly this type of factual misrepresentation that the Receiver has included by the score in every one of his reports over the past twenty three months, and why these are wholly unreliable, and should not be accepted by the Court (and in fact, records show that the Court has not accepted any of the Receiver's reports since November of 2012, a period gone-by of more than twenty months now. Additionally, the Receiver has failed to proofread his sixth fee request. The narrative portion paragraph covering SB Capital tax returns ends on line 4, page 6, with a sentence suspended midway and no indication where the Receiver was headed with his half-completed sentence.

10. The Receiver and his Counsel, as is their established pattern, spend time and investor money to point out expenses related to "Mark Feathers". Both of these parties need to re-examine the hundreds of letters and sworn declarations this Court holds which indicate belief that "fraud" in this lawsuit was that of the Receiver and the SEC, and not Mark Feathers. The Receiver purports to have "responded to numerous investor inquiries" because they were misled by "Mr. Feathers". Similar to all prior reports, they fail to provide evidentiary basis to support these so-called examples of how investors were "mislead". **And what about the Receiver and the SEC and their unfair, bullying and misleading tactics and flat-out falsified information (see Court Docket 187)? And what of the Receiver's false accusations of fancy restaurant gift certificates, expensive car payments, false licensing credentials, false financial illustrations, disguising of equity/capital infusion, grossly misleading financial terms (see Court Docket 54) which the Court referenced in denying legal fees to Feathers (see Court Docket 70), clearly all used by Seaman to create bias and misinform the investors of the true facts?**

11. The Receiver has now managed the SBA loan portfolios of the Receivership Estate for 25 months – essentially as long as it was managed by SB Capital from time of their first SBA 7(a) loan funding. It is time for the Receiver to stop referencing "reduced operating costs". The post-SBA licensing operational period under the Receiver is now more than that of SB Capital. The Receiver makes reference that payroll expenses were "$253,000" per month before he arrived. He fails to mention is that gross revenues were triple their level at that time, or that this payroll was for twenty eight employees (**appx. $9,036 per month per employee**). Now, under the Receiver's watch, he is billing at $83,333 per month for the work of 2.8 employees (per his report), or at a level of **$29,762 per month per employee**...or almost 3.29x the amount of pre-receivership wage levels per employee, in other words.

12. *According to the receivers own interim reports #1-#3, the loan servicing duties were provided by that of TWO former SB Capital employees, or after that for a short period by J.R. Bruno & Assoc. (who abruptly resigned for reasons undisclosed – but known to be as a result of the Receivers greed not J.R. Bruno). The loan servicing expense (per the Receivers own reports) was only approx. $20K-$25K per month during the period from June 2012 through October 2013. Why is it - now that the Receiver has assumed the loan servicing responsibility - has the cost more than tripled? Why should the investors pay for the cost of the Receivers incompetence and his "on the job training"? Rather than laying me off in June 2012, perhaps the Receiver should have retained my services at my "so called" $15K per month salary; for over 75% of my job responsibilities with SB Capital were that of loan servicing. I personally have over 25 years in loan servicing/loan portfolio management experience, and during my tenure with SB Capital, all loan servicing duties were handled in a diligent and "CONCERNED" manner, with any exception items handled immediately and appropriately.*

The Receiver now whines for sympathy from the Court and from fund investors out loud when he states in his fee request "It does not appear to the Receiver that the Court fully understands the complexity and work required to abide by the SBAs SOP" (*id*, page 9, lines 5 – 6). The failure here, however, is only Seaman's, who never should have been appointed to this position.

Additionally, the Receiver's fee request makes reference that he expects to wrap up the receivership in September of 2014, even while he has not settled the California Business Bank lawsuit, nor collected his purported goal of approximately $1.2M in so-called "clawbacks".

Respectfully,

*[signature: Natalie Feathers]*

Natalie E. Feathers