Mark Feathers, in *Pro Per*
1520 Grant Rd.
Los Altos, CA 94024
Telephone: (650) 575-7881

UNITED STATES DISTRICT COURT

NORTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION ) ) ) PLAINTIFF, ) ) vs. ) ) SMALL BUSINESS CAPITAL CORP., MARK ) FEATHERS, INVESTORS PRIME FUND, LLC, ) AND SBC PORTFOLIO FUND, LLC ) ) DEFENDANTS. ) ) ) ) ) ) ) ) | Case No.   CV12-03237-EJD **MEMORANDUM OF POINTS AND UNDERSTANDING TO MARK FEATHERS' MOTION TO ALTER OR AMEND JUDGMENT UNDER RULE 60(b)1, 2, & 3 OF THE FEDERAL RULES OF CIVIL PROCEDURE** |

MARK FEATHERS MEMORANDUM OF POINTS AND UNDERSTANDING

**LAWSUIT HISTORY AND RELEVANT BACKGROUND INFORMATION**

Prior in this lawsuit SEC admitted, not of its own volition, that it gave this Court false financial illustrations, by the score, about the defendants; see Court Docket 187. SEC Enforcement Division CPAs implausibly added positive adjustments to equity (aka "fund distribution reinvestments") to negative adjustments to equity (aka "fund distributions"). By so making such adjustments which are the kind that would never be made by CPAs, unless by either intention on their part, or perhaps even worse, with the highest level of gross recklessness, or carelessness, SEC overstated fund distributions for SEC's three year claims period by 54%. This is the equivalent of stating that these invested funds paid their members an annual yield of 11.25%, instead of 7.5%, which they neither ever claimed, nor ever did do, in order to pay what surely is a stupendous yield, if the Court were to believe what SEC stated in its hidden *ex parte prima facie* court filings. Surely SEC hid these court filings from the defendants for good reason, given SEC's false financial illustrations. For very experienced and licensed SEC certified public accountants, who regulate tens of thousands of public and private companies, and who work for a federal agency that is almost one hundred years old, with thousands of employees and a multibillion dollar budget[1], SEC's false financial illustrations statements of their CPA's being only "good faith errors" is wholly implausible to have occurred unless it was by SEC's Enforcement Division design. A useful analogy of the implausibility of this so-called "good faith error" is to think of an experienced car mechanic putting his fingers on both the negative and positive terminals of a car battery just in order to see if that battery held a charge. That act would only be done deliberately, if it were to occur, because the results would be disastrous, and could even cause the death of a mechanic, as they know. The death caused here was that of very viable specialty mortgage investment funds. However, this party has never heard of an SEC Enforcement CPA suffering the consequence of such gross misconduct as creating false financial illustrations. Blanketed with substantial personal immunity for their actions, SEC's enforcement CPAs do not concern themselves with drastic and

---

[1] Freedom of Information filings of this Party show SEC's Enforcement division CPA, Roger Boudreau, a public servant, to have made more than $1,000,000 in salary and benefits in the past five years with SEC, and a multiple of several times that amount in his career at SEC. Proof, again, that crime pays well.

-1-
MARK FEATHERS MEMORANDUM OF POINTS AND UNDERSTANDING
Case No. CV-12-03237

everlasting lifetime consequences that such gross misconduct such as their's may bring upon others. By overstating, by 54%, the fund's actual historical distributions, SEC's CPAs built false premise that capital from new members was needed to make SEC's, not the defendants' - vastly overstated claimed amount of distributions. On the basis of its own false financial information, SEC was then able to invoke against what, for any small company a prejudicial death knell when it originates from an Agency such as SEC who labels it a Ponzi scheme, which SEC did state time and time again in their sealed and hidden Complaint, even though that sealed and hidden Complaint was replete, as SEC knew, with SEC's false financial illustrations. Even with admitting it employed created false financial illustrations about the Defendants, which logic and fact indicates SEC's CPAs could only have created by design, apparently the Enforcement Division of this agency, to say it again, does not show itself ever in this lawsuit to be concerned about the consequences of their gross misconduct of employing the most harmful label in all of the financial services industry, and made possible only by way of SEC's own false financial illustrations.

SEC regularly revokes permanently the ability of public and private industry CPAs to practice in the field of accounting, and imposes lifetime bans on them (see Exhibit 1) for this kind of financial accounting gimmickry or trickery such as SEC used in its Complaint. SEC itself is fully aware that such a "good faith error" would not be plausible of highly experienced CPAs who have audit methods and practices firmly in place precisely to ever avoid such an "error" in a lawsuit involving tens of millions of dollars and professional reputations and livelihoods at stake.

> Case5:12-cv-03237-EJD   Document160   Filed01/14/13   Page2 of 13
>
> 18  The Commission does not dispute that in calculating member returns in the Complaint, it
> 19  added together the line items "distributions" and "re-invested distributions" to arrive at the total
> 20  distributions alleged in the Compliant.

This background information, however, is not for the purpose of re-hashing prior court pleadings. It is provided to save the Court the time and resources necessary to review past information for this lawsuit, in considering the merit of this Motion to set aside its prior order.

Prior in this lawsuit, SEC admitted, though not of its own volition, that it falsely labeled its recommended Receiver, Thomas A. Seaman, as a licensed certified public accountant; see Court Docket 275. SEC has done this for Seaman in consecutive SEC lawsuits, in fact. Seaman and his

long time SEC legal action counsel kept silent on this matter all the time, in both lawsuits, for years. Seaman also falsely advertised himself before his first very first SEC lawsuit as a CPA:

> **THOMAS A. SEAMAN, CPA, RECEIVER**
>
> Thomas Seaman Company
> Tel: 949.222.0551
> tom@thomasseaman.com
>
> Is pleased to announce his appointment
> as Receiver for
>
> Regions Medical Center, a partnership
> dispute receivership
>
> Superior Court
> County of Orange

SEC, Seaman, and Seaman's counsel do not have have *unclean hands* here. They have *filthy dirty stinking hands* here. This point is made not for the purpose of re-hashing old pleadings, rather, it is to outline important prior events in this lawsuit, and to show that whether collectively, or taken separately, the due process rights of this party were violated by the elements of SEC first using false financial information in its hidden complaint, and then falsely stating their receiver, holding thereafter all assets, to hold a special financial services license which he does not hold.

That Receiver also told the Court, falsely on his part but there is no surprise there, very early in this lawsuit, that this defendant took $100,000 out of his business checking account by way of a cashier's check, for his personal use, and – according to the Receiver's submissions to the Court - even after this party was told "by bank employees that his business account was frozen under an injunction" or words to that effect. That was but one of many false statement made by Seaman with no basis of valid support to it. Seaman also made false statements about expensive car payments from investor capital, seafood restaurant gift certificates from investor capital, and, even claimed, falsely, that he could not find evidence of this party's half million dollar+ investment into his own company. Whether by design, or just as recklessness, it is clear that statements such as these could only help in this lawsuit to assist SEC in their early propaganda, which included SEC's unfettered use of words like "Ponzi", "fraudster", and "thief" as harmful (and effective, it

-3-
MARK FEATHERS MEMORANDUM OF POINTS AND UNDERSTANDING
Case No. CV-12-03237

appears) and prejudicial character attacks on this Party, even though it was SEC who admits to presenting false financial information to this court, hidden under seal. Again, these matters are not brought up to rehash old issues, but to save the Court time in reading through prior pleadings.

As additional background which is worthwhile for the Court to reflect upon, the defendants held federal licensing which allowed them to sell 85% or more of each of their guaranteed loans, i.e., on $10,000,000 in capital they could fund in excess of $50,000,000 in loans to small businesses. This ability to leverage their capital, and without the risky use of debt, along with federal guarantees on their loan portfolio, were the most critical components of their SBA licensed lending business model. Yet SEC has admitted in its prior Court pleadings that it did not understand the all important loan sale component of the defendant's business model (and which also allowed the funds to earn millions of dollars annually in loan premiums). Certainly, even despite six months of enforcement review, SEC did not bother to learn about the business model of SB Capital, et al, or that they held an unusual license not well known outside of the world of SBA lending (there being only 14 of these licenses), and were both federally and state regulated. Again, this information is presented to the Court to save the Court the efforts necessary to remember that SEC did not bother to ever understand the defendant's business model, and not to rehash old issues.

## BASIS FOR FRCP 60(b) 1, 2, & 3 MOTION REQUEST

SEC Enforcement initiated an administrative action against this party in its own court system February of 2014. SEC's stated purpose is to implement a lifetime ban against this party to prevent him from selling securities or work in any regulated field of financial services. This is even though SEC provided a federal court with false financial information, and which could only have been knowingly on the part of SEC and its Enforcement Division, and not this party who provided false financial information to a federal court of law, and which SEC cannot deny.

Because of SEC's own proceedings, SEC was required in March of this year to turn over a trove of exhibits and documents which it hid, prior, from this party and from this Court. The majority, or all, of these SEC documents were provided to SEC by a party, Ms. Lee V. Emerson, of Nashville, Tennessee, and formerly of Los Altos, California. Emerson, based upon all of her information now provided over two years ago to SEC, has clearly been operating for twenty years or greater, and through this day, even, (see Exhibit 2) as an unlicensed securities broker-dealer.

During this time, and which SEC must be aware of, Emerson appears to have earned hundreds of thousands, if not millions of dollars, of income illegally and in violation of well-established federal securities laws. SEC's Enforcement is not just creating false financial illustrations in federal lawsuits, it is also clearly sleeping with its enemies to achieve illicit goals.

Emerson was a past investor of this party's investment funds. She, or those whom she claims to represent, lost many prior lawsuits against this party. Emerson meets the classic definition, if ever there were such a definition, of a disgruntled party with an ax to grind, based upon her scores of false or misleading writings that she provided to SEC, which SEC never shared with this person, or with this Court, until after summary judgment against this person.

SEC has refused to honestly and transparently answer Freedom of Information Requests of this Party to ascertain if this disgruntled ex-investor, Emerson, who makes her living as an unlicensed securities broker-dealer, has also submitted so-called "Whistleblower" claims to SEC (see Exhibit 3) for further enrichment of millions of dollars, to $2,400,000, on SEC's award of $8,000,000 for "disgorgement", which such award is on appeal with the 9th Circuit at this time.

Faced with the reality that this party has been a victim of SEC's lies, and violations of Constitutional due-process rights, SEC's response to this party has been to threaten him with sanctions on multiple occasions if he now, after SEC received its favorable judgment, blows any kind of lid off the fact that SEC Enforcement's did hide information from this person and from the Court (see Exhibit 4). So, SEC sealed its false financial illustrations, and hid information about its so-called Whistleblower/Informant or whatever Emerson is. SEC and its federal trial prosecutors could have, and should have, shared this information with all parties, as it is material in nature. SEC's own Enforcement Manual policies indicate this. However, SEC's Enforcement Division chose, instead, to obstruct justice and the opportunity of this party for due process in discovery.

Emerson was included on Plaintiff's and Defendant's Rule 26 list. Plaintiff held scores, if not hundreds, of evidentiary exhibits provided to them by Emerson. Had these properly been provided to this party and to the Court, these would have helped the Court with its knowledge to be gained that a former investor of the funds, who apparently always was also an unlicensed broker-dealer, was repeatedly, for a lengthy period, providing SEC false, and even libelous, it appears, information about the defendants.

SEC's Exhibits for Emerson show she distributes marketing materials for Stonecrest Financial (Exhibit 5). To this party's knowledge and belief Emerson was never an employee of that entity, only a person who received commissions for aiding Stonecrest sell security instruments. SEC can only have held full awareness that Emerson was never a direct securities issuer (such as the defendants were). By federal securities law guidelines, since she was not an employee of Stonecrest, she was therefore acting as an unlicensed broker-dealer. Emerson in her own emails, held by SEC, oft makes reference to the "Emerson Group", demonstrating she was also acting as an unlicensed investment advisor, which was even touted in the newsletters of Stonecrest (Exhibit 6).

An Emerson email to Feathers shows factual and irrefutable acknowledgement Emerson and her followers, all prior investors of Feathers' funds, were asked by SB Capital for approval to convert fund organization and operating expenses to a note receivable to the investment funds (Exhibit 7). This so-called failure of Feathers and SB Capital to properly disclose this fact to investors was a major, perhaps the most central, element of the Court's summary judgment against Feathers. Yet, this email was hidden by SEC from the Court. This email, even taken by itself, entirely invalidates SEC's repeated arguments to the Court that Feathers failed to inform investors about the nature of the receivable that was created, and provides, on its own, a stand-alone basis for this FRCP motion.

Emerson prior organized six or more former fund investors to file lawsuits against defendant in Santa Clara County California Small Claims Court, alleging unlawful conduct of defendant. Emerson did attend these court hearings, and was instructed by the presiding judge to sit down and discontinue her attempts to illegally represent these parties, when she had no lawful authority to do so. These parties all lost their small claims hearings against this party.

The owner/CEO of Stonecrest, Jon Freeman ("Freeman"), after seizure of this party's company and investment funds, personally stated to Feathers that he, in fact, paid Emerson to influence the former investors of this party's investment funds to move their investments from the defendants' investment funds to Stonecrest. Freeman, some two weeks after an injunction of late June, 2012, against this party, also contacted this party and asked if the SBA Small Business Lending Company license of this party's investment fund was now available for purchase. Freeman indicated his knowledge at that same time of the lawsuit and injunction against this party.

Prior, Freeman advised Emerson that the purchase of such an SBA license by a fund manager was not in the best interest of the members of an investment fund (Exhibit 8). Emerson took Freeman's advice to heart. Immediately thereafter she demanded all of her investment back from this party's investment funds, and had her investors do same. Whereas while Emerson was an investor in this party's investment funds Freeman advised Emerson strongly that this SBA license purchase was "unconscionable", when Emerson invested in Freeman's fund, and after Freeman paid her substantial amounts to persuade other investors from this party's funds to move their investment to his fund, Freeman suddenly changed his tune and now desired the SBA lending license of this party's investment funds.

At this very moment in time, Freeman falsely, and in violation of federal statutes, advertises himself to be an SBA 7(a) "participating lender institution":

Commercial Loans » Stonecrest Fincancial



### Types of Commercial Real Estate Financing

Different types of financing packages are available for commercial loans. They fall into three general categories:

**1) Small Business Administration Financing.** The SBA offers a number of programs that are designed for business owners who want to finance owner occupied commercial property and preserve working capital. Financing can be available for up to 90% of a property's value.

If you're thinking of expanding your business and commercial property ownership is part of the plan, take a look at the following:

- The SBA's Basic 7(a) Loan program. This program – considered by the SBA to be its least complicated – provides loans to eligible borrowers looking to expand their holdings and acquire more property. You must apply through what the SBA calls a "participating lender institution." Stonecrest Financial is one of those institutions.

Emerson and Freeman had self-serving purposes to engage in their conspiracy. Freeman had a valuable license to gain, and the millions of dollars in upward revenues for his companies and himself that could be made possible with such a license. Emerson had the benefit of continued large broker-dealer fees she could earn from her relationship with Freeman.

Emerson by all appearance held a grudge against Feathers which motivate her unsuccessful attempt to obtain small claims awards for "her investors" (as she makes claim) that she managed,

based upon the content of Emerson's authenticated writings between herself and her counsel, which she provided to SEC, and which SEC has in turn just recently provided to this party after an adverse judgment upon him. Based upon the scores, if not hundreds, of exhibits in SEC's possession from Emerson, and the expansive time span over which these were submitted to SEC by Emerson, it appears that SEC encouraged Emerson to continue to provide SEC with misleading information and accusations, even though little, if any, appears sufficient to meet any evidentiary standard for SEC for its cause. The one item that SEC appears to have decided to employ, in fact, is Emerson's frequent use of the word Ponzi.

As further evidence that Emerson's position only was to incite SEC to make allegations which had little, if any, factual basis, which SEC allowed her to do, always hidden by SEC, Emerson was not deposed as a witness at any point by SEC despite being on SEC's Rule 26 list. In return for a nominal fee paid readily by this party on behalf of fund investors to avoid years of legal battles with Emerson, he entered into with her a binding agreement in February of 2011 in which Emerson agreed to refrain and forebear from commencing "any…action or other proceeding" with institutions or agencies against this party or any of his affiliated businesses. SEC is aware that Emerson has no regard for securities law or civil law, only for her own self-serving interests.

SEC has obstructed justice and violated due process against this party, and SEC, the self-proclaimed "investors advocate" brought substantial harm to the third party investors of these investment funds. Even worse, SEC is aware that Emerson was always operating afoul of federal securities law broker-dealer licensing guidelines. Freeman's coordination with Emerson adds another element of unlawful conspiracy. Freeman appears to have been seeking to see Feathers be put out of business as a competitor in the small regional SBA non-bank lending community, and also because Freeman desired Feathers' funds' unique license, and, also, in retaliation against Feathers because Feathers just two months before SEC's lawsuit refused to bow to extortion of Freeman to pay for legal fees to defend Freeman for a lawsuit which Feathers had very little, or nothing, to do with (Exhibit 9).

The Trial Court clearly made a very serious due process mistake (see FRCP Rule 60(b) 2)

-8-

MARK FEATHERS MEMORANDUM OF POINTS AND UNDERSTANDING
Case No. CV-12-03237

in not allowing Feathers monies under his funds' manager indemnification agreements, by requiring him to prove his innocence before allowing monies to be used for such purposes. This must now be remedied. Lawful basis to award legal fees is outlined in another federal lawsuit:

> **II. As the District Court Aptly Noted, It is Absurd to Require an Insured to Prove Their Innocence Before Being Entitled to a Defense Under a D&O Policy.**
>
> Judge Hittner was exactly right in calling Underwriters' position "absurd" in that "it would contravene the very purpose of the Policies—as well as the policy language itself—to require Plaintiffs to prove their innocence before being entitled to funds for their defense."[22] If Underwriters' arguments were legitimate, the D&O Policy itself would be "rendered a nullity," and the coverage it supposedly provided would be completely illusory.[23]
>
> ---
>
> [22] Order Denying Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint and granting Plaintiffs' Request for Emergency Preliminary Injunction in Laura Pendergest-Holt v. Certain Underwriters At Lloyd's Of London, Civil Action No. H-09-3712, pg. 32 (S.D. Tex Jan. 26, 2010).
>
> [23] See, e.g., United States. v. Weissman, No. S294 CR. 760(CSH), 1997 WL 334966, at *16 (S.D.N.Y. June 16, 1997) (Holding that provision in D&O Policy to 'advance' defense costs would be null if the insurer "could simply wait out the results of an action before deciding whether to pay the requisite costs; if the ultimate judgment was adverse to the defendant, Empire could claim that it was no longer required to pay the expenses previously incurred.").

SEC Los Angeles Regional Office Director Michelle W. Layne, at, or about at, the time of this lawsuit stated that "I'm willing to take risks...Sometimes that means bringing a tough case even when all the odds are against you" (Exhibit 10). The Court should note that before Layne's appointment, she managed the Enforcement Division of the Los Angeles Regional Office of SEC, which included supervising Roger Boudreau, the Enforcement CPA who provided SEC with its false financial illustrations. Apparently, "risk" means for Ms. Layne the risks she has taken of authorizing her staff CPA's to provide false financial illustrations in a hidden federal lawsuit securities complaint, and directing her trial staff attorneys to provide false licensing descriptions of their recommended receivers in order to interfere with due process.

In another of a recurring theme on the issue of licensed certified public accountants, SEC's documents, prior hidden, show that whistleblower/informant (?) Emerson provided SEC with false statements that SB Capital was telling investors, falsely, that it employed a CPA. That

MARK FEATHERS MEMORANDUM OF POINTS AND UNDERSTANDING
Case No. CV-12-03237

was a lie on her part, however, or a product of her own incomplete investigation (or witch's hunt). In fact, SB Capital employed an individual, Ms. Carmen Palenske, who was a CPA, at the time that SB Capital informed investors that a CPA had joined the company. Emerson errantly investigated a consultant of SB Capital, David Gruebele, with the California Board of Accountancy, saw that he was not a licensed CPA, and made a false assumption that SB Capital misrepresented themselves as employing a CPA. Emerson, as a fund investor, had only to call SB Capital on this matter. This is one of many examples of Emerson choosing to make false and libelous statements to SEC and to "her investors" on this matter about SB Capital and Feathers operations (see Exhibit 11).

**Summary**

On the basis of their being discovered very material new evidence, which shows SEC's suppression of their Enforcement Division "Informant/whistleblower (?)" who by all appearances is a serious violator of federal securities laws, which SEC will not deny, and which such information could not have been discovered in time to move for a new trial under Rule 59(b) because SEC suppressed this information, it appears, this Party holds right under the Federal Rules of Civil Procedure to ask the trial Court set aside its summary judgment against him. This will benefit all parties, and the Judiciary, by promoting integrity in the Court's decision making. SEC failed to provide the Court and this party with all relevant evidence and information, which it cannot deny, though it will try to now. The Court should discharge this lawsuit in full, with no opportunity for SEC to re-submit the lawsuit, given its gross misconduct and obstructions of justice. It is also warranted that this party be approved legal fees already ordered by the Court to be set aside by the Receiver, and for a period of discovery on the matters outlined herein.

The 9th Circuit will be informed of these matters, and this Party will ask for leave of the 9th Circuit to approve a hearing on this motion, separate from its consideration of this Party's other appeals now before it, and in accordance with federal statues which require this Party asks for leave of the 9th Circuit, and which such states this Party only became aware of on, or about, this date.

Respectfully Submitted

August 15th, 2014        Mark Feathers, in *pro per*