Exhibit 1

# King & Spalding

# Client Alert

March 4, 2013

## SEC Enforcement Update
### *The SEC Speaks in 2013*

For more information, contact:

**Russell G. Ryan**
+1 202 661 7984
rryan@kslaw.com

**Matthew H. Baughman**
+1 404 572 4751
mbaughman@kslaw.com

**Laura K. Bennett**
+1 202 626 5418
lkbennett@kslaw.com

**Andrew Lyness**
+1 404 572 4731
alyness@kslaw.com

**King & Spalding**
*Atlanta*
1180 Peachtree Street, NE
Atlanta, Georgia 30309-3521
Tel: +1 404 572 4600
Fax: +1 404 572 5100

*Washington, D.C.*
1700 Pennsylvania Avenue, NW
Washington, D.C. 20006-4707
Tel: +1 202 737 0500
Fax: +1 202 626 3737

www.kslaw.com

The U.S. Securities and Exchange Commission held its annual SEC Speaks program in Washington, D.C. on February 22-23, 2013. In the post-financial crisis, post-Dodd-Frank world, it is clear that the Commission and its staff are attempting to move forward from the tumultuous events of the last several years, which have reshaped not only the financial landscape regulated by the Commission but also some of the basic tools used by the staff to conduct its business. George Canellos, Acting Director of the Division of Enforcement, told the assembled audience that the staff was moving into an era in which the financial markets are rebuilding and recovering, and that the SEC was focusing its resources on ensuring that the recovery was built on a foundation of compliance.

**"Creative" Thinking on Remedies and Process; Encouraging Cooperation**

Canellos expressed his view that the SEC should be making more "creative use" of the range of enforcement remedies available to the agency rather than following its historical "one size fits all" approach. For example, he mentioned that the SEC has recently been seeking more specific "conduct-based" injunctions in addition to, or in lieu of, the kind of sweeping "obey-the-law" injunctions that have been the hallmark of SEC enforcement for decades (and that have faced occasional but increasing scrutiny from federal judges). Canellos also suggested that the SEC was likely to make more frequent use of its new statutory power to impose monetary penalties in administrative cease-and-desist proceedings, an option now available to the SEC under Section 929P of the Dodd-Frank Wall Street Reform and Consumer Protection Act. He also hinted that the Commission might make greater use of so-called Section 21(a) reports, in which the Commission publicly articulates its views about a case after an investigation is completed, sometimes in tandem with the filing of an enforcement action but often instead of filing formal charges.

David Bergers, the newly-appointed Acting Deputy Director of Enforcement, likewise focused on the division's desire to improve its processes. He alluded to a recently-formed Enforcement Advisory Committee that he said will focus on making more effective use of the division's limited resources, with the goal of "empowering" the enforcement staff and "making things easier" for the staff. (It was unclear

# King & Spalding

# Client Alert

whether this advisory committee will include representation or input from outside of the SEC.) Bergers also hinted that the division's areas of focus, reflected by its specialized units, could be tweaked or expanded as the SEC's enforcement priorities evolve.

Eric Bustillo, Director of the SEC's Miami Regional Office, highlighted the successes of the Enforcement Division's cooperation initiative, which was announced in January 2010.[1] He said the SEC has already entered into 51 cooperation agreements with companies or individuals, and that every SEC office has made use of such agreements. He cited in particular the SEC's first corporate non-prosecution agreement with Carter's, Inc. in December 2010,[2] and two subsequent corporate deferred prosecution agreements (with Tenaris S.A. in May 2011 and with Amish Helping Fund in July 2012).[3] Emphasizing the potential benefits of cooperation for individuals, Bustillo specifically cited the SEC's litigation release issued in connection with a March 2012 enforcement action against AXA Rosenberg Group LLC, which provides extensive and unusual detail about why the agency declined to charge a former executive who cooperated.[4]

**Enforcement Division Take on Significant Court Decisions**

Enforcement Division Chief Counsel Joe Brenner and Chief Litigation Counsel Matthew Martens provided a mostly sanguine view of recent court decisions that could affect the SEC's enforcement program to varying degrees. (The conference preceded the SEC's recent defeat in the Supreme Court on an important statute of limitations issue in *Gabelli v. SEC*.) Brenner said the Supreme Court's 2011 *Janus* decision – which significantly restricted private rights of action under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 against defendants who did not personally create or authorize false or misleading statements – had relatively little effect on the SEC because, unlike private parties, the SEC has a statutory right to charge secondary actors as aiders and abettors or control persons.[5] Brenner emphasized that the SEC does not view such claims as "inferior" or as tools of last resort, adding that the remedies available to the SEC in such cases are essentially identical to those it can obtain against primary violators. He did allow, however, that even though *Janus* dealt with private rights of action and not SEC enforcement cases, the SEC has generally refrained from charging primary liability in cases that would be precluded by the reasoning of *Janus*.

Brenner also pointed to the SEC's litigation success in recent "clawback" cases against CEOs and CFOs under Section 304 of the Sarbanes-Oxley Act of 2002.[6] He noted that the Commission has brought approximately 50 clawback cases so far, approximately 15% of which have been against CEOs or CFOs who were charged with no personal wrongdoing. Brenner confidently observed that the Commission has generally prevailed in court with respect to its controversial interpretations of Section 304, including most notably its view that it need not allege or prove any personal culpability on the part of the CEO or CFO to obtain a clawback.

---

[1] *See* SEC Release No. 2010-6, available at http://www.sec.gov/news/press/2010/2010-6.htm.
[2] *See* SEC Release No. 2010-252, available at http://www.sec.gov/news/press/2010/2010-252.htm.
[3] *See* SEC Release No. 2011-112, available at http://www.sec.gov/news/press/2011/2011-112.htm; SEC Release No. 2012-138, available at http://www.sec.gov/news/press/2012/2012-138.htm.
[4]  *See* SEC Release No. LR-22298, available at http://www.sec.gov/litigation/litreleases/2012/lr22298.htm.
[5] *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011).
[6] Sarbanes-Oxley § 304, codified at 15 U.S.C. § 7243.

# King & Spalding
# Client Alert

Martens touted the SEC's overall litigation success rate in 2012, claiming a 23-1 record in contested cases (as compared with the agency's historical success rate of closer to 80%). He expressed confidence that the SEC would ultimately prevail in its Second Circuit appeal from a district court decision in the *Citigroup* case that rejected a settlement with the usual "neither admit nor deny" protection for the defendant, and he said the SEC has not made any determination to rely more on administrative proceedings to avoid potential judicial scrutiny of its settlements.[7] Martens acknowledged mixed results in court concerning the applicability to SEC enforcement of the Supreme Court's 2010 *Morrison* case – which significantly curtailed the extraterritorial reach of the federal securities laws – but noted that Dodd-Frank had largely "fixed" any problems going forward.[8]

**Continued Focus on Gatekeepers**

Perhaps no word was more often uttered by more conference participants than "gatekeeper." Beginning with Cannellos, and followed by a long line of other Enforcement officials, the staff repeatedly referenced the SEC's focus on corporate gatekeepers, including accountants and lawyers, as key to ensuring a sustainable recovery. Philadelphia Regional Office Director Dan Hawke, who heads the Enforcement Division's Market Abuse specialized unit, also specifically mentioned the securities exchanges and self-regulatory organizations as gatekeepers. New York Regional Director Andrew Calamari later added that one of the key types of cases the SEC is pursuing in the accounting area – in addition to cross-border cases and cases involving valuations of loans and other instruments by banks – are those involving gatekeepers such as auditors and directors. In the asset management space, specialized unit chief Bruce Karpati mentioned the unit's intention to focus on board-level oversight of mutual fund fee arrangements, sub-adviser relationships, asset valuations, and other issues. Unit deputy chief Julie Riewe predicted more focus on fees, marketing practices, and conflicts of interest in the private equity space.

Charles Wright, Counsel to the Chief Accountant of Enforcement, discussed the focus on accountants as corporate gatekeepers, and noted in particular the SEC's interest in accountants who audit foreign companies or subsidiaries whose securities trade in the U.S. markets. Wright observed that there had been much publicity regarding cases involving Chinese companies or subsidiaries, but said that the Commission's focus on accountants was much more wide-ranging. He cited as an example the SEC's December 2012 auditor independence case against the South African affiliate of a Big Four accounting firm, in which the SEC found the firm's independence to be impaired due to the employment, by the firm's consulting practice, of an individual who became a director of one of the firm's audit clients.[9] Without admitting or denying the SEC's charges, the firm agreed, among other things, to pay disgorgement and prejudgment interest of almost $250,000.

Wright also discussed the Commission's January 2012 action against both in-house accountants and two auditors from the British office of another Big Four firm, alleging violations in connection with a three-year fraud that occurred at the UK subsidiary of Symmetry Medical, Inc.[10] Symmetry was alleged to have understated expenses and overstated assets and revenues since at least its December 2004 initial public offering. The Commission charged the company's Finance Director, Controller, and Management Accountant, each of whom agreed to sanctions that

---

[7] *SEC. v. Citigroup Global Markets Inc.*, 827 F.Supp.2d 328 (S.D.N.Y. 2011).
[8] *Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869 (2010).
[9] *See* SEC Release No. 34-68432, available at http://www.sec.gov/litigation/admin/2012/34-68432.pdf.
[10] *See* SEC Release No. 2012-21, available at http://www.sec.gov/news/press/2012/2012-21.htm.

# King & Spalding
# Client Alert

included being permanently barred from appearing or practicing before the Commission as accountants under SEC Rule of Practice 102(e). The two outside auditors agreed to a two-year suspension from practicing before the Commission.

Los Angeles Regional Office Director Michele Layne contended that the Commission must concentrate on gatekeepers because if the SEC tried to focus on generalized "issues" – for example, offering fraud or market manipulation – it would be like trying to "boil water in the ocean." Layne emphasized that the SEC continues to believe that in-house and outside lawyers are key gatekeepers who have the ability to detect and stop fraud in the course of their duties, and that the Commission will bring actions against counsel who fail in that responsibility in appropriate matters.

Layne cited the recent case brought against an in-house counsel at We The People, Inc., a purported charitable organization based in Florida that the Commission alleged operated as a continuous offering fraud.[11] In its complaint, the SEC alleged that the in-house lawyer reviewed We The People's marketing and promotional materials, but failed to conduct reasonable due diligence to ensure that the materials were accurate or to exercise appropriate oversight over the organization's principals. As a result, the Commission charged the in-house counsel with negligence-based offering fraud under Sections 17(a)(2) and (3) of the Securities Act of 1933, as well as participating in the illegal offering of unregistered securities. Layne noted that the in-house attorney had settled with the Commission and was now cooperating with respect to the SEC's prosecution of others involved in the alleged scheme.

**Update on Whistleblower Rules**

In tandem with scrutinizing gatekeepers, the SEC is also attempting to leverage the wealth of information being provided by corporate whistleblowers. Jane Norberg, Deputy Director of the Office of the Whistleblower, said that in fiscal 2012 the SEC received 3,001 whistleblower tips, which came from all 50 states as well as 49 foreign countries. The most common whistleblower tips related to corporate disclosures, alleged offering fraud, and manipulation. Norberg said that in 2013, the Whistleblower Office will be focusing on continuing to use to the greatest advantage the information and assistance that can be provided by both whistleblowers and their counsel. She stated that the Office responds to all calls that are made to the SEC's whistleblower hotline, and that the Office has a goal of returning calls within 24 hours of receipt.

Norberg also warned that the staff has concerns that employees were being retaliated against because of their provision of information to the Commission, and noted that Section 922 of Dodd-Frank contains a provision explicitly prohibiting any employer from retaliating or discriminating against any employee who provides information to the SEC or otherwise assists in the Commission's investigation.[12] Norberg said that the staff has received reports that certain employers have attempted to persuade employees to "sign away" their right to report securities law violations to the Commission or, if the employees did make such a report, their right to receive a whistleblower award. Norberg expressed a concern that any such agreements would have a "chilling affect" on the employee-reporting encouraged by Dodd-Frank, and reminded the audience that in addition to the statutory anti-retaliation provisions, the

---

[11] *See* SEC Release No. LR-22608, available at http://www.sec.gov/litigation/litreleases/2013/lr22608.htm.
[12] Dodd-Frank § 922, codified at 15 U.S.C. § 78-u6(h).

Exhibit 2

**MOUNTAIN VIEW**
**Company accused of $17 million fraud**

Federal authorities allege that a Mountain View firm defrauded its investors out of $17 million while assuring them their money was safe.

The Securities and Exchange Commission announced this week that it filed charges in federal court against JSW Financial and five of its officers, seeking civil penalties and repayment of the defendants' "ill-gotten gains."

The SEC said in a statement that between 2002 and 2008, JSW and its predecessor, Jim Ward & Associates, created two real estate investment firms, called Blue Chip Realty Fund and Shoreline Investment Fund.

Firm officers used the money to fund their own failing real estate projects, the SEC said. The complaint names as defendants JSW founder James Ward, 64, of Delaware, Ohio; former presidents, David Lee, 53, of Los Altos and Edward Locker, 35, of Highland Heights, Ohio; former JSW vice president Richard Tipton, 60, of Palo Alto; and JSW general counsel David Lin, 42, of Los Altos.

— *Diana Samuels, Bay Area News Group*

3/27/2011

Dear Lee,

Here is an article from the March 24th San Jose Mercury News, I thought may interest you. I'm sure glad we got our money back from him. Hope to see you during your next trip to California.

Karliq Shilsen,

Ellen

One of my investors 20 yr history.

Thanks!

SEC-LE-000609

Exhibit 3

| | |
|---|---|
| **Subject:** | FW: FOIA Response 14-08310-FOIA |
| **From:** | Ovall, Jeffery L. (OvallJ@SEC.GOV) |
| **To:** | markfeathers@sbcglobal.net; |
| **Cc:** | OsborneS@SEC.GOV; |
| **Date:** | Tuesday, August 5, 2014 6:07 AM |

Good morning, Mr. Feathers. As stated in our response letter, the FOIA is a records access statute. Therefore, we can only respond to your request by providing records. And as stated in our response letter, any records that would be responsive to your request would be withheld under the applicable FOIA Exemptions.

You may appeal our response to the SEC Office of General Counsel if you wish, in accordance with the appeal instructions provided in our response letter.

Sincerely,

# *Jeff Ovall*

FOIA Branch Chief
FOIA/Privacy Act Office
Securities and Exchange Commission
100 F Street, NE
Room 2702, Station Place 2
Washington, DC  20549

Phone  (202) 551-6376

Ovallj@sec.gov

---

**From:** Mark Feathers [mailto:markfeathers@sbcglobal.net]
**Sent:** Monday, August 04, 2014 5:07 PM
**To:** Osborne, Sonja
**Subject:** Re: FOIA Response 14-08310-FOIA

Thank you.

With regards to the attached, I have NOT asked for any identifying information of a whistleblower. I have simply asked if there were any application or awards in the matter of SEC v. Small Business Capital Corp., et al.

Please answer my FOIA request at this time.

Regards,

Mark Feathers

1520 Grant Rd.

Los Altos, CA  94024

ph. 650-776-2496

**From:** "Osborne, Sonja" <osbornes@sec.gov>
**To:** markfeathers@sbcglobal.net
**Sent:** Monday, August 4, 2014 2:49 PM
**Subject:** FOIA Response 14-08310-FOIA

Since becoming Chairman of the SEC, Mary Schapiro has worked to address the "important questions" raised by the Markopolous affair concerning the SEC's handling of tips and whistleblower information.[8] As part of an ongoing initiative to review and improve the SEC's internal procedures in evaluating tips, complaints, and referrals, the Enforcement Division established the Office of Market Intelligence, which serves as a central office for handling all such information.[9] In addition, the SEC has established the Office of the Whistleblower, which administers the whistleblower rules and provides substantial monetary awards to eligible individuals who come forward with information that assists the Commission in identifying potential fraud and other violations.[10]

The provision for compensating whistleblowers is included in the Dodd-Frank financial reform bill, enacted in 2010, and in implementing rules adopted by the SEC in 2011.[11] The legislation and rules reward whistleblowers who voluntarily provide original information that leads to a successful enforcement action and imposition of monetary sanctions of over $1 million. The whistleblower in such cases is entitled to between 10% and 30% of the total monetary sanctions imposed.[12] The whistleblower program went into effect on August 12, 2011. According to the Commission's 2011 Annual Report, during the first seven weeks of the program, the SEC received 334 whistleblower tips.[13] The most common complaint categories included tips regarding market manipulation, corporate disclosures and financial statements, and offering fraud.[14] Since the passage of Dodd-Frank, the SEC has reported an increase in the quality of tips it receives.[15] On August 21, 2012, the SEC reported its first payout as a

---

8. Mary L. Schapiro, Chairman, SEC, Testimony Before the Subcommittee on Financial Services and General Government, U.S. Senate Committee on Appropriations (Apr. 28, 2010), *available at* www.sec.gov/news/testimony/2010/ts042810mls.htm.
9. *Id.*
10. *See Office of the Whistleblower*, SEC, www.sec.gov/whistleblower.
11. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 (H.R. 4173), 124 Stat. 1376 (July 21, 2010) [hereinafter Dodd-Frank]; *see also* Press Release No. 2011-116, SEC, SEC Adopts Rules to Establish Whistleblower Program (May 25, 2011), *available at* sec.gov/news/press/2011/2011-116.htm.
12. *Id.* § 922.
13. U.S. SEC. & EXCH. COMM'N, ANNUAL REPORT ON THE DODD-FRANK WHISTLEBLOWER PROGRAM, FISCAL YEAR 2011 (Nov. 2011), *available at* www.sec.gov/about/offices/owb/whistleblower-annual-report-2011.pdf.
14. *Id.*
15. *See* Mary L. Schapiro, Chairman, U.S. Sec. & Exch. Comm'n, Opening Statement at SEC Open Meeting Item 2—Whistleblower Program (May 25, 2011), *available at* www.sec.gov/news/speech/2011/spch052511mls-item2.htm.

Exhibit 4

| | |
|---|---|
| **Subject:** | RE: FRCP 60(b) Motion re: SEC v. Small Business Capital Corp. |
| **From:** | Bulgozdy, John (BULGOZDYJ@sec.gov) |
| **To:** | markfeathers@sbcglobal.net; |
| **Cc:** | DeanL@sec.gov; HannanS@sec.gov; BerryJ@sec.gov; BULGOZDYJ@sec.gov; |
| **Date:** | Wednesday, August 6, 2014 10:45 AM |

Mr. Feathers,

You previously raised this issue in March 2014, and we responded at that time to advise you that there is no factual basis to support your speculative claim that Lee Emerson made a complaint to the SEC that initiated its investigation of Small Business Capital Corp. We further advised you that any factual contentions suggesting in any way that Lee Emerson had anything to do with the SEC's initiation of its investigation of Small Business Capital Corp. do not have any evidentiary support, and will never have any evidentiary support. *See* Federal Rule of Civil Procedure 11(b)(3). The prior email exchange is attached.

Moreover, your speculation about Ms. Emerson is irrelevant to the issues decided on the motion for summary judgment. The Court decided the motion for summary judgment on the basis of the evidence presented about *your* conduct. Your suppositions about Ms. Emerson are irrelevant to *your* conduct which was at issue in this case. Your speculation and theories do not provide a basis for reconsideration of the summary judgment motion.

Please be advised that the SEC may consider seeking appropriate relief if you persist and file your proposed motion.

Very truly yours,

**John B. Bulgozdy** | Senior Trial Counsel | Los Angeles Regional Office

United States Securities and Exchange Commission

5670 Wilshire Boulevard, 11th Floor | Los Angeles, CA 90036

Phone: 323-965-3322 | Fax: 323-965-3908

bulgozdyj@sec.gov

**From:** Mark Feathers [mailto:markfeathers@sbcglobal.net]
**Sent:** Wednesday, August 06, 2014 3:17 AM
**To:** Bulgozdy, John; Dean, Lynn M.; Hannan, Susan F.; Berry, John W.
**Subject:** FRCP 60(b) Motion re: SEC v. Small Business Capital Corp.

All,

The Commission kept from me having knowledge on a timely basis of the fact that one former fund investor was the source of a complaint with SEC against myself and my company, and which appears to have been the trigger for SEC's Enforcement Inquisition (sorry, "review").  That person was Ms. Lee Emerson.

Weeks after the injunction, I received a phone call from a Mr. Jon Freeman of Stonecrest Financial, in San Jose, CA, asking if my funds' SBA license was available.  During that same conversation, I asked Mr. Freeman if he had paid Emerson to bring investors over from my fund to his fund.  He confirmed that he had.  In confirming this matter, and with my knowledge gained (at some level) of securities laws over the past 2 years, it appears clear to me that:

1. Emerson was acting as an unlicensed broker dealer

2. Emerson had substantial financial gain for making complaints about our fund, in that my funds held a valuable asset, and Freeman desired this asset, and he admitted paying Emerson to bring over investors, and appears to have had substantial motivation to cultivate an unlawful conspiracy with Emerson to make false statements about my fund for their own gain

The many exhibits provided to myself by SEC due to the OIAP demonstrates a sound basis to my position of SEC leaning on the unlawful conspiracy of other parties to meet their own self-serving agency goals.  I say this based upon the wording choices of Emerson in her email to the SEC, and to her own counsel.

With all this, I have reserved a motion hearing date, and I intend to file a Rule 60(b) motion to overturn the Court's summary judgment within the next week.  If you wish to discuss this matter with me before that time, now is your chance.

Regards

Mark Feathers