Exhibit 5

**Lee Emerson**
Investor Relations
lvemerson@comcast.net





4300 Stevens Creek Blvd., Suite 275
San Jose, CA 95129
615.371.8749

www.stonecrestmanagers.com

SEC-LE-000360

Exhibit 6

# *Perspectives*

**November 2007**
A monthly news bulletin

**Stonecrest Private Capital Fund, LLC**

## In This Issue:

Feature Article: Homeowner
   Groups Take Freedoms   p1
Dear Jon   p1
Investor Profile: Lee Emerson   p1
Featured Loan: Martinez, CA   p2
Company News   p2
Performance Report   p2

## Dear Jon:

Q. With the current fires on my mind, how do I know I have enough insurance for my home?

A. The experts are stating that 25% of all homes destroyed in the Southern California fires were under insured. There are two primary home insurance issues that need to be addressed: the building and its contents.

Homeowners are encouraged to have their insurance policies reviewed by their agents at least once every five years to make sure that they have maximum coverage, which reflects the current value of their homes. Many people upgrade their homes by remodeling, etc., but fail to upgrade their policies. In addition, it's important and that your policy has a "replacement cost" component. Many homeowners in the Oakland

*cont. p2*

**Hold the Date:** Our *Investors' Holiday Party* will be held from 4-8pm on Thursday December 6th. There will be plenty of good food and cheer to celebrate this holiday season with our old and new friends, and to give thanks for this year's good fortune. Look for your invitations to arrive by mail soon. We look forward to seeing you there!

## Homeowners Groups Take Away Some Freedoms

Buying a home is already a complex endeavor. Add in the sometimes-unfathomable machinations of a homeowners association and you enter a realm filled with the potential for misunderstandings that may have legal and financial consequences.



Often, home buyers don't fully realize the trade-off they're making when they move into communities that involve becoming association members, experts say.

Associations provide a number of important benefits including, for instance, landscape maintenance and access to fitness facilities; and their rules often help protect property values. But it's the horror stories that make the news: full-blown fights over a homeowner flying a flag, stringing a clothesline or owning a large dog. And in some states associations are within their rights to foreclose on homeowners who respond to disagreements by refusing to pay their dues. Two common homeowner complaints: unexpected increases in dues and unwelcome rule changes.

Still, despite the difficulties, associations offer plenty of benefits, including supporting property values by keeping common areas well-maintained. Another plus: homeowners who, alone, can't afford a swimming pool or access to a golf course can enjoy such amenities through the resources of the association.

Do your homework before signing with an association. Potential conflicts include restrictions on pets, home exteriors and yards, including antennas, clotheslines, flags, fence types, paint color, home-based businesses, and restrictions on parking commercial vehicles.

*By Andrea Coombes, 10/11/2007, excerpted from mercurynews.com*

## Investor Profile:  Lee Emerson

Lee Emerson grew up in Nashville, lived 38 years in California, and in 2006 became semi-retired and moved back to Tennessee.  She relocated to be with old friends – a group of 11 who call themselves the YaYa's and get together monthly to have a "hoot of a good time".  Her husband of 5 years, Ray Enochs, a retired insurance agent, claims that during his two years in their new southern home, he has been called "honey" more times than in his entire life.  Lee has one daughter who lives nearby and another in Seattle.

Lee has an MA in speech pathology and audiology, and spent 5 years teaching in Palo Alto.  But then she took a real estate class and her professional focus changed.  She didn't want to be an agent and so she took a class in private mortgage lending in 1976. She worked for a broker bringing in investors, but in 1981 she got her own broker's license and in 1986 she went to work

*cont. p2*



**Stonecrest**
MANAGERS

# *Perspectives*

**November 2007**

**Stonecrest Private Capital Fund, LLC**

## Company News

Halloween gave our Stonecrest family another good excuse to play. In honor of this incredibly important holiday, we shut down our office for one-half day, enjoyed delicious pot luck, dressed in fun costumes, played tons of games, and let our inner kids come out to trick or treat. ◼



## Dear Jon... *(cont.)*

fire did not have this provision and received only a fraction of the money needed to rebuild their homes.

Your policy should also cover the replacement costs for your home's contents. Records for new furniture purchases, home entertainment systems, appliances etc. should be kept current and major items should be cataloged. Detailed records should be kept either in a fire proof safe or off site. Home contents can be valued at hundreds of thousands of dollars, but without proper documentation it is difficult to get full value when making an insurance claim.

Visit the Department of Insurance web site at www.insurance.ca.gov (click on the "Don't Get Burned Twice" link) for advice and forms designed to help homeowners catalog belongings. ◼

Email Dear Jon questions to Joan Verduzco, Fund Administrator, at jpverduzco@stonecrest.net ◼

## Featured Loan: Martinez, CA

This is a $631,000 business loan on three basic homes. We have a 1st on one home and are in 2nd position on the other two – all of which are located in Martinez, CA (4375 Arthur Drive, 640 Michele Drive, and 4197 Rita Drive). The total value for the three properties together is $1,270,000 and our combined loan to value is 62%. The borrowers are three business partners who have excellent credit history, have a proven track record of being fiscally responsible, and have little or no debt against their homes. They are purchasing a building from the IRS for their business operations. This property has a six-month redemption period attached to it that allows the previous owner to pay the IRS and get their property back. Because of this redemption contingency, our borrowers had to pay all cash. After the six months expires, they will be able to get traditional financing on the building and pay our loan off. Another great deal for Stonecrest! ◼

## Lee Emerson... *(cont.)*

for an S&L – all while raising her two daughters. She learned so much during her 3 years at the S&L, that at the end of 1989, she returned to private mortgage lending. It was in 1990 that she launched her first investors' newsletter and her business took off in 1993 – all via referrals. Over the next decade, Lee worked in a variety of settings and cultivated a loyal following of investors through her newsletter. Her goal has always been to protect her investors – and she always invests along with them.

After seeing an advertisement for Stonecrest Managers, she arranged a meeting to review their strategy and performance. Especially after meeting key people and because of Jon Freeman's responses to her questions, she felt comfortable recommending Stonecrest to her investors. Lee finds the people at Stonecrest delightful, open, and their business strategies sound and smart. She and her investors now invest with Stonecrest and she reviews their loan portfolio annually in order to report results through her newsletter. She plans to fly in from Nashville to attend Stonecrest's Investors Holiday Party in December and to visit with all her old and new friends. ◼

## Performance Report as of 10/31/07

Last Month's Return: 9.3%     YTD: 9.4%     Loans in default: 3

Number of loans:   80 (56 in 1st and 24 in 2nd position)

Gross loan portfolio dollars:   $31,585,531

Average loan to value on loans in the fund:   51.60%

<u>Comments:</u> Thank you for your referrals. We appreciate your trust and welcome your friends, families, and colleagues to the Private Capital Fund.

### Property Types



7.89%
30.87%
61.24%

- Commercial
- Residential
- Land Only



## Stonecrest
MANAGERS

4300 Stevens Creek Blvd., # 275  •  San Jose, CA  95129

tel: (408) 557-0700  •  stonecrestmanagers.com

Exhibit 7

3/16/2014                                    Workspace Webmail :: Print

contract or agreement under the Uniform Electronic Transaction Act or any similar law. Thank you for your courtesy and cooperation.

-------- Original Message --------
Subject: Re: Operating Agreement, etc.
From: lvemerson@comcast.net
Date: Sat, June 19, 2010 2:26 pm
To: mark@sbcapital.com

Mark, you must know that the information from April Anair you report to me is "hearsay" aka "Gossip" from another party, but also slanted by your own interpretation of what you may have or may not have heard.  April is my friend, former neighbor,  and investor. Any issues you want to discuss about me, and my association with you and your company, should be addressed directly to me.

To describe my protection of my investors as "wounded pride" is another of your backbiting techniques, that I suffered through during our face to face meetings, phone conversations and emails. No one who crosses you is exempt so I know I am included in the group. The foul language you attributed to Christine Corso when you told me in December 2009 she had been terminated was unnecessary. Again, heresay (gossip) and backbiting. I did not for one minute believe your disgusting story about Christine.  She is a very bright, experience lady and a professional. Many of my investors were shocked to learn she was no longer with SB Capital as she was the one person on your staff they could count on when they had a question or wanted a statement for their retirement account.

**Re your voting request.** I have had my CPA review your request. Another CPA, who has not been available, but in New York completing audits for a company there, will be providing his input and evaluation of your voting requests Monday, June 21st.  Once we have the 2nd opinion, we will decide the appropriate response to your request for a vote on Items #1 and # 2.

I encouraged you to change attorneys because I tired of  your frequent complaints  about Stein and Lubin's "excessive" fees and charges.  As the Fund Manager, you have the power to change law firms/attorneys at any time you choose. **If approval of a majority of investors to hire new attorneys was required, it would be in the Operating Agreement, and its not.**

Further, your request for a vote of the investors to allow you to repay the Fund some amount of organizational and syndication expenses deducted from the Fund, is not necessary.

https://email14.secureserver.net/view_print_multi.php?uidArray=1032461INBOX&aEmfPart=0

**Per pages 18 and 19 of the Operating Agreement,**

"10.4, <u>Reimbursement of Manager for Certain Expenses.</u>   The Manager shall be reimbursed by the Company for all organizational, syndication and operating expenses incurred on behalf of the Company, including without limitation, out of pocket general and administrative expenses of the Company, accounting and audit fees, legal fees and expenses, postage, and preparation of reports to Members." You want to reimburse us money. Who would object?

**The Operating Agreement does NOT contain any requirement of  a majority vote of the investors to empower you to return to the Fund any of the expenses you have charged the Fund. It is simply your choice.**

**Your statement, "Do you want to to slow down the redemptions" is typical of your ilk Redemptions of our shares in SBC Fund have nothing to do with the outcome of your proposed voting on changes to the Operating Agreement.**

Your email reply avoids addressing any of the legitimate inquiries I emailed to you last week.  Your constant use of inuendos, backbiting, and "second hand hearsay information" to avoid addressing the real issues does not work with me or my investors.  We have the right to request the input of CPA's or any other professional when asked to vote. We also have the right to vote one way or the other or to abstain. **The right to vote in the USA is not and has never been compulsory. I believe that applies even to you.**

You continue to sidestep the real issues of nine causes of action against you prepared by Dan Ballesteros and Colleen Kelley. These are not fiction. You have created your own reality about your company and your two Funds. You attempt to use the "why are you so ungrateful approach after all I have done for you," while suggesting that my recommendations to my investors are without basis.  Good try,  but it doesn't work with the Emerson Group. They clearly understand who has their best interests at heart.

The Emerson Group is heartily in agreement that you complete redemption of our shares in both Funds at the earliest possible date.  I have suggested to you several times that redeeming us as soon as possible allows you to move forward with SB Capital, unencumbered with hostile investors. If you want to get past "fielding constant calls, faxes, letters, emails, etc. threat of lawsuit, etc. from my group, redeem our shares and let us go.

I am faxing this email entire mail to you so you have a hard copy to which you may easily refer.    Lee V. Emerson

Exhibit 8

**Excerpts of a Lee Emerson letter turned over by SEC – pattern here is pretty clear of threats, blackmail, tactics and vindictiveness when combined with SEC lawsuit.   This Letter is now no longer shielded by attorney client privilege**

Tuesday, February 2nd, 2010                    Page 1 of 3

FROM: Lee Emerson

In November, I received a phone call from an investor asking if I had received the information from Mark about purchase of a SBA Business License. I had not as my letter took 2 days extra via snail mail. Immediately when I received Mark's letter and the approval document he was asking investors in IPF to sign and return to him , ASAP, I phoned my friend, Jon Freeman at Stonecrest. Jon said he and staff had explored the concept of purchasing an SBA Business License to incorporate into private mortgage lending. The conclusion was it was not feasible for many reasons. When I told him Mark's intention was to use the investors' principal to purchase the license, his comment, "That is unconscionable."

It was at this juncture I decided it was time for my investors to get out of the two SB Capital funds and place their money elsewhere.

Mark cannot afford the publicity of his actions toward us as he and his wife have quite a public image in Los Altos and environs.

The other companies just wanted us out  of the way and quickly repaid any of my investors who asked requested their principal,

EXHIBIT 9

LAW OFFICES OF
## BELZER, HULCHIY & MURRAY
3650 MT. DIABLO BOULEVARD, SUITE 130
LAFAYETTE, CALIFORNIA 94549-3765
**TELEPHONE (925) 284-9600**
FACSIMILE (925) 284-9630

ROBERT A. BELZER
NICHOLAS P. HULCHIY
WILLIAM J. MURRAY
ROBERT P. RICH
CYRECE MARIE PUCCIO
CORIE A. EDWARDS
MICHAEL D. MANDELL

OF COUNSEL
BRUCE CORNELIUS
DIRECT DIAL (925) 283-9977
DIRECT FACSIMILE (925) 283-5192

*VIA FIRST CLASS MAIL*
*AND ELECTRONIC DELIVERY TO mark@sbcapital.com*

April 27, 2012

Mark Feathers
1520 Grant Road
Los Altos, CA 94024-6151

Re:   *Coast Capital Income Fund, LLC v. Stern, et al.*
       Monterey County Superior Court Case No. M107020

Dear Mr. Feathers:

This office is counsel to Coast Capital Income Fund, LLC ("CCIF"); Stonecrest Managers, Inc. ("Stonecrest"); and Jon O. Freeman, in Monterey County Superior Court litigation now pending against George Stern and The Stern Coast Redwoods Charitable Unitrust (collectively, "Mr. Stern"). By this letter, we request that you immediately undertake the defense of the cross-complaint filed by Mr. Stern against CCIF, Stonecrest, and Mr. Freeman.

Mr. Stern's cross-complaint seeks to impose liability on CCIF, Stonecrest, and Freeman, based on conduct by E C I Corporation ("ECI") during the period when you were its designated officer. The claims relate specifically to the conduct of Pete Cline, whom you had a duty to supervise pursuant to California Business & Professions Code section 10159.2 and section 2725 of Title 10 of the California Code of Regulations.

Mr. Stern claims that ECI and Mr. Cline damaged him in connection with a $4 million loan, funded by CCIF, that was arranged by Cline while you were ECI's designated broker.[1] Mr. Stern also claims that ECI and Cline were involved with Mr. Stern's purchase of membership interests in CCIF, which was managed by ECI at the time Mr. Stern made his investments. A copy of the Second Amended Cross-Complaint filed by Mr. Stern is enclosed for your reference. That document will provide you with additional detail regarding Mr. Stern's allegations.

The allegations made by Mr. Stern establish that you have an equitable duty to defend and indemnify CCIF, Stonecrest, and Mr. Freeman against Mr. Stern's claims. In the event that we

---

[1]     We understand that you resigned as the designated officer of ECI on February 14, 2007, and that George Hill assumed the role of designated officer shortly after.

Mr. Mark Feathers
April 27, 2012
P a g e | 2

must file suit to obtain indemnity, we will pursue an award of attorneys' fees and costs in connection with that action, pursuant to California Code of Civil Procedure section 1021.6.

Please note that on April 6, 2012, we requested that the Monterey County Superior Court compel Mr. Stern to pursue his claims through binding arbitration. A ruling on the Petition to Compel has not yet been received, but is expected before May 11, 2012.

Kindly contact this office, or have you attorney do so, to discuss further handling of this matter.

Very truly yours,
BELZER, HULCHIY & MURRAY

Bruce Cornelius, Of Counsel
Corie A. Edwards

Encl.

cc:     Jon O. Freeman (via electronic delivery)
        Shafiq Taymuree (via electronic delivery)
        Chad Hansen (via electronic delivery)