1  DAVID R. ZARO (BAR NO. 124334)
   TED FATES (BAR NO. 227809)
2  ALLEN MATKINS LECK GAMBLE
      MALLORY & NATSIS LLP
3  515 South Figueroa Street, Ninth Floor
   Los Angeles, California 90071-3309
4  Phone: (213) 622-5555
   Fax: (213) 620-8816
5  E-Mail: dzaro@allenmatkins.com
           tfates@allenmatkins.com
6
7  Attorneys for Receiver
   THOMAS A. SEAMAN

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>  Plaintiff,<br><br>  vs.<br><br>SMALL BUSINESS CAPITAL CORP.; MARK FEATHERS; INVESTORS PRIME FUND, LLC; and SBC PORTFOLIOS, LLC,<br><br>  Defendants. | Case No. CV12-03237 EJD<br><br>DECLARATION OF THOMAS A. SEAMAN IN SUPPORT OF MOTION FOR APPROVAL OF SALE OF 504/FMLP LOAN AND NON SBA LOAN PORTFOLIOS<br><br>Date:  February 5, 2015<br>Time:  10:00 a.m.<br>Ctrm:  4, 5th Floor<br>Judge: Hon. Edward J. Davila |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

1005501.01/LA

Case No. CV12-03237 EJD
DECLARATION OF THOMAS A. SEAMAN

I, Thomas A. Seaman, declare:

1. I am the court-appointed receiver for Small Business Capital Corp. ("SB Capital"), Investors Prime Fund, LLC ("IPF"), and SBC Portfolio Fund, LLC ("SPF"), and their subsidiaries and affiliates ("Receivership Entities"). I have personal knowledge of the facts stated herein, and if called upon to do so, I could and would personally and competently testify to them. This declaration is prepared in support of the Motion for Approval To Sell 504/FMLP Loan and non-SBA loan portfolios (the "Sale Motion").

2. Since the inception of this receivership, I have continuously operated the Receivership Entities. Initially, the operations focused on servicing 72 loans, however, some of these loans have been paid off or otherwise resolved. Presently there are 52 loans being serviced and they represent the primary assets of this receivership estate. Fifteen of these loans are 504/FMLP loans and three are non-SBA loans. At present, I am seeking Court approval of the sale to Western Alliance Bank ("Western"), of the 504/FMLP and non-SBA loans, which loans are listed in <u>Exhibit A</u>, attached hereto and incorporated herein by this reference. The remaining 34 loans are SBA 7(a) loans. In addition, I hold a SBA small business lending company license (the "License"). The 7(a) loans and the License are being sold separately due to SBA requirements and other considerations.

3. During my tenure as Receiver, I have stabilized the servicing of the loans and ensured that the loan portfolios generated profits. Prior to my appointment the operating expenses of the Receivership Entities exceeded the interest and servicing income, leaving no net profit from which to make investor distributions. In the course of servicing of the loans, I have diligently managed the servicing, addressed borrower compliance with loan covenants, and enforced the rights of the lender. The resulting stability of the loan portfolios, combined with effective marketing of the assets and the yield enhancement of the servicing income, has proved to be attractive to potential bidders.

As such, if the Motion is approved, Western will pay the Receivership Entities 110% of the amounts due on the 504/FMLP loans and 60% of the non-SBA loans.[1]

4. Based upon the status of the case, the condition of the loan portfolios, and the general economy, in March 2014, I proposed a process to market and sell the loan portfolios. The proposed process for marketing and selling the loan portfolios was described in detail in the Motion for (A) Approval of Sales Procedures for Loan Portfolios and 7(a) License and (B) Authority to Engage Voit Real Estate Services LP as Broker, filed in this Court on March 12, 2014. Following oral argument, on April 25, 2014, on May 9, 2014, the Court entered the Order Granting Approval for Sale Procedures for Loan Portfolios and 7(a) License; Authorizing Engagement of Voit Real Estate Services LP as Broker (the "Sale Procedures Order").

5. After entry of the Sale Procedures Order, the broker, Voit Real Estate Services LP ("Voit"), and I diligently marketed the loan portfolios for sale in accordance with the process described in the Sale Procedures Order. Among other things, this work included: establishing a virtual due diligence platform where prospective buyers could review the loans and loan files; providing a broad notice to interested parties; reviewing prospective purchasers for their financial capabilities; evaluating indicative bids received from interested parties; establishing a competitive ranges for bids; reviewing final bids; consulting with the Small Business Administration ("SBA"); and selecting the purchaser.

6. As indicated by the following statistics, the loan portfolios were widely exposed to the marketplace: 7,262 parties were notified of the sale; the Receiver executed non-disclosure agreements with 149 entities with access given to 191 people at those entities; and 24 potential bidders paid the $500 access fee to complete full due diligence.

7. Upon the conclusion of the due diligence period, I received 15 indicative bids. Seven were for the 504/FMLP loan portfolio only, and five were for the non-SBA

---

[1] The non-SBA loans are either unsecured or undersecured. As such, they are much riskier than SBA 504 loans. In addition, the non-SBA loans do not produce servicing income.

1  loans only. Eight bidders bid on both portfolios. The range of initial indicative bids were
2  approximately 88% - 100% on the 504/FMLP loans and 28% to 65% of the non-SBA
3  loans.

4    8. The six highest bidders were submitted to the SBA for their preliminary
5  review and approval. Thereafter, I solicited new bids from the six bidders. Five bidders
6  decided to submit bids in this next round. The highest bid was 106% with the balance of
7  bids clustered near 100%. At that point, I requested the SBA to approve the highest bidder
8  at 106% of the 504/FMLP loans. After several weeks and further discussions with the
9  SBA, the SBA stated that they would not approve of the highest bidder.

10    9. In light of the 3 remaining almost identical bidders, and with the knowledge
11 that some of the unsuccessful bidders had indicated that they may improve their price (and
12 with the belief that declining interest rates and the servicing income component of the
13 loans had not been fully realized), I solicited another round of offers. This time, the offers
14 ranged from 107.08 to 110. I selected Western based on its bid of 110% of the 504/FMLP
15 loans and 60% of the non-SBA loans. Western executed the Loan Purchase and Sale
16 Agreement, a true and correct copy of which is attached hereto as <u>Exhibit B</u> and
17 incorporated herein by this reference.

18    10. The SBA submitted a claim for over $24 million in the receivership. This
19 claim is contingent upon the SBA proving their contention that certain of the loans in the
20 portfolio did not conform to the loan program rules and that they have suffered damages as
21 a result of the loan program deficiencies. I strongly object to the SBA claim. Based on my
22 discussions with the SBA, it has become clear that one way to satisfy the SBA's claim may
23 be through the sale of the loan portfolios to third parties who assume the liability
24 associated with the loans. The sale of Assets is conditioned upon an assumption of
25 liabilities to the SBA.

26    11. Based upon the foregoing analysis and my good faith business judgment, I
27 recommend proceeding with the sale of the Assets pursuant to the Loan Purchase and Sale
28 Agreement.

12. In the course of concluding the agreement with Western, my counsel sought a Court date for a hearing to approve the sale. The Court's calendar clerk provided a hearing date of February 5, 2015. I informed the buyer of the date. Based upon their response, I am concerned that they may either withdraw from the sale altogether or demand a discount or improvement in the terms. There is also the risk associated with prepayments. To date, several of the loans in these portfolios have been paid off. If a borrower in the 504/FMLP loan pool were to prepay their loan, the estate will only receive 100% of the unpaid principal as opposed to 110% when the sale concludes. Moreover, if certain of the large loans are prepaid, then the portfolio may be too small to be of interest to Western and they may choose not to close based upon a material change.

13. Part of the appeal of this portfolio is the ability of the purchaser to refinance higher interest rate loans. If we experience additional prepayments prior to closing, this benefit to the buyer could be diluted. In short, I am concerned that if the Court does not hear the matter until February 5, 2015 that the sale could be lost.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 12th day of December 2014, at Irvine, California.

_____
THOMAS A. SEAMAN

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

1005501.01/LA

-4-

Case No. CV12-03237 EJD
DECLARATION OF THOMAS A. SEAMAN