Mark Feathers, in *Pro Per*
1520 Grant Rd.
Los Altos, CA 94024
Telephone: (650) 575-7881

FILED
DEC 19
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>PLAINTIFF,<br><br>vs.<br><br>SMALL BUSINESS CAPITAL CORP., MARK FEATHERS, INVESTORS PRIME FUND, LLC, AND SBC PORTFOLIO FUND, LLC<br><br>DEFENDANTS. | Case No.    CV12-03237-EJD<br><br>**MARK FEATHERS' CONDITIONAL NON-OPPOSITION TO RECEIVER'S MOTION (COURT DOCKET 988) TO SELL CERTAIN ASSETS OF DEFENDANT INVESTMENT FUNDS**<br><br>Crtm: 4 – 5th Floor<br>Judge: Hon. Edward J. Davila<br>Date: Jan. 8th, 2015    9:00 a.m. |

MARK FEATHERS RESPONSE TO RECEIVER'S MOTION TO SELL ASSETS

I  **FEATHERS' REPLY TO RECEIVER'S REQUEST TO SELL ASSETS**

The Defendant investment funds, which were Investors Prime Fund, SBC Portfolio Fund, and SBC Senior Commercial Mortgage Fund, were formed in 2005, 2007, and 2011, resp. The surprise seizure of these entities occurred in late June of 2012.

Investors Prime Fund, the largest and oldest of the funds, received its SBA non-bank license in April of 2010, through its wholly owned subsidiary, Small Business Capital, LLC. In only twenty six months' time, between April of 2010 and June 2012, SB Capital transitioned the funds' mortgage portfolios from a pre-2010 level of only 2% SBA guaranteed loans (constituted by one small SBA 504 loan of appx. $200,000) to a level of more than 90% SBA guaranteed loans at the time of seizure, as confirmed by the Receiver's reports to this Court. This took Herculean efforts of Feathers and his employees during that time, during which Feathers typically engaged in eighty hour work weeks, at well below market compensation levels, with other employees always going the extra mile, as well. In that twenty six months' time after they obtained their SBA license, approximately $100,000,000 of SBA loans were originated by SB Capital and the funds – at least one third of these through Feathers' own personal loan origination efforts, even while managing more than twenty six other company employees. Some additional $50,000,000 of loan fundings were at various levels of funding preparation and underwriting, as has been shown to this Court in Feathers' prior pleadings.

Such a rapid transition of existing investment fund loan portfolios, which occurred entirely through loan origination efforts of the employees of operating businesses - as opposed to purchases of loan portfolios - is a rare occurrence in banking and non-bank SBA lending. Such a rapid transition demonstrates both the commitment, and the capacity, of Feathers and SB Capital to the funds to deliver on the promise made to fund investors in late 2009 to focus entirely on SBA lending from the time they received their coveted SBA Small Business Lending Company license... one of only 14 such licensed in the United States, and which the funds obtained only because of the experience, know-how, and solid prior relationship of Mark Feathers and the SBA. Such a rapid transition bespeaks the loan origination, underwriting, and servicing efforts of defendant Feathers over year's time, as well as the very talented team the Defendant's employed.

Now the Receiver seeks to sell defendant assets, primarily their SBA 504 loans.

These loans are of superior quality. This is confirmed by the Receiver's motion and his declarations. These confirm that many bids have been received on these loans, and at a substantial premium to their carried value on the books of the defendant investment funds This defendant respectfully prays that the Court take notice that these loans which the Receivers proposes now be sold to Western Alliance Bancorp are selling for well over their book value even several years after Mark Feathers, SB Capital, and fund employees originated, underwrote, and funded these loans, and even with a substantial portion of the expected duration and lifetime revenue stream (before client's refinances or loan payoffs) of these loans now behind them, instead of in front of them. **Western Alliance Bancorp no doubt has an additional level of comfort in the quality of these loans, which it is willing to pay a premium on, because Natalie Feathers, employed by SB Capital on the date of surprise seizure, was a Senior Vice President and department manager with Western Alliance Bancorp, and community banks owned by Western Alliance Bancorp, and she was held in the highest regard by that bank, before she joined SB Capital.**

Of more than ten thousand licensed financial institutions in the United States which have the capital and the capacity to potentially acquire the investment portfolios of the defendant investment funds (i.e., banks, credit unions, and other SBA non-bank lenders), the Court should take note that the Receiver is now proposing to sell these to the nationally chartered and regulated financial institution which Natalie Feathers was most immediately was employed with. This fact, as just one of many similar facts presented to this Court for more than two years, clearly bespeaks that these businesses were no "Ponzi-like scheme". These funds, and SB Capital as their manager, were bona-fide operating businesses that SEC grossly misrepresented to this Court in its sealed *ex parte prima* facie Complaint, as well as thereafter, and that by all appearances for more than two years' time Thomas Seaman has also misrepresented with every opportunity to this Court.

## II  THE VALUE OF THESE LOANS IS OF NO SURPRISE TO THIS DEFENDANT

A matter which the SEC and the Receiver have failed to recognize for more than two years, and, or, obscured from this Court, is the fact that the investment funds and SB Capital were also substantially worth more than the sum of their parts outlined in the book value of their financial statements, as opposed to their enterprise value, which was never afforded a proper determination

-2-

because of the staunch opposition of this matter by SEC and by the Receiver. Reflection of this fact is now partially visible through the bids on the funds' SBA 504 loans. Because the defendant investment funds were immediately dismantled as going-concerns by Seaman, a prior value of the funds as going-concerns could only be ascertained through a proper look-back forensic analysis by a qualified party. This Defendant and the funds were always denied this opportunity due to SEC's and the Receiver's opposition to Feathers' motion for an expert witness to be appointed under relevant and appropriate Federal Rules of Evidence, to the funds' and fund member's detriment, and despite their asset values of tens of millions of dollars, and their enterprise value likely exceeding their book values by substantial amounts, by clear indication of the Receiver's descriptions of the bids which have arrived on the assets of the defendant investment funds.

These entities clearly had going-concern value at the time of their surprise seizure, as evidenced by the Receiver's bids for their assets. The going-concern value of the defendant investment funds was destroyed in one day's time, of course, when the Receiver fired ninety percent of the employees of these entities immediately upon his arrival, despite the universal mandate that Receivers take the time, which he failed to do, to properly analyze those companies they take control over. Upon his arrival and his immediate firing of essentially all employees, the funds lost their ability to originate, underwrite, and service loans forever thereafter. Clearly, with well documented earnings of several million dollars each year, as demonstrated to this Court through the Receiver's own reports, these funds did not need to be dismantled instantaneously with the Receiver's arrival, and before this Court had been presented with a fair opportunity to understand the nature of the business operations of SB Capital and the defendant investment funds.

The simple fact is that Feathers and his employees were very highly skilled at originating, underwriting, and servicing these specialized SBA loans. For example, here are descriptions of the prior professional experience of employees Feathers, Richard Jones, and Jordan Blanchard from fund offering documents:

> **Richard Jones** was the 504 Program Finance Chief in the Sacramento Loan Processing Center of the Small Business Administration from 2004 to October of 2011, when he retired after 31 years with SBA. In this senior management position for the Agency, Richard reviewed in excess of $1B annually of applicant and lender small business credit and program eligibility.

Previous experience with the SBA included four years as a Senior Examiner in SBA's Small Business Investment Company program, five years as Chief, Finance Division in SBA's San Francisco District Office, and more than ten years of as a senior Commercial Loan Officer for the Agency in the San Francisco, San Diego, and Chicago District Offices.

**Jordan Blanchard** is on the executive committee of the Manager. Mr. Blanchard has been involved in SBA 504 lending for over 20 years. He has extensive experience in selling SBA 504 first mortgage loans to wholesale buyers. He formally headed 504 wholesale departments at Borrego Springs Bank, Community National Bank and Temecula Valley Bank. In 2003, Jordan joined Community National Bank, a regional bank headquartered in southern California. In the 12 months prior to joining the bank, Community National had funded just four SBA 504 loans. Under Jordan's leadership, that number increased to 78 by 2005, which made Community National the nation's 6th largest SBA 504 lender, and the #1 community or regional bank lender of SBA 504 loans in the nation.

**Mark Feathers**...has an extensive background in commercial and investment real estate and real estate lending. He has worked as a Senior Commercial Loan Specialist for the U.S. Small Business Administration ("**SBA**"), served as Vice President and SBA Department Manager for Bank of Los Altos, Senior Vice President and Northern California Group Manager for Cedars Bank and Senior Vice President of Sequoia National Bank. Mr. Feathers served as a Senior Vice President and Manager of Commercial Real Estate Lending at United American Bank where he was responsible for managing commercial loan originations and servicing for the bank and assisted in pre-opening capital raising efforts and formulating loan policies and credit products marketing strategy. Mr. Feathers received his Masters Degree in Business Administration in 1991 from Golden Gate University in San Francisco, and his Bachelor's Degree in Finance in 1985 from Pennsylvania State University. In between his periods of degree work, Mark served with distinction as an officer in the United States Navy. He has received the Armed Forces Expeditionary medal, the Pacific Fleet Best Sales and Service Award and several other service commendations.

## III  FEATHERS POSITION ON THE SALE OF THESE FUND ASSETS

Feathers does not oppose the conditional sale of these assets which he and other employees originated, underwrote, and serviced through late June of 2012, the date of their surprise seizure, subject to a third party review of their value to be performed by Government Loan Solutions, or a similarly qualified outside third party. That entity performed analysis of the value of these loans prior to the seizure of the funds. A limited scope review would take less than thirty days' time, in all likelihood, based upon this Defendant's prior experience with Government Loan Solutions. The nature and quality of the work of GLS is known to be acceptable by this defendant, as GLS's work in reviewing the fund's SBA loans has already been prior accepted by the FDIC and the California Dept. of Financial Institutions, at the direction of this person. Such a review would also likely be at a de minimus expense to the Funds, and would establish an independent fair value, as required by

valuation codes and statutes that this Court is already familiar with. Feathers cited these statues and codes prior in his opposition pleadings to the sale of these assets, as opposed to Feathers' proposal that these funds be reorganized and commence again their SBA origination, underwriting, and loan servicing operations, which was the stated desire of the funds' members.

## IV    SALE OF THE SO-CALLED "non-SBA" LOANS

As to the few non-SBA loan(s) which are to be sold at 60% of the note amounts, these loans were originated by the funds as "hard money loans" (high risk, high return), with such type loans fully allowed and described with clear detail in fund offering documents. For example, here is a passage from defendant SBC Portfolio Fund's Private Placement Memorandum:

> **Loan Defaults and Foreclosures**
> The purpose of the Fund is to invest in loans and, as such, it takes the risk of defaults by borrowers and other risks faced by lenders. Company loans may be made to some Borrowers who are unable to avail themselves of more traditional sources of financing, such as banks or savings and loans, either due to expedited funding requirements, credit or other underwriting issues.

The "Rampur" loan constitutes almost all of the principal amount of the so-called "non-SBA" loans. The receiver proposes to sell this note of appx. $2.1M for a 40% discount, or at approximately $1.26M. The Rampur loan was funded in Oakland at the peak of commercial property values just prior to the Great Recession. In his 7th Interim Report, Court Docket 618, Seaman references that he obtained an appraisal on this property in anticipation of a foreclosure. Given that millions of dollars of investor money is at stake here, it would benefit the Court and fund investors to know the independent third party appraiser's final determination of value on the Rampur property, as well as to have a quick and affordable MAI appraiser's desk-review by another independent appraiser who is not engaged by the Receiver, in order for the Court and for investors to compare the appraised value of that property to the discounted sale amount of $1.26M that the Receiver is proposing the court accept.

Additionally, in his Interim Report No. 2, the Receiver makes reference on the Rampur loan to having established a reserve of $1.147M (Docket 53, page 8, line 11) on this loan. The Court

and investors would benefit to know if there may actually be a gain on the Receivers' reported book value on this loan, therefore, by way of a reversal of some portion of the prior established loan loss reserve? Aside from the statutory matters of valuation, the Receiver should explain adequately the economic basis for this particular transaction as well, and the relationship, if any, of the pricing of this loan as it relates to the pricing of the other assets of the note portfolio now proposed to be sold. For numerous reasons raised here, the steeply discounted proposed sale value of the Rampur loan should receiver further attention.

All proposed 504 loans and non-SBA loans should be sold, subject to the Receiver adhering to statutory requirements. The proceeds from these sales should be then distributed back to fund investors as soon as is practical, minus hold-backs for the funds to commence their lending operations again, should the 9th Circuit dismiss this lawsuit with prejudice. The core mission of Investors' Prime Fund was, after all, from April of 2010 and thereafter (and should still be) to originate, underwrite, and service SBA 7(a) loans under its unique Small Business Lending Company license. Investors have voiced their desire for such activities to be re-implemented (see Court Dockets 684 & 699).

**V      MARKET INDICATION THAT THE SUCCESFUL PATH OF THE FUNDS WAS INTERRUPTED BY THEIR SURPROSE SEIZURE, INJUNCTION, AND DISMANTLING OF THEIR PERSONNEL AND LOAN ORIGINATION, UNDERWRITING, AND SERVICING OPERATIONS**

If not for their surprise seizure, the funds may have enjoyed similar performance of a fivefold increase in net income in the year 2013 as described here by another similarly licensed, SBA non-bank licensee, with similar SBA 7(a) actual, or expected, loan origination volumes to those of IPF and Small Business Capital:

> **COLEMAN REPORT**
> Small Business Financing Experts
>
> Afternoon Brief
> July 10, 2014
>
> **Newtek Extends its Capital One Credit Facility**
>
> Newtek Business Services aka The Small Business Authority, announced it has entered into a $20 million credit agreement with Capital One, N.A., which consists of a $10 million term loan and a $10 million revolving credit facility. This is in addition to the current $27 million financing line from Capital One which Newtek uses exclusively for its small business lending business and brings the Company's total financing through Capital One to $47 million.
>
> Barry Sloane, Newtek's Chairman, President and Chief Executive Officer says, "We are extremely pleased to enter into this new agreement, expanding our existing relationship with Capital One, as well as reducing our overall cost of capital. That said, we are also grateful for the capital that Summit provided to us in April 2012, which played an integral role in the Company's growth. Specifically, it significantly contributed to the 83% growth in our lending platform from $97.1 million in loan originations in 2011 to $177.9 million in loan originations in 2013. Furthermore, it enabled us to increase our consolidated pretax income practically fivefold from $2.0 million in 2011 to $11.1 million in 2013. In 2014, we anticipate continuing this upward trajectory of growth in both loan originations and pretax income."

Like this other SBA non-bank lender, the funds also were pre-approved, as has been shown by Feathers in prior court pleadings, for a substantial line of credit, of more than $20,000,000 in fact, by Wells Fargo Bank, or its subsidiaries, in the very same week of the surprise injunction.

## VI THE BASIS TO THE CREATION OF THE FUNDS' SBA 504 LOAN PORTFOLIOS

The funds' SBA 504 note assets were strategically put into place specifically because they presented investment opportunities to the funds which presented substantial risk adjusted return premium opportunities over real estate mortgage debt instruments with similar rates and longevity, namely due to their SBA federal repayment guarantees, and which the funds were uniquely positioned to obtain due to Mark Feathers' founding and management of these funds through the date of their surprise seizure. As most of the substantial amounts of interest and servicing income of these loans has not been passed through to investors over the past two years, going primarily to

the Receiver and to his counsel during this period, it is best that these now be sold, so that investors may then put their capital to more productive use.

## VII  OTHER MATTERS WHICH NEED TO BE CLARIFIED

On page 2 of his motion (Docket 988), the Receiver states that he and his agent have "marketed and conducted the sale of...SB Cap Loans". There are no "SB Cap Loans", however, which have been marketed, there have only been defendant investment fund loans marketed for sale.

The Receiver states in his declarations "The non-SBA loans are either unsecured or undersecured". There were no "unsecured" loans to this party's knowledge and belief; every portfolio loan made to the funds' small business clients were "secured" loans made by way of properly recorded deeds of trust and mortgage note instruments.

## VIII  CLOSING

In closing, this Defendant does not oppose the conditional sale of these assets, subject to a third party confirmation of value of these SBA 504 and non-SBA assets, and subject to sufficient (and acceptable) detail being further provided to the Court and to the Defendants on the other matters outlined herein.

Respectfully

Dated: 12-19-14

Mark Feathers, *pro se*