Mark Feathers, in *pro per*
1520 Grant Rd.
Los Altos, CA 94024
Telephone: (650) 575-7881



FILED
APR 22 2015
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

NORTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>PLAINTIFF,<br><br>vs.<br><br>SMALL BUSINESS CAPITAL CORP., MARK FEATHERS, INVESTORS PRIME FUND, LLC, AND SBC PORTFOLIO FUND, LLC<br><br>DEFENDANTS. | Case No.    CV12-03237-EJD<br><br>**MARK FEATHERS' RESPONSE TO RECEIVER'S MOTION (DKT 1027)**<br><br>**REQUEST FOR JUDICIAL NOTICE OF EXHIBITS TO RESPONSE UNDER FEDERAL RULES OF EVIDENCE**<br><br>**AND**<br><br>**MARK FEATHERS' MOTION FOR HEARING TO STAY SALE OF ASSETS**<br><br>**AND**<br><br>DECLARATIONS OF MARK FEATHERS AND PROOF OF SERVICE<br><br>Judge: Hon. Edward J. Davila |

**I    INTRODUCTION**

The Receiver, Seaman, requests what appears a fraudulent transfer. Seaman asks the Court's assistance to allow him to violate CA Civil Codes (i.e., 3399 – 3402) by allowing sale of the assets of Small Business Capital, LLC, ("SBC"), which will render it to no longer be a going concern. Seaman employs descriptive asset guises of "loans, license, loan servicing rights" rather than referring to SBC for what it is, a going concern. Feathers and third party members of the funds of the Receivership Estate oppose Seaman's motion for legal and equitable reasons.

MARK FEATHERS' OPPOSITION TO RECEIVER'S MOTION TO SELL KEY INVESTMENT FUND ASSETS

## II  BACKGROUND INFORMATION ON SMALL BUSINESS CAPITAL, LLC

SBC is a federally licensed Small Business Lending Company ("SBLC"), which was founded by Mark Feathers and Small Business Capital Corp., and which is owned by the members of Investors Prime Fund, LLC. Under its U.S. Small Business Administration license ("SBA"), SBC originates and services SBA guaranteed loans to small businesses throughout the United States. SBA lenders such as SBC typically sell up to 90% of each loan origination, and for a loan premium which may be as much as 20% of loan principal of the portions of loans which they sell over the past three years per market information (www.glsolutions.com). In addition, SBC earns loan servicing revenues typically at 1% on the amount of each loans that it would sell. SBA's guarantee is pro rata on the portion of each loan SBC retains, i.e., up to 90% repayment of any possible loss (i.e., any loss remaining of loan principal after the sale of collateral real estate for a loan) by SBA. Since each SBC loan is also real estate secured, the loss potential to SBC is typically very low, at single digits. The actual historical principal losses of SBC on its balance sheet and income statement from its loans have been extremely low, if any.

SBC is structured similar to an agency mortgage real estate investment trust ("REIT"). Due to its substantial revenues from operations along with its unique agency loan guarantees, combined with SBC's very low historical loss rate, SBC has over-performed relative even to its agency mortgage REIT peer group. As a whole, agency mortgage REITs themselves far outperformed the stock market for the recent period 1990 – 2011; see Exhibits "A" and "B". With SBC we have an entity with federal guarantees, steady and high revenues relative to its capitalization, and no liabilities to creditors nor the risk that may accompany such credit facilities. Mortgage REITS, which SBC is most similar to, generally trade at significant premium to book value; Exhibit "B".

With hearings due shortly on Feathers' appeals with the 9th Circuit, the Constitutional due process rights and entitlements of Feathers' and of members to hold onto the plum of their investment should take priority over the Receiver's and SEC's pretense of urgency in their desire for a forced dissolution of SBC.

The time is not ripe for the sale of SBC's assets for all of the reasons outlined herein.

-1-

DEFENDANTS OPPOSITION TO RECEIVER'S MOTION TO SELL KEY INVESTMENT FUND ASSETS
Case No. CV-12-03237

## III   IT WAS NEVER SPECIFIED AT INJUNCTION AND RECEIVERSHIP THAT THIS WAS TO BE A LIQUIDATION RECEIVERSHIP

At the Receiver's permanent appointment (Docket 34) never was it clear to Feathers this receivership was to be a liquidation receivership. Feathers would not have consented to injunction and the appointment of Seaman had this matter been clear. This Court is also aware of Feathers' and the hundreds of sworn declarations of investors' opposition to selling the assets of Small Business Capital and supporting the reorganization of the funds (i.e., see Court Dockets 765, 765-1, 821). Feathers did not oppose the sale of the Receivership Estate's SBA 504 loans because these could be sold without affecting the core SBA 7(a) business model of Investors Prime Fund/SBC, and also because Feathers' felt there would be benefit to investors in regaining some liquidity and control of their investment into the funds of the Receivership Estate several years into this lawsuit.

## IV   SEAMAN IGNORES THE LAWS AND CORPORATION CODES OF CA

Seaman ignores California Corp. Codes 1300, 1301, 2000, other Codes which may apply, and state and federal laws which outline the rights of citizens to control their property and govern the sale of a going concern, which are different than those that govern the liquidation of assets of an entity that is not a going concern, i.e., a bankrupt business. The Receiver's reports to the Court validate SBC to be a going concern. SBC generates interest and servicing revenues of approximately $.5 million+ per year, which the Receiver or SEC cannot reasonably dispute.

**Dissolution Actions Yield Less than Fair Market Enterprise Value (Appraising for "Fair Value" Under California Corporations Code Section 2000)**

> "The fair value shall be determined on the basis of the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation." Section 2000(a)

The formula for determination of "fair value" under Section 2000 therefore is as follows:

$$\text{Fair Value} = \text{Piecemeal Liquidation Value} + \text{Incremental value based on the percentage of possibility, if any, of the sale for cash of the entire business as a going concern in a liquidation}$$

-2-

DEFENDANTS OPPOSITION TO RECEIVER'S MOTION TO SELL KEY INVESTMENT FUND ASSETS
Case No. CV-12-03237

The going concern fair value of SBC was not addressed by the Receiver. There has not been a concrete third party assessment of value, including a discounted cash flow analysis valuation to SBC's assets. This party also outlined relevant laws and doctrine in his opposition to the Receiver's motion to package these assets out for sale (see Court Docket 824). In Seaman's and SEC's pleadings to support the sale of these assets, they identify perhaps five or six members who support Seaman's motion. A ratio of twenty to one of members who support retention of SBC's assets and reorganization as opposed to sale has not been properly considered by the Court.

Seaman has failed to provide a qualified third party FASB (Financial Accounting Standards Board) 156 and 157 valuation which is required at the time of selling SBC's servicing assets which have federal (SBA) guarantees. FASB 157 emphasizes that fair value is a market based measurement, not an entity specific measurement. Real time market observations are required on SBC's loan portfolio and loan servicing rights – with those valuations not established by the sale itself. The Receiver fails to follow Sorbanes-Oxley Requirements, his fiduciary responsibilities, or to show the transparency which is required to the owners of these assets.

This Court, Defendants, and affected third party investors do not have transparent proof presented to determine if members are getting a good deal, or a raw deal. Under 28 U.S Code § 2001 & 2004 Seaman is required to obtain a fair market valuation of these related - and in this instance combined - assets before liquidating them. Seaman's employment of his description "principal value" in his motion for SBC's loans cannot substitute for a "fair market" valuation from a qualified outside party. "Principal value" and "Fair Market Value" are distinct terms with their own meanings as defined under both FASB and Generally Accepted Accounting Principles. Seaman recently sold the fund's SBA 504 loans at a 10% premium to their "principal" value (see Court Docket 1011, "Receiver's Twelfth Interim Report", page 2, line 1). In this instance Seaman asks for authorization to sell SBC's assets at only 93% of their "principal" value. Who is to tell what percentage of fair market value 93% represents here?

Prior to confirmation of a private sale, CA Corp. Code Section 2001(b) calls for the appointment of three disinterested persons to appraise property, and requires a sale price no less than two-thirds of

-3-

appraised value. Here there is no appraisal benchmark to determine two-third's value. The Receiver has only reported to the court a value here for two items, which are of "93% of SBC's loan principal balance" plus a value of subjective value he assigns of $700,000 for the "licensing and loan servicing rights". There should be four values which are aggregated to determine a basis for a "two-thirds" comparison. Values must be properly established for: (a) SBC's loans, (b) SBC's license, and (c) SBC's loan servicing, all as part of a going concern analysis, and (d) SBC's value as a going concern. Seaman overlooks, also, that SBA allows that almost any bank or credit union in the United States, or SBA Small Business Lending Company, may purchase SBC's SBA7(a) loans. The Receiver fails to provide evidence to this court that SBA has required "the license and loan servicing" bundled, or even that SBA is allowed that. Seaman provides to this Court only hearsay comments on what SBA desires.

Seaman reflects SBC as a going concern in his declarations (Dkt. 1028, page 1, lines 27 – 28,): *"Since the inception of this receivership, I have continuously operated the Receivership Entities"*. When interpreting any statute, courts are to assume that the plain meaning of terms expresses the intent of the legislature. *See Emergency Services Billing Corp., Inc. v. Allstate Ins. Co.*, 668 F.3d 459, 465 (7th Cir. 2012). An "appraisal" refers to "[t]he determination of what constitutes a fair price; valuation; estimation of worth." Black's Law Dictionary (9th ed. 2009). Here, we cannot determine if Seaman's price is great than two-thirds of value required for a sale because there has never been a fair market value determination, or even a "fair value" determination for that matter.

## V  SEAMAN'S OWN DECLARATIONS SHOW THE TIME IS NOT RIPE HERE

To push the sale of SBC's assets, the Receiver states (see Docket 1030, page 3, lines 17 – 21): *"If there was a substantial change in the makeup of the 7(a) loan portfolio, then Buyer could possibly seek to withdraw from the deal. For example, if a substantial number of loans went into default, the value of the 7(a) loan portfolio may be substantially reduced"*.

Seamans' other accompanying declaration (see Docket 1028, page 2, lines 12 – 13) contradict this "substantial number of loans into default" possibility. Seaman states: *"During my tenure as Receiver, I have stabilized the servicing of the 7(a) Loans... "* in describing the "resulting stability

-4-

of the loan portfolios" (*id*, page 2, line 18). Also contradicting any stated or implied urgency of the Receiver here to sell assets, the Receiver confirms in his Twelfth Interim Report that only one of SBC's thirty four loans is in a late payment status; no loan is reported to be in foreclosure. So, loans in non-payment status represent exactly 0% of SBC's loans, and only one out of thirty three of SBC's borrowers are late. Notably, Seaman's Twelfth Interim report states that the "previously established loan loss reserve of $985,000 is obsolete…". Clearly here, Seaman's most recent report Court shows the likelihood of a "substantial number of loans" going into default unlikely.

## VI    SEAMAN HAS NOT ADDRESSED RISKS OF POST-SALE REDEMPTION RIGHTS

Federal courts may allow a post-sale right of redemption under equitable principles and federal common law. A sale, followed by the legal and other costs of a post-sale redemption, clearly could be very expensive for the Receivership Estate, and not in the best interest of the Receivership Estate. The 9th Circuit may shortly rule there to have been violations of due process in this lawsuit by SEC, Seaman, or both, both of whom are the subject of Feathers several appeals.

## VII    SBC'S SBLC LICENSE AND SERVICING REVENUES

Seaman proposes selling SBC's license for $700,000. This is less than its cost of $750,000 some five years ago, and at which time it was not tied to some $500,000 of annual revenues, like now. Seaman's forensic accounting reports show that SBC earned normalized earnings in the $2 Million+ range, when properly including loan premiums along with loan interest and servicing income. SBC's revenues have dropped by 2/3's, or more, it appears, while under Seaman's management. However, at a forward ratio of next year's earnings potential of SBC, SBC should be worth approximately $8,000,000 in today's market based upon [Normalized Revenues of $2 Million+] – [Expenses of $1 Million] x [times price earnings ratio multiplier of 6x] (for market price:earnings see www.greenstreetadvisors.com/pdf/GreenStreetPricingModelReport.pdf). These figures are realistic based upon actual past performance of SBC. Seaman's motion pleadings prepare no analysis of true value to the buyer, or to the seller, nor show any outside valuation.

-5-

Seaman's proposed sale price is less than two-thirds the amount that SBC may be worth. Seaman's motion pleading is lacking for even minimal evidentiary support for his price. Seaman fails to establish the last sale date and price of a similar license, if that sale included servicing and interest income, how many licenses are now available for sale, their sale prices, etc.

Mortgage servicing rights ("MSR") are the present value of the future income stream from mortgage servicing related cash flows. The value is the sum of the present value of these future income streams, which is impacted by assumptions on prepayment speeds, mortgage age and type, and the rate at which these cash flows are discounted. The Receiver has not followed, nor has he engaged any third party to follow, Financial Accounting Standards Board ("FASB") 157 guidelines to determine the net present value of these MSR's. A proper MSR valuation by the Receiver, or by a qualified third party, could have, and should have, (1) reflected future cash flows, (2) calculated remittance delays, (3) analyzed the float of taxes & insurance, based on payment schedules, (4) factored in additional income (i.e., late fees), (5) analyzed costs of servicing (dollar amount per loan, and, or, percentage of current balances), and, finally, subtracting costs of servicing to determine net servicing income, and from their determining a Net Servicing Valuation for the portfolio. There has been ample prior opportunity and time afforded the Receiver over the past three years' time to have a qualified outside third party determine the net present value of the 7(a) portfolio's expected stream of future cash flows through a loan-by-loan analysis utilizing assumptions which are typically used, including stress tests which could have been, and should have been, applied for each loan, and for the entire portfolio. Instead, here, the receiver exposes the receivership estate and third party investors to the possibility of substantial losses against the fair market value of assets, and without benefit to the investors of any third party valuation.

Here the Receiver is not abiding by the laws of California which cover the sale of going concerns, nor of federal laws governing property rights of individuals; *See Integrated Solutions v. Service Support Spec.*, 124 F.3d 487 (3rd Circ. 1997).

## VIII  RECEIVER'S HEARSAY THAT "SBA HAS CONSENTED TO THE SALE"

Nothing presented to the Court validates "SBA has consented to the sale". Additionally, Seaman provides no evidentiary support that "it has become clear that one way to satisfy SBA's claim" because "certain of the loans in the portfolio did not conform to the loan program" (see Declarations, Docket 1028, statement 12) "may be through the sale of the loan portfolios". Nowhere in Seaman's pleadings is there a declaration of any SBA official supporting Seaman.

## IX   SBA IS A PARTY OF INTEREST WITH A CLAIM

SBA holds a so-called claim against SBC (see Docket 632, page 3, line 11) of $24.15 Million. In this matter and for guidance, and due to SBA's claim against SBC, the Court may look at Bankruptcy Code 363 asset sale guidance to justify not allowing SBC's assets be sold. The language in the code @ 1129(d) states that "On Request of a party in interest that is a governmental unit (i.e., "SBA" here), the court may not approve a sale of substantially all of the debtor's assets if the principal purpose of the sale is the avoidance of environmental or other liability to a governmental unit under state or federal laws. Here, Seaman directly states his motivation for sale is to satisfy SBA's claim, and indeed, SBA itself implies same with its so-called claim here.

## X   RECEIVER'S REPRESENTATION THAT SBA REQUIRES BUNDLING OF SMALL BUSINESS CAPITAL'S LICENSE AND LOAN SERVICING RIGHTS

Seaman has attached no declarations of any SBA official with his motion. Yet Seaman represents that SBA insists that SBC's license be sold with its loan portfolio. This party is quite knowledgeable as to SBA lending, and asserts as fact that almost any charted financial institution in the United States (i.e. bank or credit union) in good standing may acquire SBC's loan portfolio without SBC's license. Bundling these two items may not be beneficial to third party members, it may be quite harmful. This Court has knowledge that acts of administrative agencies, such as the SBA, are subject to judicial review for abuse of discretion. Additionally, any interest of SBA is a statutory interest in the assets of SBC, and not an interest *per* se in SBC's assets, whereas Feathers and third party members have a direct and Constitutionally protected interest in the assets of SBC.

-7-

Here we have hearsay by the Receiver as to what SBA would like. If Seaman is able to provide an evidentiary basis as to what SBA would like, that evidentiary material should be provided to the Court and to Feathers for their ability to review this for abuse of discretion, as entitled to by the Administrative Procedures Act.

## XI    RECEIVER'S OMISSIONS AND FALSE ASSERTIONS IN HIS DECLARATIONS

The Court should be alarmed that in Seaman's declarations (Dkt. 1028, statement 3) he omits $3.63 Million of his own forensically verified loan premium revenues when he describes the so-called "net profit" (the Receiver's non-GAAP figure which was never subjected to any third party analysis). The Court should agree that $3.63 Million is a substantial number for Seaman to omit, without any explanation provided, from his own descriptions of the past financial performance of the Receivership Estate. The Court must ask itself why the Receiver here distorts a very large percentage of the Receivership Estate's revenues when describing its prior financial performance.

## XII    REQUEST FOR HEARING FOR A STAY ON SALE OF ASSETS

A district court's decision concerning the supervision of an equitable receivership is reviewed for abuse of discretion; see *Commodity Futures Trading Comm'n v. Topworth Int'l*, 205 F.3d 1107, 1115 (9th Cir. 1999). The 9th Circuit holds jurisdiction on the matter of Feathers' appeal against a Court order to sell assets (should that occur) as a final order has been issued in this lawsuit.

Feathers invested $.5 Million into Small Business Capital Corp (see Court Docket 497). He made his investment into his company, the manager and founder of Investors Prime Fund, LLC, and SBC, LLC, on expectation that he would receive a return on his life savings' investment, and that the return would provide current and future income to him and his family. A sale of SBC's assets (whether "assets" or a "going concern") greatly harms Feathers. It deprives him a return on his investment and the primary investment capital from which his and his family's future needs could be met. A sale of SBC's assets would also deprive Small Business Capital Corp. of the

means to meet the credit terms agreed upon by members of the Receivership Estate which were created with the "due-to-funds" promissory note assets of the funds.

Feathers asks the Court for a stay on the sale of SBC's assets, should the Court approve Seaman's motion, in order for Feathers to appeal this to the 9th Circuit; see *In re Roberts Farms, Inc.*, 652 F.2d 793 (9th Cir. 1981). Substantial consummation of the dissolution of the Receivership Estate has not yet occurred. This is evidenced by the Receiver's most recent interim report show that the Receivership entities still have substantial capital and revenues generated from loan interest and from loan servicing. All importantly, SBC is a going concern which still has its unique license, one of only fourteen SBA Small Business Lending Company licenses in the United States. Third party members will be inequitably harmed by a sale of SBC's assets. Retention of these, for at least a short while longer, will continue to produce gains on member's investment, and will avoid destroying SBC as a going concern. Here there should be no great urgency to interrupt the status quo, and, therefore, a stay Order at this time will not be a moot issue. The District Court should provide the 9th Circuit opportunity to review this issue because the 9th Circuit "can give the appellant any effective relief in the event that [we] decide [] the matter on the merits in [its' favor." *Thorpe*, 677, F.3d at 880 (citations omitted). The 9th Circuit could "reverse plan confirmation or require modification of the plan." *Id.* Here, the issue is also not equitably moot, as halting a sale prevents the need for unwinding "transactions that are so complex or difficult" that "debtors, creditors, and third parties are entitled to rely on…[the] final…court order." *Thorpe*, 677 F.3d at 880 (citation omitted). This court has the power to suspend its own Order to sell SBC's assets during the pendency of an appeal in this matter, in order to protect the rights of all parties in interest. Additionally, no bond should be required, because SBC will only continue to generate profits and net income for the Receivership Estate, as validated by the Receiver's Twelfth Interim Report to the Court. A stay here will ensure that "the estate and the status quo may be preserved pending resolution of the appeal." *In re Chateaugay Corp.* 988 F.2d 322, 326 (2d Circ. 1993). Any relief from a stay here would not include a request to overturn previous distributions and allocations to third parties, nor require a claw-back from any investor, so no burden is created in

those ways. If the 9th Circuit remands *SEC v. Small Business Corp., et al,* back to the district court, or if it dismisses the lawsuit in its entirety, this will be a moot issue if the assets of SBC have been sold. So a stay here is paramount to providing equitably remedy.

Here, it is likely (1) that the 9th Circuit will approve the stay request, because Seaman has not met California State Law valuation guidelines for the sale of SBC's assets, and (2) the stay will prevent irreparable harm, as an asset sale would cripple SBC, and (3) a stay will not harm the Receiver, the SEC, or the Receivership Estate for reasons already mentioned, and (4) public interest favors granting a stay, because there are important Constitutional matters of law as outlined in Feathers' appeal in November of 2013 of the Court's order of summary judgement against him, with a hearing on that appeal now likely to be heard very soon (*see Nken v. Holder,* 129 S.Ct. 1749, 1761 (2009). These four factors may be evaluated on a sliding scale; *see Davis v. Pension Benefit Guar. Corp.* 571 F.3d 1288, 1291 (D.C. Cir. 2009). The presence of "novel and weighty" questions "squarely favors" a finding that the movant has satisfied the first element, *Al Maqaleh v. Gates,* 620 F.Supp. 2d 51, 56 (D.D.C. 2009). "Serious legal questions" present a "fair ground for litigation"; *Baker v. Socialist People's Libyan Arab Jamahirya,* 810 F.Supp.2d 90, 97 (D.D.C. 2010). Feathers will file a stay request with the 9th Circuit within only a few days' time of any Order adverse to his interest in the matter of the sale of SBC's assets. Plaintiff SEC, and Seaman, will no doubt not consent to a stay, but should be afforded opportunity to respond to Feathers' stay request, and Feathers should then be afforded opportunity to respond to their replies.

## XII SEC CONTENDS THE RECEIVER'S REQUEST IS "MOOT" HERE TO WAIVE THE REQUIREMENTS OF 28 U.S.C. § 2004

SEC is wrong (see Docket 1037, page 1) to contend SBC's assets need no valuation for the same reasons already outlined herein by Feathers. That both Seaman and SEC bring this issue to attention bespeaks collusion on their part in disregarding established state and federal laws on this matter.

## XI CONCLUSION

-10-

DEFENDANTS OPPOSITION TO RECEIVER'S MOTION TO SELL KEY INVESTMENT FUND ASSETS
Case No. CV-12-03237

Neither SEC or the Receiver provide legal basis to skirt state and federal codes here. important area of law. "...any distribution of assets must also be done equitably and fairly." *See S.E.C. v. Elliott*, 953 F.2d 1560, 1569 (11th Cir. 1992). Here, neither of these requirements has been met. Nor has the Receiver provided legal justification for a waiver of the requirements of 28 U.S.C. § 2004. Additionally, while the Receiver employs the "regulatory requirements of the SBA in connection with the sale (*see* Court Docket 1027, page 6, line 4) as the basis to his waiver request of 28 U.S.C. § 2004, nowhere has he cited these "regulatory requirements" of SBA in this motion, or in his prior motion to market SBC's assets for sale.

For the reasons outlined herein, and for those related reasons established prior in Feathers' docket no. 824, SEAMAN'S Motion should not be accepted. In the event of a Court Order which is adverse to his position, Feathers' respectfully requests the Court afford him the opportunity for a stay while he appeals this matter to the 9th Circuit. The Court should note that on a prior occasion (see Court Docket 766) which included a substantial distribution of assets of the Receivership Estate, the Receiver rushed a distribution before Feathers was afforded the brief period necessary to prepare paperwork for the 9th Circuit. In the interest of due process, the Court should direct the Receiver to ensure that Feathers is afforded opportunity for lawful due process.

Respectfully submitted,

April 22nd, 2015

Mark Feathers, in *Pro Per*

### Declarations of Mark Feathers

I, Mark Feathers, in Los Altos, CA, swear under penalty of perjury on my knowledge and belief that all comments herein are truthful and accurate.

Mark Feathers, in *Pro Per*

### Proof of Service

I have caused this opposition filing to be delivered to all parties of record on this date, April 22nd, 2015, by email delivery.

Mark Feathers, 1520 Grant Rd., Los Altos, CA 94024

-11-

DEFENDANTS OPPOSITION TO RECEIVER'S MOTION TO SELL KEY INVESTMENT FUND ASSETS
Case No. CV-12-03237