1  STEVEN G. KALAR
   Federal Public Defender
2  RITA BOSWORTH
   Assistant Federal Public Defender
3  55 S. Market Street, Suite 820
   San Jose, CA  95113
4  Telephone:  (408) 291-7753

5  Counsel for Defendant FEATHERS

6
7
8
                    IN THE UNITED STATES DISTRICT COURT
9
                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
                              SAN JOSE DIVISION
11
12 UNITED STATES OF AMERICA,        )   No.  CR 14-00531 RMW
                                    )
13                Plaintiff,        )   **REPORT OF ANNETTE M.**
                                    )   **STALKER, CPA/CFF, CFE**
                                    )
14 vs.                              )   Date:   September 26, 2016
                                    )   Time:   9:00 a.m.
15 MARK FEATHERS,                   )
                                    )   **Honorable Ronald M. Whyte**
16                Defendant.        )
   _____)
17
18
19
20
21
22
23
24
25
26 OBSERVATIONAL REPORT OF DEFENSE
   FORENSIC ACCOUNTING EXPERT
   No. CR 14-531 RMW

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES

## v.

## MARK FEATHERS

CASE NO. 5:14-cr-000531-RMW

REPORT OF
ANNETTE M. STALKER, CPA/CFF, CFE

AUGUST 22, 2016



I. **Nature and Scope of Assignment**

I, Annette Stalker, through my firm, Stalker Forensics, have been retained by the Federal Public Defender's Office for the Northern District of California, located in San Jose, California to provide forensic accounting services relative to the criminal matter US v. Feathers. In specific, I have been provided with financial records related to several entities that Mark Feathers ("MF") owned or managed and include: Small Business Capital Corporation ("SBCC"), a California subchapter S corporation, and four mortgage investment funds managed by MF via SBCC: Investors Prime Fund, LLC ("IPF") including subsidiary SB Capital, LLC ("SBC LLC"), SBC Portfolio Fund, LLC ("SPF"), and SBC Senior Commercial Mortgage Fund, LLC ("SCMF"). The entity names, acronyms and relationships are illustrated in Chart 1 below.

In connection with the forensic accounting analysis being performed in the criminal matter, I have been asked to review and provide observations about the supporting records for the financial amounts cited in the Order for Summary Judgment from the underlying civil matter (case number 5:12-cv-03237-EJD).

The observations in this report are based on review of the restored QuickBooks Company files, audited financial statements and related workpapers, tax returns, offering documents, operating agreements, interim reports by the receiver, as well as declarations and briefs filed in the civil matter. On August 11, 2016 several thousand additional pages of audit workpapers pertaining to the entities under receivership were provided. My review of those documents is not yet completed. As such, the observations in this document may be amended and/or supplemented based on review and analysis of the contents of the recently provided records.

II. **Introduction**

The observations expressed in this report and portions of the information presented in the accompanying exhibits are based on work performed to date. Amendments and additions to this report and accompanying exhibits may be required as indicated or as a result of new evidence, expert discovery, and the testimony of other witnesses at trial.

III. **Qualifications**

I am the owner of Stalker Forensics which is a Certified Public Accounting firm that provides forensic accounting and consulting services.

I hold a Bachelor of Science degree in Business with a concentration in Accounting from California Polytechnic University in San Luis Obispo, California. I am a Certified Public Accountant, a Certified Fraud Examiner and am Certified in Financial Forensics. I have provided forensic accounting, litigation support, and management consulting services since 1994. My experience, education and professional involvement is more detailed in my current curriculum vitae, included as Exhibit A.

I am a member of the American Institute of Certified Public Accountants ("AICPA"), the professional associate that provides guidance for over 400,000 CPA professionals in the United States. Since 2013, I have served as the Chair of the AICPA's Forensic and Litigation Services ("FLS") Committee. The FLS Committee provides guidance to AICPA Forensic and Valuation Services Section members.

I am a member of the California Society of Certified Public Accountants ("CalCPA") where I serve as the Chair of the statewide Professional Conduct Committee and as member of the statewide Steering Committee for the Forensic Services Section. I am also an instructor of Forensic Accounting at UC Davis Extension in their Accounting Certificate Program.

IV. **Background - Timeline and Parties**

Mark Feathers is the founder and former manager of several fund entities that specialized in SBA lending (collectively, "Funds"). He was also the majority shareholder of the corporation that served as the manager of the Funds, SBCC.

At all times relevant to the formation and operation of the Funds, CPA Jeffrey Spiegel and his related firms provided annual audit and tax return preparation services to the Funds.

The indictment in the current matter follows a civil complaint filed by the SEC against Mark Feathers ("MF") and related entities on June 21, 2012 for various violations of the US securities acts. SBCC and Fund entity assets were seized and a temporary receiver, the Thomas Seaman Company, was installed on June 26, 2012. By July 10, 2012, the receiver was made permanent.

Several SEC-issued declarations/pleadings were filed during the approximately 19 days between the original complaint filing and the final order that included the installment of a permanent receiver.

An Order Granting the SEC's Motion for Summary Judgment was filed on 8/16/2013. The Order outlines several bases for the decision as detailed in the civil matter action as Document_591.

Chart 1, below, is an Organization Chart that includes entity names and acronyms used throughout this document.

**Chart 1**



V.  **Records Considered**

   A detailed list of records provided for my review in conjunction with this matter is included at Exhibit B to this document. In general, the relevant records include:

   1. Various filings, declarations, and exhibits related to the civil case by the SEC
   2. Fund offering documents and operating agreements
   3. Audited Financial Statements of SPF, IPF, SBC LLC (subsidiary of IPF) and SCMF for the years ended December 31, 2008 through December 31, 2010
   4. Draft Audit Reports and Financial Statements for SPF, IPF, SBC LLC, and SCMF for the year ended December 31, 2011
   5. Tax Returns of IPF, SPF, and SCMF for the
   6. Tax Returns of SBCC (the funds' manager) for 2009-2010
   7. Mortgage Pool Statements (from ABS, system that manages investors and loans)
   8. QuickBooks Company Data

VI. **Primary Citation of Cash "Advances" Claimed in MSJ (and Mitchell Declaration, Document 479)**

   The following "Table 1" appears in the order granting the Commission's MSJ. This table was reported in the declaration of Commission employee Sarah Mitchell, a paralegal (civil case Document no. 479). In Ms. Mitchell's declaration, she identifies the method used to create the schedule as being based on print-outs of the general ledger for the Investors Prime Fund, LLC ("IPF") and Small Business Capital Portfolio Fund, LLC ("SPF") "*which were produced to the Commission by the Receiver*."

   The method described represents a summation of all check payments from IPF and SPF, collectively the Funds, to the Manager, SBCC. The inverse, monies that were deposited into a Fund bank account by the Manager, SBCC, does not appear to have been taken into account.[1] There is also no reference to the GAAP-basis audited financial statements for the Funds which reflect the financial transactions between the Fund and Manager as well as provide detail disclosure about the nature and timing of payments by the Fund to the Manager.

---

[1] For example, the IPF general ledger (from QuickBooks) reflects a sum of four interest payments by Manager SBCC to IPF for a total of $244,661 as a reduction to the accrued interest receivable of $324,623 during the years 2011-2012. See Exhibit E, IPF General Ledger Export page 42.

Table 1

| Table 1: Gross Cash Transfers From Funds to SBCC from January 1, 2009 through Date of Receivership ||||||
|---|---|---|---|---|---|
| Year | Fund | Ledger Acct. No. | Ledger Acct. Name | Cash Paid to SBCC | Source |
| 2009 | IPF | 1770 | Syndication Expense (2009) | $100,000.00 | A-00624 |
| 2009 | IPF | 1725-22 | Loan 65 | $100,000.00 | A-00626 |
| 2009 | IPF | 1725-20 | Loan 300001 | $152,148.37 | A-00627 |
| 2009 | IPF | 1780-4 | Organizational Expenses | $200,000.00 | A-00632 |
| 2009 | IPF | 6550-2 | Management Fees – SB Capital | $439,500.00 | A-00789-90 |
| 2009 | SPF | 6550 | Management Fees | $63,780.00 | A-01212-3 |
| 2009 | SPF | 2050 | Capitalization of Contract | $540,000.00 | A-01169 |
| 2010 | IPF | 1250 | LT Rec – Fund Mgrs Organ Invt | $1,374,047.14 | A-00882 |
| 2010 | SPF | 1220 | Due From Manager | $175,000.00 | A-01273-4 |
| 2011 | IPF | 5020 | Fund Management Fees | $100,000.00 | A-00959-60 |
| 2011 | IPF | 1250 | LT Rec – Fund Mgrs Organ Invt | $2,930,000.00 | A-00882-3 |
| 2012 | IPF | 1250 | LT Rec – Fund Mgrs Organ Invt | $400,000.00 | A-00882-3 |
| 2012 | SPF | 5020 | Fund Management Fee | $922,927.00 | A-01322 |
| Total | | | | $7,497,402.51 | |

### VII. Summary of Analysis and Observations

My analyses of the specific cash outflow from IPF and SPF as listed in Table 1 include the following observations.

A. <u>The Cash Basis Accounting Method Differs Significantly from the Generally Accepted Accounting Principles (GAAP) Accounting Method</u>

The Receiver used a cash-basis method of accounting that was inconsistent with the Funds' required Generally Accepted Accounting Principles ("GAAP") basis of accounting, as stated in the offering documents and operating agreements. The Receiver has indicated that the version of QuickBooks received did not contain complete records prior to 2010.[2] The Receiver appears to have recreated the accounting records on a cash basis using the bank records as the source of information. However, for the same time periods in which the Receiver sought to create cash basis accounting records, there were GAAP-compliant audited financial statements available. It is not clear why the Receiver did not use the audited financial statements and the underlying trial balance detail data from the external independent auditor, Spiegel Accountancy Corporation ("SAC"), a Certified Public Accounting firm, as the source for the accounting analysis.

---

[2] Receiver's Second Interim Report dated 8/10/2012.

Often in cases where a claim of fraud is made and there are not reliable financial accounting records, an accountant will seek to analyze records from a pure cash basis and perform a simple "Source and Use of Funds" analysis. While this exercise is helpful for determining where the funds came from and where they went, there are shortcomings with regard to using those results as a measure against GAAP-based financial statement elements.

A primary example of this issue is with regard to the collection of entries that have been cast as being part of the "Loans to Manager" issue. Under GAAP, those loans (monies advanced by the Fund to the Manager) are an asset of the Fund. Under Cash Basis, those funds represent an expense of the Fund which decreases the net income or net proceeds on a Profit and Loss statement.

In specific, there are disclosures and explanations in the audited financial statements, QuickBooks accounting records, and auditor-prepared workpapers that are counter to the $7.497 million portrayed as "Misstatements Regarding Fund Loans and Money Transfers".[3]

B. Offering Documents' "Use of Proceeds" Section Includes Provision for Payment by the Fund to the Manager for Organizational Expenses

Several parts of the offering documents put the reader on notice about the authority and potential conflicts with the Manager SBCC. For example, the Table of Contents to the January 28, 2011 offering document includes sections entitled RISK FACTORS, COMPENSATION TO MANAGER AND ITS AFFILIATES, CONFLICTS OF INTEREST, and USE OF PROCEEDS.

In particular, the SUMMARY OF THE OFFERING states that "*The Manager can change a portion of the organization and syndication accruals which <u>have been, or may be incurred in the year 2010 and afterwards</u>, and separate from any similar prior year's accruals, <u>up to 1% of the Fund's maximum capitalization of $250,000,000</u>, from a capital asset to a receivable from the Manager.*"[4] The change referenced above equates to $2,500,000 while the limits stated in the Use of Proceeds section (see below for details from each Fund's offering documents) reference a 2% anticipated maximum which equates to $5,000,000. IPF did not exceed the maximum during the 2011 year according to the draft audited financial statements, audit workpapers, and the internal QuickBooks balance sheet report.

The offering documents include provisions whereby the Fund could advance up to a set percentage of the funds' maximum capitalization amount. Based on review of the Use of Proceeds portion of various Fund offering documents, the approximate uses are outlined as being for Organizational/Syndication Expenses, Mortgage Loans, and Reserves. The introductory paragraph indicates that the figures set forth "are only estimates, and actual use of the proceeds will vary."[5] The maximum limit of the advances to Manager related to organization/syndication expenses are represented as:

*Related to IPF*
1. The June 9, 2010 offering document for IPF contained a provision for the capitalization of organization and syndication costs of up to 1% of the maximum fund capitalization of $100 million ($1,000,000 limit) [Bates SBCC010348].

---

[3] Civil case Order Granting Plaintiffs' Motion for Summary Judgment (case 5:12-cv-03237-EJD Document 591 page 8 line 12)
[4] Bates page SAC00000621 (and Case 5:12-cv-0237-EJD Document 480, Exhibit 26-12)
[5] Bates SBCC0011666 (also civil Case 5:12-cv-03237 Document 9-3, page 31 of 59)

2. The January 28, 2011 offering document for IPF modified that provision to 2% of the maximum fund capitalization of $250 million ($5,000,000 limit) [Bates SBCC006960].

3. The June 29, 2011 offering document for IPF reflected another modification to 2% of the maximum fund capitalization of $500 million ($10,000,000 limit) [Bates SBCC006911].

*Related to SPF*

4. The December 28, 2009 offering document for SPF reflects that up to 2% of the maximum fund capitalization of $50,000,000 (a $1,000,000 limit) may be advanced to the Manager [Bates SBCC007611].

5. The January 25, 2011 offering document for SPF reflects that up to 2% of the maximum fund capitalization of $50,000,000 (a $1,000,000 limit) may be advanced to the Manager [Bates SBCC007611].

It appears that the auditor used the maximum capitalization amount in audit procedures to test the Fund's compliance with the Use of Proceeds provision of the offering and operating agreement.

C. The Advances/Payments to Manager Were Fully Disclosed in the Funds' Audit Reports

For the years ended December 31, 2009 and 2010, the amounts that were recorded by the Funds as capitalized costs (an asset) were reported as either a capitalized cost asset or, later, as part of the Note Receivable-Manager or Due From Manager (another asset) in the audited financial statements of SPF and IPF. The various offering documents for IPF and SPF specified that annual reports including audited financial statements would be provided at investor's request [example for IPF is as of 1/28/2011, Ex. 26-1 thru 26-38].

Email communications between MF and the auditor reveal that between April 2010 and July 2010 there was a change in the CPA's interpretation of accounting rules that guide the types of costs that may be capitalized as organization/syndication costs. The auditor advised MF that the types of costs being reimbursed by the Fund to the Manager did not constitute "syndication" costs but rather a return of member equity. This change in position occurred between April and July of 2010. The auditor issued the **2009 IPF** audit report in April 2010 which included Syndication Costs as an asset of the Fund. Then, by the time the **2009 SPF** audit report was issued in July 2010 the capitalized costs were reported as a Due From Manager asset (as opposed to a capital cost asset). In both the IPF and SPF audit reports, the auditors' opinion was that the financial statements present fairly, in all material respects, the financial position of the Funds.

1. SPF 2009 Audit Report and Financial Statements Note 6, Related Party Transactions, disclosure includes:

> Due to Related Party
>
> During the year ended December 31, 2009, advanced $534,736 to the Fund manager. This receivable from the fund manager is unsecured, has a 5 year term and bears an interest rate of 5% per annum. Payments of $25,000 per quarter, principal and interest, will begin on January 1, 2011. The receivable from the fund manager is in violation of the Fund's operating agreement and offering circular. Subsequent to December 31, 2009, the Fund Manager is in the process of obtaining approval of this receivable from the Fund members.

The auditor workpaper entitled "Contract Capitalization" and "Interest and Other Receivables" demonstrate that the final balance of $534,736 amount is comprised of two components: (a) the 2009 advances for syndication costs of $490,000 that the "auditor noted that the syndication fees incurred during the year were not in accordance with the offering circular for the period ended 12/31/2009, therefore auditor will record AJE#104 to adjust the syndication fee balance to a receivable from fund manager balance"[6] and (b) an auditor-proposed adjustment (reclassification from management fee expense to receivable) for the previously recorded management fee expense of $63,780[7] (along with a few other adjustments) for an ending balance of $534,736.

Based on the audit report supplemented by the auditor workpapers, it appears that the reported amount Due from Manager of $534,736 was accurately stated. As such, it appears that the $540,000 amount included in Table 1 was known, audited and adjusted by Spiegel/SAC and, therefore, not misrepresented by MF or the Fund.

2. SPF 2010 Audit Report and Financial Statements Note 7, Related Party Transactions, disclosure includes details about the amount and terms of the note due from manager.[8] Specifically, the Note includes details about the non-GAAP requirement to assess collectability of the receivable and the balance and terms of the promissory note as illustrated below:

> NOTE 7 - RELATED PARTY TRANSACTIONS (CONTINUED)
>
> Note Receivable from Manager
>
> The Fund does not account for its note receivable from Manager in accordance with generally accepted accounting principles (GAAP), which would require the Fund to assess the carrying value of the note receivable for fair value impairment due to the unsecured nature of the note and the lack of certainty of cash flows of the Manager. The Fund carries the note at the full value of the cash advanced to the Manager under the note.
>
> As of December 31, 2010, $707,464 has been advanced to the Fund manager under the promissory note agreement. The note is unsecured, and bears an interest rate of 7.5% per annum beginning on January 1, 2011. Payment of interest is due quarterly beginning on March 31, 2011 with all principal due on or before January 1, 2016. The receivable from the Fund manager is prohibited by the Fund's operating agreement and offering circular. The Fund manager is currently preparing a revision to the operating agreement.

The $175,000 reflected as having been transferred to SBCC by SPF in 2010 for "Due From Manager" is included in the audited transactions that result in the balance of $707,464. The details transactions comprising the $175,000 are detailed in the SPF Company QuickBooks file as well. See Exhibit C for an excerpt of the SPF General Ledger detail for

---

[6] Civil case 5:12-cv-03237-EJD Document 480-5 page 75 of 105
[7] Civil case 5:12-cv-03237-EJD Document 480-5 page 79 of 105
[8] Bates page SBCC004905 (also civil case 5:12-cv-03237-EJD Document 480-4, Ex. 28-16)

account no. 1220, Due From Manager. As such, it appears that the $707,464 amount included in Table 1 was known, audited and disclosed by Spiegel/SAC and, therefore, not misrepresented by MF or the Fund.

3. SPF 2011 Audit Report Draft and Financial Statement Note 10, Related Party Transactions, includes disclosures about the current year balance in Due From Manager of $690,868. Similar to prior years, the note disclosure includes the balance and terms of the note. [9]

   The balance in the 2011 SPF Due from Manager decreased from the prior year. As such, there are no advances listed on Table1. It should be noted that the QuickBooks General Ledger details of the SPF account 1220, Due From Manager, and account 1215, Interest Receivable on Due From Manager, reflect over $50,000 of deposits made to the Fund from the Manager.[10] The 2011 audit was never issued but based on the draft report and audit workpapers, the majority of the auditing procedures had been completed. Review of the audit workpapers for the 2011 audit of SPF, some of which were provided to me on August 11, 2016, is not complete and may provide additional insights.

4. IPF 2009 Audit Report and Financial Statements Note 4, Capitalized Costs, include disclosure about the Capitalized Cost asset balance of $353,779 as of 12/31/2009. There are two transactions for a total of $300,000 listed in Table 1, represented as advances by IPF to the Manager SBCC. The audited financial statements in Note 4 shows that there was a $300,000 increase in Syndication Costs (a component of the Capitalized Cost asset). Note 4 provides details about the composition, amounts reimbursed by the Fund to the Manager, and related amortization of the asset.

   Below is an excerpt from Note 4 of the IPF 2009 Audited Financial Statement:[11]

---

[9] Civil case 5:12-cv-03237-EJD Document 480-5 Page 46 of 105
[10] Exhibit C, Excerpt of QuickBooks General Ledger export report
[11] Bates page SBCC002960 and SBA-027262

Page 9 of 18

**NOTE 4 -  CAPITALIZED COSTS, NET**

Capitalized Costs as shown in the summary below represent Fund disbursements for expenditures incurred during the organization and structuring of the fund and costs of raising long term capital investments. These costs are amortized on a straight line basis over the estimate period that the fund will benefit from the incurred costs. Under the terms of the Offering Circular, the fund manager is entitled to reimbursement from the Fund for all out-of-pocket organization and syndication expenses. The Offering Circular allows for a total reimbursement of 5% of the total Fund capitalization to a maximum of $500,000. To date the Fund has reimbursed the Manager a total of $383,929 for organization and syndication costs.

|  | 2009 | 2008 |
|---|---|---|
| Organization Costs | $ 33,929 | $ 33,929 |
| Restructuring Costs | 51,670 | 51,670 |
| Syndication Costs | 350,000 | 50,000 |
| Total Capitalized Costs | 435,599 | 135,599 |
| Accumulated Amortization | (81,820) | (27,202) |
| Total Capitalized Costs, Net | $ 353,779 | $ 108,397 |

**Organization Costs** – These were incurred when the fund was first organized and represent legal fees and the costs associated with the initial Fund offering.

**Restructuring Costs** – These were incurred when the fund separated from its previous manager restructured into the current fund. These costs represent legal fees and expenditures related to revisions in the offering circular and management agreement.

**Syndication Costs** – These are the reimbursements to the Fund Manager for his costs in developing and raising additional capital investments.

Amortization charged to fund operations for the years ended December 31, 2009 and 2008 was $54,948 and $18,345, respectively.

The transactions cited in Table1 are consistent with the IPF Company General Ledger details as well. See <u>Exhibit E</u> for the general ledger detail for IPF exported from QuickBooks, page 44 includes the account 1653, Syndication Costs.

Given the audited financial statements, which is consistent with the IPF QuickBooks general ledger details, it appears that the $300,000 amount included in Table 1 was known, audited and disclosed by Spiegel/SAC and, therefore, not misrepresented by MF or the Fund.

5. IPF 2010 Audit Report[12] and Financial Statements Note 11, Related Party Transactions, disclose details about the amount and terms of the note due from manager.[13]  The reported balance of the Note Receivable from Fund Manager is $1,850,000 as of 12/31/2010.  This balance includes $350,000 from the prior year which were reported as part of Capitalized Cost asset which were reclassified to the Note Receivable Due from Fund Manager as of the end of 2010.

Specifically, the Note includes that the funds were advanced the the Fund Manager, that the note is unsecured, and that the receivable was "…*prohibited by the Fund's operating agreement and offering circular, which has been amended and approved by the*

---

[12] Bates page SBCC002966 (and Government Exhibit 11 dated 5-14-12)
[13] Bates page SBA-027247

*Department of Corporations in November 2010.*"[14] An excerpt from the audit report, Note 11 is below:

> **Investors Prime Fund, LLC and Subsidiary**
> **Notes to Consolidated Financial Statements**
> **Years Ended December 31, 2010 and 2009**
>
> **NOTE 11 -   RELATED PARTY TRANSACTIONS (CONTINUED)**
>
> Note Receivable from Manager (Continued)
>
> As of December 31, 2010, $1,850,000 has been advanced to the Fund manager under the promissory note agreement. The note is unsecured, and bears an interest rate of 7.5% per annum beginning on January 1, 2011. Payment of interest is due quarterly beginning on March 31, 2011 with all principal due on or before January 1, 2016. The receivable from the Fund manager was prohibited by the Fund's operating agreement and offering circular, which has been amended and approved by the Department of Corporations in November 2010.

Table 1 includes advances of $1,374,047 being made during 2010 from IPF to SBCC. This amount is consistent with the prior year balance of $350,000 and the current year, 12/31/2010, ending balance of $1,850,000. The general ledger exported detail for IPF is consistent with the total amount listed in Table1 as well as the supporting details listed in the exhibits to Sarah Mitchell's declaration (Document 479, Exhibit 220-7 and 220-8).

Given the audited financial statements, which are consistent with the IPF QuickBooks general ledger details, it appears that the $1,374,047 amount included in Table 1 was known, audited and disclosed by Spiegel/SAC and, therefore, not misrepresented by MF or the Fund.

6. IPF 2011 Draft Audit Report Note 12[15] and Workpaper for Due From Fund Manager Lead Sheet[16] and Offering Circular Provide Amounts and Details About the Advances.

The 2011 audit was never issued but based on the draft report and audit workpapers, the audit testing and procedures had been substantially completed.  The Note 12 disclosure on the draft audit report states the balance of $4,863,479 as having been advanced, that the note is unsecured and bears interest at 7.5%. The note also indicates that "*Prior to July 2011, the note receivable from the Manager was prohibited by the Fund's operating agreement and offering circular. The operating agreement has been amended and approved by the Department of Corporations to allow the note receivable from Manager up to 1% of the Fund's maximum capitalization of $500,000,000 or $5,000,000, but the offering circular was not amended and still prohibits the receivable from Manager.*"[17]  The basis for the Spiegel statement that the offering circular prohibited the receivable because the June 29, 2011 IPF Offering Circular indicates that up to 2% of the Fund's maximum capitalization of $500,000,000 proceeds may be used for Organizational Expenses (or $10,000,000).

---

[14] Bates page SBA-027247
[15] IPF 2011 draft audited financial statements' Note 12 is Exhibit 46-15 of civil case 5:12-cv-03237 Document 480-5
[16] SAC 2011 audit workpaper Due From Fund Manager LS (Lead Sheet) is Bates page SBA-000085
[17] IPF 2011 draft audited financial statements' Note 12 is Exhibit 46-15 of civil case 5:12-cv-03237 Document 480-5

Below is an excerpt from the June 29, 2011 Offering Circular (Case 5:12-cv-03237-EJD, Document 9-2, page 54 of 59):

**USE OF PROCEEDS**

The proceeds from the sale of Units offered hereby will be used approximately as set forth below. The figures set forth below are only estimates, and actual use of proceeds will vary.

|  | Minimum Offering | Percentage | Maximum Offering | Percentage |
|---|---|---|---|---|
| Organizational Expenses | $10,000 | 2% | $10,000,000 | 2% |
| Mortgage Loans[1] | $490,000 | 98% | $490,000,000 | 98.0% |
| TOTAL | $500,000 | 100.0% | $500,000,000 | 100.00% |

In either case, the Note Receivable from Manager balance at the end of 2011 was less than $5,000,000. The audit workpaper demonstrating the audit procedures performed over the 2011 IPF Due From Fund Manager is attached as Exhibit D to this report. The audit workpaper, Note A includes a statement that although the balance is in accordance with the note receivable, the auditor does not believe the balance is in accordance with the offering circular/operating agreement. The auditor's conclusion noted their workpaper (Note A on the workpaper noted above) was a plan to note the non-compliance on the auditor's opinion and in the Notes to the financial statements (as had been done in prior years).

Counter to the auditor's notation in their workpapers regarding the offering circular, the Offering Circular as of January 28, 2011, indicates that a portion of the funds advanced as reimbursement of organizational costs may be reflected as a note receivable on the Fund balance sheet. Below is an excerpt from the IPF Offering Circular:

Tax and Accounting Treatment ……. The Manager can change a portion of organizational and syndication accruals which have been, or may be incurred in the year 2010 and afterwards, and separate from any similar prior year's accruals, up to 1% of the Fund's maximum capitalization of $250,000,000, from a capitalized asset to a receivable from the Manager. This may eliminate substantial portion of the tax schedule amortization of these expenses and increase earnings. The receivable will be reduced annually over a period of 5 years from Manager contributions, and also generate additional interest earnings to the Fund at the preferred yield of 7.5%.

D. The 2010 Audit Report Opinion Was Qualified Due to Inability to Assess Collectability of Receivable from Fund Manager, Not Due to Impropriety of Fund Advances

The 2010 audit report opinion is qualified for both IPF and SPF. However, the only reason stated for the qualified audit opinion on both audit reports is the Fund's inability to assess the collectability of the receivable due from the Manager to determine whether an allowance would be required against the receivable, which is a departure from GAAP. By definition, a GAAP departure will result in a qualified audit opinion. The audit report opinion references the related Note disclosure that more fully explains the situation.

The **IPF 2010** audit report includes that "…the Fund is unable to assess the collectability of the note receivable from the fund manager and thus cannot determine whether an allowance for

loss is necessary which reflects a departure from generally accepted accounting principles."[18] Reference is made to Note 11 which states the balance and terms of the note including that "the receivable was prohibited by the Fund's operating agreement and offering circular which **has been amended and approved by the Department of Corporations in November 2010**." Importantly, the Note details and audit workpaper documentation provide qualifications as to the collectability of the note, not the validity of the note being recorded as an asset of the Fund. Further, the auditor's reference to the approval by the Department of Corporations appears to support the propriety of the receivable asset being recorded on the balance sheet of the Fund.

The **SPF 2010** audit report includes that "…the Fund is unable to assess the collectability of the note receivable from the fund manager and thus cannot reasonably determine whether an allowance for loss is necessary…" Reference is made to Note 7 which states the balance and terms of the note including that "the receivable from the Fund manager is prohibited by the Fund's operating agreement and offering circular. The Fund manager is currently preparing a revision to the operating agreement."

First, the balance and terms of the receivables are fully disclosed. Second, the auditor provided an opinion that the receivable is not in compliance with GAAP due to an inability to assess the collectable value to determine whether an allowance should be recorded. Third, the Notes disclose that the receivable may not have been in compliance with offering documents. Importantly, neither the auditor's opinion or Note details identify the nature of costs reimbursed by the Funds as being improper.

E. <u>Permission was obtained by the Manager from the Fund investors to reclassify the capital cost asset. The request was to reclassify the capitalized as a Note Receivable from Manager.</u>

Despite several parts of the various offering documents which convey the broad authority and responsibility of the Manager, the Manager still sought to disclose and obtain investor approval of changes in the Fund operations and accounting.

For example, there is language in the various offering documents that the Use of Proceeds indicate an approximate portion of the proceeds will be used for "Organizational Expenses", but that the actual use of proceeds will vary. Specific communications related to the "Loans to Manger" topic include:

1. Letters were sent by MF to Fund investors in August 2010 explaining the Manager's reasoning for re-classifying the Organization/Syndication as Loans to Manager and requesting approval.[19]

    "Request No. 1 – SB Capital would assume accrued IPF organizational and syndication expenses, *up to 1% of the fund manager's maximum approved capitalization now and in the future* for the fund…" and "…pay for these expenses through contributions from fund manager's income."[20]

---

[18] IPF 2010 audited financial statements
[19] Bates page SBCC011137 (also civil case 5:12-cv-03237 Document 480-2, Ex. 25-2), and Bates page G 00521 (also civil case 5:12-cv-03237 Document 9-8, page 14 of 59)
[20] ibid

The letter includes another reference to a similar measure having been approved by the Fund CPA and implemented for SPF. As of the date of this letter, August 16, 2010, the SPF audit report for 2009 recently been issued (July 14, 2010)[21] whereby the previously recorded Organization & Syndication capital asset was reported as part of the Due From Manager receivable. It is not unreasonable to infer the CPA had approved of the measure since the auditor provided SPF with a clean (unqualified) audit opinion for the financial statements in which the CPA auditor re-classified the syndication asset to a receivable asset.

2. An updated operating agreement was sent with the requests so it could be considered along with the letter explanation.

F. <u>The Monies Paid to SBCC which are reflected as Management Fee Expenses in Table 1 Do Not Comport with Audited Financial Statements (Income Statement).</u>

1. Table 1 reflects an advance of $63,780 by SPF in 2009 for Management Fees. However, the audit reports for SPF state that there were no management fees paid by SPF to SBCC. The SPF 2010 Audit Report Note 7, Related Party Transactions, states that "There were no management fees incurred during the years ended December 31, 2010 and 2009."[22] Excerpt from the audit report follows:

> Management Fees
>
> The Manager shall receive subordinated monthly distributions from the Fund in amounts equal to the remainder of funds available for distribution after all allocations of the higher of prime rate published in the Wall Street Journal as of the last business day of the month, plus 1.5%, or 7.50% (the "floor rate") has been made first to the Members, and after payment of Fund expenses. <u>There were no management fees incurred during the years ended December 31, 2010 and 2009.</u>

An adjustment must have been made at or after the year end to remove the management fee expenses from SPF books for 2009. Since the calculation of earnings and related investor distributions was done on a monthly basis, there may have been payments made during the year (the excess of earnings over the distributions) which were not warranted once the full year was measured.

2. Advancement and later repayment by the Manager to the Fund is outlined in the offering documents. Under Manager's Subordinated Profits Interest in the SPF January 25, 2011 Private Placement Memorandum ("PPM") states that the Manager would may monthly distributions from the Fund. These monies were subject to return if the year-end calculations demonstrate the Fund profits allocated to Members was less than the Member Return. An excerpt from the SPF PPM[23] includes:

---

[21] Spiegel Declaration civil case5:12-cv-03237 Document 480 paragraph 42 (email from Ms. Thomas dated 7/14/2010 stating that the SPF 2009 Audit Report would be issued "today")
[22] Bates page SBCC004904
[23] Bates page SBCC0011724

Page 14 of 18

> **Manager's Subordinated Profits Interest**
>
> The Manager shall receive subordinated monthly distributions from the Fund in amounts equal to the remainder of the Fund's net income after all Fund expenses and all allocations of the Member Return to the Members. The Manager is required to disgorge such monthly distributions only if and to the extent that it is later determined, as of the end of that same calendar year, that total Fund profits allocated to Members for that year was less than the Member Return. The Manager does not guaranty the Member Return, and is not required to disgorge any distributions to subsidize the Member Return in later years.

3. Table 1 reflects $439,500 advanced by IPF in 2009 as being paid for Management Fees. However, according to the audited financial statement, there were no management fee expenses in 2009.[24]
   Below is an excerpt from the IPF audited financial statements:

   **Investors Prime Fund, LLC**
   **Statements of Income**

   | | Years Ended December 31, | |
   |---|---|---|
   | | 2009 | 2008 |
   | Mortgage Interest Income | $ 725,733 | $ 690,365 |
   | Operating Expenses: | | |
   | Advertising and Marketing | - | 26,426 |
   | Amortization Capitalized Costs | 54,948 | 17,974 |
   | Amortization SBA License Costs | 3,669 | 371 |
   | Consulting | 66,698 | 1,200 |
   | Insurance | 25,940 | 8,508 |
   | Management Fees | - | 72,500 |
   | Meals and Entertainment | - | 1,770 |
   | Miscellaneous Fees | 10,618 | 8,251 |
   | Professional Fees | 44,922 | 39,875 |
   | Total Operating Expenses | 206,795 | 176,875 |
   | Income from Operations | 518,938 | 513,490 |

   An adjustment must have been made at or after the year end to remove the management fee expenses from IPF books for 2009. Since the calculation of earnings and related investor distributions was done on a monthly basis, there may have been payments made during the year (the excess of earnings over the distributions) which were not warranted once the full year was measured.

4. Table 1 reflects $100,000 advanced by IPF to Manager for 2011 Fund Management Fees. While there was originally $100,000 advanced according to the QuickBooks accounting details for IPF, that amount was not reported on the draft audited financial statements for 2011.[25] As such, an adjustment must have been made by the auditor. An excerpt from the Note 12, Related Party Transactions, includes:

> **Management Fees** 
>
> The Manager shall receive monthly distributions from the Fund in amounts equal to the remainder of funds available for distribution after all allocations of the higher of Prime Rate or 7.5% (the "floor rate") has been made first to the members, and after payment of Fund expenses. During the year ended December 31, 2011, no management fees were earned.

---

[24] Bates page SBCC002956 (and SBA-027257)
[25] Reference civil case 5:12-cv-03237-EJD, Document 480-5, Exhibit 46-16

5. Table 1 also reflects $922,927 as having been advanced by SPF as Fund Management Fee expense in 2012. There is no SPF audit report since it was mid-year at the time of the asset seizure. The SPF 2012 General Ledger details reflect expenses (payments and journal entries) to Manager, SBCC, as Management Fee expense of $1.17 million between January 1, 2012 and May 31, 2012. The SPF Profit & Loss Statement generated out of the QuickBooks file shows a Net Income of $522,199 for the partial year (through May 31st). The detail entries to Fund Management Fees (account no. 5020) include payments by IPF to SBCC for "Excess Earnings" and "Management Fees" which appear to have been paid periodically in 2012. See Exhibit G for the SPF Profit & Loss Report and detail transactions within the Fund Management Fees account generated from QuickBooks for 2012.

Should the year have continued, a year end recalculation and true-up, if needed, would have been made as in the prior years. Given the incomplete accounting for 2012, the advances listed on Table1 for 2012 as management fees paid by SPF in the amount of $922,927 would require further analysis to determine whether they are a proper expense of the SPF Fund.

G. Table 1 of the MSJ Order Does Not Consider Monies Advanced/Paid for Troubled Properties as Allowable (Loan 65 and 300001) Despite Language in Offering Circular Related to Loans to Manager.

The two amounts listed on Table1 as having been advanced in 2009 for "Loan 65" and "Loan 300001" are $100,000 and $152,148, respectively. Based on information contained in the Spiegel declaration, there is some question as to the status of these loans and the related property.

At this time, the two amounts have been listed as "pending" further analysis since the IPF Company QuickBooks begins with 2010 details, an analysis of the 2009 audit workpapers is necessary to corroborate the details surrounding these advances. At this time, the analysis of the audit workpapers is pending as these were provided recently among over 5,000 pages of PDF documents and multiple native files.

However, if it is shown that the monies paid by IPF to Manager SBCC were related to troubled loan property, there are provisions in the offering documents which permit those transactions.

As early as 2007, the Fund offering documents have contained provisions for advances to the Manager for purposes of financing related to a sale of real estate owned ("REO") or loans purchased as a result of foreclosure.

For example, an excerpt from the SPF offering document from July 26, 2007[26] contains this statement:

> 6. **No Loans to Manager**. No loans will be made by the Fund to the Manager or to any of its affiliates, except for any financing extended as part of a sale of real estate owned or loans purchased as a result of foreclosure. (See "Conflicts of Interest – Sale of Real Estate Owned to Affiliates.")

Similar language is included in the majority of subsequent offering documents.

---

[26] Bates page SBCC011654 (and civil case 5:12-cv-03237 Document 9-3 page 19 of 59)

Page 16 of 18

As early as 2008, the offering documents included a provision outlining the process for defaulted loans or real estate owned. Below is an excerpt from the IPF Offering dated March 11, 2008[27] which provides:

> **Sale of Defaulted Loans or Real Estate Owned to Affiliates**
>
> In the event a Fund loan goes into default or the Fund becomes the owner of any real property by reason of foreclosure on a Fund loan, the Manager's first priority will be to arrange the sale of the loan or property for a price that will permit the Fund to recover the full amount of its invested capital plus accrued but unpaid interest and other charges, or so much thereof as can reasonably be obtained in light of current market conditions. In order to facilitate such a sale, the Manager may arrange a sale to persons or entities controlled by or affiliated with the Manager (e.g., to another entity formed by the Manager or its affiliates), for the express purpose of acquiring defaulted loans or foreclosure properties from lenders such as the Fund. The Manager will be subject to conflicts of interest in arranging such sales since it will represent both parties to the transaction. For example, the Fund and the potential buyer will have conflicting interests in determining the purchase price and other terms and conditions of sale. The Manager's decision will not be subject to review by any outside parties.
>
> The Manager shall undertake to resolve these conflicts by setting a purchase price for each defaulted loan or property which is not less than any of the following: (i) the independently appraised value of such loan or property, if any, at the time of sale; (ii) the amount of any third party offer already received, if any; or (iii) the total amount of the Fund's investment in the property. The Fund's investment is deemed to include without limitation the following: the unpaid principal amount of the loan upon which the Fund foreclosed, all unpaid interest accrued to the date of foreclosure, expenditures made to protect the Fund's interest in the property such as payments to senior lienholders and for insurance and taxes, all costs of foreclosure (including attorneys fees actually incurred to prosecute the foreclosure or to obtain relief from stays in bankruptcy), and any advances made by or on behalf of the Fund for any of the foregoing. A portion of the purchase price may be paid by the affiliate executing a promissory note in favor of the Fund, secured by a deed of trust on the property being sold. The total loan-to-value ratio for the property (including the Fund's note and any senior liens) will not exceed 90% of the appraised value of the property, and the note will otherwise contain terms and conditions comparable to those that would be contained in notes executed by third parties.

Again, if the 2009 audit workpapers reflect that the purpose of the two advances cited on Table 1 for Loans 65 and 300001 are related to troubled assets, the funds may have been properly advanced and recorded.

H. The Advances by IPF to Manager Continued in 2012 Under the Provisions Outlined in the Offering Documents and Operating Agreements

By the start of the 2012 calendar year, the operative offering document provided for The amounts listed in Table1 as 2012 advances by IPF to the Manager of $400,000. The IPF balance sheet from the IPF QuickBooks records show that the balance of the Note Receivable Due from Manager as of May 31, 2012 included the advances of $400,000 as well as some re-payments (where excess earnings was recorded as a reduction to the receivable rather than a deposit).

Since the 2012 year was incomplete, final review and adjusting entries have not been completed or recorded in the financial records. As such, the $400,000 reported as advances made by IPF in 2012 as Notes Receivable From Manager on Table1 would require further analysis to determine whether they are supported by the operating agreements and disclosures to investors.

---

[27] Bates pages SAC00006719 and SBA-003852

VIII. **Summary of Adjusted Table1**

Based on the foregoing analyses and observations, I recreated the Table1 from Sarah Mitchell's declaration and made adjustments to reflect the above analyses.

| Year | Fund | GL Acct. No. | GL Account Name | Source | Cash Paid to SBCC | Adjustment | Net | VII. Summary Reference |
|---|---|---|---|---|---|---|---|---|
| 2009 | IPF | 1770 | Syndication Expense (2009) | A-00624 | $ 100,000.00 | $ (100,000.00) | $ - | C., E. |
| 2009 | IPF | 1725-22 | Loan 65 | A-00626 | $ 100,000.00 | | $ 100,000.00 | G. Pending |
| 2009 | IPF | 1725-20 | Loan 300001 | A-00627 | $ 152,148.37 | | $ 152,148.37 | G. Pending |
| 2009 | IPF | 1780-4 | Organizational Expenses | A-00632 | $ 200,000.00 | $ (200,000.00) | $ - | C., E. |
| 2009 | IPF | 6550-2 | Management Fees - SB Capital | A-01212 -3 | $ 439,500.00 | $ (439,500.00) | $ - | F.3 |
| 2009 | SPF | 6550 | Management Fees | A-00789-90 | $ 63,780.00 | $ (63,780.00) | $ - | F.1 |
| 2009 | SPF | 2050 | Capitalization of Contract | A-01169 | $ 540,000.00 | $ (540,000.00) | $ - | C. |
| 2010 | IPF | 1250 | LT Rec-Fund Mgrs Organ Invt | A-00882 | $ 1,374,047.14 | $ (1,374,047.14) | $ - | C., E. |
| 2010 | SPF | 1220 | Due From Manager | A-01273-4 | $ 175,000.00 | $ (175,000.00) | $ - | C. |
| 2011 | IPF | 5020 | Fund Management Fees | A-00959-60 | $ 100,000.00 | $ (100,000.00) | $ - | F.4 |
| 2011 | IPF | 1250 | LT Rec-Fund Mgrs Organ Invt | A-00882 | $ 2,930,000.00 | $ (2,930,000.00) | $ - | C., E. |
| | | Subtotal 2009 through 2011 Items | | | $ 6,174,475.51 | $ (5,922,327.14) | $ 252,148.37 | |
| 2012 | IPF | 1250 | LT Rec-Fund Mgrs Organ Invt | A-00882 | $ 400,000.00 | | $ 400,000.00 | H. Pending |
| 2012 | SPF | 5020 | Fund Management Fees | A-01322 | $ 922,927.00 | | $ 922,927.00 | F.5 Pending |
| | | Subtoal 2012 (in-process year) Items | | | $ 1,322,927.00 | $ - | $ 1,322,927.00 | |
| | | Grand Total All of Table 1 | | | $ 7,497,402.51 | $ (5,922,327.14) | $ 1,575,075.37 | |

The basis for the various adjustments made to Table1 above are reflected in the referenced section within VII. Summary of Analysis and Observations, of this document.

IX. **Miscellaneous**

For services rendered in my engagement with the Federal Public Defenders' Office, Stalker Forensics is being compensated at the contractually agreed upon rate of $280 per hour. My work is ongoing and my opinions are subject to revision based on new information (including reports or testimony by other parties and experts), which subsequently may be provided to or obtained by me.

_____  
Annette M. Stalker, CPA/CFF, CFE

8/22/2016  
Date